Barrett S. Litt, SBN 45527
Paul J. Estuar, SBN 167764
E-Mail: pestuar@littlaw.com
Litt, Estuar & Kitson LLP
1055 Wilshire Boulevard, Suite 1880
Los Angeles, California 90017
Phone: (213) 386-3114
Facsimile: (213) 380-4585

Robert Mann, SBN 48293
Donald W. Cook, SBN 116666
E-Mail: manncook@earthlink.net
Attorneys at Law
3435 Wilshire Boulevard, Suite 2900
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Attorneys for Plaintiffs

Cynthia Anderson-Barker, SBN 175764
E-Mail: cablaw@hotmail.com
LAW OFFICES OF CYNTHIA ANDERSON-BARKER
3435 Wilshire Boulevard, Suite 2900
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

MARY AMADOR, LORA BARRANCA, DIANA PAIZ, DIANE VIGIL, ALISA BATTISTE, FELICE CHOLEWIAK, and EVANGELINA MADRID, individually and as class representatives,

Plaintiffs,

vs.

SHERIFF LEROY D. BACA, individually and in his official capacity; COUNTY OF LOS ANGELES, a governmental entity; LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, a California public entity; SAMMY JONES, individually and in his official capacity; TIMOTHY CORNELL, individually and in his official capacity; JOHN H. CLARK, individually and in his official capacity; Dennis Burns, individually and in his official capacity; Gerald K. Cooper, individually and in his official capacity; Daniel Cruz, individually and in his official capacity; Stacy L. Lee, individually and in her official capacity, and DOES 1 through 10,

Defendants.

Case No. CV-10-1649 SVW (RC)

**SECOND AMENDED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**

1. 42 U.S.C. §1983
2. Equal Protection
3. Cal. Const. Art. I, §§1, 7, 13
4. Cal. Civ. Code §52.1
5. Statutory Duties
6. Mandatory Duties

<u>DEMAND FOR JURY TRIAL</u>

## I.     INTRODUCTION

1.     This action concerns the manner in which inmates are searched in Los Angeles County's jails, alleging, *inter alia*, violations of the Fourth, Eighth and Fourteenth Amendments of the United States Constitution and their corollaries under the California Constitution.

2.     The gravamen of this complaint concerns the privacy rights of inmates who are routinely subjected to strip and body cavity searches in violation of the Constitutions and laws of the United States and the State of California.

3.     Of particular concern is that female inmates are subjected to degrading strip and body cavity searches under circumstances and conditions when male inmates are not.

## II.     JURISDICTION AND VENUE

4.     Plaintiffs present federal claims for relief under 42 U.S.C. §1983. Accordingly, federal jurisdiction is conferred upon this Court by 28 U.S.C. §§1331 and 1343. Plaintiffs' state law claims are so related to their federal law claims that they form part of the same case or controversy. Accordingly, supplemental jurisdiction over the state law claims is conferred upon this Court by 28 U.S.C. §1367.

5.     Plaintiffs' claims arise out of acts of the Los Angeles County Sheriff's Department in the County of Los Angeles, State of California. Accordingly, venue is proper within the Central District of California.

## III.     PARTIES

### A.     *PLAINTIFFS*

6.     Plaintiffs Mary Amador, Alisa Battiste, Felice Cholewiak, and Evangelina Madrid are women who were incarcerated in Los Angeles County Sheriff's Department facilities, and who were subjected to highly intrusive strip and body cavity searches.

7.     Plaintiffs Lora Barranca, Diana Paiz and Diane Vigil are women who are currently incarcerated in Los Angeles County Sheriff's Department facilities. They have been subjected, and will continue to be subjected to highly intrusive strip and body cavity searches.

### B.    DEFENDANTS

8.    Defendant County of Los Angeles (hereafter "County") is a public entity organized and existing under the laws of the State of California. Defendant Los Angeles Sheriff's Department (hereafter "LASD") is a public entity within the meaning of California law, and is a County agency. These Defendants are sued in their own right for a County and/or LASD policy, practice or custom which caused Plaintiffs' injuries in violation of one or more federal constitutional guarantees, and on Plaintiffs' state law claims based on *respondeat superior* under California Government Code §815.2, and mandatory duties under California Government Code §815.6.

9.    Defendant Leroy Baca (hereafter "Baca") is the Sheriff of Los Angeles County, and is the policy maker for the LASD. He is sued in his official and individual capacities.

10.    Defendant Sammy Jones (hereafter "Jones") is a deputy sheriff holding the rank of division chief. He is the commanding officer of the LASD's Custody Operations Division. He is sued in his individual and official capacities.

11.    Defendant Dennis Burns (hereafter "Burns") is a deputy sheriff holding the rank of division chief. He is the commanding officer of the LASD's Custody Operations Division. Burns is sued in his individual and official capacities.

12.    Defendant Timothy Cornell (hereafter "Cornell") is a deputy sheriff holding the rank of captain. He is the commanding officer of the LASD's Inmate Reception Center ("IRC"). IRC is the primary intake and release facility for inmates, and the transfer and pickup point for inmates transferred between jail facilities and inmates returned to jail after an appearance in court. Cornell is sued in his individual and official capacities.

13.    Defendant Gerald K. Cooper (hereafter "Cooper") is a deputy sheriff holding the rank of captain. He is the commanding officer of the LASD's Inmate Reception Center ("IRC"). IRC is the primary intake and release facility for inmates, the transfer and pickup point for inmates transferred between jail facilities, and for inmates returned

to jail after an appearance in court. Cooper is sued in his individual and official capacities.

14.     Defendant John H. Clark (hereafter "Clark") is a deputy sheriff holding the rank of captain. He is the commanding officer of the LASD's Men's Central Jail ("MCJ"). Clark is sued in his individual and official capacities.

15.     Defendant Daniel Cruz (hereafter "Cruz") is a deputy sheriff holding the rank of captain. He is the commanding officer of the LASD's Men's Central Jail (hereafter "MCJ"). Cruz is sued in his individual and official capacities.

16.     Defendant Stacy L. Lee is a deputy sheriff holding the rank of captain. She is the commanding officer of the Century Regional Detention Center (hereafter "CRDF"). CRDF houses female inmates. Lee is sued in her individual and official capacities.

