1  Barrett S. Litt, SBN 45527
2  Paul J. Estuar, SBN 167764
   E-Mail: pestuar@littlaw.com
3  Litt, Estuar & Kitson LLP
4  1055 Wilshire Boulevard, Suite 1880
   Los Angeles, California 90017
5  Phone:    (213) 386-3114
6  Facsimile: (213) 380-4585

7  Robert Mann, SBN 48293
8  Donald W. Cook, SBN 116666
   E-Mail: manncook@earthlink.net          Cynthia Anderson-Barker SBN 175764
9  Attorneys at Law                        E-Mail: cablaw@hotmail.com
10 3435 Wilshire Boulevard, Suite 2900     Law Offices Of Cynthia Anderson-Barker
   Los Angeles, California 90010           3435 Wilshire Boulevard, Suite 2900
11 Phone: (213) 252-9444                   Los Angeles, California 90010
12 Facsimile: (213) 252-0091                Phone: (213) 252-9444
                                            Facsimile: (213) 252-0091
13
   Attorneys for Plaintiffs
14

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| MARY AMADOR, et al., individually and as class representatives, | Case No. CV 10-1649 SVW (RC) |
|---|---|
| Plaintiffs, | [Hon. Stephen V. Wilson] |
| vs. | PLAINTIFFS' BRIEF *RE:* IMPACT OF *FLORENCE* DECISION |
| SHERIFF LEROY D. BACA, individually and in his official capacity, et al, | |
| Defendants. | |

## I. INTRODUCTION

Pursuant to this Court's order of April 4, Plaintiffs file this brief regarding the impact of the Supreme Court's decision in *Florence v. Bd. of Chosen Freeholders of County of Burlington*, 566 U.S. —, 132 S. Ct. 1510 (2012).[1] Because *Florence's* holding is limited to whether strip search policies at issue there (searching all arrestees entering the general population of the jail) were constitutional (in the parlance of *Bell v. Wolfish*, whether they were justified), it has no adverse impact on the claims advanced here.

As Plaintiffs have argued, and the Supreme Court has since made clear in a 5-4 decision, the issue in *Florence* was the constitutionality of a blanket policy of strip searching all inmates prior to initial entry into the general jail population. *Florence, supra*, at *3 ("T]he controversy concerns whether every detainee who will be admitted to the general population may be required to undergo a close visual inspection while undressed."). The Supreme Court, however, made clear that its opinion should not be conflated to shield all jail strip search practices from constitutional inquiry. The majority opinion, for example, listed abusive strip search practices as "not implicated" by the *Florence* facts. *Opinion at *13. Chief Justice Roberts, in his concurrence, writes that the majority's opinion "leave[s] open the possibility of exceptions" to the holding allowing strip searches of new arrestees in order to "ensure that we 'not embarrass the future.'" *Id*. at *14. Justice Alito, writing in a separate concurring opinion, noted that strip searches of those for whom an alternative to placement into the general population existed, "may not be reasonable". *Id*. at *15.

As Plaintiffs explain below, holding that strip searches prior to initial entry into the general population does not violate the Fourth or Fourteenth Amendments has no effect on the final outcome in this case where the issues are the *manner, scope and place* of the strip search. Indeed, Justice Kennedy was explicit that "intentional humiliation and other

---

[1] Defendants' brief exceeds the scope of the Court's order by arguing the impact of *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. ___, 131 S.Ct. 2541 (2011). That portion of the brief should be disregarded or, in the alternative, Plaintiffs should be given an opportunity to address *Wal-Mart* in another brief if the Court feels it is material to its consideration of this case.

abusive practices… are not implicated on the facts of this case, however, and it is unnecessary to consider them here**.**" *Id*. at *13. In making this statement, Justice Kennedy explicitly referred to the "Brief for Sister Bernie Galvin et al. as *Amici Curiae*" as illustrating the problem of abusive practices. Plaintiffs attach as an exhibit to this Memorandum the "Brief for Sister Bernie Galvin et al. as *Amici Curiae*" submitted in *Florence*. We particularly call the Court's attention to the descriptions of the following individuals because they describe in part conditions similar to those involved here, although the overall conditions here are more extreme. See Individual Descriptions of Betty Welch (pp.7-9). Ms. Welch was strip searched in groups up to 30 inmates; searches were subject to the view of others not participating in the searches; deputies made unflattering and derogatory comments; menstruating women had to remove tampons and at times menstruated on the floor); Mary Doe (pp.11-12). Ms. Doe was strip searched while menstruating; she bled onto herself and on the floor while deputies called her names; Judith Haney (pp.14-15). Inmate was required to hop during strip search and to remove naval piercing, which guards removed when she could not, all in full view of other inmates; Michael Fanning (pp.10-11). Obese man was forced to strip and touch his testicles in full view of other inmates.

