FILED
CLERK, U.S. DISTRICT COURT

Dec. 18, 2014

CENTRAL DISTRICT OF CALIFORNIA
BY: \_\_\_\_\_DG\_\_\_\_\_ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY AMADOR, et al., <br><br>Plaintiffs, <br><br>v. <br><br>SHERIFF LEROY D. BACA, et al., <br><br>Defendants. | Case No. CV-10-1649 SVW <br><br>ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION [236] |

**Introduction**

The Court set forth the underlying facts in its prior class certification order, *Amador v. Baca*, 299 F.R.D. 618, 624-28 (C.D. Cal. 2014), so it need not repeat them here.[1] In that order, the Court certified part of Plaintiffs' requested class. Specifically, the Court certified a class for injunctive relief under Federal Rule of Civil Procedure 23(b)(2) that included "all present or future women inmates of the Los Angeles County Jail who, upon their admission or return to the Century Regional Detention Facility from outside of the facility, are being or will be

---

[1] Plaintiffs submitted new expert declarations with their renewed motion. These declarations shed light on the viability of their risk-of-harm theory, discussed *infra*, but they do not change the Court's view of the basic policies and procedures used at the CRDF.

subjected to a visual body cavity search in a group with other inmates in an outside bus stall." *Id.* at 637-38.

The Court, however, rejected a class encompassing uncommon conditions: the cleanliness of the floor, verbal abuse, outside viewers, the order in which body cavities were probed, and the accommodation of disabilities. *Id.* at 629 & n.6. Plaintiffs failed to adduce significant proof that Defendants had a pattern and practice of searching all putative class members under these conditions — indeed, the Court's analysis revealed that only a very small number were searched under these conditions. *Id.* at 626-29.[2] Furthermore, the Court declined to certify a damages class under Federal Rule of Civil Procedure 23(b)(3) because each case would require individualized proof of damages, which undermined the class format's superiority. *Id.* at 629-35. The Court also denied a liability issue class under Federal Rule of Civil Procedure 23(c)(4) on the same grounds — but it invited a renewed motion on this issue. *Id.* at 635-38.

Plaintiffs' renewed motion was a bit more than the Court bargained for. In essence, it was a polite request for reconsideration. Plaintiffs proposed an injunctive class including:

> Women in the custody of LA County Jail who, upon their admission or return to CRDF from outside CRDF, until the time the practice stops or a date set for the verdict cutoff in this case, were strip/visual body cavity searched in a group, with other inmates, in an outside bus stall, including whether there was (a) substandard sanitation policies (or lack thereof) and/or practices with regard to searches conducted in the bus bay which threatened the health and safety of inmates trip searched in the bus bay, (b) a pattern and practice and culture of

---

[2] Plaintiffs also submitted additional declarations from putative class members evidencing additional searches conducted with certain "uncommon" characteristics. (Dkt. 247, Decl. of Lindsey Battle). But these declarations still admit large variation among the nonuniform conditions during the searches at issue.

2

>deputy harassment and/or abuse during bus bay strip searches, (c) a pattern and practice of searching inmates in unreasonably cold air temperatures and/or precipitation, and/or (d) a policy (or lack thereof) and/or pattern and practice of failing to consistently protect the privacy of inmates being strip searched.

This broader class definition hinged on a new (or renewed) theory of commonality. They argued that the CRDF's cumulative policies — including those related to the uncommon conditions (sanitation, deputy abuse, cold weather, and privacy) — increased every inmate's exposure to the risk of harm through the spread of disease, which satisfied commonality. In the alternative, Plaintiffs argued that any of these enumerated conditions could constitute a subclass. Plaintiffs also renewed their request for a liability issue class along the same bounds as their proposed injunctive class.

## Discussion

Plaintiffs' motion raises three issues: first, whether the injunctive class should be expanded; if not, whether a subclass for each uncommon condition is appropriate; last, whether a liability issue class is appropriate.

### I. Legal Standards

"Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation." *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160 (1982) (citing Fed. R. Civ. P. 23(c)(1)).

For a class to exist, it must be subject to "precise, objective, and presently ascertainable" definition. *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 319 (C.D. Cal. 1998). Moreover, any putative class must meet Federal Rule of Civil Procedure 23(a)'s familiar requirements: numerosity, commonality, typicality, and adequacy.

