1  DAVID D. LAWRENCE, State Bar 123039
   dlawrence@lbaclaw.com
2  PAUL B. BEACH, State Bar No. 166265
   pbeach@lbaclaw.com
3  JIN S. CHOI, State Bar No. 180270
   jchoi@lbaclaw.com
4  JUSTIN W. CLARK, State Bar No. 235477
   jclark@lbaclaw.com
5  LAWRENCE BEACH ALLEN & CHOI, PC
   100 West Broadway, Suite 1200
6  Glendale, California 91210-1219
   Telephone No. (818) 545-1925
7  Facsimile No. (818) 545-1937

8  Attorneys for Defendants
   County of Los Angeles, Los Angeles County Sheriff's Department,
9  Sheriff Leroy D. Baca, Captain John H. Clark, Timothy Cornell,
   Dennis Burns, Gerald K. Cooper, Daniel Cruz, and Stacy L. Lee

10

11              **UNITED STATES DISTRICT COURT**

12              **CENTRAL DISTRICT OF CALIFORNIA**

13

| | |
|---|---|
| MARY AMADOR, et al., | Case No. CV 10-01649 SVW (JEMx) |
| Plaintiffs, | Honorable Stephen V. Wilson |
| vs. | **DEFENDANTS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT AS TO THE CERTIFIED F.R.C.P. RULE 23(c)(4) LIABILITY CLASS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| SHERIFF LEROY D. BACA, etc., et al., | [Local Rule 56-1] |
| Defendants. | *[Separate Statement of Undisputed Facts and Conclusions of Law, Declarations and Exhibits, and [Proposed] Judgment filed concurrently herewith]* |
| | Date:   March 7, 2016 |
| | Time:   1:30 p.m. |
| | Crtm:   6 |

26

27        TO THE HONORABLE COURT, ALL PARTIES, AND TO THEIR

28  COUNSEL OF RECORD:

                              1

1       Pursuant to the Court's instructions at the August 31, 2015 status conference,

2   Defendants County of Los Angeles, Los Angeles County Sheriff's Department,

3   Sheriff Leroy D. Baca, Captain John H. Clark, Timothy Cornell,

4   Dennis Burns, Gerald K. Cooper, Daniel Cruz, and Stacy L. Lee (collectively,

5   "Defendants") hereby move for summary judgment as to the F.R.C.P., Rule 23(c)(4)

6   class certified for purposes of liability only — the determination of which is subject

7   to the search conditions found to be common to the proposed class.  (*See,* Exhibits

8   "O" and "P", Docket Nos. 232, 262.)

9       This Motion is based upon this Notice, the attached Memorandum of Points

10  and Authorities, the concurrently filed Declarations and Exhibits, the Separate

11  Statement of Uncontroverted Material Facts and Conclusions of Law, and the

12  Court's file in this matter, and upon such other and further matters as may properly

13  come before the Court.

14

15  Dated:  December 21, 2015        LAWRENCE BEACH ALLEN & CHOI, PC

16

17

18                By _____/s/  Justin W. Clark_____

19                          Paul B. Beach

20                          Justin W. Clark

21                          Attorneys for Defendants

22                          County of Los Angeles,

23                          Los Angeles County Sheriff's

24                          Department, Sheriff Leroy D. Baca,

25                          Captain John H. Clark, Timothy

26                          Cornell, Dennis Burns, Gerald K.

27                          Cooper, Daniel Cruz, and Stacy L. Lee

28

# TABLE OF CONTENTS

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.     INTRODUCTION .................................................................................. 1

II.    THIS COURT'S CLASS CERTIFICATION ORDERS HAVE
       NARROWLY DEFINED THE PARAMETERS FOR THE INSTANT
       CLASS-WIDE LIABILITY DETERMINATION ........................................ 2

III.   STATEMENT OF FACTS ..................................................................... 5

       A.    Group Strip Searches Are Necessary To Prevent And Deter The
             Introduction Of Contraband Into The Jail Population. ..................... 5

       B.    Physical Layout Of CRDF And Recent Modifications. ................... 7

IV.    SUMMARY JUDGMENT STANDARD. ................................................. 8

V.     THIS COURT'S SUMMARY JUDGMENT RULING IN *SOLIS v.
       BACA* IS HIGHLY RELEVANT TO THE ASSESSMENT OF THE
       VIABILITY OF PLAINTIFFS' CLASS-WIDE THEORY OF
       LIABILITY. .......................................................................................... 9

VI.    THE CLASS-WIDE LIABILITY DETERMINATION MUST BE
       BASED ON THE BINDING ANALYTICAL BLUEPRINT
       MANDATED BY SUPREME COURT PRECEDENT. ............................. 11

       A.    The Controlling Supreme Court Precedents Must Be Stringently
             Applied To Plaintiffs' Group Search Claim. ............................... 11

       B.    The Blanket Strip Search Policy Cases Underscore The
             Irrefutable Nature Of The Penological Interests At Stake. ............ 14

VII.   GROUP SEARCHES AT CRDF ARE JUSTIFIED BY LEGITIMATE
       PENOLOGICAL INTERESTS WHICH FAR OUTWEIGH THE
       LIMITED INFRINGEMENT OF PRIVACY INTERESTS. ........................ 17

       A.    Penologically Justified Strip Searches Retain Their
             Constitutionality When They Are Conducted In Controlled
             Group Settings ................................................................... 17

       B.    The Group Searches Satisfy The Controlling Constitutional
             Threshold Under Turner and Bell. ............................................ 21

VIII.  THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO
       QUALIFIED IMMUNITY. ..................................................................... 22

IX.    THE CERTIFICATION OF A WEATHER SUBCLASS DOES NOT
       MEANINGFULLY AFFECT THE INSTANT RULE 23(c)(4)
       ANALYSIS. ........................................................................................ 23

X.     CONCLUSION. ................................................................................. 25

i

1

## TABLE OF AUTHORITIES

2

**Cases**

*Anderson v. Creighton*,
   483 U.S. 635 (1987) .......................................................................................23

*Barnett v. Centoni*,
   31 F.3d 813 (9th Cir. 1994) ............................................................................8

*Bell v. Wolfish*,
   441 U.S. 520 (1979) ...............................................................................passim

*Block v. Rutherford*,
   468 U.S. 576 (1984) ...............................................................................12, 15

*British Airways Board v. Boeing Co.*,
   585 F.2d 946 (9th Cir. 1978) ..........................................................................8

*Bull v. City and County of San Francisco*,
   595 F.3d 964 (9th Cir. 2010) ...................................................................passim

*Byrd v. Maricopa County Sheriff's Dep't*,
   629 F.3d 1135 (9th Cir. 2011) .......................................................................10

