Barrett S. Litt, SBN 45527
blitt@kmbllaw.com
Lindsay B. Battles, SBN 262862
Kaye, McLane, Bednarski & Litt, LLP
234 Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Robert Mann, SBN 48293
Donald W. Cook, SBN 116666
E-Mail: manncook@earthlink.net
Attorneys at Law
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Cynthia Anderson-Barker, SBN 175764
E-Mail: cablaw@hotmail.com
Law Offices Of Cynthia Anderson-Barker
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY AMADOR et al., individually and as class representatives<br><br>               Plaintiffs,<br><br>  vs.<br><br>SHERIFF LEROY D. BACA, individually and in his official capacity, et al,<br><br>               Defendants. | Case No. CV 10-1649 SVW (RC)<br>[Hon. Stephen V. Wilson]<br><br>OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; FILED CONCURRENTLY WITH PLAINTIIFFS' RESPONSE TO UNDISPUTED FACTS AND AND ADDITIONAL MATERIAL FACTS; DECLARATIONS; EXHIBITS<br><br>Date:          April 18, 2016<br>Time:         1:30 P.M.<br>Courtroom:    6 |

# TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................1

II.    LASD'S SEARCH PROCEDURES ..................................................4

  A.  CRDF SUBJECTED FEMALE INMATES TO EXTRAORDINARILY INVASIVE SEARCH PROCEDURES, IN LARGE GROUPS. ....................................................5

    1.  LASD Searched Female Inmates in Exceptionally Large Groups ........5

    2.  The Strip Searches Used Highly Invasive Procedures ........................6

  B.  THE SEARCH CONDITIONS WERE ENVIRONMENTALLY EXTREME .....................10

    1.  Until 2014, Most Searches Occurred In An Outdoor Garage Space Exposed To Insects, Bird Droppings, And Bird Feathers............................10

    2.  Many Searches Occurred In Very Cold Conditions. .........................11

III.   LEGAL STANDARD ..........................................................13

  A.  FEDERAL COURTS CONSIDER SCOPE, MANNER, LOCATION AND JUSTIFICATION IN ASSESSING THE REASONABLENESS OF SEARCHES. ..................................13

  B.  CORRECTIONAL POLICIES ARE NOT REASONABLE WHERE OBVIOUS, EASY, READILY AVAILABLE, EFFECTIVE ALTERNATIVES EXIST. ............................15

  C.  SPECIAL CHARACTERISTICS OF THE SEX OR AGE OF THE POPULATION TO BE SEARCHED ARE HIGHLY RELEVANT ....................................................15

IV.   LASD'S SEARCH PRACTICES VIOLATED THE FOURTH AMENDMENT. .................................................................18

  A.  LASD SUBJECTED FEMALE INMATES TO HIGHLY INVASIVE VISUAL BODY CAVITY SEARCHES IN VIEW OF OTHERS. .............................................18

  B.  CRDF CONDUCTED LARGE GROUP, PUBLIC SEARCHES .........................21

  C.  CRDF'S SEARCH PROCEDURES CARRIED A HIGH RISK OF PSYCHOLOGICAL TRAUMA FOR FEMALE INMATES ....................................................24

  D.  THE USE OF IN AN OUTDOOR BUS GARAGE EXPOSED TO ELEMENTS AND INSECTS ADDED TO THE OUTRAGEOUSNESS OF THE PROCESS. .....................27

  E.  THE EXTREME COLD CONDITIONS ALONE RENDER THE SEARCHES UNCONSTITIONAL. ................................................................27

  F.  LASD'S SEARCH PROCEDURES WERE UNNECESSARY AND UNSUPPORTED BY ANY VALID PENOLOGICAL JUSTIFICATION ..............................................29

    1.  LASD's Search Practices Are An Extreme Departure From The Practices Of

i

*Other Women's Jails And Prisons.* ...................................................29

2. *LASD's Invasive Searches Without Privacy Lack Penological Justification; There Were Always Feasible Alternatives.* ...................................................31

3. *There Was No Penological Justification to Expose Inmates to Significant Cold Discomfort During Searches* ...................................................34

G. THE TOTALITY OF THE CIRCUMSTANCES ESTABLISHES THAT THE SEARCH PROCEDURES VIOLATED THE FOURTH AMENDMENT. ...................................................34

H. DEFENDANTS' CASES ARE INAPPOSITE. ...................................................35

I. THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY...36

VI. CONCLUSION ...................................................37

ii

# TABLE OF AUTHORITIES

## Federal Cases

*Anderson v. Cornejo*
  199 F.R.D. 228 (N.D.Ill.2000) ....................................................... 32

*Avilez v. Pinkerton Gov't Servs.*
  286 F.R.D. 450 (C.D. Cal. 2012) .................................................... 31

*Barnes v. Dist. of Columbia*
  278 F.R.D. 14 (D.D.C. 2011) .................................................... 37, 38

*Behrend v. Comcast Corp.*
  655 F.3d 182 (3d Cir. 2011) .......................................................... 35

*Blackie v. Barrack*
  524 F.2d 891(9th Cir. 1975), .......................................................... 20

*Blake v. City of Los Angeles*
  595 F.2d 1367 (9th Cir. 1979) ........................................................ 20

*Blihovde v. St. Croix Cnty., Wis.*
  219 F.R.D. 607 (W.D. Wis. 2003) ............................................. 32, 34

*Brandon v. Allen*
  719 F.2d 151 (6th Cir. 1983) .......................................................... 37

*Brown v. City of Detroit*
  2012 WL 4470433 (E.D. Mich. Sept. 27, 2012) ......................... 29, 32

*Bullock v. Sheahan*
  568 F.Supp.2d 965 (N.D.Ill. 2008) ................................................. 21

*Butler v. Suffolk County,*
  2013 WL 1136547 (E.D.N.Y. Mar. 19, 2013) ............................... 28

*Califano v. Yamasaki*
  442 U.S. 682 (1979) ......................................................................... 31

*Calvin v. Sheriff of Will County*
  2004 WL 1125922 (N.D.Ill. May 17, 2004) ............................. 29, 34

iii

*Carey v. Piphus*
    435 U.S. 247, 98 S.Ct. 1042 (1978) .......................................................................36
*Carnegie v. Household Int'l , Inc.*
    376 F.3d 656 (7th Cir.2004).................................................................................38
*Carson Harbor Village, Ltd. v. Unocal Corp.*
    270 F3d 863 (9th Cir. 2001)..................................................................................31
*Chang v. U.S.*
    217 F.R.D. 262 (D.D.C. 2003) .............................................................................34
*Chief Goes Out v. Missoula County*
    2013 WL 139938 (D. Mont. Jan. 10, 2013) ........................................................28
*Comcast v. Behrend*
    569 U.S. __ , 133 S.Ct. 1426 (3/27/2013)......................................................34, 35
*Craft v. County of San Bernardino*
    No. EDCV 05-00359 SGL (OPx) .........................................................................21
*Crown, Cork, & Seal Co. v. Parker*
    462 US 345 (1983) ...............................................................................................20
*Cummings v. Connell*
    316 F.3d 886 (9th Cir. 2003)................................................................................20
*D.D. v. Washington County, Ohio*
    2011 WL 830761 (S.D. Ohio Mar. 3, 2011) ..................................................29, 32
*Dellums v Powell*
    566 F.2d 167 (D.C. Cir. 1977) .............................................................................38
*Doe v. Calumet City, Illinois*
    754 F.Supp. 1211 (N.D.Ill. 1990) .......................................................................33
*Dukes v. Wal-Mart Stores, Inc.*
    2012 WL 4329009 (N.D. Cal. Sept. 21, 2012) ....................................................26
*Dunn v. City of Chicago*
    231 F.R.D. 367 (N.D.Ill.2005) ............................................................................29

iv

*East Texas Motor Freight, Inc. v. Rodriguez*
  431 U.S. 395 (1977) ...................................................................................20
*Ellis v. Costco Wholesale Corp.*
  285 F.R.D. 492 (N.D. Cal. 2012) ...............................................................26
*Ford v. City of Boston*
  154 F.Supp.2d 131 (D.Mass. 2001) ............................................................21
*Gary v. Sheahan*
  1998 WL 547116 (N.D.Ill. 1998)................................................................21
*Gay v. Waiters' & Dairy Lunchmen's Union*
  549 F.2d 1330 (9th Cir.1997).....................................................................22
*General Telephone Co. of Southwest v. Falcon*
  457 U.S. 147 (1982) ...................................................................................20
*Guido v. L'Oreal, USA, Inc.*
  2012 WL 1616912 (C.D.Cal. May 7, 2012)...............................................26
*Hanon v. Dataproducts Corp.*
  976 F. 2d 497 (9th Cir. 1992).........................................................22, 24, 25, 32
*Hessel v. O'Hearn*
  977 F.2d 299 (7th Cir. 1992) ......................................................................37
*Hilao v. Estate of Marcos*
  103 F.3d 767 ..............................................................................................36
*Hurley v. Ward,*
  1979 U.S. Dist. LEXIS 8630 (S.D.N.Y. 1979) .........................................32
In re Live Concert Antitrust Litig.
  247 F.R.D. 98 (C.D. Cal. 2007) .................................................................35
*In re Motor Fuel Temperature Sales Practices Litig.*
  2013 WL 1397125 (D. Kan. Apr. 5, 2013) ................................................36
*In re Nassau County Strip Search Cases*
  2008 WL 850268 (E.D.N.Y. Mar. 27, 2008) .............................................37

*In re Nassau County Strip Search Cases*

  461 F.3d 219 (2nd Cir. 2006) .................................................................21, 34

*In re Visa Check/MasterMoney Antitrust Litigation*

  280 F.3d 124 (2d Cir. 2001) ..............................................................................34

*In Re: Northern Dist. Of Cal Dalkon Shield*

  Etc., 693 F. 2nd 847 (9th Cir. 1982) ...............................................................23

*International Brotherhood of Teamsters v. United States*

  431 U.S. 324 (1977) ..........................................................................................34

*International Molders' and Allied Workers' Local Union No. 164 v. Nelson*

  102 F.R.D. 457 (N.D. Cal. 1983) .....................................................................22

*Jaegel v. County of Alameda*

  2010 WL 334862 (N.D. Cal. 2010) ..................................................................21

*Johnson v. District of Columbia*

  248 F.R.D. 46 (D.D.C. 2008) ............................................................................21

*Johnson v. District of Columbia*

  461 F.Supp.2d 48 (D.D.C. 2006) ......................................................................21

*Jones v. Murphy*

  547 F.Supp.2d 787 (D. Md. 2008) ....................................................................21

*Jordan v. Los Angeles County*

  669 F.2d 1311 (9th Cir. 1982)...........................................................................22

*Kelsey v. County of Schoharie*

  2007 WL 603406 (N.D.N.Y. 2007) ..................................................................21

*Kerman v. City of New York*

  374 F.3d 93 (2d Cir. 2004) ...............................................................................37

*Kingsbury v. U.S. Greenfiber, LLC*

  2012 WL 2775022 (C.D. Cal. June 29, 2012) .................................................26

*Kohatsu v. United States*

  351 F.2d 898 (9th Cir. 1965).............................................................................31

vi

*Lerwill Inflight Motion Pictures, Inc.*
   582 F. 2d 507 (9th Cir. 1978) ..........................................................................23