17.     Plaintiffs are ignorant of the true names and capacities of Defendants sued herein as DOES 1 through 10, inclusive, and therefore sue these defendants by such fictitious names. Plaintiffs will give notice of this complaint, and of one of more DOES' true names and capacities, when ascertained. Plaintiffs are informed and believe and based thereon allege, that Defendants DOES 1 through 5 are responsible in some manner for the damages and injuries hereinafter complained of.

18.     DOES 6 through 10 (hereinafter collectively referred to as "LASD Supervisory Defendants") were and are now responsible for the LASD jails. Among other duties, they are responsible for the training, supervision, control, assignment and discipline of both sworn and civilian personnel of the LASD and County who work in, operate, administer and manage the jails, and for the formulation, promulgation, adoption, application, administration and enforcement of the policies, rules, regulations and practices of the LASD jails.

19.     Upon information and belief, Plaintiffs further allege that, at all times relevant herein, the LASD Supervisory Defendants participated in, approved, and/or ratified the unconstitutional or illegal acts that occurred within LASD jails which are complained of herein.

20.     Plaintiffs are informed and believe, and thereupon allege that, at all times relevant herein, the individual Defendants, and each of them, were the agents, servants and employees of their respective employers (Defendants LASD, County) and were acting at all times within the scope of their agency and employment with the knowledge and consent of their principals and employers. At all times herein, Defendants, and each of them, were acting under the color of state law.

## IV.    CLAIMS OF CLASS REPRESENTATIVES

### C.    MARY AMADOR

21.     Mary Amador was arrested by Los Angeles County Sheriff's personnel on or about March 1, 2009. She surrendered to a Detective Corrigan in the parking lot of the Century Regional Detention Facility (hereafter "CRDF"), after Detective Corrigan told advised that she had a welfare fraud warrant for her arrest. CRDF is commonly known and referred to as the "Lynwood Jail".  The detective gave Mrs. Amador a week to surrender so that she could make arrangements for child care for her young daughter, and so that she could arrange bail. Mrs. Amador surrendered at 9:00 A.M. Bail had already been posted.

22.     Mrs. Amador was strip searched at about 6-7 P.M. that evening in a group with about 12 other women, outside in the open, in cold air, in an area bordered on one side by a facility wall and entry door, on another by a solid block wall, on the third by a solid gate, and on the fourth by a chain link fence shielded by a torn and shredded tarp. She could see about five male deputies on the other side of the torn tarp. The location was apparently a driveway, and/or discharge area for buses.

23.     The ground in the area was concrete. The women were required to completely disrobe, place their street clothes on the ground, squat, spread their buttocks, lift their breasts, etc., and change into jail attire which they picked up from the ground.

24.     One of the women, about 60 years old, complained bitterly of the cold, and cried.

25.     Having spent most of the day with four of the women, Mrs. Amador had learned that they had just been arrested, and had not yet been to court. Mrs. Amador had not been to court, either.

26.     About an hour after having been strip searched, Mrs. Amador was released on bail. A jailer told Mrs. Amador that her bail bond had been at the jail since 9:00 A.M. in the morning.

27.     The day after bailing out, Mrs. Amador called the facility to complain about the strip search. She left a detailed voice mail on the watch commander's extension. She has never heard back, or received any type of acknowledgement of her complaint..

28.     Mrs. Amador and the women were searched as a group with each woman able to, and forced to, watch the other women being searched. They were forced to stand naked within inches of each other as they were searched. They were forced to place their clothing on the unsanitary concrete. This is the same concrete Plaintiff and the women were forced to stand on, barefoot and naked.

**D.     LORA BARRANCA**

29.     Lora Barranca was arrested by LASD on or about August 28, 2009. She was transferred to CRDF on September 2nd or 3rd. She remains in custody, and expects to remain in custody beyond the date of her next court appearance on September 21, 2010.

30.     During the booking process, LASD strip searched/body cavity searched Ms. Barranca in a large group of women, in an outdoor area used to park buses (hereafter "bus stall"). The women were required to completely disrobe, place their clothes on the concrete, squat, spread their buttocks, lift their breasts, etc., and change into jail attire, which they picked up from the concrete.

31.     LASD personnel at CRDF have strip searched/body cavity searched Ms. Barranca on multiple occasions, including each time she returned from court, or after visiting the hospital. All strip searches occurred in the bus stall, and in a group setting. Ms. Barranca will likely be strip searched/body cavity searched, pursuant to LASD policy, in the same manner and location when she returns from court on September 21, 2010.

32.     Ms. Barranca has been strip searched in groups as large as 50 women. Deputies told the women to line up on opposite walls, in two lines of 25 women. Each detainee could watch the other women being searched, and in fact, could not avoid watching the other women being searched.  During the search, when the women are naked and facing each other, they can see each other's gang tattoos. I have heard women at CRDF later discuss which women had a certain kind of gang tattoo.

33.     As the women lined up, the deputies shouted "shoulder to shoulder," forcing the women to stand so close that their bodies touched at the shoulders. When the deputies told Ms. Barranca to bend over for the body cavity search, her thighs also touched the women adjacent to her.

34.     The bus stall entrance is adjacent to the CRDF booking area. In Ms. Barranca's experience, deputies left the entrance open.  They did not take measures to block the view of those being strip searched by persons inside the facility. CRDF personnel, including male personnel, frequently passed the bus stall entrance and could see the searches taking place. Detainees sitting in a nearby processing area could also observe the strip searches.

35.     A chain link fence comprises one wall of the bus stall. Ms. Barranca has been searched in the stall when no tarps or other materials shielded her from the view of persons outside the stall. The ceiling is also a chain link fence. No tarp covered the ceiling when Ms. Barranca was initially booked into CRDF. When it drizzles outside, women in the search area get rained on.

36.     The bus stall is usually very cold in the late afternoon and evening, when most searches take place. The floor of the bus stall is porous, grey cement. It is dirty. Sometimes Ms. Barranca could observe trash lying around from previous searches. She has also observed menstrual blood on the cement, ants on the ground, insects crawling up the walls, and oil spots where the busses have dripped oil. Ms. Barranca was forced to place her clothing on the unsanitary cement.