## II.    THE SEARCHES AT ISSUE IN *AMADOR*

### A.    SCOPE OF THE SEARCHES – VISUAL BODY CAVITY SEARCHES.

A visual body cavity search at the L.A. County Jail consists of a visual inspection of a person's body cavities, including rectal and vaginal cavities and skin folds. Jail personnel conduct these searches whenever a person is placed in the general jail population, and whenever a person returns to the general jail population after a court appearance.[2]

---

[2] Ex.103 (Sheriff's Manual 5-08/010.00); Ex.104 (Twin Towers Unit Order 3-09-310); Ex.131 (IRC Manual 8-14/000-001.00); Ex.132 (Franco Depo, pp.9:15-18, 10:16-17, 17:8-18, 20:3-20)**. The foregoing citations are taken from the Separate Statement in Support of Plaintiffs' Motion for Summary Judgment in the related case** *Solis v. Baca***, Case No. CV06-1135 SVW, Docket No. 165, Uncontroverted Facts 1-3.**

2

### B.   PLACE OF THE SEARCHES – OUTSIDE BUS BAY.[3]

With very narrow exceptions, LASD engages in strip/visual body cavity searches of all female court returns in an outdoor area used to dock buses. Inmates are searched without privacy, in groups ranging from 20 to 80 women, in a bus stall that provides very little privacy from persons not involved in the search. Deputies routinely leave the entrance open, and as a result, anyone inside the booking area can see into the bus stall during strip searches. The bus stall is only partially enclosed. One wall is a chain link fence, partially covered by wood paneling and a tarp. There is no ceiling, rather chain link fencing covered by a tarp comprises the roof. Even the tarps do not fully protect women from the elements. There are holes, and openings between the tarp and fence which allow air and rain to blow in. Multiple women recount how they have been stripped outside when the air temperature feels very cold, if not freezing.

The cement floor on which the women are ordered to stand without shoes or socks is flecked with oil spots, and stains from dried blood, urine and vomit. Inmates describe significant amounts of trash on the ground when they enter the stall, including food garbage, Kotex boxes, tissues, hair fasteners, *used* sanitary napkins and tampons. Women often observe ants, spiders, bird droppings, and bird feathers. The stall reeks of vehicle emissions, body odor and dried bodily fluids. When it is hot outside, the odor is dramatically worse. Inmates can also smell the bodies of women standing next them, especially as some women arrive at CRDF without having showered for days.

These descriptions are overall more horrifying and repulsive than those described in the Sister Bernie Galvin Amicus Brief that Justice Kennedy referenced as illustrative of abusive practices. None of the stories in that Amicus Brief involved outdoor searches or the degree of unsanitary conditions routinely described in this case.

---

[3] The following description is supported by inmate declarations filed in support of class certification and observations from counsels' tour of CRDF bus stall #3 where strip searches are conducted. *See Motion for Class Certification*, Docket No. 59, at Exhibit 110.

### C. MANNER OF THE SEARCHES.

Once women enter the bus stall, deputies order them to line up along the walls and remove all clothing, except panties, and place their clothes on the dirty cement ground. This includes removing their bras. Deputies ask them to raise their hands if they are menstruating, and they receive a box with a clean sanitary napkin. Then, in the presence of the entire group, they must remove their soiled tampon or pad, place it in the empty box, then throw the box on the ground. Pads may be replaced only when the search is finished. This practice forces women to bleed on themselves, and sometimes on the ground, in the view of deputies and a large group of other inmates.