A class seeking injunctive relief must satisfy Federal Rule of Civil

Procedure 23(b)(2). Such a class is appropriate if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Fed. R. Civ. P. 23(b)(2).

A class seeking damages is subject to a different standard. Under Federal Rule of Civil Procedure 23(b)(3), Plaintiffs must establish predominance and superiority. Courts consider:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). This list of factors, however, is non-exhaustive. *Local Joint Exec. Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir. 2001).

When appropriate, the Court may also certify a class as to a particular issue. Fed. R. Civ. P. 23(c)(4). Although "courts and commentators are sharply split on when issue certification is proper," the Ninth Circuit endorses 23(c)(4) liability classes. 2 William Rubenstein, et al., Newberg on Class Actions § 4:91 381-82 (citing *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227 (9th Cir. 1996)); *see also Jiminez v. Allstate Ins. Co.*, 765 F.3d 1161, 1166-69 (9th Cir. 2014).

A court may also create subclasses, each of which is treated as a class and subject to the same requirements as one. *Betts v. Reliable Collection Agency, Ltd.*, 659 F.2d 1000, 1005 (9th Cir. 1981).

**II.    Expanded Class Definition**

    **A.    A Class Including the Uncommon Conditions Lacks Commonality**

"[I]n a civil-rights suit, . . . commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members." *Armstrong v. Davis*, 275 F.3d 849, 868 (9th Cir. 2001) (citing *LaDuke v. Nelson*, 762 F.2d 1318 (9th Cir. 1985), abrogated on other grounds by *Johnson v. California*, 543 U.S. 499, 504-05 (2005)). What it means for a policy or practice to "affect" a class member must be divined in light of *Wal-Mart*, which requires the possibility of common answers, not the presence of common questions. *Wal-Mart v. Dukes*, 131 S. Ct. 2541, 2551 (2011). In the search for a question yielding a common answer, the Court must peel back the pleadings and examine the underlying legal merits. *See id.* at 2551-52; *Jimenez v. Allstate Ins. Co.*, 765 F.3d 1161, 1165 (9th Cir. 2014). For example, in *Wal-Mart* — a Title VII discrimination case — the ultimate question was "why was I disfavored." 131 S. Ct. at 2252. Here, Plaintiffs appeal to the Fourth Amendment, so the question is "was I searched unreasonably." *See United States v. Knights*, 534 U.S. 112, 118 (2001) ("The touchstone of the Fourth Amendment is reasonableness."). Consequently, Plaintiffs' proffered bases of commonality must be germane to "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, [or] the place in which it is conducted" — the considerations courts assess when probing reasonableness under the Fourth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 559 (1979); *see also United States v. Kriesel*, 508 F.3d 941, 947 (9th Cir. 2007) (observing that the basic Fourth Amendment analysis balances the intrusiveness of a search against the government's justification).

The uncommon conditions' deleterious effect on commonality is apparent. The uncommon conditions introduce significant variation among the challenged searches. Without venturing too far down the path of tautology, Fourth Amendment analyses, which turn on the circumstances of individual searches, will differ when the circumstances of each search are decidedly different — the

5

1 unmanageable dissimilarity injected by the uncommon would make the quest for a
2 common Fourth Amendment answer quixotic. Therefore, the Court cannot certify
3 a class including the uncommon conditions.[3]

4      A counterfactual is illustrative. If the Court certified the class Plaintiffs
5 propose, resolution of the case would not create common answers for all the class
6 members. For example, it could be unreasonable to search an inmate when the
7 floor was covered in vermin and filth, the air was frigid, and the deputies yelled
8 and jeered. At the same time, it could be reasonable to search an inmate when the
9 floor was clean, the air temperate, and the deputies polite. However, the proposed
10 class would not allow the Court to distinguish between the two, even though the
11 class would contain those subject to both kinds of searches. And because it would
12 not allow the Court to differentiate among the different groups of inmates, the
13 answers produced by class-wide resolution would not help answer the ultimate
14 question — was I searched unreasonably — for all class members.