*City & Cnty. of San Francisco v. Sheehan*,
   __, U.S. __, 135 S.Ct. 1765 (2015) ...............................................................23

*Fernandez v. Rapone*,
   926 F.Supp. 255 (D. Mass. 1996) .................................................................20

*Florence v. Board of Chosen Freeholders of County of Burlington*,
   __ U.S. __, 132 S.Ct. 1510 (2012) ................................................................16

*Fostery v. Gentry*,
   2011 U.S. Dist. LEXIS 154218 (D. Nev. Dec. 20, 2011), *approved and adopted by* 2012 U.S. Dist. LEXIS 37281 (D. Nev. Mar. 19, 2012) .............................16

*Giles v. Ackerman*,
   746 F.2d 614 (9th Cir. 1984) .........................................................................16

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Gipson v. Wilkinson*,
   2015 WL 4395031 (W.D. La. July 16, 2015) ......................................................20

*Green v. Portillo*,
   2015 WL 5092679 (D. Nev. Aug. 27, 2015) ......................................................20

*Letcher v. Turner*,
   968 F.2d 508 (5th Cir. 1992)................................................................20, 21

*Lyons v. Bisbee*,
   2010 U.S. Dist. LEXIS 6181 (D. Nev. Apr. 7, 2011), *approved and adopted by*
   2011 U.S. Dist. LEXIS 61739 (D. Nev., June 9, 2011).................................20, 21

*Malo v. Hernandez*,
   2014 WL 7246730 (C.D. Cal. Dec. 18, 2014) ......................................................24

*Michenfelder v. Sumner*,
   860 F.2d 328 (9th Cir. 1988)...............................................10, 14, 18, 19

*Pearson*,
   555 U.S. ....................................................................................22

*Powell v. Barrett*,
   541 F.3d 1298 (11th Cir. 2008)................................................................19

*Romero v. Kitsap County*,
   931 F.2d 624 (9th Cir. 1991).................................................................22

*Saucier v. Katz*,
   533 U.S. 194 (2001) ..........................................................................22

*Thompson v. City of Los Angeles*,
   885 F.2d 1439 (9th Cir. 1989).................................................................16

*Thompson v. Souza*,
   111 F.3d 694 (9th Cir. 1997)..................................................................10

*Turner v. Safley*,
   482 U.S. 78 (1987) ......................................................................passim

iii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Tyler v. Watson*,

    2009 WL 4110304 (W.D. Va. Nov. 25, 2009)........................................................24

*Wagner v. Thomas*,

    608 F.Supp. 1095 (D.C. Tex. 1985) ........................................................20

**Rules**

Fed.R.Civ.P. Rule 23(c)(4) ........................................................passim

Fed.R.Civ.P. Rule  23(a) ........................................................5

Fed.R.Civ.P. Rule  23(b)(2) ........................................................1, 2, 5

Fed.R.Civ.P. Rule  23(b)(3) ........................................................2, 4

Fed.R.Civ.P. Rule 56(b), (d) ........................................................8

Fed.R.Civ.P. Rule Rule 56(c) ........................................................8

iv

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

In this proposed class action, Plaintiffs challenge the constitutionality of group strip searches of female inmates housed at the Century Regional Detention Facility ("CRDF").  The subject group searches at issue have been conducted inside Bus Bay #3 ("BB3") at CRDF.

On December 18, 2014, this Court granted certification of a F.R.C.P. Rule 23(c)(4) class, as to the issue of liability only, with the determination of class-wide liability strictly limited to the search-related conditions found to be common to the proposed class.  The Court has referred to these conditions as the "common conditions" or "common procedures."  (*See*, Exhibits "O" and "P".)[1]

On August 31, 2015, the Court conducted a status conference to assess the current procedural posture of this action and provided instructions as to the scope of Defendants' motion for summary judgment.  The Court stayed Plaintiffs' state law claims and indicated that Defendants should not move for summary judgment as to the certified Rule 23(b)(2) injunctive relief class at this time.  (*See,* Clark Decl., ¶ 2, Exhibit "Q" at 211:23-212:2.)  The Court further instructed Defendants to move for summary judgment as to the Rule 23(c)(4) issue of whether the "common conditions" give rise to constitutional liability as a matter of law.  (*Id*. at 212:6-213:3.)  This instruction was consistent with the Court's statement in the December 18, 2014 class certification order: "the efficiency of a **single liability determination regarding the common procedures used by CRDF deputies** is sufficient for Federal Rules of Civil Procedure 23(c)(4)."  (*See*, Clark Decl., ¶ 2, Exhibit "P" at 197:25-198:2, emphasis added.)

---

[1] For the Court's convenience, copies of the Court's class certification orders (Dkt Nos. 232 and 262), as well as a copy of the reporter's transcript from the August 31, 2015 status conference are included among the Exhibits filed concurrently herewith. (*See*, Clark Decl., ¶ 2, Exhibits "O", "P", and "Q".)

As such, for purposes of the instant motion, the fundamental question is whether the conditions "common" to the BB3 strip searches, during the proposed class period, give rise to constitutional liability as a matter of law.  This motion seeks summary judgment with respect to the entirety of the proposed class period since the procedures for the BB3 searches have largely remained the same throughout this period, and recent modifications to BB3 do not materially affect this constitutional analysis.  The undisputed material facts regarding the conditions common to the search process, the legitimate penological interests served by the search process, and the limited nature of the inmates' privacy rights, must be considered against the well-established controlling Supreme Court and Ninth Circuit precedent requiring heightened judicial deference to such jail procedures.  The balancing of these factors mandates the granting of summary judgment as to the Rule 23(c)(4) class.

Because the Court's earlier rulings on Plaintiffs' motions for class certification and related findings regarding conditions common to the proposed class are particularly relevant to the instant motion, a detailed summary of these rulings is set forth immediately below.

## II.   THIS COURT'S CLASS CERTIFICATION ORDERS HAVE NARROWLY DEFINED THE PARAMETERS FOR THE INSTANT CLASS-WIDE LIABILITY DETERMINATION.

In ruling on Plaintiffs' motion for class certification seeking certification of a Rule 23(b)(2) injunctive relief class and a Rule 23(b)(3) damages class, the Court found "that while there is evidence that the entire class was subject to the same allegedly unlawful practice or policy during the searches in certain respects, the entire class was not subject to the same conditions with respect to the cleanliness of the floor, verbal abuse, outside viewers, the order in which body cavities were probed, and the accommodation of disabilities." (*See*, Clark Decl., ¶ 2, Exhibit "O" at 160:20, 163:28.)