*Levya v. Medline Industries*
   No. 11-56849 (9th Cir. 5/28/13)......................................................................35

*Leyva v. Buley*
   125 F.R.D. 512 (E.D.Wash.1989) ...................................................................22

*Logory v. County of Susquehanna*
   277 F.R.D. 135 (M.D. Pa. 2011) .....................................................................27

*Mack v. Suffolk County*
   191 F.R.D. 16 (D.Mass. 2000) ........................................................................33

*MacNamara v. City of New York*
   275 F.R.D. 125 (S.D.N.Y. 2011)......................................................................29

*Martins v. 3PD, Inc.*
   2013 WL 1320454 (D. Mass. Mar. 28, 2013) .................................................36

*Mary Beth G. v. City of Chicago*
   723 F.2d 1263 (7th Cir. 1983) .........................................................................21

*McCarthy v. Kleindienst*
   741 F.2d 1406 (D.C.Cir. 1984) .......................................................................34

*Memphis Cmty. Sch. Dist. v. Stachura*
   477 U.S. 299, 106 S. Ct. 2537 (1986) ........................................................36, 37

*Miri v. Dillon*
   2013 WL 2034310 (E.D. Mich. May 14, 2013)...............................................36

*Moyle v. County of Contra Costa*
   2007 WL 4287315 (N.D. Cal. 2007).................................................................21

*Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles*
   246 F.R.D. 621 (C.D.Cal. 2007) .....................................................................22

*Newton v. Merrill Lynch, Pierce, Fenner and Smith, Inc.*
   259 F.3d 154 (3d Cir.2001) .............................................................................35

*O'Connor v. Boeing N. Am., Inc.*
    184 F.R.D. 311 (C.D. Cal. 1998) .......................................................... 33
*Ortega v. J.B. Hunt Transp., Inc.*
    258 F.R.D. 361 (C.D.Cal.2009) ............................................................ 32
*Orvis v. Spokane County*
    281 F.R.D. 469 (E.D. Wash. 2012) ...................................................... 28
*Owner-Operator Independent Drivers Ass'n, Inc. v. Allied Van Lines, Inc.*
    231 F.R.D. 280 (N.D.Ill. 2005) ............................................................ 39
*Parish v. Sheriff of Cook County*
    2008 WL 4812875 (N.D.Ill. Oct.24, 2008) .......................................... 29
*Phillips Petroleum Co v. Shutts*
    472 U.S. 797 (1985) .............................................................................. 20
*Powers v. Hamilton Cnty. Pub. Defender Comm'n*
    501 F.3d 592 (6th Cir.2007) ................................................................. 30
*Probe v. State Teachers' Retirement System*
    780 F.2d 776 (9th Cir. 1986) ................................................................ 24
*Rahim v. Sheahan*
    2001 WL 1263493 (N.D.Ill. Oct.19, 2001) .......................................... 29
*Rossini v. Olgivy & Mather*
    798 F.2d 590 (2d Cir. 1986) ................................................................. 32
*Schilling v. TransCor Am., LLC*,
    2012 WL 2792688 (N.D. Cal. July 9, 2012) ........................................ 27
*Smith v. Dearborn County, Ind.*
    244 F.R.D. 512 (S.D. Ind. 2007) .......................................................... 21
*Solis v. Baca*
    No. CV06-1135 SVW (CTx) ................................................................. 19
*Spalding v. City of Oakland*
    2012 Wl 994644 (N.D. Cal. Mar. 23, 2012) ........................................ 28

*Stanton v. Boeing*
    327 F.3d 938 (9th Cir. 2003) ...................................................23

*Sterling v. Velsicol*
    855 F.2d 1188 (6th Cir. 1988) .................................................34

*Tait v. BSH Home Appliances Corp.*
    SA CV 10-0711 DOC, 2012 WL 6699247 (C.D. Cal. Dec. 20, 2012)...........25

*Tyler v. Suffolk County*
    253 F.R.D. 8 (D. Mass. 2008) .................................................28

*United States v. Cray*
    450 F. App'x 923 (11th Cir. 2012) ...........................................31

*United States v. Eldridge*
    107 F. App'x 36 (9th Cir. 2004) .............................................31

*Valentino v. Carter- Wallace, Inc.*
    97 F.3d 1227 (9th Cir. 1996) ................................................34

*Villanueva v. George*
    659 F.2d 851 (8th Cir. 1981) ................................................37

*Vodak v. City of Chicago*
    2006 WL 1037151 (N.D.Ill. Apr.17, 2006) ....................................29

*Waine-Golston v. Time Warner Entm't-Advance/New House P'ship*
    2012 WL 6591610 (S.D. Cal. Dec. 18, 2012)...................................25

*Wallace v. Powell*
    2013 WL 2042369 (M.D. Pa. May 14, 2013) ....................................36

*Wal-Mart Stores, Inc. v. Dukes*
    __ U.S. __,131 S. Ct. 2541, 180 L. Ed. 2d 374 (2011) ..................24, 25, 26

*Walters v. Reno*
    145 F.3d 1032 (9th Cir.1998)................................................24, 32

*Wilson v. County of Gloucester*
    256 F.R.D. 479 (D. N.J. 2009) ..............................................21

*Yokoyama v. Midland Nat'l Life Ins. Co.*

   594 F.3d 1087 (9th Cir. 2010) ...................................................................................36

*Young v. County of Cook*

   2007 WL 1238920 (N.D.Ill. Apr.25, 2007) ................................................................29

*Young v. County of Cook*

   598 F.Supp.2d 854, 2009 WL 436114 (N.D.Ill. 2009) ................................................21

*Young v. County of Cook*

   616 F.Supp.2d 834 ...........................................................................................passim

# Constitutional Provisions

FRCP 23(a) .............................................................................................................. 21, 24

FRE 1006 .....................................................................................................................31

Rule 23 ...................................................................................................................33, 34

Rule 23 (b)(2) .......................................................................................................1, 19, 24

Rule 23(a)(4) ...............................................................................................................23

Rule 23(b)(2) and (b)(3) .................................................................................................21

Rule 23(b)(3) .........................................................................................................passim

Rule 23(c) (1) ...............................................................................................................20

Rule 23(c)(4) ...............................................................................................................34

Rule 23(c)(4)(A) ...........................................................................................................34

Rule 23(g) ...................................................................................................................23

# Treatises

7A Wright & Miller, §1778 ........................................................................................33, 34

7A Wright, Miller & Kane, Federal Practice & Procedure §1775 (3d ed.).......................24

Newberg §7.17 .............................................................................................................20

Newberg, §25:20 ...........................................................................................................24

x

## I.      INTRODUCTION

This lawsuit does not challenge whether LASD was entitled to strip search inmates entering (or returning to) the general population at LASD. Nor does challenge as such whether LASD was entitled to conduct strip searches in groups. Notwithstanding Defendants' characterization, this is not a generic case challenging group searches per se and regardless of gender (which was Plaintiffs' challenge in *Solis v. County of Los Angles*, Case No. CV 06-1135 SVW (CTx)). Although the *Solis* plaintiffs were women, they did not contend that their gender was a significant factor in the constitutional analysis. Rather, *Solis* contended that group searches, whether of men or women, were per se unconstitutional.

In this unique case, Plaintiffs challenge the totality of LASD's strip search practices, which involved (a) subjecting *female* inmates to extraordinarily invasive and unnecessary search techniques, not used by other jails, without privacy, and for which there were readily available alternatives; and (b) searching *female* inmates in an outdoor bus garage that was, by even LASD's account, infested with birds and insects, and where inmates were more often than not exposed to unacceptably cold temperatures, while bare foot and dressed only in underpants. The fact and size of the groups is only one factor in this analysis. Paramount to the instant challenge, which Defendants completely ignore, is the gender-specific nature of many of the core practices at issue (e.g.. the handling of the search process and menstruating women and search techniques requiring women to digitally spread their labia) and the devestating effect of these barbaric practices on female inmates specifically.

At the outset, it is critical to understand that CRDF's visual body cavity searches were invasive to the extreme. In the view of other inmates, and with no privacy, female inmates were required to disrobe completely, present their breasts and pubic area for inspection, remove tampons or pads so that deputies could thoroughly inspect their vaginal opening, and then bend over and physically spread their labia with their fingers to expose their vaginal cavity. Leaving aside the issue

1

of privacy, these practices represent a substantial departure from those at most jail and facilities for women. It is not standard to require physical manipulate of the labia. Instead, most jails use the less intrusive squat-and-cough procedure that is more than sufficient for searches of inmates entering general population. Most jails do not employ the labia-lift procedure unlees there is reason to believe that a more intrusive search is individually warranted. Similarly, no other jail of which Plaintiffs' correctional expert is aware requires menstruating women to submit to visual body cavity inspections in the view of other inmates.

Moreover, and regardless of what technique is used to accomplish the visual body cavity inspection, normal and accepted practice for all strip searches of female inmates (who generally comprise only approximately (10-15% of most jails' total population) is to provide individual privacy in the form of privacy curtains, partitions or rooms. CRDF is unique in that it not only failed to provide privacy, but also routinely conducted searches in large groups of 20, and frequently 40 or more, utilizing highly invasive, unnecessary methods.

U.S. jails uniformly provide individual privacy to *female* inmates for several reasons. The correctional community recognizes that privacy violations – including strip searches – are particularly traumatizing to women, in part, because a disproportionately high percentage of women have histories of sexual abuse that leave them susceptible to re-traumatization during strip searches. As recognized by LASD, approximately 70% of CRDF's all-female population has experienced physical or sexual abuse. U.S. jails also provide privacy based on the recognition that menstruation carries special privacy and hygiene concerns. Remarkably, LASD provided no consideration for the special privacy needs of menstruating women, which comprise approximately 12% of the female jail population on any given day. Rather, LASD required menstruating women to remove soiled tampons or pads in the view of large groups before submitting to a visual body cavity inspection. Inmates commonly bled on themselves and the ground during this

process. Defendants never even address that this is a female population, and present no evidence on the special characteristics of women inmates. Plaintiffs have presented expert declarations from four highly qualified experts who explain why the challenged practices have a devastating impact on women.