**E.**   *DIANA PAIZ*

37.   Diana Paiz was arrested on or about February 12, 2010. She was booked into CRDF on approximately February 17, 2010. She remains in custody, and expects to remain in custody beyond the date of her next court appearance on September 23, 2010.

38.   LASD personnel at CRDF have strip searched/body cavity searched Ms. Paiz approximately 5 times, including each time she returned from court. Each of the searches occurred with a large group of women in an outdoor bus stall. The women were required to completely disrobe, place their clothes on the cement, squat, spread their buttocks, lift their breasts, etc., and change into jail attire which they picked up from the cement. Ms. Paiz will almost certainly be strip searched/body cavity searched in the same manner and location when she returns from court on September 23, 2010.

39.   Ms. Paiz has been strip searched in groups ranging from 20 to 40 women. Deputies told the women to line up on opposite walls. Each woman could watch the other women being searched and, in fact, could not avoid watching the other women being searched.  As the women lined up, the deputies shouted "shoulder to shoulder," forcing the women to stand so close that their bodies touched at the shoulders. Deputies told the women to put their noses on the wall, which is visibly dirty.

40.   The bus stall entrance is adjacent to the CRDF booking area. In Ms. Paiz's experience, deputies left the entrance open and did not take measures to block the view of those being searched from persons inside the facility.

41.   The bus stall is usually cold in the late afternoon and evening, when most searches take place. The concrete is dirty, and sometimes Ms. Paiz could observe trash lying around from previous searches. During searches, Ms. Paiz was forced to place her clothing on the unsanitary cement.

42.   Guards routinely gave instructions using abusive and profane language. After women undressed, the guards laughed at them, making jokes about the appearance of their bodies and how the area smelled.

43.     Some severely overweight or physically disabled women cannot expose their body cavities by bending over. They are subjected to an even less dignified search: the guards order them to sit or lie on the bare concrete, spread their legs and raise their feet off the ground.

**F.**   *DIANE VIGIL*

44.     Diane Vigil was arrested by LASD on or about May 9, 2010. Ms. Vigil was transferred to CRDF on May 12, 2010. She remains in custody and expects to remain in custody beyond the date of her next court appearance on September 28, 2010.

45.     During the booking process, LASD strip searched/body cavity searched Ms. Vigil with a large group of women, in an outdoor bus stall. The women were required to completely disrobe, place their clothes on the ground, squat, spread their buttocks, lift their breasts, etc., and change into jail attire, which they picked up from the cement. Ms. Vigil began menstruating shortly before she arrived at CDRF for booking, though she did not realize it until she pulled down her underwear for the body cavity search. She requested a sanitary napkin, but was chastised for not informing them earlier. Even though blood was dripping down her leg and onto the ground, she had to wait for a sanitary napkin until after the body cavity search was finished.

46.     CRDF has strip searched/body cavity searched Ms. Vigil approximately 5 times, including each time she returned from court. All strip searches occurred in the bus stall and *en masse*. Ms. Vigil will almost likely be strip searched/body cavity searched in the same manner and location when she returns from court on September 23, 2010.

47.     Ms. Vigil has been strip searched in groups as large as 50 women. Deputies told the women to line up on opposite walls. Each woman could watch the other women being searched and, in fact, could not avoid watching the other women being searched. As the women lined up, the deputies shouted "shoulder to shoulder," forcing women to stand so close that their bodies touched at the shoulders.

48.     The bus stall entrance is adjacent to the CRDF booking area. In Ms. Vigil's experience, deputies left the entrance open and typically did not take measures to block

the view of those being searched from persons inside the facility. Prior to August 18, 2010, Ms. Vigil had never observed deputies move laundry carts in front of the doors.

49.    The bus stall is usually cold in the late afternoon and evening, when most searches take place. The cement is dirty and sometimes Ms. Vigil could observe trash lying around from previous searches. She has also observed menstrual blood on the cement and ants crawling on the ground.

50.    Guards routinely gave instructions using abusive and profane language.

51.    Some severely overweight or physically disabled women cannot expose their body cavities by bending over. They are subjected to an even less dignified search: the guards order them to sit on the bare concrete, spread their legs and raise their feet off the ground.

**G.**   *ALISA BATTISTE*

52.    Alisa Battiste was arrested by LASD deputies on January 30, 2010 and was transferred directly to CRDF on January 31, 2010, before going to court. Upon processing into CRDF and each time she came back from court (about 7-8 times), she was strip and visual body cavity searched outdoors, in a bus stall adjacent to the booking area.

53.    Each time she was searched, Ms. Battiste and the women being searched with her were forced to stand close together, strip naked, face the women across from them, lift their breasts and stomachs, open their mouths, use their fingers to spread their cheeks (without an opportunity to wash their hands first), turn to face the wall, bend over, use their hands to spread their buttocks and vaginas, and cough while guards looked into their body cavities.

54.    Ms. Battiste and the other women then had to lift each foot and wiggle their toes. Many women would lose their balance attempting to stand on one foot and would fall over, while naked, and bump into one of the naked women next to them.

55.    If a woman was menstruating, she had to remove her soiled menstrual pad, or pull out her used tampon while in the group, put it into a box, and then put the box on

1    the ground.

2        56.    The bus stall is connected to the interior of the jail by sliding glass doors

3    which were always open during the searches. When Ms. Battiste was searched in the bus

4    stall, inmates were usually chained to the benches just inside the door.  They could see

5    the searches. Sometimes it was inmates in yellow jump suits whom Ms. Battiste

6    understood to have mental problems, or were "5150". Male deputies and other jail staff

7    walking by could also see the searches. Although the door was always open, because the

8    door is made of glass guards and inmates on the other side would be able to see the

9    searches even if the door were closed.

10       57.    After the searches, Ms. Battiste and the other women would put on jail

11   clothes which were placed on the ground before the women were allowed to put them on.

12   Because the searches took place outside, in a bus stall, there was often dirt, dust and

13   sometimes even ants on the clothes they picked up from the ground. The ground was

14   concrete and dirty, even stained with menstrual blood. Ms. Battiste's feet were often dirty

15   from standing bare-foot during the searches, but the deputies would sometimes not allow

16   the women to shower until the following day.