After menstruating women have removed their pads, guards order everyone in the group to turn away from the wall pull their underwear to their knees or ankles, and face the center of the stall. It is impossible for the two facing lines of women not to see each other naked. Guards order them to lift their breasts exposing the area underneath. Heavier women must lift up their stomachs and any rolls of fat.[4] Even though women have just handled *used* tampons and sanitary napkins, deputies order them to run their fingers between their lips and gums to demonstrate they have secreted nothing in their mouth. Next deputies order women to face the wall again, pull their underwear down to their knees (or completely remove it), bend over and then cough. Deputies tell women to use their unsanitized fingers to spread the lips of their vagina. They must remain in this position until a deputy has visually inspected their body cavities with a flashlight. After the search is complete, women must pick up their clothing from the dirty ground and re-dress.

At least two of the descriptions in the Sister Bernie Galvin Amicus Brief that Justice Kennedy referenced as illustrative of abusive practices involved the handling of

---

[4] Some severely overweight or physically disabled women cannot expose their body cavities by bending over. LASD personnel order these women to sit or lie on the bare concrete, spread their legs and raise their feet off the ground. *Motion for Class Certification*, Ex. 110, (Paiz Decl. ¶12, Vigil Decl. ¶15, Lawton ¶12, Williams Decl. ¶16

4

menstruation and tampons in similar fashion to those here. There can be little doubt that such practices are among those that Justice Kennedy was referring to.

### III. ISSUES OF MANNER AND PLACE ARE NOT IMPACTED BY *FLORENCE*

The question in *Florence* was whether the Fourth Amendment permits a jail to conduct a suspicionless strip search whenever an individual is arrested and brought into the general jail population. *Florence* at *3. This includes searches prior to entry into the general population of persons arrested for minor offenses, such as the search of petitioner Albert Florence.

Florence was arrested by a New Jersey state trooper based on an outstanding warrant for failure to appear in court for an earlier criminal proceeding ("enforcement hearing"). *Florence* at *4. Florence was taken to the Burlington County Detention Center where jail procedures required every arrestee to shower with a delousing agent. *Id*. Officers would check arrestees for scars, marks, gang tattoos, and contraband as they disrobed. *Id*. Florence claimed he was also instructed to open his mouth, lift his tongue, hold out his arms, turn around, and lift his genitals. *Id*. After six days, he was transferred to the Essex County Correctional Facility where he underwent a visual body cavity search prior to entry into the general jail population. *Id*.

The Supreme Court granted certiorari to address the question whether the Fourth Amendment required correctional officials to exempt some detainees who will be admitted to a jail's general population from strip searches. *Florence* at *5. The Court examined, as its starting point, *Bell v. Wolfish*, 441 U.S. 520, 559, 99 S. Ct. 1861, 1884 (1979), which held that the reasonableness under the Fourth Amendment for a strip search "requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the *scope* of the particular intrusion, the *manner* in which it is conducted, the *justification* for initiating it, and the *place* in which it is conducted." (Emphasis supplied); *see also Florence¸ supra* at *6. It is apparent from the opinion that the petitioner's challenge was primarily to the "justification" for the strip searches, since the Court's analysis solely focused on the

necessity of contraband deterrence and detection prior to entry into the general jail population for those arrestees charged with minor offenses. The Court noted that, for example, people detained for minor offenses have tried to smuggle contraband into jail (*11); people arrested for minor offenses may be coerced into bringing contraband into general population (*11); and it would be difficult as a practical matter to classify inmates by their current and prior offenses before the intake search (*12).

This case, in contrast, does not present the question of the justification for the strip search. Plaintiffs are not contending that strip searches of female court returns were not justified. Rather, Plaintiffs are complaining that, in light of the *scope* of the searches (visual body cavity searches, the most intrusive type of search absent physical touching by the officer)[5], the combination of the *place* of the strip searches (a fetid outdoor bus bay) and the *manner* of the strip searches (strip searches in large groups where others are able to view the inspection of body cavities, on dirty cement in the outside which cannot readily be cleaned, exposed to the elements including very cold weather, where insects have ready access, where menstruation occurs regularly, and where a variety of abusive comments and practices occur regularly) render the strip searches unreasonable.

### IV.    *FLORENCE* DOES NOT FORECLOSE FUTURE CHALLENGES TO JAIL STRIP SEARCH POLICIES EVEN WHERE THE ISSUE IS JUSTIFICATION, MUCH LESS FOR THE ISSUES INVOLVED HERE.