15      Judge Mordue reached an analogous conclusion in *Mothersell v. City of
16 Syracuse*, 289 F.R.D. 389 (N.D.N.Y. 2013). In *Mothersell*, the plaintiffs sought to
17 certify a class of those strip-searched pursuant to "all-persons-present" clauses in
18 search warrants. *Id.* at 390. However, the record showed that officers strip-
19 searched many putative class-members because they had probable cause to do so.
20 *Id.* at 395. Therefore, "[t]he evidence fail[ed] to show that people who otherwise
21 [met] the class definition — that is, people who were strip searched during the
22 execution of an all-persons-present warrant during the class period — were strip
23 searched based on the existence of the all-persons-present clause, rather than on the
24 facts known to the officers at the time of each search." *Id.* In essence, *Mothersell*
25 found that a difference in the justifications for the searches destroyed commonality.
26 *See id*. Here, the disparities exist in the manner of the searches. But both

---

[3] This analysis merely mirrors the Court's prior order. *Amador*, 299 F.R.D. at 626-28.

considerations are part of Fourth Amendment analyses. *Bell*, 441 U.S. at 559. And, therefore, the wide variation in the manner of the searches introduced by the uncommon conditions preclude commonality, just as the differences in justification prevented Judge Mordue from finding commonality in *Mothersell*.

Hence, the expanded class suggested by Plaintiffs fails to satisfy Federal Rule of Civil Procedure 23(a) because — in the context of the Fourth Amendment claims at issue in this case — it lacks commonality among its putative members. *See* 1 Joseph McLaughlin, McLaughlin on Class Actions § 4:7 (11th ed. 2014) ("*Wal-Mart* will bar certification of proposed classes where adjudication of the claims will necessitate significant and time-consuming individualized liability inquiries which undermine the fairness and efficiency of a class-wide determination.").

### B. The Increased Risk of Harm Stemming from Some Class Members' Searches Does Not Establish Commonality Among All Class Members

Plaintiffs, however, push their argument one step further. They submit that even though the individual searches were dissimilar, the departmental policies pertaining to searches in filthy or intemperate conditions affected each inmate, even if that particular inmate was not searched under those circumstances.[4] That is, Plaintiffs submit that CRDF policies empowered deputies to search some women under filthy or intemperate conditions. These searches increased those women's risk of falling ill. And, as a result, the deputies exposed all class members to an increased risk of harm by way of contagious disease. Therefore, a CRDF policy "affected" all class members, satisfying commonality. This argument is flawed. As already discussed, the uncommon conditions do not

---

[4] Only weather and sanitation are discussed in this section. Plaintiffs' risk-of-harm theory is premised on the spread of disease. They have not adduced sufficient proof that verbal abuse or privacy concerns increase the risk of contagious disease among inmates. Thus, by their own reasoning, those conditions are unrelated to the theory of commonality.

7

"affect" each class member in a manner relevant to the Fourth Amendment. This inappositeness is the result of Plaintiffs' attempt to import an Eighth Amendment doctrine into a Fourth Amendment case — the equivalent of trying to put a square peg through a round hole.

Plaintiffs' reliance on the risk-of-harm theory stems from a misreading of the case law. As discussed above, there is no place for this reasoning in a Fourth Amendment analysis. The Fourth Amendment examines a search's intrusiveness; another inmate's noncontemporaneous search has no bearing on one's own Fourth Amendment rights[5] — and Plaintiffs have furnished no authority that it does. In short, Plaintiffs' risk-of-harm theory does not fit the Fourth Amendment's paradigm.

In arguing the contrary, Plaintiffs' rely on the Ninth Circuit's recent decision in *Parsons v. Ryan*, 754 F.3d 657 (9th Cir. 2014). In *Parsons*, the Ninth Circuit endorsed the risk-of-harm theory because it was part of the prima facie claim brought under the Eighth Amendment — the relevant provision in that case. *See Parsons*, 765 F.3d at 677. To be specific, there are four elements in an Eighth Amendment deliberate indifference claim: (1) an existing policy or practice creates an unreasonable risk of harm; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice. *Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir. 1989). Thus, a deliberate indifference claim is premised on government apathy to unsafe conditions — regardless of whether a "tragic event" has occurred — so it is possible to enjoin a policy before the actual harm manifests. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Helling v. McKinney*, 509 U.S. 25, 33 (1993);

---

[5] If one is searched in a manner that might harm him or her, he or she has a cognizable Fourth Amendment injury. *See, e.g.*, *United States v. Edwards*, 666 F.3d 877, 885 (4th Cir. 2011). However, someone that falls ill from another who fell ill due to an unsanitary search was not, herself, searched unreasonably. Therefore, the risk-of-harm theory cannot bind together a Fourth Amendment class featuring significantly different search conditions.