2

Based on the findings regarding common versus uncommon search conditions, the Court certified an injunctive relief class to "determine whether the common conditions of the strip searches conducted at CRDF render those searches unconstitutional." (*See*, Clark Decl., ¶ 2, Exhibit "O" at 162:26-163:1".) Specifically, the injunctive relief class was defined as follows: "a class of all present or future women inmates of the Los Angeles County Jail who, upon their admission or return to the Century Regional Detention Facility from outside of the facility, **are being or will be subjected to a visual body cavity search in a group with other inmates in an outside bus stall**." (*Id.* at 180:26-181:2; emphasis added.) With respect to the proposed Rule 23(b)(3) damages class, the Court explained that "[t]he questions of law and fact common to the determination of whether defendants are *liable* to the proposed class members for constitutional violations, **based on the shared characteristics of the searches identified above**, clearly predominate over any questions affecting only individual members. The **issue of liability is readily resolved 'in one stroke'** for the reasons discussed in connection with the injunctive relief class." (*Id.* at 163:20-164:2; emphasis in bold added.) This finding, however, did not warrant certification of the proposed damages class because "the proposed class members' claims also include damages allegedly caused by the federal constitutional violations." (*Id.* at 164:2-4.) The Court also rejected Plaintiffs' reliance on the concept of presumed damages, finding that Plaintiffs' proposal "would impose an artificial homogeneity on the complex facts" surrounding the actual damages of each putative class member. (*Id.* at 173:12-23.)

This Court further concluded that "on the issue of damages for the physical and emotional pain and suffering caused by the strip searches conducted at CRDF, common questions do not in fact predominate over individual questions." (*Id.* at 174:11-14.) Because presumed damages would not be an "adequate substitute for the class members' compensatory damages, which could readily be established on

an individual basis through testimony", the Court ruled that Plaintiffs failed to establish that a Rule 23(b)(3) class "for the purpose of determining liability and damages" should be certified.  (*Id*. at 175:27-176:4.)

The Court also addressed Plaintiffs' request for the certification of a Rule 23(b)(3) damages class "solely on the issue of liability, leaving individual damage determinations to subsequent separate proceedings", pursuant to Rule 23(c)(4).  (*Id*. at 176:6-8.)  The Court explained that the "certification of a class **on the issue of liability alone** would entail first holding a trial on **whether the common characteristics of the searches renders them unconstitutional**, and then, if the Court found liability, proceeding with thousands of jury trials."  (*Id*. at 179:11-14; emphasis added.)  The Court specifically noted that individual damages trials for each class member would not be avoided by the certification of a Rule 23(c)(4) liability class but allowed Plaintiffs to argue in a renewed motion that "even with the common question framed more narrowly than they originally proposed, a class action on the issue of liability alone would be superior to individual litigation."  (*Id*. at 180:19-22.)

In their renewed motion for class certification, Plaintiffs not only argued for Rule 23(c)(4) certification on liability only, but also sought to expand the injunctive relief class to include four alleged search conditions, three of which the Court had previously found to be uncommon to the class: (1) sanitation; (2) deputy abuse; (3) inmate privacy; and (4) "unreasonably cold air temperatures and/or precipitation".  (*See*, Clark Decl., ¶ "P" at 183:184-3:5.)  This broadened class definition was based on the theory that all CRDF inmates were subject to a higher risk of harm, and alternatively, Plaintiffs sought certification of these conditions as separate subclasses.  (*See*, Clark Decl., ¶ 2, Exhibit "P" at 184:6-13.)

The Court rejected Plaintiffs' argument for expansion of the class definition since "[t]he uncommon conditions introduce significant variation among the challenged searches."  (*Id*. at 186:25-26.)  The proposed expanded class, therefore,

4

did not satisfy Rule 23(a) due to the inevitable lack of commonality among its putative members.  (*Id.* at 7:5-7.)

The Court also addressed whether Plaintiffs' four proposed subclasses should be appended to the injunctive class.  The Court found inherent problems with the proposed abuse, privacy, and sanitation subclasses, but ruled that the "weather subclass" — based on searches conducted when the temperature was at or less than 68 degrees — is "objectively ascertainable".  (*Id.* at 195:14-21.)

The Court also certified a Rule 23(c)(4) liability issue class along the same parameters as the Rule 23(b)(2) class and weather subclass.  The Court concluded that notwithstanding individualized damages calculations, "the efficiency of a **single liability determination regarding the common procedures used by CRDF deputies** is sufficient for Federal Rule of Civil Procedure 23(c)(4)" and certified a Rule 23(c)(4) issue (liability) class "along the same parameters" as the injunctive relief class.  (*Id.* at 197:25-198:4; emphasis added.)  Accordingly, in this motion, pursuant to the Court's instructions at the August 31, 2015 status conference, Defendants move for summary judgment with respect to the issue of class-wide liability, subject to those conditions common to the BB3 search procedure.

## III.  STATEMENT OF FACTS.

### A.  Group Strip Searches Are Necessary To Prevent And Deter The Introduction Of Contraband Into The Jail Population.

The class-wide liability determination as to the constitutionality of the visual body cavity searches ("strip searches") of female inmates, conducted inside BB3, is contingent upon the assessment of the common conditions:

- Inmates are searched in groups inside BB3 (*see*, Clark Decl., ¶ 2, Exhibit "O" at 154:2-3; *see also*, Defendants' Separate Statement of Undisputed Facts ["SS"] 13-17);

- The searches are conducted inside BB3 "at least when the temperature in the area is above 68 degrees" (*Id.* at 7:3-4; *see also*, SS 20); and

5

- Strip searches are conducted pursuant to an established sequential procedure. (*see*, Clark Decl., ¶2, Exhibit "O" at 7:1-9:9; *see also*, SS 41-63).

The Ninth Circuit has reaffirmed the necessity of adhering to the Supreme Court's strict instructions for reviewing constitutional challenges to jail procedures, including those claimed to violate inmates' privacy rights.[2]  Courts must afford the required level of deference to jail officials' discretionary decisions, without substituting their judgment for that of jail officials, and limiting the inquiry to whether the policy was rationally connected to a legitimate penological interest.

These well-established standards must be applied in examining the propriety of the group searches inside BB3.  This examination is controlled by numerous, undisputed material facts, including:

- contraband poses constant and significant security concerns in the jail setting (SS 8-10);
- the LACJ is the largest county jail system in the country, and the average daily inmate population of CRDF is approximately 2000 inmates  (SS 4);
- strip searches help prevent and reduce the flow of contraband into the inmate population (SS 10, 14);
- conducting strip searches on an individualized basis or with the use of individual partitions is impractical and raises additional security concerns (SS 14-16; 75-76);
- banning group strip searches would disrupt jail operations and cause re-allocation of finite and scarce resources necessary for other vital jail functions (SS 15-16).