There was no valid penological justification for CRDF's practices. Though LASD contends otherwise, there was no need to subject female inmates to invasive searches, without privacy, in large groups.  LASD's 30(b)(6) witness (Cmdr. Maria Gutierrez) acknowledged that LASD could have installed privacy curtains earlier. They were **always** (not just after scanners were installed) a readily available option.  She agreed that the privacy curtains installed in 2015 did not undermine security and could have been installed years ago. She also testified that CRDF's practice of conducting searches in groups of 40 inmates (or larger) *undermined* institutional security because staff could not ensure effective contraband interception using such large groups. The practices of other large female jails further establish the feasibility of providing individual privacy. Other large women's jails – including New York (Riker's Island), Chicago (Cook County jail) and Philadelphia – have long managed to conduct searches of female inmates using private rooms and/or privacy partitions. Cook County manages one of the largest jails in the United Statesand is a relevant comparator. LASD in fact looks to Cook County for best practices in women's jails.Thus LASD testimony establishes that privacy curtains were always a readily available option.

Evidence adduced in this case similarly establishes that it was not necessary to conduct searches in a partially enclosed bus garage (Bus Bay #3 or BB3) where inmates were exposed to unacceptable and unreasonably cold temperatures, wind, insects and bird droppings and feathers. The majority of the searches were outside, and the majority of those occurred in unreasonably cold condition; a third or more of the searches were in weather that can only be described as extremely cold. In 2014, LASD enclosed BB3 and installed a roof and heaters for less than $50,000.

This "easy" project, according to LASD's Facilities Services Director, could have been undertaken at any time. The outside searches in the cold alone violated the Constitution regardless of all the other challenged aspects of the searches.

Plaintiffs contend that the totality of the search practices (including the menstruation issues, the genital manipulation, complete absence of privacy (full exposure and searches of genitals, lifting of breasts and stomach) when there were readily available alternatives, the exceptionally large group sizes, the inevitability that women would touch each other, searches outside (including ants, birds and bird droppings and weather), the lack of hygiene (property on floor, hands in mouth and vagina without sanitization), and the psychological vulnerability of women inmates) was unconstitutional at least until the enclosure of Bus Bay #3 and installation of heaters. Plaintiffs further contend that the cold conditions, separately and in combination with the foregoing, were unconstitutional, and that the search practices even after 2014 renovations  continued to be outrageously and unnecessarily invasive in violation of Plaintiffs' constitutional rights until at least the installation of body scanners as a substitute for strip searches. (Because the Court ruled that deputy abuse was not a class-wide issue, we do not address it except to note that Plaintiffs continue to contend otherwise, and that it should be an additional significant factor in the totality of the circumstances analysis,)

## II.   LASD'S SEARCH PROCEDURES

In the following factual summary, we highlight some of the critical facts in the case. We elaborate on many of these these issues in the legal discussion (e.g., the ready availability of privacy curtainsin durig the whole class period and the special privacy considerations for female inmates).

A.   **CRDF SUBJECTED FEMALE INMATES TO EXTRAORDINARILY INVASIVE SEARCH PROCEDURES, IN LARGE GROUPS.**

*1.  LASD Searched Female Inmates in Exceptionally Large Groups*

Before initiating a body scanner pilot project in late-2014, CRDF's strip/ visual body cavity searched all post-arraignment new bookings and post-court and off-site medical appointment returning inmates ("returnees"). AMF 1.[1] LASD grossly minimizes the size of the search groups. Until July 2013, LASD had no rule limiting group sizes. AMF 15. In 2010, LASD's Rule 30(b)(6) witness testified that the average group size was approximately 25 - **40** inmates. AMFs 16,17.

Groups of 40 were very common, and inmates were sometimes searched in even larger groups. In February 2011, CRDF began recording search group size in Electronic Daily Activity Logs ("EUDAL Logs" or "activity logs"). They demonstrate that CRDF groups reached as large as 70 inmates on one occasion, and confirm witness testimony estimating group sizes between  20 – 60. Prior to April 2013, 96% of court returns were searched in groups of 10 or more; 79% in groups of 20 or more; 64% in groups of 25 or more; and 34% in groups of 40 or more. Before April 2013, searches of 25 or more inmates occurred on 97% of weekdays; searches of 40 or more occurred on 78% of weekdays. Nearly half (47.5%) of all group searches were in groups of 25 or more, which LASD Cmdr. Gutierrez testified was too high to safe or productive. AMF 23. Hundreds of inmates were searched in groups of 50 or more, which were not uncommon (generaly at least several times per month). AMFs. 18-23.

In April 2013, CRDF painted 24 numbered squares in the Bus Bay. D's SSUF, No.45. In July 2013, it formally limited group size to 24 (although not all

---

[1] Daily activity logs establish that the facility searched an average of 198 inmates each weekday. AMF 6. The highest volume of inmates entering the facility occurred Monday through Friday, during the late-afternoon and evening hours (2:00 – 10:00 p.m.). AMF 6.

post-July searches were under 24 inmates). 72% of post-July searches were in groups of 20 or more inmates, 94% were in groups of 10 or more.  AMFs 24, 25.

### 2.  *The Strip Searches Used Highly Invasive Procedures*

At the beginning of each group search, deputies instructed inmates to line up, "shoulder-to-shoulder," on the two long walls of the bus bay. Because group sizes were so large, inmates were required to stand in extremely close proximity, so close they could not avoid brushing up against each other's bodies. Groups of even 30 inmates would have had *less* than 6 inches on either side of their body and therefore would have inevitably brushed against each other when undressing and performing search exercises. Groups of 40 or more inmates would have had less than 2-3 inches on either side. AMFs 27-31.

After lining up and facing the wall, deputies instructed inmates to disrobe to their underwear, removing their shoes, socks, pants, shirt *and bra*.[2] Deputies searched their clothing and tossed it onto the ground. Next, inmates had to lift their hair and then feet for inspection. AMFs 32, 33. Deputies then ordered inmates to turn and face the center of the room, wearing only underwear with bare breasts exposed. Then, the women  had to raise their arms in the air and then lift their breasts without crossing their arms. Deputies also ordered inmates to pull their underwear to their knees (resulting in full frontal nudity) and lift their stomachs. AMFs 34-41. Inmates who were confused commonly look at other inmates to see what they were supposed to do. AMF 42. During much of the class period, women were facing each other full frontal. AMF 43.[3] Inmates could not avoid seeing each

---

[2] Inmates were always required to remove their bra when they removed their shirt and pants.
[3] Until approximately late-2011, deputies consistently ordered both lines to face the center simultaneously, so that both lines were directly facing each other, bare-chested, wearing only their underwear. At some point in late-2011, the search sequence changed so that only one line at a time faced the center. Until July 2013, no written policy required deputies to stagger the two lines in this way. This modification is of essentially no consequence from a privacy perspective because, even where only one line of inmates faced the center of the room, inmates were forced to expose their bodies (including breasts and pubic regions) to a large group of women.

6

other's' bare bodies, including pubic area, stretch marks, breasts missing from
mastectomies, surgery scars and tattoos (exposure of which was a safety issue).
AMF 41. This experience would have been shaming and mortifying;, many
inmates would have never before been nude or so exposed in public. AMFs 278-
37, 280.

The search procedures called attention to the areas of women's bodies that
make them feel most self-conscious and ashamed (breasts and stomach). AMF 280.
Some deputies directly called attention to heavier women: "if you have a large
stomach or any rolls of fat, lift them up," requiring women to publicly identify if
they had large stomachs, and then be one-by-one in the view of the whole group.
AMFs 38, 39. For larger women, having one's body singled out in this manner
would have been shattering. AMF 280.

After inspecting the front of inmates' bodies, deputies ordered them to turn
and face the wall again. Next, they ordered women wearing tampons, pads, or
"anything [else] in their vagina" to raise their hand, thereby requiring menstruating
women to publicly identify themselves. AMFs 69 - 71.Menstruating women
(approximately 12% of inmates on average[4]) were required to remove soiled
tampons or pads in the view of the group, without any privacy measures. They
were told, "If you have anything between your legs or inside of you, please take it
out now." AMF 70, 71. Heavily bleeding women could not avoid bleeding onto
their fingers, legs or the floor when removing saturated tampons or pads. AMFs
.72-74.[5] Because women are socialized to handle menstruation in private, and

---

[4] A significant percentage of female inmates are menstruating during any given search. The great
majority of inmates are between the ages of 18 – 50 years old. On a given day, approximately
12% of inmates will be menstruating. In a group of 40 inmates, approximately 5 will be
menstruating. In a group of 24 inmates, 2-3 will be menstruating. AMFs 65 – 67.
[5] Removing saturated tampons is a messy process that is normally done while sitting over a toilet
seat, in a private bathroom or stall. Heavily menstruating women may expel blood – dripping it
onto themselves or the floor – the moment a tampon or sanitary napkin is removed, even if it is
removed for only a moment. AMFs 72 - 74.

given the perception of menstrual blood as disgusting and unclean, removing blood-soiled feminine hygiene products in the view of strangers would have been mortifying for any woman, and worse for those who bled on themselves or the ground. AMF 92. Witnesses confirm that never before had they attended to soiled feminine hygiene products in the presence of strangers. AMF 75. Deputies distributed clean feminine hygiene products but did not permit menstruating women to replace them until the visual body cavity search was complete, often several minutes later. AMF 76, 77.

After menstruating women removed feminine hygiene products, deputies ordered inmates to bend at the waist, reach behind their bodies and pull apart their labia with their fingers to expose their vaginas.[6] AMFs 45-49. Deputies specifically instructed inmates to "open their vagina lips," and sometimes the phrase "open your pussy lips" was used. AMF 49. This procedure is the most extreme form of a visual body cavity search for female inmates and is not standard practice in most jails. AMFs 11- 116. Many inmates had never before had to expose their genitals to strangers (aside from doctors), and some had likely never touched their vagina. AMF 50.  Some inmates would become confused about what deputies are asking them to do, and some were then told, "spread your lips, not your asshole." AMF 49. This would have been profoundly mortifying to any woman AMF 285, 286.

Inmates were required to cough continuously until deputies inspected their vagina and rectum with a flashlight. AMFs 51 – 59. As deputies worked their way down the line, inspecting each person individually, inmates were required to look between their legs so they could see when the deputy reached them, for much of the time while viewing similarly positioned women on the opposite wall.[7] AMF

_____

[6] Inmates were often standing so closely that they would touch at the hips and/or buttocks when they bent over for the body cavity inspection. AMF 47.