17       58.    Every time Ms. Battiste was strip searched, she felt embarrassed and

18   humiliated as a woman. She felt it robbed her of her femininity, of her womanhood.

19   Every time she was strip searched, at least one woman in the group would cry, especially

20   the younger women, who felt especially embarrassed about having to expose their bodies.

21       **H.**   *FELICE CHOLEWIAK*

22       59.    On or about March 26, 2010, Felice Cholewiak was arrested by LAPD and

23   taken directly to CRDF.  Ms. Cholewiak was strip searched upon arriving at CRDF, and

24   each time she returned from court.  Each strip search was conducted outdoors in an area

25   where she has been buses parked.   She  estimates that she was strip searched 5 times.

26       62.    On one side of this bus depot area, there is a blue tarp. The opposite wall is a

27   brick wall. These walls are approximately 15-20 feet apart. Along another wall, there is a

28   roll-up door where buses come in and out. Opposite the roll-up door is the entrance to the

bus depot strip search area. The door to this area is always open. Ms. Cholewiak has never seen anything obstructing this doorway. She has seen male deputies and male workers walk by the entrance to the bus depot. These males have an unobstructed view to the bus depot when women are being strip searched. The floor of the depot is porous, grey cement, like a sidewalk.  Ms. Cholewiak has seen motor oil on the floor of the bus depot. She has seen blood on the floor of the bus depot. She has seen bird poop on the floor of the bus depot, and bird feathers in the bus depot.

63.   Before being strip searched in the bus depot area, Ms. Cholewiak was taken to a holding cell. She has waited in that holding cell to be strip searched between 1 to 3 hours. At times it appeared that deputies are waiting for more women to arrive so that they can strip search more women at one time. At other times it appeared that deputies are waiting for shift change so that the next shift had to strip search the women. During a strip search, from 60 to 80 women are taken off the buses returning from court, and are lined up inside the bus depot against the blue tarp wall and the brick wall.  The women are divided into two lines, each line facing the other.  While deputies are lining the women up, they are constantly ordering them to stand "shoulder to shoulder" and to "get closer." They are sometimes standing so close that they touch each other.

64.   After the women are lined up, they are ordered to remove all clothing except their underwear.  The clothing is then searched and thrown on the ground behind them. Shoes are removed along with the clothing and the women stand barefoot during the searches.  They are ordered to lift their feet.  Ms. Cholewiak and a number of other women must steady themselves by touching the wall in front of her.

65.   Deputies then shouted "If you're bleeding and if you have anything between your legs" to take out the pad or tampon.  Deputies then gave the women jail issue pads in boxes.   Ms. Cholewiak and the women were ordered to put the used pads or tampons in the boxes and put the new pads on the ground on top of their clothing.  At that point, they were ordered to turn around and Ms. Cholewiak could see the topless women across

from her and next to her.  She could see gang tattoos on some women, and has heard discussions among some of the women about the tattoos.

66.    The women were then ordered to lift their hair, to lift their breasts and, those with "excess fat" were ordered to lift their stomachs.  They were then ordered to pull their lips away from their gums, using the same fingers used to remove the menstrual pads and tampons. Ms. Cholewiak and the women were never able to wash their hands before putting them in their mouths.  They were then ordered to take down their underwear, spread their legs, bend over, open their vaginas with their fingers and cough so deputies could inspect the vaginas with flashlights.  While bending over, Ms. Cholewiak was able to see the women in the line across from her also bending over.

67.    Ms. Cholewiak and the women were then ordered to pull up their underwear, put on shirts, pants and shoes, but sock and bras must go in pockets.  The searches average about 20 minutes, but can take much longer if women do not comply quickly.  Ms. Cholewiak has heard deputies yell, scream and curse at women who do not move quickly enough, or those who do not speak English.  She has seen deputies taunt women, and make derogatory remarks within the women's hearing.  Women often cry during the searches.

68.    Because the searches took place outside, sometimes as late as 10 PM, the weather was very cold and Ms. Cholewiak could feel the cold wind blowing through the space.  Every time Ms. Cholewiak was searched, she would be disgusted and tearful.  She was emotionally exhausted after every search.

**I.**    *EVANGELINA MADRID*

69.    Evangelina Madrid's experiences with CRDF began around October 4, 2009 when she was first arrested by LASD and taken to CRDF.  She estimates that she was strip searched between 10 to 12 times upon each entry into CRDF, and each time she returned from court.  Except for those times when Ms. Madrid returned to CRDF from a medical appointment, she was searched in an outdoor area where she has seen buses parked.

70.     One side of the bus depo is a chain link fence which is covered by a blue tarp.  The opposite wall is brick.  These walls are about 15-20 feet apart.  Along another wall is a roll-up door where buses come in and out. Opposite the roll-up door is the entrance to the bus stall from the booking area. Male deputies and workers walking by the entrance to the bus depo can see the women being searched.  Ms. Madrid states that there is no privacy and she and the other women are completely exposed.

71.     The floor of the bus stall is porous, grey cement, like a sidewalk. Ms. Madrid has seen worms and slug-like creatures crawling on the floor, and has seen motor oil on the floor as well. The ceiling of the stall is a chain link fence covered by a blue tarp which sometimes flaps up and down in the wind.  Ms. Madrid has been searched outside in this bus area in the winter when the air feels freezing cold, the cold air blows through the chain link fencing and the temperature is well below 68 degrees.  Sometimes the searches were done as late as 10 or 11 P.M.

72.     Ms. Madrid was searched with 20 to 50 other women who were taken from buses after court.  They are lined up in the bus stall against the chain link and the brick wall.  After the women are lined up, they are ordered to remove all clothing except their underwear.  Because the women are forced to stand so close together, Ms. Madrid could often smell the body odor of women who had not showered.  The clothing is then searched and thrown on the ground behind them. Shoes are removed along with the clothing and the women stand barefoot during the searches.  They were then ordered to lift their hair, to lift their breasts, and to pull their lips away from their gums.  Ms. Madrid could see the topless bodies of the women in the line facing her.  She could tell who had breast implants, stretch marks, and those with gang tattoos.