The reach of *Florence* is very limited. The ruling does not apply, for example, to an instance where the detainee "will be held without assignment to the general jail population and without substantial contact with other detainees." *Florence* at *13. Nor does the case reach instances involving allegations of officers engaging in intentional humiliation and other abusive practices as we have discussed above. The Court's clear

---

[5] The *Florence* oral argument transcript indicates a less intrusive scope of the searches there. http://www.supremecourt.gov/oral_arguments/argument_transcripts/10-945.pdf, e.g., p.36:5-9 (Respondent's argument: a "true body cavity search…is more intrusive than even what Essex County does in this case, because he wasn't asked to bend over -- and to have a body cavity anal search. What he was asked to do was to squat and cough"); pp.26:21--27:7 (Justice Scalia: "I can understand that [rule of individualized reasonable suspicion for minor offenders entering the jail] -- I can understand that for cavity searches, but").

1 limitation that the holding did not apply to strip searches of detainees for whom an
2 alternative to holding them in the general jail population existed means that even whether
3 strip searches are permissible is open for question under some circumstances.
4 "[A]dmission to the general jail population, with the concomitant humiliation of a strip
5 search, may not be reasonable, particularly if an alternative procedure is feasible." *Id*. at
6 *14 (Alito, J. concurring). *See also Turner v. Safley*, 482 U.S. 78, 90 (1987)("The
7 absence of ready alternatives is evidence of the reasonableness of a prison regulation.")
8 Regardless of the remaining issues to litigate regarding when a strip search is permissible,
9 there is no question that *Florence* has no adverse impact on challenges to strip search
10 policy and custom based on the place, scope and manner of the searches.
11     The Supreme Court's analysis is also evident in a pre-*Florence* decision out of the
12 Ninth Circuit, *Byrd v. Maricopa County Sheriff's Dept.*, 629 F.3d 1135, 1143 (9th Cir.
13 1/5/2011) (*en banc*) *cert. denied,* 131 S. Ct. 2964 (U.S. 2011) (finding the strip search
14 conducted by female guards unconstitutional). "Although the last two [*Bell v. Wolfish*]
15 factors [justification and place] weigh in favor of a determination of reasonableness, the
16 effect of the first two factors [scope and manner] is so extreme that a conclusion of
17 unreasonableness is compelled. Courts throughout the country have universally frowned
18 upon cross-gender strip searches in the absence of an emergency or exigent
19 circumstances"[6]
20     As in *Byrd, supra*, the justification for the strip search is not in issue here, and thus
21 the outcome of *Florence* is not dispositive of the outcome of this case.
22 **V.     DETERMINATION OF ISSUES PENDING BEFORE THIS COURT**
23     Pending before this Court are the following motions:
24         • Plaintiffs' Motion for Class Certification

---

[6] Although numerous cases address strip searches in the view of others, not many address other place and manner issues. One that does, although it pre-dates *Florence*, is *Evans v. Stephens*, 407 F.3d 1272, 1281 (11th Cir. 2005) (*en banc*) (manner of search unlawful where plaintiffs "were taken to and searched in an abnormal place …[,] a broom closet or supply room, not a dedicated search cell, medical examination room, or even a bathroom").

7

- Defendants' Motion to Dismiss

The parties have addressed the substance of these motions in extensive briefing already on file. The parties, further, appeared for oral argument on these motions on January 26, 2011. As the Court may recall, it was prepared to grant the Motion for Class Certification. (1/26/11 Hearing Tr., p.8:3–9).

*Florence* does not impact the analysis of the aforementioned motions. Defendants' motion to dismiss deals with exhaustion of administrative remedies, immunities under California law, and whether Plaintiffs could state claims under Article I, §§7 and 13 of the California Constitution. *See Motion to Dismiss*, Docket No. 121, p.2:11-19. Plaintiffs' class certification motion is not a motion on the merits and, even if it were, would not be impacted by the holding in *Florence* for the reasons previously stated above.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court grant Plaintiffs' Motion for Class Certification, and deny Defendants' Motion to Dismiss.

Dated: April 11, 2012                               LITT, ESTUAR & KITSON, LLP


                                                     _/s/  Barrett S. Litt_____
                                                        Barrett S. Litt

8