8

1 *see also Brown v. Plata*, 131 S. Ct. 1910, 1925 n.3 (2011) (citing *Farmer*, 511 U.S.
2 at 834); *Thomas v. Ponder*, 611 F.3d 1144, 1151 n.5 (9th Cir. 2010).
3 Consequently, "polices and practices that expose inmates to a substantial risk of
4 serious harm" can be integral to an Eighth Amendment claim, and, therefore, form
5 the common basis for a class action. *Parsons*, 754 F.3d at 677 (9th Cir. 2014); *see
6 also Brown*, 131 S. Ct. at 1925 n.3. However, as explained above, the Fourth
7 Amendment admits no analogous considerations. The focus is on each individual's
8 search — the risk of harm derived from another's asynchronous search does not fit
9 into the analysis.
10       Indeed, at least one other court also found *Parsons* inapposite outside the
11 setting of the Eighth Amendment. *In re WellPoint, Inc. Out-of-Network UCR
12 Rates Litig.*, No. MDL 09-2074 PSG (FFMx), 2014 WL 6888549, at *11 n.10
13 (C.D. Cal. Sept. 3, 2014). And two more decisions kept the risk-of-harm theory
14 separate from a search's unreasonableness when considering both Fourth and
15 Eighth Amendment claims. *See Martin v. Sullivan*, No. 06-cv-00906, 2011 WL
16 754886, at *6 (E.D. Cal. Feb. 24, 2011); *Jackson v. CDCR*, No. 07-cv-01414, 2009
17 WL 256967, at *4-5 (E.D. Cal. Feb. 3, 2009).
18       Plaintiffs rely on three cases to challenge the Court's interpretation of
19 *Parsons* and rejection of the risk-of-harm theory in this case: *DG ex rel. Stricklin v.
20 Devaughn*, 594 F.3d 1188 (10th Cir. 2010), *Kenneth R. ex rel. Tri-Cnty. CAP,
21 Inc./GS v. Hassan*, 293 F.R.D. 254 (D.N.H. 2013), and *Karen L. ex rel. Jane L. v.
22 Physicians Health Servs., Inc.*, 202 F.R.D. 94 (D. Conn. 2001). According to
23 them, these cases show that *Parsons* should not be limited to its circumstances;
24 rather, the risk-of-harm theory it endorsed is generally applicable in commonality
25 analyses. However, like *Parsons*, *Devaughn* and *Kenneth R.* involved claims
26 where the risk-of-harm was part of the underlying legal violation. Moreover,
27 *Karen L.* is outdated after *Wal-Mart*.
28       *Devaughn* ratifies the risk-of-harm theory no more than *Parsons*. In

*Devaughn*, caseworkers "routinely fail[ed] to comply with [the] policy of requiring caseworkers to visit monitor children's safety and placement." 594 F.3d at 1195. These routine failures "allegedly exposed [plaintiffs] to the same unreasonable risk of harm." *Id.* at 1195-97. The common question was "whether [OK]DHS's policies or practices violate class members' right to be reasonably free from harm and imminent risk of harm while in state custody." *Id.* at 1193. But, like *Parsons*, the risk of harm posed a common question because it was an element of the underlying legal claim. *Id.* at 1196 ("[C]hildren in state custody have a constitutional [substantive due process] right to be reasonably safe from harm." (citing *Yvonne L. v. New Mexico Dep't of Human Serv.*, 959 F.2d 883, 892 (10th Cir. 1992)). Indeed, all the cases cited by the *Devaughn* court in supporting the risk-of-harm theory's viability centered on the peculiar nature of child-welfare. *See id.* at 1196-97. As did the authority cited in the *Devaughn* plaintiffs' appellate brief. *See* Appellees' Resp. in Opp. to Appellants' Opening Br. at 16-27. In this case, however, Plaintiffs have not shown that the risk of harm from another's noncontemporaneous search is part of a cognizable Fourth Amendment case.