---

[2]  As discussed in Section III, *infra*, these cases include *Bell v. Wolfish*, 441 U.S. 520 (1979) and *Turner v. Safley*, 482 U.S. 78 (1987).

6

Indeed, the presence and flow of contraband at the Los Angeles County Jail ("LACJ) is an ongoing problem that jail officials combat in various ways, including strip searches of inmates returning from outside facilities, and prior to their return to their housing locations.  (SS 15.)  The sheer size of the daily inmate population compounds the effects of the contraband problem.  Although contraband in the jail system cannot be eliminated entirely, these strip searches are vital, without which the contraband problem will increase exponentially, endangering the safety of inmates and jail staff, and disrupting the jail's operational functions as a whole. (SS 8-10; 14-16.)

The effective performance of these searches is made possible by conducting them in groups.  (SS 16.)  Group strip searches enable the Sheriff's Department to more efficiently allocate its limited financial and personnel resources, while at the same time, searching for contraband in a fashion that does not disrupt the flow of inmates in and out of the jail, as well as a myriad of other related jail functions.  (SS Id.)  The group searches are also performed in a manner that limits the infringement upon the inmates' privacy interests and which allows for an effective search for contraband.[3]

## B.   Physical Layout Of CRDF And Recent Modifications.

The only searches governed by this Court's class certification rulings are those group searches conducted inside BB3, which is configured as follows:

The height of the ceiling is approximately 18 feet high, the width of the room is approximately 15 feet wide, and the depth of the room (measured from the retractable door to the entrance to the reception area) is approximately 31 feet, for a total of 450 square feet.  (SS 22.)  The entrance from the parking area has a large

---

[3] Judicial notice can properly be taken of the fact that persons drafted into the U.S. armed forces were not constitutionally entitled to completely private shower areas, and nor do millions of public school students enjoy such privacy in their locker rooms and shower areas.

retractable metal door, which is rolled down when searches are performed; the wall to the immediate left of this entrance is cinderblock; the wall directly ahead is solid, except for doors to the reception area, which are closed or blocked by large laundry carts and a curtain during searches; and the last wall is covered by solid wood siding at least 12 feet high with metal siding above.  (SS 23.)  The roof is also constructed of metal siding, and lights and heaters are suspended from the roof, which were installed as part of physical modifications to BB3 that were completed between November, 2013 and February, 2014.  (SS 24.)  Prior to the installation of the metal roof and siding, tarps were used to cover the sidewall above the wood siding and roof.[4]  (SS 25.)

## IV.   SUMMARY JUDGMENT STANDARD.

Summary judgment must be rendered when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Federal Rules of Civil Procedure, Rule 56(c); *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir. 1978).  Further, if summary judgment is not granted on the entire action, a court may render partial summary judgment on individual issues as to which there remains no genuine issue of material fact.  Fed.R.Civ.Pro., Rule 56(b), (d).  The nonmoving party with the burden of proof "must establish each

---

[4] Before heaters were installed in BB3, a much smaller internal room was used for strip searches when the temperature inside BB3 fell below 68 degrees (and later, 70 degrees).  (SS 20.)  All searches at CRDF cannot be conducted in this internal search room because: 1) it is an inferior search space (since it is so small, when it is used, it prolongs the process and if there are too many inmates, some end up getting sent to housing without being searched (which threatens security)), and 2) the room suffers from very poor ventilation.  (*Id*.)  While the internal search room is still available for searches (and is used occasionally for that purpose), the installation of the heaters in BB3 has generally allowed a temperature of at least 70 degrees inside BB3, making the use of internal search room largely unnecessary.  (SS 26.)

8

element of his claim with significant probative evidence tending to support the complaint." *Barnett v. Centoni*, 31 F.3d 813, 815 (9th Cir. 1994).

## V.    THIS COURT'S SUMMARY JUDGMENT RULING IN *SOLIS v. BACA* IS HIGHLY RELEVANT TO THE ASSESSMENT OF THE VIABILITY OF PLAINTIFFS' CLASS-WIDE THEORY OF LIABILITY.

On August 23, 2012, this Court entered an order granting Defendants summary judgment in *Solis v. Baca*, Case No. CV 06-1135 SVW(CTx). *Solis* was a proposed class action in which the plaintiffs alleged that the constitutional rights of female inmates were violated by the group strip search procedures employed at the Twin Towers Correctional Facility ("TTCF") — the Los Angeles County jail facility at which female inmates were housed, prior to the employment of CRDF for their housing. The *Solis* plaintiffs' allegations largely paralleled the allegations made in the instant case due to the many similarities between the search procedures at TTCF and CRDF. In fact, at the time of summary judgment in *Solis*, the scope of the plaintiffs' constitutional claims was broader since they included allegations about unsanitary conditions and lack of privacy from outside observers.

Indeed, the group strip search procedures found to be constitutional in *Solis* were very similar to the CRDF strip search procedures previously summarized by this Court. (*Compare* Exhibit "N" at pp. 124:8-126:18 with Exhibit "O" p. 154-156:1-9:14.) The similarities found in *Solis* and the instant case make sense since the constitutionally valid strip search procedures were imported to CRDF and implemented for the BB3 group searches.

In *Solis*, this Court explained, "The gravamen of Plaintiffs' Fourth Amendment claim is that Defendants' practice of strip-searching inmates in *groups*, where the individuals being searched could be viewed by other inmates and jail personnel, was unconstitutional." (Exhibit "N" p. 127:10-13 (original emphasis).) In granting summary judgment, this Court closely examined the most relevant Ninth

9

Circuit case law, and noted that "every time the Ninth Circuit has confronted strip searches (including visual body cavity searches) conducted in a group setting, it has affirmed the reasonableness of the *group* nature of the search at issue." *Id.* at pp. 13:14-14:3 (citing *Michenfelder v. Sumner*, 860 F.2d 328 (9th Cir. 1988); *Thompson v. Souza*, 111 F.3d 694 (9th Cir. 1997); *Byrd v. Maricopa County Sheriff's Dep't*, 629 F.3d 1135 (9th Cir. 2011); *Lyons v. Bisbee*, 2010 U.S. Dist. LEXIS 6181 (D. Nev. Apr. 7, 2011), *approved and adopted by* 2011 U.S. Dist. LEXIS 61739 (D. Nev., June 9, 2011); *Foster v. Gentry*, 2011 U.S. Dist. LEXIS 154218 (D. Nev. Dec. 20, 2011), *approved and adopted by* 2012 U.S. Dist. LEXIS 37281 (D. Nev. Marc. 19, 2012).)