[7] Until late-2011, the visual body cavity inspections occurred simultaneously, with women bent over and looking through their legs and unable to avoid seeing others similarly positioned on the opposite wall In late-2011, some deputies modified the procedure to one line at a time. While

61. LASD's 30(b)(6) witness testified that inmates maintained this position for 3-5 minutes.[8] AMF 60. The purpose of requiring inmates to cough is to produce a muscle contraction to help expel anything in the vagina. AMF 52. Coughing, however, may cause heavily menstruating women to expel blood from their vagina, as happened in some cases. AMFs 53, 54. CRDF personnel and inmate witnesses both observed some inmates heavily bleeding, including on themselves or the ground, or even expelling blood clots. AMFs 78 - 80. Such nmates were not immediately provided soap and water. AMF 81 .Witnesses observed inmates urinate, vomit or defecate, and others observed urine, vomit and feces on the bus bay floor. AMF 85.

To inspect the mouth, deputies instructed inmates to insert their fingers in their mouths, pull out their upper and lower gums and run their fingers between their lips and gums; those with dentures had to remove them and put them with their clothes. AMF 96, 97. Until July 2013, no hand sanitization was available to sanitize inmates' fingers before touching inside their mouths, and no policy required that the mouth search occur at the beginning; at times, the mouth search occurred after inmates touched soiled feminine hygiene products. AMFs 98 – 100,

Inmates often cried during searches, which they uniformly experienced as humiliating, degrading and dehumanizing. Some described the searches as the most degrading and/or humiliating  experience of their lives (felt like "an animal," "like trash," "worthless," powerless). AMFs 103 – 107. More than a few compared the experience to rape (AFM 104), and those who had been previously raped or abused described the searches as re-traumatizing. AMF 105.

---

some improvement, this did not resolve the basic privacy problem because the inmates were still exposed to and could not help but see the group on their wall. AMFs 62-64.

[8] Due to physical disability or obesity, some inmates could not perform the labia spread. They were told to sit or lie on the ground, bare-bottomed, with their legs spread and bent at the knees so that deputies could inspect their vaginas from the front, ot to sit on a chair and spread their labia from the front. This occurred in view of other inmates. AMF #.

There was no need for these publicly invasive practices. Privacy curtains were always a low cost, effective, and readily available alternative, as demonstrated by LASD's installation of 24 curtains in 2015. See §IV, F, 2.

### B.   THE SEARCH CONDITIONS WERE ENVIRONMENTALLY EXTREME.

#### 1.   *Until 2014, Most Searches Occurred In An Outdoor Garage Space Exposed To Insects, Bird Droppings, And Bird Feathers.*

The vast majority of searches were conducted in BB3, an outdoor garage space with porous cement floor that was only partially enclosed until February 2014. AMFs 10-13 160, 172,  CRDF preferred BB3 to the alternative indoor storage room because the larger space permitted larger search group sizes. AMF 8..

Until at least March 2015, BB3 was used as both a strip search location and a working bus garage. AMF 160.. Inmates searched there had to stand barefoot on a porous, cement ground, stained with motor oil from buses. AMF 172, 173. It was not sealed from vehicle fumes from the adjacent bus bays and smelled, as LASD acknowledges. (Air fresheners were installed in Aug-Sept. 2013.) AMF 177 – 179. Before 2014 renovations, the use of BB3 for searches violated building codes for occupied spaces. AMF 162.

Because the garage was not fully enclosed, it was open to birds, insects or rodents. AMFs 163 - 171. Deputies acknowledge there were ants, AMF 167, and bird feathers on the ground. AMF164. Numerous inmates observed ants, and occasionally worms, slugs, spiders, roaches, and other insects. Some report birds flying in the room, bird nests, fallen bird nests, bird feathers and bird droppings on the floor. AMF 165. One saw deputies trying to kill a bird with pepper spray. AMF 165 (Ex. 999). LASD acknowledged that birds were able to enter before foam sealant was applied in August 2015 (even after the enclosure). Ex. 166, Maxie Dep. Tr., p. Clothing was placed directly on the ground until tables were installed in October 2013. AMF 174, 175.

### 2. Many Searches Occurred In Very Cold Conditions.

Prior to 2014 renovations, Bus Bay #3 was not climate controlled and provided little protection from the elements. There was no roof, but only, a chain link fence top covered by a tarp. One of two long walls was also constructed of chain link fence, partially covered by siding and a tarp. Even when the tarps were properly fastened and in good repair, gaps between them permitted air to blow in. AMFs 180-196. LASD's 30(b)(6) witness described the space as "very windy," particularly in the evening. AMF 195.  Inmates reported feeling extremely cold. AMF 196.

While LASD asserts that no searches were conducted outside in the bus bay when it was 68° or less (and after July 2013, 70° or less), there initially were no rules prohibiting searches when it was cold. By October 2010, CRDF purportedly adopted a rule prohibiting searches under 68°, no written policy exists. AMFs 198 – 201. CRDF's own records demonstrate that searches were routinely conducted when the temperature was below 68°.AMF 228.

And 68° was nowhere near sufficient.There is no scientific or logical basis for the 68° rule. In fact, searches conducted at 68° would have produced very significant cold discomfort, far outside of acceptable ranges established by the American Society of Heating, Refrigeration Engineers (ASHREA). *See* AMFs 202- 226.  LASD 30(b)(6) witness and Director of LASD's Facilities Services Bureau John Carrillo acknowledges ASHREA as the governing standard. ASHREA 55 sets the industry standard for minimal acceptable temperatures for occupied spaces. AMF 207, 208. The acceptable temperature range depends on five factors, **including the amount of clothing worn** by occupants. AMF 206 The acceptable temperature for persons wearing only underpants is substantially higher than for those clothed because the body loses far more heat. *See* AMF 206.  Using the most conservative assumptions, the minimum acceptable temperature was 77º.

Using more realistic assumptions for air speed and metabolic rate, the minimum acceptable temperature was 81°. AMF 213, 223.

Defendants' EUDAL time stamps for outdoor searches in BB3, prior to the installation of heaters, show that they were frequently conducted in unacceptably cold weather, well outside the ASHREA 55 acceptable ranges. Defendants obviously based their conclusion that 68 (or 70) degrees was an acceptable cutoff without consideration of the impact of being unclothed. Plaintiffs' thermal comfort expert analyzed what a given temperature experienced by a fully clothed person (pants, shirt, and sweater or jacket) would feel like to one wearing only underpants (based on equivalent heat loss). Thus, for example, 65 degrees feels to the unclothed person like 35 degrees to the clothed person. *See* AMF 215.

Using what he considers the conservative approach, Plaintiffs' expert Gwelen Paliaga concluded that 88% of search events would have been experienced by inmates as 61° or colder; 35% would have experienced it as 35 degrees or colder, and an additional 22% as between 35 and 45 degrees. AMFs 213 – 219. Using what he considers the most realistic assessment, 94% of search events would have been experienced by inmates as 61° or colder; 61% would have been experienced it as 35 ° or colder, and an additional 16% as between 35 and 45 degrees. AMFs 219 – 227. These facts render the searches unconstitutional. LASD simply never considered the extreme cold effects of no clothing, bare feet and cold cement. *See* AMF 208 (LASD considered ASHREA 55 the appropriate standard but did not consider the absence of clothing). *Cf., Jordan v. Gardner*, 986 F.2d 1521, 1544 (9th Cir. 1993) ("A bland American civil servant can be as much of a beast as a ferocious concentration camp guard if he does not think about what his actions are doing") (Judge Noonan, concurring).

## III.   LEGAL STANDARD [9]

### A.   FEDERAL COURTS CONSIDER SCOPE, MANNER, LOCATION AND JUSTIFICATION IN ASSESSING THE REASONABLENESS OF SEARCHES.

Strip searches are "an invasion of personal rights of the first magnitude." *Chapman v. Nichols*, 989 F.2d 393, 395 – 396 (10th Cir. 1993). They implicate Fourth Amendment "reasonableness" standards. *Florence v. Board of Freeholders of the County of Burlington*, 132 S.Ct. 1510, 1516 (2012) (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)); *see also*, e.g., *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (citing cases).  Reasonableness is assessed under the "totality of the circumstances." *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 385, 129 S. Ct. 2633, 2647 (2009); *Bell*, 441 U.S. at 552. It is an "objective" inquiry without regard to subjective intent. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872 (1989); *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011).

In *Bell*, the seminal strip search case, the Supreme Court held that the standard for determining reasonableness is whether the jail's "need for the ***particular*** search" outweighs "the invasion of personal rights that the search entails." *Bell*, 441 U.S. 520, 559 (1979) (emphasis supplied). "[E]ach case [] requires a balancing of the need for the ***particular*** search against the invasion of personal rights that the search entails." *Id.* at 559 (emphasis supplied). Thus, "[c]ourts must consider the <u>scope of intrusion</u>, <u>manner</u>, the <u>justification</u> for initiating it, and the <u>place</u> in which it is conducted." *Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 18 61, 60 L.Ed.2d 647 (1979) (emphasis supplied); *Florence*, 132 S. Ct. 1510 at 1516 (citing *Bell*).  Accordingly, the search may be justified but unlawful based on the scope, place or manner of conducting it.

---

[9] As Defendants did not raise the California claims, we do not discuss them.

*Florence* left untouched the longstanding rule that justifiable searches must still be conducted in a reasonable manner.  It **solely** addressed whether blanket searches of new general population inmates without individualized reasonable suspicion were justifiable, expressly limited its holding to that issue, and had no impact on the other *Bell* factors. *Florence* specifically re-emphasized that "[t]he need for a particular search must be balanced against the resulting invasion of personal rights. 132 S.Ct. 1516. *Florence*, 132 S. Ct. 1510 at 1516 (courts must consider the *scope* of intrusion, *manner*, location and justification of a search) (citing *Bell*).

Federal courts have routinely recognized that *Florence* does not affect Fourth Amendment challenges to the **manner** of conducting strip searches of individuals entering the jail population. *See United States v. Falkes*, 770 F.3d 748, 758 (9th Cir. 2014) (otherwise justified strip search must be performed in a reasonable manner); *Williams v. City of Cleveland*, 771 F.3d 945, 951 (post-*Florence* case reversing dismissal of delousing groups of inmates without privacy; a "search conducted in a particularly invasive manner" not necessitated by "exigent circumstances…may be unreasonable by virtue of the way in which it is conducted."); *Stoudemire  v. Michigan Dep't of Corr.*, 705 F.3d 560, 573 (6th Cir. 2013) (*Florence* "does not mean that the strip searches may be conducted in any manner whatsoever that the facility chooses."); *Mashburn v. Yamhill County*, 2012 WL 587 WL 5879444 at 7-11 (D.Or., Nov. 19, 2012) (under *Florence*, a strip "search may still be unconstitutional if it is excessively intrusive in relation to the government's need for the search"). *See also Bell*, 441 U.S. at 559, 560 ("the manner in which [the search] is conducted" and "the justification for initiating it" are *two different aspects of whether a search is reasonable*." (emphasis supplied); *Vaughan v. Ricketts*, 859 F.2d 736, 740-41 (9th Cir. 1988) ("issues of privacy, hygiene, and … training are relevant to determining whether the manner of search was reasonable…" (citing *Bell*).