73.     Ms. Madrid and the other women were then ordered to face the wall, take down their underwear, spread their legs, bend over, open their vaginas with their fingers and cough.  Sometimes they were ordered to cough for a long as 3 minutes while deputies inspected their vaginas with flashlights.  While bent over, Ms. Madrid could see the women in the line facing her also bending over.  These searches could take as long as 15-

20 minutes if some women were not complying.

74.     Ms. Madrid has been strip searched when she was menstruating.  She was given a jail issue pad in a cardboard box, ordered to take the new pad and place it on her clothing on the floor of the stall, remove the old pad and put it in the box, and throw the box into the middle of the bus stall.  She had to wait about 5 minutes to replace her pad, and at times had to wait up to 15 minutes.  Ms. Madrid stated that she prayed she wouldn't bleed while waiting to replace her pad.

75.     Ms. Madrid has heard deputies yell and curse at the women in the most insulting ways.  She has seen deputies grab women who were not complying and throw them against the wall.  She has often seen women crying during the search process.  Each time she was strip searched, she felt demoralized, humiliated and depressed.

> a.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

76.     Ms. Paiz and Ms. Barranca properly filed complaints (i.e. grievances) on approximately August 6, 2010.  Their complaints requested a sanitary, indoor location for all strip searches, hidden from the view of anyone not directly involved in the strip each (including inmates). They also requested equal treatment for men and women.

77.     Ms. Vigil did not personally file a complaint, but, instead, submitted a complaint letter through her attorneys to Captain Stacy Lee, also on August 6th. This procedure was expressly authorized by defendant County of Los Angeles because Michael Gennaco, chief attorney for the County's Office of Independent Review, informed one of Plaintiffs' counsel that a valid means of filing an internal complaint was to send a letter authored by counsel on behalf of an inmate setting forth the inmate's grievance. Ms. Vigil's counsel requested CRDF to advise of any steps that must be taken in order to comply with complaint exhaustion requirements from the initial complaint through all appeal/review processes.

78.     Under LASD policy, whenever possible, custody personnel must respond to inmate complaints within 10 days. As of September 9, 2010, CRDF had not notified any of the Plaintiffs regarding the disposition of their complaints. Without a response, they

1 | cannot appeal or otherwise seek review. CRDF has not advised Plaintiffs of what
2 | additional steps, if any, must be taken to comply with the complaint exhaustion process.

3 |      79.    On August 20, 2010, Plaintiffs' counsel sent a letter to Captain Stacy Lee to
4 | determine the status of all three complaints. Captain Lee's office has not responded to the
5 | letter or to follow-up phone calls placed by Plaintiffs' attorneys.

6 |      80.    Ms. Barranca, Ms. Paiz and Ms. Vigil have satisfied their obligation to
7 | exhaust available remedies. CRDF rendered the complaint process unavailable by
8 | ignoring their complaints. *Dole v. Chandler*, 438 F.3d 804, 809, 812 ("…a remedy
9 | becomes 'unavailable' if prison employees do not respond to a properly filed grievance
10 | or otherwise use affirmative misconduct to prevent a prisoner from exhausting."); *Tuttle*
11 | *v. Boynton*, 2009 WL 2134968 (W.D. Mich. 2009) (holding that prisoner whose
12 | grievance was not answered timely and whose requests for an appeal form were denied or
13 | ignored had exhausted available remedies); *Underwood v. Wilson*, 151 F.3d 292, 295 (5th
14 | Cir. 1998) (citing with approval pre-PLRA cases excusing exhaustion where irregularities
15 | in the process prevented it or prison officials ignore or interfere with the prisoner's
16 | efforts).

## V.   CLASS ACTION ALLEGATIONS

### A.   *COMMON FACTUAL ALLEGATIONS*

19 |      81.    Plaintiffs are informed and believe that women are routinely strip searched
20 | and forced to undergo visual body cavity searches in the manner described above, before
21 | being arraigned.

22 |      82.    Plaintiffs are informed and believe that women are routinely strip searched
23 | and forced to undergo visual body cavity searches as described above, when they are first
24 | placed in general population.

25 |      83.    Plaintiffs are informed and believe that men are not routinely strip searched
26 | and forced to undergo visual body cavity searches in the manner described above, before
27 | being arraigned.

28 |      84.    Plaintiffs are informed and believe that men are not routinely strip searched

and forced to undergo visual body cavity searches in the manner described above, when they are first placed in general population.  On information and belief, Plaintiffs allege the strip and/or visual body cavity searches to which they and class members were subjected, were performed pursuant to Defendants' policy and practice to indiscriminately search all, or a large number of women, but not men being processed into the jail without regard to: a) The nature of their offense or criminal history; b) Whether they are under an order of release or not; c) Whether they have had contact with any persons from outside the County jail system who could reasonably be believed to be a potential source of contraband or weapons; d) Whether there is cause of any kind to believe they are a potential source of contraband or weapons; e) Whether there is any other articulable justification for Defendants' indiscriminate strip and body search policy; f) Whether they are "pre-arraignment detainees," as that term is used in California Penal Code §4030(b); and g) Whether there is any legitimate reason to strip search women, but not men, as set forth herein.

85.    On information and belief, Plaintiffs allege that Defendants have a policy of not limiting the persons who can see, or hear, or observe all or part of the strip and body cavity searches to those who are necessary for the procedure. Thus, other inmates, members of the opposite sex, dispensable jail personnel and possibly others are able to see or hear some or all of the searches described above. Specifically, class members are required to submit to strip searches during which other people who are not participating in the search and/or are of the opposite sex, including jail staff and other inmates, are able to observe the search and the class members' naked bodies. On further information and belief, in many instances class members are forced to touch each other's bodies during the searches in order to comply with the directions given by Sheriff's deputies.

86.    Plaintiffs bring this action on their own behalf, and on behalf of a class of all other persons similarly situated, pursuant to Rule 23 of the Federal Rules of Civil Procedure. The class is defined as those women who were forced to undergo the unlawful strip and/or visual body cavity searches in Los Angeles County's jails which are

operated, maintained and under the control of the County, the LASD and the Supervisory Defendants as set forth in this complaint;  to wit, searches that violated the Fourth Amendment or its California equivalent, or searches that violated equal protection of the law due to the fact that that the policy and custom of strip searches was applied to women, but not to men.