Likewise, a New Hampshire District Court certified a class when "the State's policies and practices . . . created a systemic deficiency in the availability of community-based mental health care services" because all class members suffered the same harm: "a serious risk of unnecessary institutionalizaion." *Kenneth R.*, 293 F.R.D. at 267. That case involved a federal regulation: 28 C.F.R. § 35.130(d). *Id.* at 259. And, once again, a risk of harm was part of a valid theory of liability under that particular regulation. *See id.* at 267 n.4 ("[T]he cases seem to indicate, at least by implication, that no individualized inquires need be made to determine whether a systemic condition places class members at serious risk of unnecessary institutionalization; instead, the inquiry can properly turn on systemwide proof."). Both parties endorsed this interpretation of the regulation. *Id.* Accordingly, like *Devaughn* and *Parsons*, the court premised certification on the risk-of-harm theory

because it was tenable under the regulation.

Last, *Karen L.* — which predates *Wal-Mart* by over a decade — is no longer persuasive. There, the court certified a class of plaintiffs who received health care from a Medicaid insurer because

> each potential class member [was] at risk of suffering the same harms alleged by the named plaintiffs: denials of coverage without proper notification; lack of adequate hearing rights to challenge denials, and the inability to apply for and receive prescription drugs without delay. . . . [T]he fact that each plaintiff 'has his or her own circumstances' does not preclude certification where plaintiffs 'are challenging conditions and practices under a unitary regime.' . . . [T]he plaintiffs share the common circumstance of being enrolled in the PHS medical plan, and as such, they are subject to the violations of state and federal law alleged by the plaintiffs.

*Karen L. ex rel. Jane L. v. Physicians Health Servs., Inc.*, 202 F.R.D. 94, 96, 100-01 (D. Conn. 2001). This shared predicament generated the common legal issues: "whether notice and denial procedures of PHS violate Medicaid statutes, due process, and state law, and whether the Commissioner has committed similar violations based upon its contract with PHS." *Id.* at 100. These issues, however, resemble the questions *Wal-Mart* deemed insufficient. *See* 131 S. Ct. at 2551 ("suffer[ing] a violation of the same provision of law" is not a common question); *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 841 (5th Cir. 2012) (finding "various allegations of 'systemic deficiencies' in the State's administration of its [conservatorship of children]" insufficient to raise common questions of fact or law). Thus, the Court does not find *Karen L.* persuasive.

In sum, Plaintiffs' authority is unconvincing. *Parsons*, *Devaughn*, and *Kenneth R.* are confined to their classes' particular legal claims. And *Karen L.* must defer to *Wal-Mart*. Consequently, the risk-of-harm theory cannot function as

the "glue" binding this putative class's issues together. *See Wal-Mart*, 131 S. Ct. at 2552.[6]

### III. Sub-Classes

Even though expansion of the class is improper, sub-class certification may be appropriate. "[C]ertification of subclasses must satisfy all the elements of the same standard required of certification of the class as a whole." *Walker v. Life Ins. Co. of the Sw.*, CV 10-9198 JVS RNBX, 2012 WL 7170602, at *7 (C.D. Cal. Nov. 9, 2012); *accord Betts*, 659 F.2d at 1005. Here, the Court would append the subclasses to the injunctive class, so the subclasses must meet the requirements of Federal Rule of Civil Procedure 23(b)(2). *See, e.g.*, *Foster v. City of Oakland*, Nos. C 05-3110 MHP et al., 2009 WL 88433, at *4-5 (N.D. Cal. Jan. 13, 2009). There are four proposed subclasses: abuse, privacy, sanitation, and weather. They are defined as:

1. Women who were present during, experienced or threatened by abuse.
2. Women who were present when lack of privacy existed, or were threatened with the prospect of such condition.
3. Women who were personally exposed to, observed or whose health or safety was threatened by, unsanitary conditions (which include bodily fluids, trash, sanitary napkins, feces, vomit, bird droppings or feathers, dead birds, exposure to rodents and vermin, and noticeably dirty or sticky floors).
4. Women who were exposed to extreme weather (hot, cold, rain) or whose health or safety was threatened by virtue of the policy or practice.