This Court's additional findings in granting summary judgment in *Solis* apply in the instant case as well:

• "The group aspect of the searches were justified by the safety, space, and logistical considerations discussed above." (*See*, Clark Decl., ¶ 2, Exhibit "N" at 134:25-27.)

• "In light of the substantial deference this Court must afford to prison officials, each of the factors enunciated in *Bell* supports the reasonableness of Defendants' policy of conducting group visual body cavity searches. Similarly, Defendants' strip-search policy undoubtedly is 'reasonably related to legitimate penological interests' under *Turner*." (*Id.* at 146:22-27.)

With the sanitation and outside privacy variables excluded from the constitutional equation, this Court's summary judgment ruling in *Solis* is that much more compelling. The penological interests served by the strip search procedures in both cases are identical. There has been no material changes in the controlling case law which governs constitutional claims of this nature. Accordingly, the instant Rule 23(c)(4) inquiry of class-wide liability based on the CRDF strip search procedure (limited to the common conditions) mandates the granting of summary judgment.

10

1 | **VI.**     <u>**THE CLASS-WIDE LIABILITY DETERMINATION MUST BE**</u>
2 |        <u>**BASED ON THE BINDING ANALYTICAL BLUEPRINT MANDATED**</u>
3 |        <u>**BY SUPREME COURT PRECEDENT.**</u>

The Ninth Circuit's *en banc* opinion in *Bull v. City and County of San Francisco*, 595 F.3d 964 (9th Cir. 2010) is a clear reminder of the analysis that controls claims against jail regulations. As in *Solis*, it is through this prism that Plaintiffs' group search claim must be scrutinized.

     **A.**     <u>**The Controlling Supreme Court Precedents Must Be Stringently**</u>
          <u>**Applied To Plaintiffs' Group Search Claim.**</u>

In *Bull*, the district court granted the plaintiffs' motion to certify a class—defined as all persons arrested on any charge not involving weapons, controlled substances, or charges of violence, and not involving a parole violation or probation violation (where consent to search is a condition of probation), and who were subjected to a blanket visual body cavity search before arraignment without any individualized reasonable suspicion that they were carrying contraband. *Id.* at 969.

On summary judgment, the plaintiffs launched a facial challenge to a "policy requiring the strip search of all arrestees [including those who have not yet been arraigned] who were to be introduced into San Francisco's general jail population for custodial housing." *Id.* at 966. These searches were conducted "in order to prevent the smuggling of contraband into the facilities" and were required to be performed "in a professional manner in an area of privacy so that the search cannot be observed by persons not participating in the search." *Id.* at 968, 969. The district court ruled that the policy of strip searching arrestees classified for general population housing violated the Fourth Amendment. The Sheriff was also denied qualified immunity. *Id.* at 969-70. On the ensuing interlocutory appeal, a divided panel affirmed the ruling, and rehearing *en banc* was granted. *Id.* at 969. The *en banc* Panel reversed, holding that the policy was in fact constitutional.

11

1    The Ninth Circuit began its analysis by recognizing that contraband in a jail

2  environment "'is all too common'" and that "'[a] detention facility is a unique place

3  fraught with serious security dangers.'"  *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520,

4  559 (1979)).  The Ninth Circuit also quoted from *Block v. Rutherford*, 468 U.S. 576,

5  588-89 (1984), where the Supreme Court stated it could "take judicial notice that the

6  unauthorized use of narcotics is a problem that plagues virtually every penal and

7  detention center in the country", including the Los Angeles County Jail.  *Bull*, 595

8  F.3d at 966.  Moreover, there was evidence of a contraband problem in San

9  Francisco's six county jail facilities, and that, obviously, "[t]he presence of such

10 contraband threatens the health and safety of inmates, corrections officers, and jail

11 employees."  *Id.* at 967.

12    In its in-depth discussion of the controlling analytical framework, the Ninth

13 Circuit explained:

14            "Because the purpose of the search policy at issue was to

15            further institutional security goals within a detention facility,

16            the principles articulated in *Bell v. Wolfish* … and *Turner v.*

17            *Safley* … **govern our analysis.**"

18 *Id.* at 971 (emphasis added; citations omitted).  The Ninth Circuit then discussed at

19 length and articulated the controlling principles of *Bell* and *Turner*.  *Id.* at 971-77.

20    In *Bell*, the plaintiffs challenged a strip search policy at a federally operated

21 short-term custodial facility in New York.  This facility housed convicted inmates,

22 pretrial detainees, persons jailed for contempt of court, and witnesses in protective

23 custody, and everyone was subject to a visual body cavity search after every contact

24 visit.  This search policy was "'designed to promote security and order at the facility

25 ….'"  *Id.* at 971 (quoting *Bell*, 441 U.S. at 544).  The Ninth Circuit highlighted how

26 the Supreme Court's analysis and holding were guided by several principles:

27    1)    that the retained constitutional rights of pretrial detainees and prisoners

28 are subject to restrictions and limitations based on "**institutional needs and**

12

1    **objectives**", and "[t]he fact of confinement as well as the legitimate goals and

2    policies of the penal institution **limits these retained constitutional rights**" (*Id.* at

3    972);

4            2)      "a central justification for this permissible restriction of constitutional

5    rights is a detention facility's need to accomplish the 'essential goals' of

6    'maintaining institutional security and preserving internal order and discipline'"

7    (*Id.*); and

8            3)      restrictions that infringe upon "'a specific constitutional guarantee'

9    must be 'evaluated in the light of the central objective of prison administration,

10   safeguarding institutional security'", and jail officials must be free to take such

11   appropriate measures.  *Id.*

12           The Ninth Circuit also summarized the Supreme Court's directions to "lower

13   courts to afford corrections officials '**wide-ranging deference** in the adoption and

14   execution of policies and practices that **in their judgment** are needed to preserve

15   internal order and discipline and to **maintain institutional security**.'"  *Id.* at 972

16   (quoting *Bell*, 441 U.S. at 547) (emphasis added).  In affording the jail officials in

17   *Bell* this high degree of deference, the Supreme Court found that the subject strip

18   search policy was designed to discover contraband and deter its smuggling, and

19   upheld the policy despite the absence of substantial evidence that contact visits were

20   sources of contraband.  Indeed, there was only one instance of contraband being

21   discovered during a strip search; nevertheless, attempts to smuggle contraband

22   secreted in body cavities were found to be "documented in this record and in other

23   cases".  *Bell*, 441 U.S. at 559.  Even though a less intrusive search policy could have

24   been employed, the Supreme Court deferred to jail officials and found that the

25   policy was neither irrational nor unreasonable.  *Id.* at 559 n. 40.