**B.**   **CORRECTIONAL POLICIES ARE NOT REASONABLE WHERE OBVIOUS, EASY, READILY AVAILABLE, EFFECTIVE ALTERNATIVES EXIST.**

Correctional policies infringing on detainees' constitutional rights are justified where they are "reasonably related to legitimate penological interests." *Florence*, 132 S.Ct. at 515 (quoting *Turner v. Safley*, 482 U.S. 78, 89 (1987). In making this determination, courts consider the existence of readily available alternatives. "[O]bvious, easy alternatives," accompanied by only a "*de minimis* cost to valid penological interests," indicate that institutional needs do **not** outweigh the burdens on detainees, and therefore the policy is unreasonable; they are evidence of an 'exaggerated response' to prison concerns" and that the policy does not satisfy the "reasonably related test."). *Id.* at 90-91[10]; *see also, Bell*, 441 U.S. at 539 n.20 (availability of "alternative and less harsh methods" would suggest a punitive purpose). *Turner* recognizes that the practices of other institutions are relevant in assessing whether readily available alternatives exist. 482 U.S. at 97-99 (citing federal Bureau of Prisons regulations as one measure of whether there were ready alternatives, and citing them to find the marriage ban there was an "exaggerated response" to legitimate security concerns).

**C.**   **SPECIAL CHARACTERISTICS OF THE SEX OR AGE OF THE POPULATION TO BE SEARCHED ARE HIGHLY RELEVANT**

The characteristics of the population being searched – specifically sex, gender and age – are relevant considerations in evaluating the scope of intrusion for the Fourth Amendment "reasonableness" analysis. In the school setting, the Supreme Court has long recognized that the "reasonableness" of special needs searches (administrative searches that do not involve individualized reasonable suspicion) must account for the sex (gender) of the population being searched in

---

[10] The *Florence* Court it considered *Bell* the starting point for applying the *Turner* standard in the context of jail strip searches . The two decisions functionally involve the same test. *See, e.g., Jones v. Salt Lake County*, 503 F.3d 1147 (10th Cir. 2007) (*Bell*] "essentially applied [*Turner's*] factors."). *Turner* reinforces the conclusion that the strip searches here are unconstitutional.

15

assessing the scope of intrusion. *Safford Unified School District #1 v. Redding*, 557 U.S. 364, 129 S.Ct. 2633, 2639 (2009) (despite reasonable suspicion that student was distributing over-the-counter medication, strip search of a female student was unreasonable; searches "will be permissible in [their] scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the **age and sex** of the student and the nature of the infraction.") (emphasis supplied, quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985)). The Court emphasized that Fourth Amendment standards are "fluid concepts that take their substantive content from the particular contexts" in which they are being assessed. *Safford*, 557 U.S. at 371.

Although students have a greater expectation of privacy than jail inmates, age and sex are equally relevant in correctional settings. While the issue has arisen more commonly in the context of juvenile inmates[11], the Ninth Circuit has recognizes that full account must be taken of the special characteristics that render female inmates particularly susceptible to psychological trauma from certain types of searches. In *Jordan v. Gardner*, 986 F.2d 1521, 1523-30 (9th Cir. 1993) (en banc), inmates challenged cross-gender clothed body searches at the Washington Corrections Center for Women ("WCCW"). Although the decision involves cross-gender pat downs (not at issue here), and is grounded in Eighth Amendment standards, it recognizes that there are "psychological differences between men and women" that impact how they experience strip searches. *Id.* at 1525. *Jordan* noted (as is the case here) that "many of the inmates at WCCW have histories of sexual or physical abuse by men" and that "that physical, emotional, and psychological

---

[11] *See e.g. Mashburn v. Yamhill County*, 2012 WL 5879444 at *7 – 11 (D.Or., Nov. 19, 2012); *Justice v. City of Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992) (requiring particularized and objective basis for searches of juveniles at a police station given the "degrading and frightening" nature of strip searches and *the potential for serious trauma to juveniles*."); *Smook v. Mennehaha County*, 457 F.3d 806, 811 (8th Cir. 2006) (recognizing greater privacy interest of juvenile detainees; "the adverse psychological effect of a strip search is likely to be much more severe upon a child") (citing *N.V. and S.G. v. Connecticut*, 382 F.3d 225, 232 (2nd Cir. 2004).

differences between men and women 'may well cause women, and especially physically and sexually abused women, to react differently to searches of this type than would male inmates subjected to similar searches by women.'"

The *Jordan* trial testimony described the "shocking histories of verbal, physical, and, in particular, sexual abuse endured by many of the inmates prior to their incarceration at WCCW," including rapes, physical beatings, attempted murder, torture, and incest. Ten expert witnesses, including psychologists and correctional experts, "described the psychological fragility of and disorders found in abused women", indicated that the "unwilling submission to bodily contact with the breasts and genitals by men would likely leave the inmate 'revictimiz[ed], resulting in a number of symptoms of post-traumatic stress disorder" and were "unanimously of the view that some would suffer substantially."  Thus, the district court found that "'[t]here is a high probability of great harm, including severe psychological injury and emotional pain and suffering, to some inmates from these searches, even if properly conducted.'" 986 F.2d at 1525. *Id.* In sum, *Jordan* requires prison officials to recognize potential psychological effects resulting from their treatment of female prisoners.[12] The psychological impact of CRDF's extremely invasive search procedures on female inmates must thus be considered in assessing the reasonableness of the searches here. *Cf.*, *Ellison v. Brady*, 924 F.2d 872, 879-80 (9th Cir. 1991) (Plaintiff establishes "pima facie case of hostile environment sexual harassment when she alleges conduct which a *reasonable*

---

[12] *Jordan* court distinguished *Grummett v. Rushen,* 779 F.2d 491 (9th Cir.1985) (pat searches by women guards on male inmates constitutional) because "women experience unwanted intimate touching by men differently from men subject to comparable touching by women" and "the differences in gender socialization would lead to differences in the experiences of men and women with regard to sexuality."986 F.2d at 1526. As here, WCCW's "policy was not required for security purposes" because cross-gender searches could be replaced with same gender searches, and the policy was "adopted … without a great deal of knowledge about the impact of the searches upon the inmates." *Id*. at 1528.

*woman* would consider sufficiently severe or pervasive to … create an abusive
working environment") (emphasis supplied).[13]

## IV.   LASD'S SEARCH PRACTICES VIOLATED THE FOURTH AMENDMENT.

### A.   LASD SUBJECTED FEMALE INMATES TO HIGHLY INVASIVE VISUAL BODY CAVITY SEARCHES IN VIEW OF OTHERS.

CRDF conducted visual body cavity inspections using extremely and
unnecessarily invasive procedures(1) requiring female inmates to physically spread
their labia to expose their vagina; and, (2) requiring menstruating women to
remove feminine hygiene products prior to the search, necessarily causing some
women to bleed on themselves (and to remain without menstrual protection for the
duration of the search, which likewise caused women to bleed on themselves in
view of others). AMFs 45-85.

The distinction between ordinary strip searches and visual body cavity
searches is constitutionally significant because visual body cavity inspections
involve an even greater degree of intrusion than strip searches. *United States v.
Barnes*, 506 F.3d 58, 62 (1st Cir. 2007) (strip search was justified but visual body
cavity search was not); *3 LaFave §5.3(c)* ("it is to be doubted that *Florence* should
be read as authorizing, as a matter of routine, the much more severe intrusion of a
'visual body cavity search' into the anus or vagina"). Body cavity searches are one
of the most humiliating and degrading law enforcement practices, involving an
extreme intrusion upon personal privacy and profound offense to individual

---

[13] *Jordan* limited its holding to the Eighth Amendment and did not reach the Fourth Amendment.
*Id*. at 1524. While the gravamen of such cases as *Michenfelder v. Sumner,* 860 F.2d 328 (9th
Cir.1988) rested on" invasions of privacy," the gravamen in *Jordan* was "that the cross-gender
clothed body searches inflict great pain and suffering,"thereby implicating the Eighth
Amendment. Although this is a Fourth Amendment, not an Eighth Amendment, claim, of the
searches come squarely within the ambit of the Fourth Amendment. *Florence's* use of the Fourth
Amendment reasonableness test makes clear that this ia a Fourth Amendment case. The Fourth
Amendment's reasonableness test is less stringent than the rigorous Eighth Amendment test.

dignity. *See, e.g.,Kennedy v. Los Angeles Police Dep't.,* 901 F.2d 702, 711 (9th Cir.1990) (visual body cavity searches are "dehumanizing and humiliating"); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1446 (9th Cir. 1989) *overruled on other grounds by Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) ("feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute"); *Blackburn v. Snow,* 771 F.2d 556, 564 (1st Cir. 1985) ("body cavity searches are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.'" quoting *Marybeth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir.1983)).[14]

Federal courts recognize that the types of public genital exposure here rather than squat-and-cough establish a Fourth Amendment violation even for men. *SeeYoung v. County of Cook,* 616 F.Supp.2d 834, 840, 850 – 851(N.D. Ill. 2009) (requiring  male inmates to bend and spread buttocks for visual search more intrusive than merely requiring inmates to squat and cough multiple times); *Salem v. Michigan Dept. of Corrections*, 2015 WL 1966727 at 17-18 (E.D. Mich. May 1, 2015) (allegations of requiring female inmates to sit on chairs, spread their legs and manipulate their vaginas where the procedure was unnecessary and gratuitous in that the same goals could have been accomplished by merely requiring inmates to bend at the waist and cough made out a Fourth Amendment claim).

LASD's search methodology was substantially more invasive than even the "bend-and-spread" methodology in *Young*.  CRDF required women to manipulate their labia and vagina with their hands. Plaintiffs' expert Wendy Still explains that

---

[14] *See also, e.g., Arruda v. Fair*, 710 F.2d 886, 887 ("We recognize….the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities."); *Doe v. Renfrow,* 631 F.2d 91, 93 (7th Cir.1980) (*per curiam*) (strip search of a minor student absent reasonable cause violates "any known principle of human decency" and "exceed[s] the 'bounds of reason' by two and a half country miles."); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

19

"requir[ing inmates] to bend over and use their hand to spread their buttocks and labia with their hands" is "an exceptionally invasive form of visual body cavity inspection." This goes a step beyond what is commonly referred to as a *visual* body cavity search. This is the most invasive form of visual body cavity inspection for women and is not standard correctional practice. AMFs 111-116.