87.     Due to the previous filing of *Solis v. Baca*, No. CV06-1135 SVW (CTx), a case currently pending in this court, the class period goes back two years prior to the filing of that case, which also alleges violation of the Fourth Amendment and equal protection rights of those subjected to strip searches by the Los Angeles County Sheriff's Department. Because the pendency of that case has tolled the statute of limitations for the class members herein, the statute of limitations in this case reaches back to May 30, 2004.

88.     Plaintiffs have also engaged in pre-litigation settlement efforts.  Specifically, Plaintiffs showed Defendants a draft copy of this complaint, and asked that Defendants immediately cease and desist their unlawful practices.  Plaintiffs also raised this issue with Defendants' counsel during a meeting to discuss county strip search policies.  To date, and to Plaintiffs' knowledge, Defendants continue to engage in the unlawful practices detailed in this complaint.

89.     On information and belief, Plaintiffs allege that Defendants will continue their aforementioned policy and practice of unlawful strip and/or visual body cavity searches unless enjoined and restrained by the court.  Without injunctive relief applicable to the class as a whole, the class members will suffer irreparable harm for which there is no adequate remedy at law in that their constitutional and statutory rights will be systematically violated.

### b. RULE 23 PREREQUISITES

#### i. Numerosity

90.     In accordance with F.R.Civ. P. Rule 23(a), the members of the class are so numerous that joinder of all members is impracticable. Plaintiffs do not know the exact number of class members. Plaintiffs are informed and believe, and thereon allege, that

there are more than 300 inmates per day who are subjected to strip and/or body cavity searches as a result of Defendants' policy and practice of indiscriminately subjecting prisoners to strip and body cavity searches. Plaintiffs are informed and believe, and thereon allege, that the number of persons in the proposed class is in the thousands.

### ii. Common Issues of Fact or Law

91.    In accordance with F.R. Civ. P. Rule 23(a), there are questions of fact common to the class. Plaintiffs are informed and believe, and thereon allege, that the common questions of fact include, but are not limited to the following: (1) Whether the LASD routinely subjects all prisoners to strip and/or body cavity searches without any reasonable suspicion, based on specific or articulable facts, to believe any particular inmate has concealed drug(s), weapon(s) and/or any contraband on their persons or in their body cavities; (2) Whether the strip and/or body cavity searches are conducted in an area of privacy so that the search cannot be observed by persons not participating in the search, or whether the strip and body cavity searches are conducted in areas where they may be observed by persons not participating in the searches; (3) Whether the strip and/or body cavity searches are conducted in an unsanitary area, infested with bacteria such as MRSA and other communicable diseases; (4) Whether females are subjected to strip and/or body cavity searches when males are not; (5) Whether females are subjected to strip and/or body cavity searches under conditions which are more intrusive and less sanitary than males.

92.    In accordance with F.R. Civ. P. Rule 23(a), there are questions of law common to the class. Plaintiffs are informed and believe and, thereon allege, that the common questions of law include but are not limited to the following: (1) Whether the LASD may indiscriminately conduct strip and/or body cavity searches of inmates without there being any reasonable suspicion, based on specific or articulable facts, to believe any particular inmate has concealed drug(s), weapon(s) and/or any contraband on their persons or in their body cavities; (2) Whether the LASD may conduct strip and/or body cavity searches of inmates in open areas where they may be observed by persons not

participating in the searches; (3) Whether LASD's policy of subjecting persons to strip and/or body cavity searches violates California Penal Code §4030; (4) Whether LASD's policy of subjecting persons to strip and/or body cavity searches in an area which is not an "area of privacy" violates California Penal Code §4030(m); (5) Whether the conduct described above violates the Fourth and/or Fourteenth Amendments, and/or California Constitution Article I, §§1, 7, and/or 13; (6) Whether the conduct described above constitutes a policy or custom of Defendants; (7) Whether any individual Defendant is entitled to qualified immunity on the federal claims, or state law immunity on the state law claims, for the practices complained of herein; and (8) Whether determination of damages suffered by a statistically representative sample of the class provides the basis for determination of all class members' damages except those who opt out, or whether category damages may appropriately be determined for the class members.

### iii.  Typicality

93.     In accordance with F.R. Civ. P. Rule 23(a), the claims of the representative Plaintiffs are typical of the class. Plaintiffs were in LASD custody when they were subjected to strip and/or visual body cavity searches of inmates without any reasonable suspicion, based on specific or articulable facts, to believe that any Plaintiff and class members had concealed drug(s), weapon(s) and/or any contraband in their body cavities; Plaintiffs were subjected to the searches in open areas where they were observed by other inmates and persons not involved in the search, including sometimes members of the opposite sex; Plaintiffs were searched and forced to stand naked in unsanitary and bacteria infested areas; females were subjected to strip and/or body cavity searches when males were not; and females were subjected to strip and/or body cavity searches under conditions which were more intrusive and less sanitary than males.

94.     Thus, Plaintiffs have the same interests and have suffered the same type of damages as the class members. Plaintiffs' claims are based upon the same or similar legal theories as the claims of the class members. Each class member suffered actual damages as a result of being subjected to a strip and/or body cavity search. The actual damages

suffered by Plaintiffs are similar in type and amount to the actual damages suffered by each class member.

95.     In accordance with F.R. Civ. P. Rule 23(a), the representative Plaintiffs will fairly and adequately protect the interests of the class. The interests of the representative Plaintiffs are consistent with and not antagonistic to the interests of the class.

### iv.  Maintenance and Superiority

96.     In accordance with Fed.R.Civ.P. Rule 23(b)(1)(A), prosecutions of separate actions by individual members of the class would create a risk that inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class.

97.     In accordance with Fed.R.Civ.P. Rule 23(b)(1)(B), prosecutions of separate actions by individual members of the class would create a risk of adjudications with respect to individual members of the class which would, as a practical matter, substantially impair or impede the interests of the other members of the class to protect their interests.

98.     In accordance with Fed.R.Civ.P. Rule 23(b)(2), Plaintiffs are informed and believe, and thereon allege that Defendants have acted on grounds generally applicable to the class.