Two are too nebulous to ascertain. The proposed sanitation subclass fails to satisfy commonality. A subclass for inclement weather conditions, however, meets

---

[6] This determination, however, does not disturb the Court's prior decision certifying an injunctive class. It only denies Plaintiffs' request to expand the injunctive class.

Federal Rule of Civil Procedure 23's certification requirements.

### A. Abuse Subclass

The Court already declined to certify an abuse subclass. There is no reason to revisit that conclusion.

### B. Privacy Subclass

There are two fatal defects in the privacy subclass. First, the subclass cannot be defined adequately. Second, the method of identification is clumsy and ineffective.

The plaintiffs seek to define this subclass as "those who were present when lack of privacy existed, or were threatened with the prospect of such conditions." (Dkt. 236, Pl. Renewed Mot., 17:1-3). That definition is vague and conclusory. There are no objective criteria for the Court to define the limits of the class. *See Guido v. L'Oreal, USA, Inc.*, No. 11-cv-1067, 2013 WL 3353857, at *18 (C.D. Cal. July 1, 2013) ("The requirement of an ascertainable class is met as long as the class can be defined through objective criteria.").

Moreover, plaintiffs seek to rely on self-identification. Plaintiffs argue that self-identification is appropriate if the subclass's definition "is sufficiently precise for potential members to determine whether they belong to the class." (Dkt. 253, Pl. Reply for Renewed Mot., 13:22-24). Putative class members would self-identify "as having been searched when the bus bay was not blocked to the view of outsiders." (Dkt. 253, Pl. Reply for Renewed Mot., 15:2-3). That is not sufficiently precise — it is inherently subjective, and there are numerous ambiguities (e.g., how unobstructed must the view of the bus bay been?). *See O'Connor*, 184 F.R.D. at 319 ("Class definition should be precise, objective and presently ascertainable." (citing Manual for Complex Litigation, Third § 30.14, at 217 (1995))).

### C. Sanitation Subclass

Plaintiffs' sanitation subclass would include any inmate claiming the bus

13

bay contained "one of the following conditions: bird feathers, bird feces, flies, bodily fluids on the ground during the search process, puddles of water on the ground (from rain) or trash left behind from previous searches." (Dkt. 236, Pl. Reply for Renewed Mot. 15:7-12). This subclass would suffer from significant commonality issues. The multifarious considerations would ensure a wide range of experiences: one plaintiff might have been searched when a single piece of litter was in the bus bay, another in a puddle of dried menstrual blood against a wall covered in animal feces while surrounded by dead vermin. Moreover, there is no evidence of a unifying policy touching on the enumerated sanitation issues. Thus, the proposed subclass embraces too broad a range of circumstances — at least as plaintiffs currently define it — to present a single question capable of resolution. *See Wal-Mart*, 131 S. Ct. at 2551.

### D. Weather Subclass

A subclass based on weather, however, is objectively ascertainable. The subclass would be based on searches conducted in temperatures at or less than sixty-eight degrees. The temperature can be independently verified by meteorological data, and the putative members would only need to indicate how many times they were searched and how many of those searches were conducted indoors. Similarly, self-identification can determine whether it was raining during one's search. These objective criteria are straightforward and well-suited for self-identification. *See Forcellati v. Hyland's Inc.*, No. 12-cv-1983, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) (self-identification based on whether plaintiff purchased defendant's medicine); *McCrary v. Elations Co.*, No. 130cv099242, 2014 WL 1779243 (C.D. Cal. Jan. 13, 2014) (self-identification based on whether plaintiff purchased defendant's supplement); *Zeisel v. Diamond Foods, Inc.*, No. C 10-01192, 2011 WL 2221113 (N.D. Cal. June 7, 2011) (self-identification based on

whether plaintiff purchased specially branded nuts).[7]

## IV. Liability Issue Class

The final question is whether to certify a Rule 23(c)(4) liability issue class along the same parameters as the Rule 23(b)(2) class (and subclass). Under Federal Rule of Civil Procedure 23(c)(4), the issue class must meet the same requirements as it would under either 23(b)(1), (b)(2), or (b)(3). *See Valentino*, 97 F.3d at 1234. Because the proposed issue class is part of Plaintiffs' pursuit of damages, the issue class must meet the requirements of Federal Rule of Civil Procedure 23(b)(3). After the Court's last order, the only remaining issue is superiority.