26           Not only did *Bell* guide the Ninth Circuit in *Bull*, so did the Supreme Court's

27   instructions in *Turner* for reviewing "a detention facility's restrictions of

28   constitutional rights that are inconsistent with incarceration"—specifically, whether

13

the subject restriction is "reasonably related to legitimate penological interests."
*Turner*, 482 U.S. at 89.  Under *Turner*, when the reasonableness of a strip search
policy is challenged:

> "we must consider the existence of a 'valid, rational connection
> between the prison regulation and the legitimate governmental
> interest put forward to justify it'; 'the **impact accommodation
> of the asserted constitutional right will have** on guards and
> other inmates, and on the **allocation of prison resources
> generally**'; and 'the existence of obvious, **easy alternatives**' as
> evidence that the regulation 'is an "exaggerated response" to
> prison concerns.'

*Bull*, 595 F.3d at 973 (quoting *Turner*, 482 U.S. at 89-91).  These factors require a
court "to give **more deference** to detention officials' determinations than does the
balancing test in *Bell* …."  *Id.* at 975 (emphasis added); *see also*, *Michenfelder v.
Sumner*, 860 F.2d 328, 331 (9th Cir. 1988) (explaining that *Turner* "emphatically set
forth the standard for reviewing alleged infringements of prisoners' constitutional
rights.").

The Ninth Court explained further that it was breaking "no new ground" in
applying *Bell* and *Turner* and the principles articulated therein to its evaluation of
San Francisco's strip search policy.  *Bull*, 595 F.3d at 974.  Similarly, these
principles—such as affording jail officials' decisions with broad deference and
determining whether the challenged regulation has a rational connection to a
legitimate penological interest—govern the group search claim in the instant case.

**B.**     **The Blanket Strip Search Policy Cases Underscore The Irrefutable
Nature Of The Penological Interests At Stake.**

In applying *Bell*, the Ninth Circuit explained that San Francisco's policy
"applied to arrestees introduced into the general jail population for custodial
housing," and therefore, "we are required to evaluate the plaintiffs' constitutional

14

claims, 'in light of the central objective of prison administration, safeguarding institutional security.'"  *Bull*, 595 F.3d at 975 (quoting *Bell*, 441 U.S. at 547).  The Ninth Circuit explained further that it may not substitute the judgment of jail officials with its own even if it disagreed with the actual judgment reached.  *Id.* at 975 (citing *Bell*, 441 U.S. at 554 and *Block*, 468 U.S. at 589).  Accordingly, the Ninth Circuit held that under the *Bell* factors, the "invasive and embarrassing" searches were reasonable and did not violate the Fourth Amendment.  *Id.* at 975.

The Ninth Circuit reached the same conclusion by applying the *Turner* factors.  The record had established the existence of a contraband problem in the San Francisco jail system, and that the strip searches help prevent the introduction of contraband that could endanger inmates and staff.  *Id.* at 976.  Accordingly, the Ninth Circuit held that there was a rational connection between the strip search policy and the legitimate penological interest "'put forward to justify it.'"  *Id.* (quoting *Turner*, 482 U.S. at 89).

Another key *Turner* factor that undermined the plaintiffs' challenge was the "concern for prison resources":

> "San Francisco produced undisputed evidence that the elimination of the strip search policy would 'lead to a higher incidence of illegal contraband in the jails,' and that implementation of more targeted policies 'requires supervisory and line staff training' that 'takes time away from other tasks and necessarily uses resources in scarce supply.'  **When the allocation of resources and the ability of administrators to protect staff and detainees at the facility are at issue**, 'courts should be **particularly deferential to the informed discretion of corrections officials**.'"

*Id.* at 976 (quoting *Turner*, 482 U.S. at 90) (emphasis added).

15

1    Thus, the "allocation of limited resources" factor also weighed against the

2    plaintiffs' constitutional claim, especially "given the deference we owe to jail

3    officials' professional judgment …." *Id.* at 977.  Ultimately, the Ninth Circuit's

4    "straightforward application of *Turner*" led to the conclusion that the strip search

5    policy was reasonably related to legitimate penological interests of "maintaining

6    security for inmates and employees by preventing contraband smuggling." *Id.* at

7    977.[5]

8    The holding in *Bull* was validated by the Supreme Court's holding in

9    *Florence v. Board of Chosen Freeholders of County of Burlington*, __ U.S. __, 132

10    S.Ct. 1510 (2012).  The Supreme Court followed the analytical construct of *Bell* and

11    *Turner*, in holding that a county jail's policy of subjecting all arrestees to visual

12    body cavity searches, prior to their entry into the general population, struck a

13    reasonable balance between inmate privacy and legitimate penological interests.

14    *See id.* at 1519 ("Detecting contraband concealed by new detainees, furthermore, is

15    a most serious responsibility.  Weapons, drugs, and alcohol all disrupt the safe

16    operation of a jail.").  The penological interests highlighted in *Florence* have equal

17    force in the instant case; the challenged group strip searches are rationally related to

18    legitimate penological interests, the operational response to which must be afforded

19    significant deference.

20

21

22    _____

23    [5] The Ninth Circuit's recognition of the controlling effect of *Bell* and *Turner* was

24    further underscored by its emphatic overruling of two earlier Ninth Circuit opinions—*Thompson v. City of Los Angeles*, 885 F.2d 1439 (9th Cir. 1989) (strip

25    searches of arrestees require individualized suspicion) and *Giles v. Ackerman*, 746

26    F.2d 614 (9th Cir. 1984) (holding that strip searches of arrestees heading to general population housing required individualized suspicion).  *Bull*, 595 F.3d at 977-81.  In

27    doing so, the Ninth Circuit declared that *Thompson* and *Giles* "failed to comply with

28    the Supreme Court's directions that we not substitute our judgment for that of corrections facility officials." *Id.* at 978.

16

VII.   **GROUP SEARCHES AT CRDF ARE JUSTIFIED BY LEGITIMATE PENOLOGICAL INTERESTS WHICH FAR OUTWEIGH THE LIMITED INFRINGEMENT OF PRIVACY INTERESTS.**

Group searches conducted at CRDF must be upheld when properly examined under controlling Supreme Court and Ninth Circuit precedent.  Adherence to the requirements of affording jail officials with substantial deference—especially with discretionary decisions regarding the allocation of limited resources—and upholding any steps taken to serve indisputably important security concerns, warrants the granting of summary judgment.