The requirement that female inmates change sanitary napkins in public is an extreme departure from civilized standards In *Wilkes v. Borough of Clayton* , 696 F. Supp. 144 (D.N.J. 1988), the court granted summary judgment to an arrestee who challenged the requirement of visual inspection by a women deputy (not in a public group, as here) when changing her sanitary napkins, or using the toilet:

 "One strains to conjure up an activity more private than the changing of a sanitary napkin….. ¶ …What many do not choose to reveal to the most intimate of their family and friends is instead, by policy, laid open for careful scrutiny by the watchful eye of the law… [I]t is indisputable that our society considers these tasks uniquely intimate and private "

CRDF not only exposed menstruating inmates to others, but the manner of search virtually ensured they would bleed on themselves in the view of others. Menstruating inmates had to identify themselves by raising their hand and then remove soiled tampons or pads – in the view of the other inmates. AMFs 69–71. Many unavoidably bled onto their fingers, legs or the ground, unable to immediately clean themselves. AMFs 72–74. Heavily menstruating women often secrete blood immediately when a tampon or pad is removed. *Id.* Inmates had to stand unprotected until the visual body cavity inspection was complete, sometimes for several minutes, while bleeding down their legs or onto the ground, until they received permission to replace feminine hygiene.AMFs 76 – 84.

Inmates also bled on themselves as a result of the requirement that each inmate spread open their labia and *cough*. Coughing produces a contraction of vaginal muscles that may cause women who are bleeding more heavily to expel

blood. Evidence in this case shows that some menstruating inmates could not avoid expelling menstrual fluid while coughing. AMFs 52 – 54. CRDF did not make soap and water immediately available to inmates who bled on themselves. AMF81.

Plaintiffs' expert is aware of no jails that institutionalize such searches. LASD cannot point to any. This is an extreme departure from accepted practice.

### B.   CRDF CONDUCTED LARGE GROUP, PUBLIC SEARCHES.

CRDF's searches were not only the most intrusive and humiliating searches imaginable, but they occurred in large groups, without privacy partitions, which were a readily available alternative. (See § IV(F)(3).

Privacy is a fundamental consideration in assessing the manner of search. *Williams v. City of Cleveland,* 771 F.3d 945, 953  (supra at pg. 16) recognized post-*Florence*  that "*a strip search is more invasive when it is performed where other people can see the person being stripped*." (quoting  *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 573 (6th Cir. 2013)) (emphasis supplied):

> "The wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers' institutional need to view her unclothed. *See Farmer v. Perrill,* 288 F.3d 1254, 1260 (10th Cir.2002) (opining that 'the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others' is 'well established'); *Amaechi v. West,* 237 F.3d 356, 362 (4th Cir.2001) ('Whether the strip search was conducted in private is especially relevant in determining whether a strip search is reasonable under the circumstances.')" 771 F.3d at 953.

The *Williams* court concluded that, "[g]iven the significant incursion into plaintiffs' privacy rights caused by the jail's preferred method of searching…, the jail's *need to perform the searches in this particular manner must be unusually dire* before it can outbalance the affront to plaintiffs' privacy." *Id*. at 954 (emphasis supplied). Plaintiff had sufficiently alleged that "the jail's decision to strip search

… plaintiffs in full view of other detainees" stated a Fourth Amendment violation in light of the "obvious alternative … to have corrections officers… conduct the searches and seizures in private rather than in the presence of other detainees." *Id*. at 955. Here, there was a feasible and readily available alternative, one that LASD ultimately (years after this litigation commenced) adopted, which was to enclose the bus bay, install heaters, search in smaller groups (a maximum of 24 at a time), create separate areas for each inmate (by drawing individual areas for each inmate), and install privacy curtains. See §§ IV (F)(2-3),pgs. 31 et seq.*infra*, for elaboaration. [15]

*Young v. Cnty. of Cook*, 616 F. Supp. 2d 834, 850-51 (N.D. Ill. 2009) is particularly analogous except that the groups were men rather than the women here. (This case is more egregious due to women's vulnerabilities. See § IV(B).) Chicago conducted large group strip searches of men without privacy screens, "in full view of the other detainees in the group being searched"; bodily fluids were occasionally present (although their "frequency and prevalence" were disputed); people were very close to each other and at times "would accidentally bump into and touch each other"; and the search method was the "less dignified bend-and-

---

[15] Numerous other cases indicate that privacy is a major factor in assessing whether the manner of strip search is constitutional. *See, e.g., Bull v. City & Cnty. of San Francisco,* 595 F.3d 964, 974-75 (9th Cir. 2010) (emphasizing that San Francisco strip searches were conducted "in a place that afforded privacy"); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872 (9th Cir. 1993) ("the Fourth Amendment requires that any strip search be conducted in a reasonable manner, and accordingly that officers must respect arrestees' privacy interests') (citing *Vaughan v. Ricketts,* 859 F.2d 736, 741 (9th Cir.1988) (discussed in § III(A); *United States v. Cameron*, 538 F.2d 254, 257-58 (9th Cir. 1976) ("body search[es]… must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma"); *Farmer v. Perrill*, 288 F.3d 1254, 1259-61 (10th Cir. 2002) ( strip searches may not "be conducted without regard for privacy without justification"; affirming summary judgment where strip searches were "conducted in an open area visible to a number of other inmates and staff"); *Shroff v. Spellman*, 604 F.3d 1179, 1191 (10th Cir. 2010) (requirement that female inmates expose breast to female guard while pumping milk violated Fourth Amendment); *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (summary judgment inappropriately granted on claim "that the searches were group searches that gratuitously exposed to other prisoners the nudity of each prisoner being searched").

spread method." The *Young* Court found that the above described strip searches "were unreasonable and violated the Fourth Amendment as a matter of law." *Id.*

Plaintiffs recognize that this Court in *Solis* which challenged group searches regardless of gender, upheld large group searches of inmates. Other courts have reached the opposite conclusions.[16] Regardless, this is not *Solis*. **Solis did not** present evidence of particularly egregious and unnecessary search methods, **did not** present evidence regarding the special vulnearbilities of women inmates, **did not** present evidence regarding search features (menstruation, genital manipulation) particular to women, **did not** involve the unique environmental facts here, and did not establish readily available alternatives.

Neither *Young* nor *Williams* involved invasive visual body cavity searches and the extreme humiliation of changing menstrual items in public. Until July 2013, using CRDF's records, it routinely searched female inmates in groups of 20 – 40 inmates (some as large as 50). Inmates sometimes could not avoid touching the person next to them. (The July 2013 limitation to 24 accomplished little to ameliorate the severe privacy intrusions of the process.)

Once inmates lined up, they disrobed to their underwear and submitted to a thorough inspection of their bodies. CRDF search procedures required inmates, dressed only in underpants, to lift their bare breasts with their hands, lift their stomach with their hands, and pull down their underwear, exposing their pubic region – all in view of the entire group. Until late-2011 (i.e. for most of the class

---

[16] *See Lopez v. Youngblood*, 609 F. Supp. 2d 1125, 1138 (E.D. Cal. 2009) ("the blanket policy of strip searching detainees in groups violates the Fourth Amendment"); *Craft v. County of San Bernardino,* 468 F.Supp.2d 1172, 1176 (C.D.Cal.2006) (manner of searches strongly favored inmates' claim searches were unconstitutional where searches were conducted "*en masse* without any attempt to limit the humiliation occasioned by conducting the searches in full view of dozens of other individuals"); *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 571-75 (6th Cir. 2013) (for strip search where people in hall could see into cell while search occurred, the question was "whether any exigent circumstances compelled [the search]...in view of other inmates and prison personnel"; record provided evidence of "no such exigency").

period), these portions of the search occurred while two lines of inmates on opposite walls *directly faced each other*.  Women with physical deformities or mastectomies were treated no differently. After inspection of their breasts, stomach and pubic region, CRDF subjected inmates to the humiliating and invasive inspection of their vaginas and rectum described previously. Until late-2011, when looking through their legs, inmates on each wall were directly facing inmates on the opposite wall, and could view them in the same humiliating search position. Such searches typically took 20 minutes, sometimes longer. Plaintiffs contend that the foregoing highly invasive procedures combined with the unnecessary lack of privacy alone render the searches unconstitutional, even absent the environmental factors (outside, insects, cold).

### C.   CRDF's Search Procedures Carried a High Risk of Psychological Trauma for Female Inmates

Strip/vcb searches present unique privacy concerns for female inmates due to physiological differences (e.g. menstruation), gender socialization, socio-cultural attitudes towards women's bodies and bodily functions, and the disproportionately high percent of women –particularly incarcerated women – who have been victims of physical and sexual abuse. AMFs 86-91, 243-270, 296-308.

While exposure of their private parts, particularly genitals, would  likely cause some shame and humiliation for all persons (AMFs 245-248), women are uniquely and negatively impacted by such privacy violations, and are particularly vulnerable to intense shame, humiliation and trauma from bodilyexposure. AMFs 251-270). This vulnerability derives from general social privacy norms, but also from gender socialization, socio-cultural representations of women's bodies, and attitudes towards menstration.*Id.*, AMFs 86-91..

Women are generally more self-conscious than men about their bodies. Unlike men, most women experience chronic body dissatisfaction, and intense *body shame* when their bodies are exposed, singled out or examined. AMFs 253 –

259. Body shame involves extremely negative self-evaluation and is commonly accompanied by an intense desire to hide one's body. AMF 256. Nearly all women experience body shame when exposing their bodies to others, even to other women. Women go to great lengths to cover their bodies (e.g. changing in closed toiled stall or under a towel). AMFs 260. Incarcerated women are no exception. AMFs 260, 267. American women experience even greater shame and anxiety when required to expose intimate body parts such as breasts, vulvas and vaginas. AMF 262, 263. Socio-cultural representations of the vagina often characterize it as a part of the female body that is shameful, unclean and disgusting. AMFs 264, 265. Thus, women almost universally avoid exposing their genitalia to unfamiliar persons, including other women, even in situations such as locker rooms, spas or restrooms. Some women may never touch their vaginas or vulvas. Men are not similarly socialized. AMFs 266 - 270.

Menstruation carries a strong cultural taboo commanding that it not be seen, discussed or, in most ways, openly acknowledged. Females are socialized to handle menstrual periods in secrecy; open acknowledgement of menstruatioj is almost never done. Even in modern, secular societies, there is a societal attitude that menstruation is dirty and disgusting. American women take great precautions to not bleed on themselves or their clothing, or reveal the fact of their menstruation for fear that others will perceive them as dirty or disgusting. AMFs 86-91.