99.     In accordance with Fed.R.Civ.P. Rule 23(b)(3), the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and this class action is superior to other available methods for the fair and efficient adjudication of the controversy between the parties. Plaintiffs are informed and believe, and thereon allege, that the interests of class members in individually controlling the prosecution of a separate action is low in that most class members would be unable to individually prosecute any action at all. Plaintiffs are informed and believe, and thereon allege that the amounts at stake for individuals are such that separate suits would be impracticable in that most members of the class will not be able to find counsel to represent them. Plaintiffs are informed and believe, and thereon

allege, that it is desirable to concentrate all litigation in one forum because all of the claims arise in the same location, *i.e.,* the County of Los Angeles. It will promote judicial efficiency to resolve the common questions of law and fact in one forum rather than in multiple courts.

100.   Plaintiffs do not know the identities of the class members. Plaintiffs are informed and believe, and thereon allege, that the identities of the class members are ascertainable from LASD records, in particular the LASD AJIS computer system used to track and identify LASD inmates. Plaintiffs are informed and believe, and thereon allege, that AJIS reflects the identities, including addresses and telephone numbers, of the persons who have been held in custody by LASD; when inmates were arrested and booked, taken to court, returned from court; why inmates were released; and when inmates were released.

101.   Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action. The class action is superior to any other available means to resolve the issues raised on behalf of the class. The class action will be manageable because so many different records systems exist from which to ascertain the members of the class. Liability can be determined on a class-wide basis. Damages can be determined on a class-wide basis using a damages matrix set by a jury, or by trying the damages of a statistically valid sample of the class to a jury and extrapolating those damages to the class as a whole.

102.   In accordance with Fed.R.Civ.P. Rule 23(b)(3), class members must be furnished with the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. Plaintiffs are informed and believe that LASD computer records contain a last known address for class members. Plaintiffs contemplate that individual notice be given to class members at such last known address by first class mail. Plaintiffs contemplate that the notice inform class members of the following:

        A.     The pendency of the class action, and the issues common to the class;

B.     The nature of the action;

C.     Their right to 'opt out' of the action within a given time, in which event they will not be bound by a decision rendered in the class action;

D.     Their right, if they do not 'opt out,' to be represented by their own counsel and enter an appearance in the case; otherwise, they will be represented by the named Plaintiffs and their counsel; and

E.     Their right, if they do not 'opt out,' to share in any recovery in favor of the class, and conversely to be bound by any judgment on the common issues, adverse to the class.

103.   Plaintiffs restate and incorporate by reference each of the foregoing and ensuing paragraphs in each of the following causes of action as if each paragraph was fully set forth therein.

## COUNT ONE – 42 U.S.C. §1983 [FOURTH AMENDMENT]
### (All Defendants)

104.   In subjecting Plaintiffs and class members to the unnecessary, demeaning, and outrageous intrusive strip and body cavity search, Defendants, and each of them, violated Plaintiffs' and class members' rights to be secure in their persons against unreasonable searches and seizures as guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution. Therefore, Plaintiffs and class members are entitled to bring suit and recover damages pursuant to 42 U.S.C. §1983.

105.   The aforementioned acts of Defendants proximately caused Plaintiffs to be deprived of their rights as stated above, thereby entitling Plaintiffs and the class to damages in an amount to be proven at trial.

106.   Plaintiffs Lora Barranca, Diana Paiz and Diane Vigil remain incarcerated at CRDF, and will remain incarcerated beyond their upcoming court appearances. Because CRDF will require them to submit to strip searches/body cavity searches upon returning

from court, they will continue to suffer deprivations of their rights and, therefore, seek injunctive relief on behalf of themselves and the class of similarly situated individuals.

## COUNT TWO – 42 U.S.C. §1983 [EQUAL PROTECTION]
### (All Defendants)

107.   The unequal treatment of men and women – and the unnecessary, demeaning, and outrageous intrusive strip and body cavity searches inflicted on women but not men – deprived the female class members of the protections afforded by provisions of the 14th Amendment Equal Protection guarantees. Therefore, the female Plaintiffs and class members are entitled to bring suit and recover damages pursuant to 42 U.S.C. §1983.

108.   The aforementioned acts of Defendants proximately caused Plaintiffs to be deprived of their rights as stated above, thereby entitling Plaintiffs and the class to damages in an amount to be proven at trial.

109.   Plaintiffs Lora Barranca, Diana Paiz and Diane Vigil remain incarcerated at CRDF and will remain incarcerated beyond their upcoming court appearances. Because CRDF will require them to submit to strip searches/body cavity searches upon  returning from court, they will continue to suffer deprivations of their rights and therefore seek injunctive relief on behalf of themselves and the class of similarly situated individuals.

## COUNT THREE – ARTICLE 1, §§1 AND 13 OF THE CALIFORNIA CONSTITUTION [PRIVACY/FOURTH AMENDMENT ANALOGUE]
### (All Defendants)

110.   Plaintiffs filed a Govt. Code §910 claim for damages against Defendants for the matters set forth in this complaint, thereby making it unnecessary for the newly added named Plaintiffs to file individual §910 claims.

111.   The unnecessary, demeaning, outrageous, and intrusive strip and body cavity search to which Plaintiffs and class members were subjected violated Plaintiffs' rights not to be subjected to invasion of their fundamental privacy interests, as guaranteed by

Article I, §1 of the California Constitution; and to be secure in their persons against unreasonable searches and seizures, as guaranteed by Article I, §13 of the California Constitution.

112.   The aforementioned acts of Defendants proximately caused Plaintiffs to be deprived of their rights as stated above, thereby entitling Plaintiffs and the class to damages in an amount to be proven at trial.

113.   Plaintiffs Lora Barranca, Diana Paiz and Diane Vigil remain incarcerated at CRDF, and will remain incarcerated beyond their upcoming court appearances. Because CRDF will require them to submit to strip searches/body cavity searches upon returning from court, they will continue to suffer deprivations of their rights and, therefore, seek injunctive relief on behalf of themselves and the class of similarly situated individuals.

**COUNT FOUR – ARTICLE 1, §7, OF THE CALIFORNIA CONSTITUTION [EQUAL PROTECTION]**
**(All Defendants)**

114.   The unequal treatment of men and women violated the female Plaintiffs' rights not to be denied equal protection of the law, as guaranteed by Article I, §7 of the California Constitution, and to be secure in their persons against unreasonable searches and seizures as guaranteed by Article I, § 13 of the California Constitution.