### A. Individual Incentive To Litigate

The first issue is whether plaintiffs would have an individual incentive to litigate their claims. *See, e.g.*, *Butler v. Sears, Roebuck and Co.*, 727 F.3d 796, 798 (7th Cir. 2013). Although the Court recognizes the potential for bias, it credits Mr. Litt's declaration. (Dkt. 237, Decl. of Barrett Litt). The potential reward is too small to entice many attorneys to pursue these cases, leaving many plaintiffs without a viable remedy.

### B. Judicial Efficiency

Judicial efficiency is more contested. The Court recognizes some merit in all the efficiency interests proffered by the plaintiffs. Some time will be saved without individualized *Monell* showings. The risk of inconsistent verdicts is real (although the threat always exists). Individual trials could overwhelm counsel and the court, even though most cases would likely settle after a few were litigated. And certification would facilitate global resolution. The Court, however, knew of these efficiencies when it issued its last order. It is not the facts that have changed — rather, the law has done so. Recent cases persuade the Court that it previously

---

[7] Defendants do not challenge certification on any other ground. The Court is satisfied that the other requirements are met.

demanded too strong an efficiency showing, and a liability class is appropriate under the circumstances.

Most pertinent to this case is the Ninth Circuit's recent endorsement of liability issue classes: "[s]o long as the plaintiffs were harmed by the same conduct, disparities in how or by how much they were harmed did not defeat class certification." *Jimenez*, 765 F.3d at 1168.

Moreover, *Jimenez* found Judge Stranch's opinion in *In re Whirlpool*, 722 F.3d 838 (6th Cir. 2013) and Judge Posner's opinion in *Butler v. Sears Roebuck and Co.*, 727 F.3d 796 (7th Cir. 2013), "compelling." *Jimenez*, 765 F.3d at 1168. *Butler* was particularly emphatic in its approval of liability issue classes:

> It would drive a stake through the heart of the class action device, in cases in which damages were sought rather than an injunction or a declaratory judgment, to require that every member of the class have identical damages. If the issues of liability are genuinely common issues, and the damages of individual class members can be readily determine in individual hearings, in settlement negotiations, or by creation of subclasses, the fact that damages are not identical across all class members should not preclude class certification.

727 F.3d at 801; *see also McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482 (7th Cir. 2012).[8]

The sum of these cases indicates that the Court was too demanding in its previous order. The Ninth Circuit — and respected jurists across the country — have energetically endorsed the concept. And such enthusiastic embrace compels reconsideration in this case. This case may involve individualized damages calculations. Even so, the efficiency of a single liability determination regarding

---

[8] Although the parties have not addressed the notice issue that accompanies a damages class, there is no indication that a notice and opt-out procedure would be infeasible under the circumstances. *See In re Whirlpool*, 722 F.3d at 861 ("[A]ny class member who wishes to control his or her own litigation may opt out of the class under Rule 23(c)(2)(B)(v).").

16

the common procedures used by CRDF deputies is sufficient for Federal Rule of Civil Procedure 23(c)(4). The Court is therefore convinced that an issue class should be certified along the same parameters as the Federal Rule of Civil Procedure 23(b)(2) class.

## Conclusion

For the foregoing reasons, the Court:

1. DENIES Plaintiffs' renewed motion to expand the scope of the injunctive class.
2. GRANTS Plaintiffs' renewed motion certify a weather subclass but DENIES Plaintiffs' renewed motion to certify all other subclasses.
3. GRANTS Plaintiffs' renewed motion to certify an issue class for the purpose of liability along the same parameters as the injunctive class and subclass.

IT IS SO ORDERED.

Dated: December 18, 2014

STEPHEN V. WILSON
United States District Judge