A.   **Penologically Justified Strip Searches Retain Their Constitutionality When They Are Conducted In Controlled Group Settings.**

Plaintiffs cannot dispute that contraband in the jail setting poses great dangers to inmates and jail staff, jeopardize institutional security, and disrupt operational functions.  They also cannot dispute that jail officials must be afforded broad discretion in their efforts to employ steps to reduce the effects of contraband. Courts are also precluded from substituting their judgment for the judgment of jail officials who have exercised their informed discretion in instituting such steps.  If such steps are rationally connected to a legitimate penological interest (in the instant case—the discovery of contraband and the corresponding deterrent effects)—they must be upheld, as were the blanket strip search policies in *Bell*, *Florence*, and *Bull*, and the group search procedure in *Solis*.

Here, the group searches were performed in a controlled and physically enclosed area, by jail staff of the same gender as the inmates being searched, in a reasonable manner designed to limit the infringement upon the inmates' privacy interests.  The inmates were required to look straight ahead throughout the entire process and instructed to fully unclothe only during the latter part of the procedure.

(SS 58-61.)  There are numerous legitimate reasons why these searches are performed in this fashion.  (SS 8, 14-16.)

These legitimate security and operational concerns, in and of themselves, warrant the granting of summary judgment under the *Bell-Turner-Bull* calculus— requiring judicial deference to jail officials' discretionary decisions regarding issues such as this.  The fact that the weight of these many legitimate penological interests is far greater than the limited encroachment upon privacy rights during the group searches, is further underscored by the limited nature of such privacy rights in the jail setting.

In *Bell*, the Supreme Court explained that although inmates retain certain constitutional rights, this "does not mean that these rights are not subject to restrictions and limitations."  *Bell*, 441 U.S. at 545.  Unquestionably, "[a] detainee simply does not possess the full range of freedoms of an unincarcerated individual." *Id.* at 546.  Consistent with this reality, and while not "underestimate[ing] the degree to which these searches may invade the personal privacy of inmates", the Supreme Court held that "[b]alancing the significant and legitimate security interests of the institution against the privacy interest of the inmates, we conclude that [strip searches can be conducted on less than probable cause]." *Id.* at 560.  In fact, the policy of strip searching every inmate after every contact visit was upheld.

The balancing of Plaintiffs' limited privacy interests against the legitimate penological interests at stake in the instant case warrants the same conclusion as in *Bell*.  The search conditions in the instant case were less invasive of privacy interests than those in *Michenfelder v. Sumner*, where an inmate argued that "strip searches [conducted in view of other inmates] should be conducted within the privacy of prisoners' cells rather than out in the hallway".  *Michenfelder*, 860 F.2d at 333.  The Ninth Circuit held it would "not question [the facility's] judgment that conditions in [the unit] reasonably require searches outside the prisoners' cells in order to protect the safety of the officers conducting them." *Id.* at 334.  The Ninth

18

Circuit also noted that the allocation of resources factor weighed against the plaintiff's claim since conducting searches inside the cells "would require additional officers" and "[r]emodeling the facility to prevent other inmates from observing the searches through their cell doors could also be costly." *Id.* The Ninth Circuit also rejected the plaintiff's claim that the strip searches are unconstitutional because female guards could occasionally view the searches of male inmates. Being viewed by female guards did not overcome the allocation of resources factor: "requiring them to be replaced by males for the duration of strip searches, would displace officers throughout the prison …." *Id.* at 334.

Indeed, Courts have consistently rejected claims brought by prisoners, challenging the constitutionality of strip searches conducted in group settings. For example, in *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (en banc), the plaintiffs in a putative class action challenged a blanket strip search policy applied to inmates entering and returning to the jail. The challenged strip searches were conducted in groups pursuant to the county jail policy of "'having the arrested person go into a large room with a group of up to thirty or forty other inmates, removal all of his clothing, and place the clothing in boxes'", and after a group shower, each inmate, "'either singly, or standing in a line with others, is visually inspected front and back by deputies.'" *Id.* at 1301. In upholding the strip search policy, the Eleventh Circuit explained that "[t]he **need for strip searches at all detention facilities, including county jails, is not exaggerated**. Employees, visitors, and (not least of all) the detained inmates themselves face a real threat of violence, and administrators must be concerned on a daily basis with the smuggling of contraband by inmates accused of misdemeanors as well as those of accused of felonies." *Id.* at 1310 (emphasis added). The Court further noted that they assumed that the group searches were not conducted in an abusive manner. *Id.* at 1314. Similarly, excluded from the instant Rule 23(c)(4) liability determination is any

alleged verbal abuse by deputies — which this Court has found was not a condition common to the proposed class.

In *Green v. Portillo*, 2015 WL 5092679 (D. Nev. Aug. 27, 2015), a state prisoner alleged that the warden had approved "of an unconstitutional policy of requiring inmates working at the Culinary to be strip searched in front of other inmates." *Id.* at *1. The purpose of the policy of subjecting all inmates entering and leaving the Culinary to strip searches was to "ensure items are not being brought into or out of the kitchen for safety and security reasons." *Id.* at *3. There were approximately 30 inmates per shift, and three shifts per day. *Id.* The Court recognized that the search policy was governed by *Bell* and *Turner*, presumed that the strip searches were invasive, and noted that "the searches apparently are conducted in a group of approximately 30 inmates" which "add to this invasiveness." *Id.* at *4. In granting summary judgment, the Court held that the searches were constitutional because the policy was "reasonably related to legitimate penological interests", and there was a "valid, rational connection between those interests and the policy." *Id.* at *5.

The Court further explained that the plaintiff had failed to dispute the security interests served by the search policy, and also did not refute that staffing was insufficient to conduct individual searches. *Id. See also*, *Gipson v. Wilkinson*, 2015 WL 4395031, *7 (W.D. La. July 16, 2015) (strip searches of inmates in groups of ten served legitimate penological interests); *Wagner v. Thomas*, 608 F.Supp. 1095, 1103-04 (D.C. Tex. 1985) ("[a] plaintiff's claim that he should not have been searched in the presence of other inmates or deputies is also baseless"); *Fernandez v. Rapone*, 926 F.Supp. 255, 261-62 (D. Mass. 1996) (because "[a]person's expectation of privacy is unquestionably diminished when he is incarcerated[,]" strip searches "in the presence of other inmates being searched does not render the searches unreasonable"); *Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir. 1992) (following the Ninth and Eighth Circuit's position in upholding the constitutionality

20

1  of strip searches in which deputies of the opposite sex and other inmates are

2  present).[6]

3      **B.**     **The Group Searches Satisfy The Controlling Constitutional**

4             **Threshold Under *Turner* and *Bell*.**

5          In accordance with the *Bell-Turner* analysis, Defendants have submitted

6  ample evidence of facts relevant to the determination of whether group searches are

7  rationally connected to important penological interests.  (SS 8 - 16.)  These facts

8  directly addressed many material issues, including: (1) the significance of the

9  contraband problem; (2) the vital security interests served by searches for

10 contraband; (3) the size of the inmate population; (4) the scope of the County Jail's

11 daily operations; (5) the need to timely and safely manage the constant flow of

12 inmates to and from various outside locations; (6) the drain on resources that would

13 result from abandoning group searches; (7) the reasons why group searches were

14 necessary; and (8) the safety concerns raised by the use of partitions during group

15 searches.  (*Id*.)