Because privacy, integrity of personal boundaries and protection from shaming are crucial for sound mental health, CRDF's searches would have been extremely particularly psychologically damaging to female inmates, regardless of personal history. AMF 290. As three of Plaintiffs' experts explain, the vast majority of female inmates, regardless of personal background, would likely have experienced extreme shame, anxiety, humiliation and even self-disgust while being ordered to undress in front of others, lift their breasts, bend over, spread their labia, and in many cases, expose intimate menstrual processes. AMFs 271 – 290.  Such

25

search practices would have been among the most degrading, demeaning and humiliating experience that most women, regardless of race or socio-economic status, have ever experienced. AMF 272, 285. The use of female officers to search does not meaningfully mitigate the body shame that most women would have experienced. AMF 273 – 291. In our society, there is no parallel to the kind of forced bodily exposure involved in this case. AMF 272. Only rape comes to mind as a more extreme violation of women's bodies, and it is not surprising that some witnesses explicitly compared the violation they experienced to that of rape. AMF 286. The predictable result of the strip searches for most women is great pain, suffering and psychological damage. AMFs 293, 294.

        The searches would have been experienced as even more traumatic by the majority of inmates with histories of physical or sexual abuse. The correctional community has long understood that women with backgrounds of sexual trauma have far greater vulnerabilities to boundaries of personal privacy, which are often experienced as re-traumatization and carry significant negative psychological consequences, including severe emotional disturbances, including but not limited to PTSD, depression and anxiety. AMFs 296, 297, 303 – 307.  Up to 33% of U.S. women report having been sexually abused or raped at some point in their lives. AMF 298. A greater proportion of female inmates has experienced sexual abuse. AMF 300 – 304. Bureau of Prisons Statistics demonstrate that as many as 6 in 10 female inmates experienced physical or sexual abuse. AMF 300.  LASD acknowledges that, approximately 70% of CRDF's female inmate population has experienced physical or sexual abuse. AMF 304.. Correctional administrators know that strip searches without adequate privacy and dignity may traumatize female inmates, and can cause feelings of abuse. AMF 305. While jails and prisons normally attempt to provide men privacy during searches, special efforts are imperative for women to avoid triggering traumatic responses. AMFs 307 – 308.

26

CRDF's strip search practices were entirely devoid of the kinds of privacy and dignity protections necessary to mitigate the traumativ nature of strip searches on female inmates, and normally available to women inmates in U.S. jails and prisons.AMF 309.  In the opinion of correctional expert, Wendy Still, and Drs. Haverty and Kupers, CRDF's practice of searching large groups of female inmates without indivudalized privacy would re-traumatize any female inmate who had been a victim of physical or sexual abuse. AMF 309 – 310, 312. The degrading and dehumanizing manner of the CRDF searches would have a devastating emotional impact on inmates with histories of abuse. AMF *Id.*. Again, the use of female officers does not alter the analysis for previously-traumatized inmates' vulnerable to re-traumatization. AMF 313.

**D.    THE USE OF IN AN OUTDOOR BUS GARAGE EXPOSED TO ELEMENTS AND INSECTS ADDED TO  THE OUTRAGEOUSNESS OF THE PROCESS.**

The location in which most female inmates were searched – Bus Bay No. 3 – only compounds the unreasonableness of the search conditions. *See Vaughan v. Ricketts*, 859 F.2d 736, 740-41 (9th Cir. 1988) (citing *Bell*) (recognizing that "the place in which the search was conducted must be considered in judging the search's reasonableness"). No other jail conducted invasive and humiliating searches in an outdoor garage space also used to park buses. The space was not sealed from vehicle fumes from the adjacent bus bays, nor was it sealed from insects and vermin. AMF 163 – 171, 173, 177, 178. CRDF officials confirm numerous inmate reports that there were ants present during searches, that birds were able to enter the garage, and that there were bird droppings and/or feathers on the ground. AMF 163 – 171.

**E.    THE EXTREME COLD CONDITIONS ALONE RENDER THE SEARCHES UNCONSTITUTIONAL.**

Until February 2014, Bus Bay #3 was unenclosed and did not have heating. Although CRDF claims that it did not search when the temperature was 68° or less,

27

Plaintiffs' thermal comfort expert (Gwelen Paliaga) report shows *over 45,000 searches* (out of approximately 116,000) *where theactual temperature(based on a three hour moving average) was 65° or less*. AMF 214.  Even more significantly, the proper measure of the cold is not recorded temperature, but the equivalent temperature based on body heat loss when wearing only underpants as compared to clothed. By that measure, and using the most conservative approach, the vast majority (well over ¾) were searched in effective temperature of 61° or less; well over half were searched in effective temperature of 45° or less; and over 1/3 were searched in effective temperature of 35° or less. Using more realistic or "best estimate" approach, even higher numbers of inmates were searched in extreme cold tempeartures. This is totally outside the bounds of any normal practice. AMF212. Except for the bald (and false) assertion that they did not strip search in 68° or less weather, Defendants completely fail to address this issue.

Plaintiffs have found no cases addressing strip searches under remotely comparable conditions, undoubtedly because it is unheard of. *Cf. Devereaux v. Abbey*, 263 F.3d 1070, 1074-75 (9th Cir. 2001) ("Perhaps because the proposition is virtually self-evident, we are not aware of any prior cases that have expressly recognized this specific right [not to be prosecuted based on false evidence], but that does not mean that there is no such right"). Some cases have found Eighth Amendment violations in cold weather, especially when combined with other conditions. *See, e.g., Gordon v. Faber*, 973 F.2d 686, 687-88 (8th Cir. 1992) (affirming Eighth Amendment violation where inmates required to go outside in sub-freezing weather, with shoes and clothing, including jackets with collars, but no hats or gloves, while cell search was conducted; district court did not err in finding conditions "extreme" and denying the "minimal civilized measure of life's necessities"); *Chandler v. Moore,* 2 F.3d 847,848 (8th Cir.1993) (reversing dismissal of complaint that plaintiff was forced to stand outside in the rain and cold without adequate protective clothing; "needlessly subjecting inmates to freezing

weather without adequate protective clothing could amount to cruel and unusual punishment"); *Mitchell v. Maynard,* 80 F.3d 1433, 1443 (10th Cir.1996) (finding actionable Eighth Amendment claim where inmate alleged lack of heat in combination with numerous other conditions); *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321 (1991)) (noting that "a low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation).

The standard for cruel and unusual punishment is far more stringent than the applicable reasonableness standard here, and so these cases are cited only to show that, even under that high bar, unacceptably cold conditions are a major consideration, and, especially when combined with other conditions, can establish the objectively deliberately indifferent standard in Eighth Amendment conditions of confinement cases. That is a much more difficult standard than reasonableness. Forcing inmates to endure the humiliating and degrading search procedures described above, when combined with the extreme cold conditions to which they were routinely subjected, was completely unreasonable, especially given that it was completely unnecessary and gratuitous, and easy alternatives were available.

## F.   LASD'S SEARCH PROCEDURES WERE UNNECESSARY AND UNSUPPORTED BY ANY VALID PENOLOGICAL JUSTIFICATION

CRDF's strip search practices were unnecessary, unsupported by a valid penological justification, and represent an extreme departure from accepted correctional practices within the United States.

### 1.   *LASD's Search Practices Are An Extreme Departure From The Practices Of Other Women's Jails And Prisons.*

CRDF's strip search practices are an extreme departure from accepted correctional norms within the United States.  Plaintiffs' correctional expert, Wendy Still, is aware of no women's jails that conduct strip/vcb searches of female inmates involving such large group exposure of the most intimate aspects of  the search process. She is unaware of any  jail conducting strip searches of any kind in

such large groups (10 or more, much less up to 40 or more); the group sizes alone render LASD unique among U.S. correctional facilities and represent a departure from accepted correctional practices. AMF 109..But it is the unwarranted privacy invasions, exacerbated by group size, that are the critical issue.

The large group nature of the searches, when joined with the alarming exposure to others of the search of the most intimate body parts and activities, is unheard of. CRDF's procedures were exceptionally invasive. Ms. Still, is aware of no major U.S. jails, outside of L.A. County, that use the invasive "labia spread," procedure used at CRDF rather than the common squat-and-cough procedure. AMF 116. See § IV(A).  Because the squat-and-cough procedure is almost always sufficient, the labia spread is entirely gratuitous; only when there is individualized reason to believe cough-and-squat is ineffective is it justified.  CRDF's methodology is not standard practice. AMFs 111 – 116, 131.

The failure to provide privacy severely compounds the intrusion. Regardless of which vaginal inspection procedure is used, **no major U.S. jails** that Ms. Still could locate conducts visual body cavity inspections without providing individual privacy in the form of privacy partitions, curtains or an individual room. Ms. Still is likewise unaware of any jails that require menstruating inmates to handle feminine hygiene products visible to groups of inmates; they occur with individual privacy. No other jails' search practices results in bleeding on women's hands, legs or the floor, in the view of others. AMFs 117 – 120, 130- 132..

Most large jail systems provide privacy by way of curtains, parittions, private rooms or scanners. AMF 120.  Privacy parititons are almost universally considered to be the reasonable correctional practice for strip searches of female inmates. AMF 118. For many years, Rikers Island, New York City's main jail complex, has conducted individual strip searches of female inmates. AMF 121. Philadelphia similarly conducts strip searches individually, in an enclosed area with a curtain. AMF 128. Cook County, Illinois (Chicago) likewise used privacy

partitions before transitioning to body scanners in 2011. Cook County's 13 individual partitions were installed so that each woman being searched was not visible to other inmates. AFMs 122-124. LASD Commander Maria Gutierrez testified that LASD looks to  Cook County for best practices because Cook County manages one of the largest jails in the U.S.  AMF125. (See AMF Nos. 121 -129 for additional information concerning the practices of other jail facilities).

### 2. *LASD's Invasive Searches Without Privacy Lack Penological Justification; There Were Always Feasible Alternatives.*

LASD has inadvertently conceded that there is no sound correctional justification for subjecting inmates to its invasive procedures in a large group setting without privacy.  First, LASD's EUDAL logs establish both that group searches involving 40 or more inmates were common (the great majority over 24 without privacy, and approximately 1/3 with 40 or more). LASD Commander Maria Gutierrez, LASD's 30(b)(6) witness), before realiing that LASD regularly searched groups of 40 or more, explained that such large group searches would be inefficient, unsafe, and *counterproductive* AMF 23.