115.   The aforementioned acts of Defendants proximately caused Plaintiffs to be deprived of their rights as stated above, thereby entitling Plaintiffs and the class to damages in an amount to be proven at trial.

116.   Plaintiffs Lora Barranca, Diana Paiz and Diane Vigil remain incarcerated at CRDF, and will remain incarcerated beyond their upcoming court appearances. Because CRDF will require them to submit to strip searches/body cavity searches upon  returning from court, they will continue to suffer deprivations of their rights and, therefore, seek injunctive relief on behalf of themselves and the class of similarly situated individuals.

**COUNT FIVE - Cal. Civ. Code §52.1**
**(All Defendants)**

117.   The unnecessary, demeaning, and outrageous intrusive strip and/or visual body cavity searches alleged herein were accomplished via threat, intimidation or coercion and/or threats of the same.

118.   The unnecessary, demeaning, and outrageous intrusive strip and visual body cavity searches, and the unequal treatment of women as opposed to men, deprived Plaintiffs and the class they represent of the protections afforded by provisions of federal constitutional and state constitutional and statutory law including, but not limited to rights protected under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution; Article I, §§1, 7, 13, and 17, of the California state constitution, and California Penal Code §4030. Therefore, Plaintiffs and the class are entitled to bring suit and recover damages pursuant to Cal. Civ. Code §52.1(b).

119.   As a direct and proximate cause of the aforementioned acts, Plaintiffs and class members were damaged in an amount to be proven at trial but in any event not less than $4,000 per violation pursuant to the provisions of Civil Code §52(b).

120.   The aforementioned acts of Defendants directly and proximately caused Plaintiffs to be deprived of their California constitutional rights as stated above, thereby entitling Plaintiffs and class members to recover damages proximately caused by Defendants' wrongful acts.

121.   Plaintiffs Lora Barranca, Diana Paiz and Diane Vigil remain incarcerated at CRDF, and will remain incarcerated beyond their upcoming court appearances. Because CRDF will require them to submit to strip searches/body cavity searches upon returning from court, they will continue to suffer deprivations of their rights and therefore seek injunctive relief on behalf of themselves and the class of similarly situated individuals.

### COUNT SIX – Violation of Statutory Duties
### (Penal Code §4030)
### (Against Defendants County and LASD Only)

122.   The unnecessary, demeaning, outrageous, and intrusive strip and body cavity searches, to which Plaintiffs and the class members were subjected by Defendants,

violated Plaintiffs' and the class members' state-law protections guaranteed by California Penal Code §4030.  The aforementioned acts of Defendants directly and proximately caused the Plaintiffs and the class members to be deprived of their rights as stated above, thereby entitling Plaintiffs and class members to recover damages proximately caused by Defendants' wrongful acts, including statutory damages under Penal Code §4030.

123.   Plaintiffs Lora Barranca, Diana Paiz and Diane Vigil remain incarcerated at CRDF, and will remain incarcerated beyond their upcoming court appearances. Because CRDF will require them to submit to strip searches/body cavity searches upon  returning from court, they will continue to suffer deprivations of their rights and, therefore, seek injunctive relief on behalf of themselves and the class of similarly situated individuals.

### COUNT SEVEN – Violation of Mandatory Duties
### (Against Defendants County and LASD)

124.   The Fourth, Eighth and Fourteenth Amendments to the United States Constitution; Article I, §§1, 7, 13, and 17, of the California state constitution; California Penal Code §4030; and California Civil Code §52.1 are enactments. Enactments form the basis of a mandatory duty under California Government Code §815.6.

125.   Any California constitutional provision is mandatory and prohibitory, per Article 1, §26, of the California Constitution.

126.   These constitutional provisions and statutes apply to all members of the general public, including Plaintiffs, and were all designed to prevent the kind of injuries alleged herein.

127.   Defendants did not exercise reasonable diligence in discharging their duty to refrain from violating the constitutional rights of Plaintiffs and class members.

128.   As a direct and proximate cause of the aforementioned acts of Defendants, Plaintiffs and class members were damaged in amounts to be determined at trial.
///

## APPROPRIATENESS OF EQUITABLE RELIEF

129.   Plaintiffs Barranca, Paiz and Vigil remain incarcerated at CRDF and will be required to attend at least one court appearance before they are released from custody. Upon returning from court, these Plaintiffs will be strip searched/body cavity searched under the conditions described above.

130.   CRDF's continuing practice of strip searching/body cavity searching female inmates *en masse*, in an unsanitary, non-private, outdoor area violates Plaintiffs' constitutional rights, and causes continuing, sweeping and irreparable harm to Plaintiffs Barranca, Paiz and Vigil.

131.   Because no adequate remedy at law exists for the injuries alleged herein, Plaintiffs seek injunctive relief under both federal and state law.

## VII.   PRAYER

WHEREFORE, Plaintiffs, on behalf of themselves and the class members they represent, request damages against each defendant as follows:

1.   General and special damages according to proof;

2.   Temporary, preliminary and permanent injunctive relief prohibiting Defendants from continuing to engage in the unlawful practices complained of herein;

3.   As against the individual Defendants only, punitive damages according to proof;

4.   In addition to actual damages, statutory damages as allowed by law, including Penal Code §4030 and treble damages under California Civil Code §§52 and 52.1;

5.   Attorneys' fees and costs under 42 U.S.C. §1988; California Civil Code §§52(b)(3), 52.1(h); California Code of Civil Procedure §1021.5, and whatever other statute or law may be applicable;

6.      The costs of this suit and such other relief as is just and proper.


DATED: January 6, 2011          LITT, ESTUAR & KITSON, LLP
                                ROBERT MANN
                                DONALD COOK
                                LAW OFFICES OF CYNTHIA ANDERSON-BARKER

                                By: _/s/  Barrett s/ Litt_____
                                    Barrett S. Litt
                                    Attorneys for Plaintiffs


### DEMAND FOR JURY TRIAL

Plaintiffs, on behalf of themselves individually and on behalf of the class, demand a jury trial.

DATED: January 6, 2011          __/s/  Barrett S. Litt_____
                                    Barrett S. Litt
                                    Attorney for Plaintiffs