16         The net effect of the undisputed material facts is unambiguous and

17 compelling—that group strip searches serve a vital function in the un-ending fight

18 against the introduction of contraband into the vast jail system.  Performing these

19 searches in groups also serves extremely important logistical interests, such as

20 transporting inmates to and from court in a timely manner, and allowing for a cost-

21 effective allocation of jail personnel and resources, which in turn promotes the

22 overall operational efficiency and security throughout the jail system.  Under *Bell*,

23 *Turner*, and *Bull*, Plaintiffs' claim cannot override the effect of this body of

24 undisputed facts and controlling case law.  Simply put, Plaintiffs' claim fails

25

26 _____

27 [6] In granting summary judgment in *Solis*, this Court cited to *Powell*, *Fernandez*, and

28 *Wagner*, in explaining that "[c]ourts in other circuits have similarly upheld the
   constitutionality of strip searches (including visual body cavity searches) conducted

                                      21

because the group searches inside BB3 at CRDF are constitutional, just as is the policy of searching all inmates entering the general population.

Thus, granting summary judgment as to the Rule 23(c)(4) liability class is entirely consistent with numerous other cases where courts have found group strip searches to be constitutional as a matter of law.   Here, the group searches indisputably serve many institutional security interests that simply could not be ignored, and the searches were performed in a manner that were reasonably mindful of inmates' privacy interests.  The fact that the group searches are conducted in BB3 does not materially affect this constitutional equation.  As the Court has already found, BB3 is used only when the temperature is at least 68 degrees.  The searches, therefore, are constitutional under the analysis mandated by *Bell* and *Turner*.

## VIII.  <u>THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.</u>

At the August 31, 2015 status conference, the Court did not specifically indicate whether the instant motion should also incorporate arguments regarding the individual Defendants' entitlement to qualified immunity.  However, since the constitutional viability of Plaintiffs' group search claim is an issue which is related to the qualified immunity argument, it is raised herein.

A determination that a defendant is entitled to qualified immunity involves a two part analysis. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Pearson*, 555 U.S. at 232.  A public employee is entitled to qualified immunity if the defendant did not violate the plaintiff's constitutional rights.  *Pearson*, 555 U.S. at 232.  Even assuming evidence of a constitutional violation is presented, the public employee is still entitled to qualified immunity if the constitutional right at issue was not "clearly established".  *Id*.  These steps are not cumulative; a defendant is entitled to qualified immunity if either test is satisfied.  *Id*. at 237.  The plaintiff bears the

in a **group setting**."  (*See*, Clark Decl., ¶2, Exhibit "N" at 130:4-19, emphasis added.)

burden of showing that the right allegedly violated was clearly established at the time of the alleged misconduct. *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). Moreover, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

The Supreme Court has repeatedly held that an officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that **existing precedent placed the statutory or constitutional question beyond debate.**" *City & Cnty. of San Francisco v. Sheehan*, __, U.S. __, 135 S.Ct. 1765, 1774 (2015) (emphasis added). The Supreme Court has also emphasized that the facts specific to each case are determinative and that the "clearly established law" as to the right in question must not be defined "at a high level of generality." *Id.* at 1775-76.

Here, the individual Defendants are entitled to qualified immunity since the challenged group searches are constitutional as a matter of law. Moreover, at the very least, the most applicable case law demonstrates that the alleged unconstitutionality of the group searches has been anything but "beyond debate" at any time during the proposed class period. Finally, Defendants Cornell, Clark, Cooper, and Cruz have never been assigned to CRDF, nor have they ever occupied a supervisory position in which they could have been responsible for CRDF operations. On this additional ground, these Defendants should be granted qualified immunity. (SS 77.)

## IX.   THE CERTIFICATION OF A WEATHER SUBCLASS DOES NOT MEANINGFULLY AFFECT THE INSTANT RULE 23(c)(4) ANALYSIS.

In addition to distinguishing between conditions which were common and uncommon to the proposed class, the Court also certified a "weather" subclass.

23

1    (Dkt No. 262.)  The certification of this subclass does not meaningfully affect the

2    Rule 23(c)(4) analysis since Plaintiffs cannot dispute that LASD policy and practice

3    have been that BB3 is not used for group strip searches when the temperature falls

4    below 68 degrees, and later, 70 degrees.  (SS 20.)  In fact, the Court has already

5    found that the group searches are conducted inside BB3 "at least when the

6    temperature in the area is above 68 degrees" — i.e., that the group searches are

7    conducted in BB3 when the temperature is above 68 degrees is one of the conditions

8    found to be common the proposed class.  (Dkt No. 232 at 7:3-4.)

9            Unquestionably, searches conducted in BB3 at or above 68 degrees does not

10   support Plaintiffs' claim of unconstitutionality; cases with allegations of strip

11   searches under significantly harsher weather conditions have been found to be

12   constitutional.  *See*, *Tyler v. Watson*, 2009 WL 4110304 (W.D. Va. Nov. 25, 2009)

13   (summary judgment granted where the plaintiff alleged that he had been subjected to

14   a five-minute long strip search outside while it was 30 degrees since no objectively

15   serious injury was alleged); *Malo v. Hernandez*, 2014 WL 7246730, *4 (C.D. Cal.

16   Dec. 18, 2014) (a prisoner's Eighth Amendment claim dismissed where he alleged

17   that he was forced to be naked outdoors for five minutes, during which time he

18   shivered violently from the cold, and where he did not allege any prolonged adverse

19   consequences).[7]

20

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   _____

28   [7] Similarly, Plaintiffs do not allege any physical injuries from the challenged group
     searches inside BB3.

24

1

## X.    CONCLUSION.

For the foregoing reasons, Defendants respectfully submit that the Court grant summary judgment as to the Rule 23(c)(4) issue class which was certified for purposes of liability only, subject to the conditions common to challenged group searches at CRDF.

Dated:  December 21, 2015          LAWRENCE BEACH ALLEN & CHOI, PC


By _____ /s/ Justin W. Clark _____
            Paul B. Beach
            Justin W. Clark
            Attorneys for Defendants
            County of Los Angeles,
            Los Angeles County Sheriff's
            Department, Sheriff Leroy D. Baca,
            Captain John H. Clark, Timothy
            Cornell, Dennis Burns, Gerald K.
            Cooper, Daniel Cruz, and Stacy L. Lee