Most fundamentally, **Cmdr. Gutierrez also testified that privacy curtains were always a viable option**. In January 2015, LASD installed **24** privacy curtains along each long wall of the bus bay. AMFs 139, 140. The curtains present no security concerns, and provide a readily available means to conduct effective searches, while ensuring inmate privacy. AMF 145, 146. Commander Gutierrez emphasized that the curtains were designed to allow staff conducting the searches to view the inmates the same way as before the installation of the curtains. *Id.* Any contention that it was necessary to search without screens is belied by these changes, which Cmdr. Gutierrez conceded could have been implemented at any time, but were not. *See Young v. Cnty. of Cook*, 616 F. Supp. 2d 856, 862 (N.D. Ill. 2009) (later installation of privacy screens rebutted Defendants' contention that the "use of privacy screens was not feasible").

LASD's assertion that privacy curtains were only feasible after the switch to body scanners (January 2015) does not withstand scrutiny. Cmdr. Gutierrez volunteered that the privacy curtains "could have solved the privacy problem years ago (had someone thought of them)." AMF 148 - 149. She testified regarding whether searches in groups of 24 (12 per side), using the privacy curtains ultimately installed, would have always been a feasible and secure option:

> "Q: Well, wouldn't it [installing privacy curtains] have always been the answer to the problem before scanners were available as to how to increase privacy? A: "I agree. You know if again if that thought would have come up 20 years ago we wouldn't probably be here today…in hind sight it would have been a wonderful thing."). AMF 148.[17]

Of course, the explanation is that LASD did not then have the will to change.

Plaintiffs' correctional expert, Wendy Still, agrees that privacy curtains were always feasible. Once CRDF limited group sizes to 24 inmates, each line completed a set of search exercises while the other line faced the wall (also an approach that was always available). AMF 150.Thus, one line faced the center of the while the lifting of breasts and stomach folds, and genital inspections occurred while the other half stood facing the opposite wall (wearing underpants, exposing only their legs and back) and unable to observe the most intimate aspects of the searches while facing each other. *Id.* Since CRDF readily adapted to searches limited to 24 inmates, and Cmdr. Gutierrez agreed that privacy curtains were always a viable option, CRDF could have conducted searches of groups of 24 as it did beginning in 2013 when the 24 squares were drawn, with the addition of

---

[17] After she made that statement, defense counsel immediately took a break to confer with the witness; upon her return, Cmdr. Gutierrez "clarified" that curtains could have decreased visibility. However, upon further questioning, she ultimately agreed that such searches would have "gone fine" assuming CRDF maintained a ratio of 1 staff person to 3 inmates, which was a normal staffing ratio.

1  privacy curtains, thereby providing privacy protection. *Id.* Inmates would have

2  only seen others' legs and backs while facing the wall in their underwear.*Id.*

3      Further, it was feasible (and arguably more efficient) to conduct searches of

4  12 inmates at a time using 12 privacy partitions (instead of 24 at a time). AMF

5  151. Wendy Still explains that doing so would not increase the processing time

6  since the elements of the search are comprised of individual inspection of each

7  inmate's clothing, property, hair, mouth, neck/ears, feet, body and body cavities.

8  *Id.*  In a nutshell, 5-8 deputies could search 12 women in approximately half the

9  time required to search 24 women. *Id.*  Moreover, after July 2013, deputies were

10  effectively searching only 12 inmates at a time (groups of 24, with 12 on each wall,

11  only one line of inmates completing each set of search exercises at a time). Twelve

12  searches at a time using privacy curtains was a readily available option if there was

13  any reason (which there was not) that doing 24 at a time posed problems. *Id.*

14      Whether CRDF chose to do 12 or 24 inmates at a time, privacy curtains could

15  have been utilized with either group size, and therefore, CRDF could, and should,

16  have been providing such readily available privacy during the whole class period.

17  AMF 152. Security would not have been compromised. Many of the worst aspects

18  of CRDF's search practices (both the public view of the intimate searches process

19  and of women inmates menstruating and changing pads or tampons) would have

20  been eliminated.  *Id.* Any nominal increase in search time would not justify the

21  extreme privacy invasions. As in *Jordan*, there was "an exaggerated regard for

22  pragmatic interests of lesser significance and a lack of proper concern for the

23  serious infringement of a counter-vailing constitutional interest." 986 F.2d at 1530.

24      After Cmdr. Gutierrez's testimony, there is no meaningful dispute that

25  privacy curtains were always a readily available option, as the foregoing discussion

26  establishes. Similarly, there was no financial or structural obstacles to earlier

27  installation of privacy curtains  AMF 144. The total cost of their installation was

28  $7056.93, and installation was "not complicated, indeed "simple." AMFs 14-143.

### 3. *There Was No Penological Justification to Expose Inmates to Significant Cold Discomfort During Searches*

Just as it was always feasible to provide privacy curtains, it was always readily feasible to conduct searches in an enclosed, heated space. Between November 2013 and February 2014, LASD enclosed BB3 by installing a sheet metal roof and sheet metal wall. AMFs 235..Heaters were also installed. AMF 236. This was a simple, inexpensive fix that dramatically changed the negative impact of the strip searches, and was readily achievable at any time. The total cost of the enclosure project, including the installation of heaters was $43,042.44. AMF 237.. The enclosure was "definitely" a "straightforward project;" there was "nothing complicated about it."AMF 238. Similarly, installation of heaters was "easy." AMF 239.No structural or architectural factors prevented installation of the heaters prior to the 2014 renovations. AMF 240.

### G. THE TOTALITY OF THE CIRCUMSTANCES ESTABLISHES THAT THE SEARCH PROCEDURES VIOLATED THE FOURTH AMENDMENT.

While we have provided cases that support the conclusion that different components of the searches here are unconstitutional (e.g., searches not conducted privately except under exceptional circumstances, searches exacerbating the special psychological vulnerabilities of women inmates), no case can compare to the extreme departure from the norm or accepted practice that this case reveals when viewed in its totality. Accordingly, there is no comparable case. In combination, the standard across-the-board practices here represent the most extreme and abusive strip search conditions of any reported strip search case. If these combined strip search practices do not comprise an unconstitutional manner of strip searches, then the concept loses all meaning. There may be individual instances that appear comparable or arguably more extreme (e.g., strip searches on a public street, *Amaechi v. West,* 237 F.3d 356, 362 (4th Cir.2001), or physical

insertion of items in body cavities, *Evans v. Stephens,* 407 F.3d 1272, 1281 (11th Cir.2005) (en banc)). No systemic strip search practices compare to those here.[18]

The thrust of Defendants' legal argument is that they must be allowed to strip search in groups. **The privacy aspect of Plaintiffs' challenge is not to group strip searches as such, but to the failure to provide privacy even if the searches were done in groups when there were readily available, fully secure alternatives that would have provided privacy for the most egregious intrusions, particularly in light of the special factors involving women**. Nor is it privacy alone. It is also the unnecessary physical manipulation of the labia, the handling of menstruation, the outdoor conditions and exposure to birds and insects, and the lack of heat. Defendants never address the actual contentions in this case.

### H.    DEFENDANTS' CASES ARE INAPPOSITE.

The cases on which Defendants rely are inapposite. *Solis*, on which defendants heavily rely, has already been addressed. It, like most of Defendants' cases, is a generic group strip search, without regard to the fact that the challenged practices exclusively apply to female inmates, to feasible alternatives, or to the myriad of particular challenged practices  that are separate from the group nature of the search. We reiterate – this case is not a per se group strip search challenge. *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988) involved a convicted, male inmate challenge to routine strip searches visible to other inmates and female correctional officers. There were no readily available alternatives; no more private locations were available; it would have required extra personnel, and been costly, to provide privacy; the inmates were convicted males, not primarily pretrial females; there was no evidence of the special vulnerability of the population; and the myriad of objectionable conditions involved here did not exist. The sole focus

---

[18] *Jordan v. Gardner* is the only comparable case, but did not actually involve strip searches A male guard phsycially pat searching a woman is unquestionably extreme. Whether it is more extreme than requiring menstrual blood to flow down one's legs in view of others along with all the other things that were standard practices here is debatabe. Both are unconstitutional.

of *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) was, like *Florence*, whether the strip searches were justified; the manner of searches (in any event, markedly different from those here) was not challenged. *Green v. Portillo*, No. 2:13-CV-00024-APG, 2015 WL 5092679 (D. Nev. Aug. 27, 2015) involved a convicted male inmate who challenged, on religious grounds, his termination from voluntary kitchen duty, which duty called for strip searches in the view of other inmates. The kitchen duty was voluntary, the inmate was not required to participate, and the prison did not have the resources to conduct individual searches. The factors distinguishing *Michenfelder* also apply here.

The same applies to Defendants' other cited cases. *See Gipson v. Wilkinson*, 2015 WL 4395031, *7 (W.D. La. July 16, 2015) (convicted prisoner challenge was to whether strip searches were permissible at all; issue was not group searches); *Wagner v. Thomas*, 608 F.Supp. 1095, 1103-04 (D.C. Tex. 1985) (male inmates challenging strip searches in presence of other inmates rejected; undisputed evidence that there would have been severe security risks in attempting individual searches, and procedure used was the most effective and efficient); *Fernandez v. Rapone*, 926 F.Supp. 255, 261-62 (D. Mass. 1996) (group strip searches of male inmates after contact visits permissible; searches had to be conducted "near the contact visit sites in order to ensure that contraband was not secreted into other areas of the institution"; no other search method was realistic; and it was the "policy and practice at the institution for an officer to comply with an inmate's request to be searched alone"); *Letcher v. Turner*, 968 F.2d 508, 510 (5th Cir. 1992) (use of female guards to strip search males on one occasion after lockdown was permissible).

## I.    THE INDIVIDUAL DEFENDANTS ARE NOT ENTITLED TO QUALIFIED IMMUNITY.

Plaintiffs have established that the searches here were unconstitutional, or at least there are disputed issues of fact on the issue, thereby disposing of the first

qualified immunity prong. The lengthy discussion above establishes that the law has been clearly established for many years that an unreasonable manner of strip search violates the constitution, and that Fourth Amendment reasonableness is based on the totality of the circumstances. Under the version of facts most favorable to Plaintiffs, Defendants' conduct violated this well-established law.

## V.    CONCLUSION

For the forgoing reasons, summary judgment should be denied. In light of the substantial undisputed evidence in this record that the privacy curtains, modifications of the genital manipulation and menstruation practices, enclosure of the bus bay and installation of privacy curtains were readily available alternatives from inception, Plaintiffs urge the Court to allow them to move for summary judgment (an option the Court rejected until Defendants' motion was resolved).

Dated February 26, 2016                     Respectfully submitted,

                                            KAYE, McLANE, BEDNARSKI & LITT, LLP
                                            MANN & COOK
                                            CYNTHIA ANDERSON-BARKER


                                            By: _/s/ Barrett S. Litt _____
                                                Barrett S. Litt


                                            By: _/s/ Lindsay Battles_____
                                                Lindsay  Battles
                                                Attorneys for Plaintiffs