Barrett S. Litt, SBN 45527
blitt@kmbllaw.com
Lindsay Battles, SBN 262862
Kaye, McLane, Bednarski & Litt, LLP
234 Colorado Boulevard, Suite 230
Pasadena, California 91101
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Donald W. Cook, SBN 116666
E-Mail: manncook@earthlink.net
Attorneys at Law
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Cynthia Anderson-Barker, SBN 175764
E-Mail: cablaw@hotmail.com
Law Offices Of Cynthia Anderson-Barker
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY AMADOR et al., individually and as class representatives<br><br>                    Plaintiffs,<br><br>  vs.<br><br>SHERIFF LEROY D. BACA, individually and in his official capacity, et al,<br><br>                    Defendants. | Case No. CV 10-1649 SVW (RC)<br>[Hon. Stephen V. Wilson]<br><br>**Plaintiffs' Motion for Summary Judgment re Plaintiffs' §1983 Fourth Amendment Claims**<br><br>Date:          May 1, 2017<br>Time:          1:30 P.M.<br>Courtroom:          10A |

TO ALL PARTIES HEREIN AND TO THEIR RESPECTIVE ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on May 1, 2017 at 1:30 P.M., in Courtroom 5A of the United States District Court for the Central District of California, 350 West First Street, Los Angeles, California 90012, Plaintiffs will, and hereby do, move this Court for an Order finding that Plaintiffs are entitled to summary judgment on the following issues:

1. Whether Defendants' search policies and practices applicable to Class #2 (July 2011 – January 2015) were constitutionally unreasonable under Fourth Amendment standards.

2. Whether Defendants' search policies and practices applicable to the Class #2 Large-Group-Subclass (July 2011 - March 2013) were constitutionally unreasonable under Fourth Amendment standards.

3. Whether Defendants' search policies and practices applicable to Class #1 (March 2008 – June 30, 2011) were constitutionally unreasonable under Fourth Amendment standards.

4. Whether Defendants' search policies and practices applicable to Class #1 and Class #2 menstruation practices subclasses were constitutionally unreasonable under Fourth Amendment standards.

5. Whether Defendants' search policies and practices applicable to Class #1 and Class #2 subclasses for inmates strip searched in temperatures of less than 77° were constitutionally unreasonable under Fourth Amendment standards.

This motion is based on the accompanying Memorandum of Law, the declarations and/or exhibits cited in Plaintiffs' Separate Statement of Uncontroverted Material Facts and Conclusions of Law, the files and records in this case (specifically including Plaintiffs' Additional Material Facts in Opposition to Defendants' Motion for Summary Judgment, Dkt. No. 282, and evidence submitted with the Declaration of Lindsay Battles

in Support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgment (Dkt. 284)), and such evidence as may be adduced at a hearing on this motion.

Dated: March 10, 2017              KAYE, McLANE, BEDNARSKI & LITT, LLP


                                   By ____/s/ Barrett S. Litt_____
                                   Barrett S. Litt
                                   Attorney for Plaintiffs

# TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................. 1

II.     FACTS ................................................................................................. 2

A. LASD STRIP SEARCHES OF FEMALE INMATES ............................................... 2

    1.  CRDF's Strip Search Procedures Required Female Inmates to Expose Intimate Body Parts, In Large Groups , With No Measure for Individual Privacy .................................................................. 2

    2.  CRDF Publicly Humiliated Menstruating Women ........................... 4

    3.  Some Class Members Experienced Even More Extreme Privacy Violations as a Result of Larger Groups and More Invasive Procedures ............................................................................... 5

        a)  Inmates Searched Before April 2013 Were Searched in Even Larger Groups and Under Less Sanitary Conditions ............... 5

        b)  Before July 2011, CRDF Subjected Inmates to Even More Outrageous Privacy Violations (Class #1) ................................... 6

B. SOME INMATES EXPERIENCED EXTREME COLD DISCOMFORT (SUBCLASS) ..... 7

III.    LEGAL  ARGUMENT ...................................................................... 8

A. SUMMARY JUDGMENT STANDARD ............................................................... 8

B. REASONABLENESS IS ASSESSED WITH REGARD TO THE SCOPE OF INTRUSION, MANNER AND LOCATION OF SEARCH, AND JUSTIFICATION ............................... 9

C. THE MANNER IN WHICH LASD SEARCHED ALL MEMBERS OF CLASS TWO WAS CONSTITUTIONALLY UNREASONABLE AS A MATTER OF LAW ............... 11

    1.  LASD's Body Cavity Inspection Was Not Entirely Visual ; No Penological Justification Supports LASD's Highly Invasive Procedure ........................................................................... 12

    2.  Strip Searching Inmates in Large Groups Constitutes a Profound Violation of Privacy and Departure from the Practices of Most Correctional Facilities .......................................................... 16

3.   Given the Existence of Readily Available Alternatives, the LASD Lacked a Legitimate Penological Justification for Conducting Invasive Body Cavity Inspections In A Large-Group Setting. ..........18

4.   Characteristics of the Female Jail Population Underscore the Need for Individual Privacy....................................................................22

D. SEARCH CONDITIONS APPLICABLE TO SPECIFIC CLASSES/SUBCLASSES ........26

1.   Class #1: Two Lines at a Time, March 2008 – July 2011 (Class #1) .27

2.   Subclass to Class #1: LASD's (Very) Large Group Search Practices Were Constitutionally Unreasonable ..................................................27

3.   Subclass to Classes # 1 and 2: The Manner in Which LASD Searched Menstruating Women was Constitutionally Unreasonable ...............28

4.   Subclass to Classes #1 and #2: Searches Involving Extreme Cold Discomfort Were Constitutionally Unreasonable ................................29

IV.   CONCLUSION.....................................................................................30

iv

# TABLE OF AUTHORITIES

**Federal Cases**

*Act Up!/Portland v. Bagley,*
  988 F.2d 868 (9th Cir. 1993) ............................................................. 12

*Amaechi v. West,*
  237 F.3d 356 (4th Cir.2001) ............................................................. 16

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ........................................................................... 9

*Arruda v. Fair,*
  710 F.2d 886 ...................................................................................... 14

*Ashcroft v. al-Kidd,*
  563 U.S. 731, 131 S. Ct. 2074, 179 L. Ed. 2d 1149 (2011) ............... 9

*Bell v. Wolfish,*
  441 U.S. 520 (1979) ...................................................................... 9, 10

*Blackburn v. Snow,*
  771 F.2d 556 (1st Cir. 1985) ............................................................. 13

*Bull v. City & Cnty. of San Francisco,*
  595 F.3d 964 (9th Cir. 2010) ......................................................... 9, 12

*Canedy v. Boardman,*
  16 F.3d 183 (7th Cir.1994) ............................................................... 12

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ............................................................................ 8

*Chandler v. Moore,*
  2 F.3d 847 (8th Cir.1993) ................................................................. 29

*Chapman v. Nichols,*
  989 F.2d 393 (10th Cir. 1993) .......................................................... 12

*Doe v. Renfrow,*
  631 F.2d 91 (7th Cir.1980) ............................................................... 14

v

*Ellison v. Brady,*

    924 F.2d 872 (9th Cir. 1991) ........................................................................... 25

*Farmer v. Perrill,*

    288 F.3d (10th Cir. 2002) ......................................................................... 12, 16

*Florence v. Board of Freeholders of the County of Burlington,*

    132 S.Ct. 1510 (2012).......................................................... 9, 10, 11, 17

*Graham v. Connor,*

    490 U.S. 386, 109 S.Ct. 1865 (1989)......................................................... 9

*Harris v. Miller,*

    818 F.3d 49 (2nd Cir. 2016) ...................................................................... 13

*Hunter v. Auger,*

    672 F.2d 668 (8th Cir.1982) ..................................................................... 14

*Jones v. Salt Lake County,*

    503 F.3d 1147 (10th Cir. 2007) ................................................................ 10

*Jordan v. Gardner,*

    986 F.2d 1521 (9th Cir. 1993) ....................................................... 21, 24, 25

*Justice v. City of Peachtree City,*

    961 F.2d 188 (11th Cir. 1992) .................................................................. 22

*Kennedy v. Los Angeles Police Dep't.,*

    901 F.2d 702 (9th Cir.1990) ..................................................................... 13

*Mary Beth G. v. City of Chicago,*

    723 F.2d 1263 (7th Cir.1983) ................................................................... 14

*Mashburn v. Yamhill County,*

    2012 WL 5879444 (D.Or., Nov. 19, 2012) ....................................... 11, 22

*Mays v. Springborn,*

    719 F.3d 631 (7th Cir. 2013) .................................................................... 12

*Michenfelder v. Sumner,*

    860 F.2d 328 (9th Cir.1988) ..................................................................... 25

*Mitchell v. Maynard,*

  80 F.3d 1433 (10th Cir.1996) ................................................................... 29

*N.V. and S.G. v. Connecticut,*

  382 F.3d 225 (2nd Cir. 2004) ................................................................... 22

*New Jersey v. T.L.O.,*

  469 U.S. 325 (1985) ................................................................................. 23

*Roberts v. State of R.I.,*

  239 F.3d 107 (1st Cir. 2001) ................................................................... 15

*Safford Unified Sch. Dist. No. 1 v. Redding,*

  557 U.S. 364, 129 S. Ct. 2633 (2009) ........................................... 9, 14, 22

*Salem v. Michigam Dept. of Corrections,*

  643 Fed.Appx. 526 (6th Cir. 2016) ............................................ 9, 15, 16, 17

*Salem v. Michigan Dept. of Corrections,*

  2015 WL 1966727 (E.D. Mich. May 1, 2015) ......................................... 15

*Shroff v. Spellman,*

  604 F.3d 1179 (10th Cir. 2010) ............................................................... 12

*Smook v. Mennehaha County,*

  457 F.3d 806 (8th Cir. 2006) ................................................................... 22

*Stoudemire  v. Michigan Dep't of Corr.,*

  705 F.3d 560 (6th Cir. 2013) ....................................................... 11, 13, 16, 17

*Thompson v. City of Los Angeles,*

  885 F.2d 1439 (9th Cir. 1989) ................................................................. 13

*Turner v. Saffley,*

  482 U.S. 78 (1987) ................................................................................... 10

*United States v. Cameron,*

  538 F.2d 254 (9th Cir. 1976) ................................................................... 12

*United States v. Falkes,*

  770 F.3d 748 (9th Cir. 2014) ................................................................... 11

*Vaughan v. Ricketts*,
    859 F.2d 736 (9th Cir.1988) ............................................................. 12, 26

*Wilkes v. Borough of Clayton*,
    696 F. Supp. 144 (D.N.J. 1988) ................................................................ 28

*Williams v. City of Cleveland*,
    ---F.Supp.3d---, 2016 WL 5462957  (N.D. Ohio, Sept. 28, 2016) ..................... 17, 18

*Williams v. City of Cleveland*,
    771 F.3d 945 (6th Cir. 2014) ............................................. 9, 10, 11, 13, 14, 16, 17

*Wilson v. Seiter*,
    501 U.S. 294, 111 S.Ct. 2321 (1991) ......................................................... 30

*Yeager v. Bowlin*,
    693 F.3d 1076 (9th Cir. 2012) ............................................................ 20, 21

*Young v. County of Cook*,
    616 F.Supp.2d 834(N.D. Ill. 2009) ....................................................... 14, 18, 19, 27

**Federal Rules**
FRCP 56(a) ................................................................................... 8

# I.      INTRODUCTION

Plaintiffs seek summary judgment on the constitutionality of LASD's practice of subjecting female inmates to highly invasive body cavity inspections, in groups, without individual privacy, and despite the absence of a penological justification and the ready availability of alternatives. We specifically challenge as unconstitutional the combined search procedures common to Class #2 (which are also common to Class #1), including practices that required female inmates to (1) manually spread their labia to expose their vaginal opening *in the presence of a group*; and (2) expose their naked body – including bare pubic region and bare breasts – *in the presence of a group*. This challenge is not merely to the group configuration of searches, nor do Plaintiffs challenge specific elements of the search sequence in the abstract. Our overriding challenge, applicable throughout the class periods, is to the use of these specific, highly invasive, gender-specific procedures in a group setting, without individual privacy, despite the known risk of trauma to female inmates and despite the availability of *inexpensive, fully secure alternatives that would have provided privacy for the most egregious intrusions.* Plaintiffs contend that these "core conditions", common to Class 1 and Class 2, represent an extreme departure from accepted practice in women's detention facilities, are unsupported by a valid penological justification, and are sufficient, standing alone, to render the searches unreasonable. The additional conditions relevant to Class #1 (lines facing) and the subclasses (large groups, menstruation practices and weather) involve conditions that render the searches more barbaric and unreasonable under Fourth Amendment standards. However, to be clear, Plaintiffs contend that the core conditions alone violated Plaintiffs' rights.

If the Court grants summary judgment on the Class #2 common practices, it is not necessary to address additional search practices applicable to Class #1 (facing lines), or to the Class #2 large group subclass, menstruation subclasses or weather subclasses. If summary judgment is not granted for Class #2, Plaintiffs

seek summary judgment on the additional conditions encompassed by Class #1 and the various subclasses in both Classes #1 and 2. All determinations are made in the aggregate (e.g., unconstitutionality for the weather subclass in Class #1 is based on the Class #1 common conditions plus the Class #1 weather subclass conditions).

## II.   FACTS

### A.   LASD STRIP SEARCHES OF FEMALE INMATES

Between March 2008 and January 2015, CRDF conducted highly invasive searches of female inmates, in large groups, and without privacy curtains or similar measures. The vast majority of searches were conducted in BB3, an outdoor garage space that was only partially enclosed until February 2014. UMFs 10-13 160, 172.

### 1.   *CRDF's Strip Search Procedures Required Female Inmates to Expose Intimate Body Parts, In Large Groups, With No Measure for Individual Privacy*

It is undisputed that CRDF conducted body cavity inspections in large groups, without individual privacy, until January 2015. Throughout the class period, the overwhelming majority of these groups involved 20+ inmates, often larger. UMF 14 – 25.

At the beginning of each group search, deputies instructed inmates to line up along two facing walls of the search area, undress, then turn and face the center, wearing only underwear with bare breasts exposed, and submit to a thorough body inspection. UMFs 32-41. Inmates were to raise their arms (permitting inspection of armpits and area underneath wristband) and then lift their breasts without crossing their arms (to ensure breasts were exposed), in view of the group. Next, inmates were to pull their underwear to their knees (resulting in full frontal nudity) and lift their stomachs, in view of the group. UMFs 34-41 (A strip search script memorialized in July 2013 reads: "Drop your underwear to your knees. Leave them there. Open your belly buttons. Lift your stomach or any skin folds."). UMF 40. Inmates could **not** avoid seeing each other's' bare bodies, including pubic area, stretch marks, breasts missing from mastectomies, surgery scars and tattoos

(exposure of which was a safety issue). UMF 41, 42. CRDF Sergeant Devane confirmed class member reports that inmates commonly were confused and looked at other inmates to determine what to do. UMF 42.

This experience would have been shaming and mortifying to any woman, most of whom have never exposed their bodies, including breasts and pubic region, in public. UMFs 37, 278-280 (Decl. of Expert Roberts). Indeed, the search procedures called attention to some of the areas of women's bodies that make them feel most self-conscious and ashamed (breasts and stomach). UMF 280. Deputies directly called out heavier women (instructing, "if you have a large stomach or any rolls of fat, lift them up"), thus requiring women to publicly identify if they had large stomachs, and then submit to inspection, one-by-one in the view of the whole group. UMFs 38, 39, 280.

After inspecting their breasts, stomach and pubic region, deputies inspected inmates' vulva, vaginal opening and rectum, ordering them to face the wall, bend at the waist, reach behind their bodies, and pull apart their labia to expose their vaginas. The search command script implemented in July 2013 reads:

> "When I tell you to, pull down your underwear, take a half step back, spread your feet wide, and bend at your waist, not at your knees. **Reach behind with your hands, spread open your vagina lips, and cough.** Look between your legs so you can see when we tell you to get up. Cough until you are told to get up." UMF 46.

Inmates were required to maintain this position for 3-5 minutes, coughing continuously and looking between their legs, while deputies individually inspected each inmate's vagina and rectum with a flashlight UMF 51-61.[1] UMF 60. Requiring women inmates to physically manipulate their vagina and labia is an

---

[1] Disabled or obese women who could not perform the labia spread had to sit on a chair or lie on the ground, bare-bottomed, with their legs spread and bent at the knees so that deputies could inspect their vaginas from the front. UMFs 93 – 95.

extreme form of body cavity inspection and is <u>not</u> standard practice within the correctional community. UMFs 111 – 116, 131. This procedure would have been profoundly mortifying to any woman. UMF 50, 285, 286. During the search, deputies instructed inmates to insert their fingers in their mouths, pull their upper and lower gums away from their teeth and run their fingers between their lips and gums. Inmates with dentures were required to remove them and place them on the ground on top of their clothing. UMFs 96-99.

### 2.   *CRDF Publicly Humiliated Menstruating Women*

Menstruating women endured even more humiliating searches. Before commencing the body cavity inspection, deputies ordered menstruating inmates to publicly identify themselves by raising their hand and to remove soiled tampons or pads – in the view of the other inmates – saying "If you have anything between your legs or inside of you, please take it out now." UMFs 69–71. The very act of removing a tampon or pad while bleeding (and when standing) may cause women to bleed on their bodies, regardless of whether the tampon or pad is promptly replaced. Heavily menstruating women may secrete blood **immediately** upon removal of a tampon or pad, and many unavoidably bled onto their fingers, legs or the ground, and were unable to immediately clean themselves. UMFs 72–84. Witnesses report that never before in their lives have they had to attend to soiled tampons or pads in the presence of strangers. UMF 75.

LASD's search procedure virtually ensured that inmates would bleed on themselves in view of others. Inmates were not permitted to replace their feminine hygiene products until the "labia lift" body cavity inspection was complete, sometimes for several minutes. UMFs 76 – 84. CRDF personnel and inmates observed inmates bleed onto themselves or the ground, sometimes expelling blood clots. UMFs 78 - 80.

Inmates often bled on themselves when they spread their labia and *coughed*. The purpose of requiring inmates to cough is to produce a contraction of vaginal

muscles, to help expel anything in the vagina.[2] UMF 52. This contraction may cause women who are bleeding more heavily to expel blood. UMF 53. Some menstruating inmates could not avoid expelling blood while coughing. UMFs 52 – 56. CRDF never made soap and water immediately available to inmates who bled on themselves. UMF 81. (This procedure may also cause women to involuntarily urinate). UMF 55. Witnesses saw others urinate, vomit or defecate, and others observed urine, vomit and feces on the bus bay floor. While the frequency may be disputed, it is undisputed that there were incidents where inmates urinated, vomited or dropped feces on the bus bay floor. CRDF personnel acknowledge this happened. UMF 85. Witnesses commonly observed dried and/or fresh blood on the floor of the bus bay; when blood ran onto the floor; deputies ordered inmate workers to spray "extra cleaner" on the blood. UMF 83.

CRDF's handling of menstruation during searches would have been humiliating and traumatizing to any woman. UMF 87 – 92. Because women are socialized to handle menstruation in private, and to believe that menstrual blood is disgusting and unclean, removing blood-soiled feminine hygiene products in the view of strangers would have been mortifying for any woman, and worse for those who bled on themselves or the ground. UMF 75, 92, 282.

### 3. *Some Class Members Experienced Even More Extreme Privacy Violations as a Result of Larger Groups and More Invasive Procedures*

#### a) Inmates Searched Before April 2013 Were Searched in Even Larger Groups and Under Less Sanitary Conditions

Until July 2013, LASD had no rule limiting group sizes, UMF 15, and searched inmates in groups commonly as large as 40 or even more inmates. In

---

[2] Women may involuntarily urinate when required to cough in this position. One witness observed an inmate expel her intra-uterine-device (IUD) while coughing for the visual body cavity inspection. UMFs 55, 56.

2010, LASD's Rule 30(b)(6) witness testified that a 40-inmate group was "normal[]." UMFs 16,17. Electronic Daily Activity Logs ("EUDAL Logs" or "activity logs") instituted in February 2011 confirm group sizes of 20 – 60. UMF 20 – 21. The large group sizes caused, inmates to stand so close together that they could not avoid brushing up against each other's bodies. UMFs 27-31. They were instructed to line up "shoulder-to-shoulder." UMF 27.

Given the (undisputed) bus bay dimensions, groups of even 30 inmates would have had *less* than 6 inches on each side of their body, inevitably causing them to brush against each other when undressing and performing search exercises (lifting arms, running hands through hair, lifting breasts, etc.). UMF 29. Inmates confirm that they could not avoid brushing up against each other. UMF 31. Inmates were often standing so closely that they would touch at the hips when bent over for the body cavity inspection. UMF 47. Groups of 40 or more would have had less than 2-3 inches on either side. UMF 30. Hundreds of search groups were 50 or more, which occurred at least several times/month. UMFs. 18-23.

During this period, clothing was placed directly on the porous concrete floor, and inmates commonly had to place unsanitary fingers inside their mouth because CRDF did not provide a way to sanitize their hands before touching their mouths. [3]

### b)    Before July 2011, CRDF Subjected Inmates to Even More Outrageous Privacy Violations (Class #1)

Inmates searched before mid-2011 experienced even more extreme privacy violations. Like the Large-Group subclass, members of Class #1 were searched in extremely large groups (commonly 40 inmates but sometimes more than even 60), were required to place their clothing on the ground, and were provided no way to

---

[3] To inspect the mouth, deputies instructed inmates to insert their fingers in their mouths, pull out their upper and lower gums and run their fingers between their lips and gums; those with dentures had to remove them and put them with their clothes. UMF 96, 97. No hand sanitization was available and no policy required that the mouth search occur at the beginning. UMFs 98 – 100

6

sanitize their hands before placing them in their mouths. In addition, before at least
July-2011, CRDF's standard practice was for both lines to directly face the center
simultaneously, bare breasts and naked pubic region exposed (fully nude) facing
the opposite line; deputies checked their armpits, under their breasts and under
rolls of fat, for much of the time while viewing similarly positioned women on the
opposite wall. UMF 43. Likewise, both lines simultaneously completed the body
cavity inspection, bent over, spread their labia with their hands to expose their
vagina, and looked between their legs until a deputy inspected them. UMF 62.
Because the process was simultaneous, inmates could not avoid seeing the exposed
genitals and rectum of inmates on the opposite wall (also looking between their
legs). UMF 63.

> ### B.   SOME INMATES EXPERIENCED EXTREME COLD DISCOMFORT (SUBCLASS)

Until February 2014, the Bus Bay #3 had no heating, and no roof, but only a
chain link fence top covered by a tarp. Even when the tarps were properly fastened,
gaps between them permitted air to blow in. UMFs 180-196. LASD's 30(b)(6)
witness described the space as "very windy," particularly in the evening. UMF
195. Inmates also reported feeling extremely cold. UMF 196. At some point before
October 2010, CRDF purportedly adopted a rule prohibiting searches under 68°
(before which there was no rule at all). CRDF's records demonstrate, however, that
searches were routinely conducted when the temperature was below 68°. UMF
228. Thermal comfort expert, Gwelen Paliaga, identified *over 45,000 searches* (of
approximately 116,000) *where the recorded temperature was 65° or less*. UMF
214. CRDF did not memorialize the purported cutoff in written policy until July
2013, when CRDF instituted a cutoff of 70°. UMFs 198 – 201.

The 68° rule has no scientific basis and was nowhere near sufficient to
ensure adequate heat. As LASD concedes, ASHRAE 55 provides the governing
standard for minimal acceptable temperatures for occupied spaces. Under the

ASHRAE 55 model, the minimum acceptable temperature depends on five factors, **including the amount of clothing worn** by occupants. UMF 206-208. The acceptable temperature when wearing only underpants is substantially higher than for those clothed because the body loses far more heat. *See* UMF 206. Defendants' conclusion that 68 (or 70) degrees was an acceptable cutoff ignored the clothing component. Defendants admittedly reached this conclusion *without* consideration of the extreme cold effects of no clothing, bare feet and cold cement. *See* UMF 206-208. Using the universal model for heating of occupied spaces, strip searches conducted at 68° (or 70°) would have produced very significant cold discomfort, far outside of acceptable ranges established by ASHRAE. *See* UMFs 202- 226.

Using the model established by ASHRAE, and the most conservative assumptions, the minimum acceptable temperature was 77°.[4] Using more realistic assumptions for air speed and metabolic rate, the minimum acceptable temperature was 81°. UMF 213, 223.

## III. LEGAL ARGUMENT

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no "genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." FRCP 56(a). The moving party satisfies its initial burden by showing "that there is an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Thereafter, the burden shifts to the non-

---

[4] ASHRAE 55's comfort model is based on the universally accepted PMV standard, by which thermal comfort is measured on an ordinal scale, with -3 representing severe cold discomfort and +3 representing severe heat discomfort (-1 obviously represents a lesser degree of dissatisfaction than -2 or -3), and the PPD (predicted percentage dissatisfied), which is based on field studies that correlate varying PMV measures to the percentage of the population exposed to those conditions who express dissatisfaction with them. *Id*. p.6. The PMV and PPD are incorporated into ASHRAE Standard 55, which is "universally accepted as the standard of care" for designing and operating thermal environments. Ex. 602, Declaration of Gwelen Paliaga, Declaration of Gwelen Paliaga, p. 5.

moving party to designate specific facts showing there is a genuine issue for trial. *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986).

### B. REASONABLENESS IS ASSESSED WITH REGARD TO THE SCOPE OF INTRUSION, MANNER AND LOCATION OF SEARCH, AND JUSTIFICATION

Strip searches are governed by Fourth Amendment "reasonableness" standards. *Florence v. Board of Freeholders of the County of Burlington*, 132 S.Ct. 1510, 1516 (2012); *see also*, e.g., *Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) (citing cases). Reasonableness is assessed under the "totality of the circumstances." *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 385, 129 S. Ct. 2633, 2647 (2009); *Bell v. Wolfish*, 441 U.S. 520, 552 (1979). It is an "objective" inquiry with no subjective component. *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 1872 (1989); *Ashcroft v. al-Kidd*, 563 U.S. 731, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011).

A search is constitutionally reasonable only when the jail's "need for the particular search" outweighs "the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559 (1979) (emphasis supplied); *see also*, *Salem v. Michigam Dept. of Corrections*, 643 Fed.Appx. 526, 529 – 531 (6th Cir. 2016). In making this determination, courts consider the scope of the intrusion, the manner in which the search is conducted, the place in which the search is conducted, and the justification for both the initiation of the search and for the specific search procedures, with reference to any "obvious" alternatives. *Williams v. City of Cleveland*, 771 F.3d 945, 954 (6th Cir. 2014); *Florence*, 132 S.Ct. at 1516 (*Bell v. Wolfish*'s balancing test is the "starting point" for assessing the constitutionality of strip searches; *Turner v. Saffley* provides the standard for evaluating asserted justifications).[5]

---

[5] *Bell* and *Turner* functionally involve the same test. *See, e.g., Jones v. Salt Lake County*, 503 F.3d 1147 (10th Cir. 2007) (*Bell* "essentially applied [*Turner's*] factors.").

Searches are *justified* only where they are "reasonably related to legitimate penological interests." *Florence*, 132 S.Ct. at 1515 (quoting *Turner v. Saffley*, 482 U.S. 78, 89 (1987))."[O]bvious, easy alternatives," accompanied by only a "*de minimis* cost to valid penological interests," indicate that institutional needs do **not** outweigh the burdens on detainees, and therefore the policy is unreasonable; they are evidence of an 'exaggerated response' to prison concerns" and that the policy does not satisfy the "reasonably related test." *Turner*, 482 U.S. 78, 89 - 91 (1987); *see also, Bell*, 441 U.S. at 539 n.20 (availability of "alternative and less harsh methods" would suggest a punitive purpose). The practices of other institutions are relevant in assessing whether readily available alternatives exist. *Turner*, 482 U.S. at 97-99 (citing federal Bureau of Prisons regulations as one measure of whether there were ready alternatives, and citing them to find the marriage ban there was an "exaggerated response" to legitimate security concerns); *see also*, *Williams*, 771 F.3d at 954 (6th Cir. 2014) (search practices of other facilities relevant to justification).

Even where a legitimate penological purpose supports the *initiation* of a search, the search itself may be unlawful based on the scope of intrusion and lack of penological justification for the manner in which the search was conducted. *Bell*, 441 U.S. at 559, 560 ("the manner in which [the search] is conducted" and "the justification for initiating it" are two different aspects of whether a search is reasonable.") (emphasis supplied); *Florence*, 132 S. Ct. 1510 at 1516,1517 [6]; *United States v. Falkes*, 770 F.3d 748, 758 (9th Cir. 2014) (otherwise justified strip

---

[6] *Florence* left untouched the longstanding rule that justifiable searches must still be conducted in a reasonable **manner**. It **solely** addressed whether blanket searches of new general population inmates without individualized reasonable suspicion were justifiable, expressly limiting it's holding to that issue. *Florence* expressly re-emphasized that "[t]he need for a particular search must be balanced against the resulting invasion of personal rights." and that courts must consider the *scope* of intrusion, *manner*, location and justification of a search). 132 S. Ct. at 1516 (citing *Bell*).

search must be performed in a reasonable manner); *Williams* 771 F.3d at 951 (6th Cir. 2014); *Stoudemire  v. Michigan Dep't of Corr.*, 705 F.3d 560, 573 (6th Cir. 2013) (*Florence* "does not mean that the strip searches may be conducted in any manner whatsoever that the facility chooses."); *Mashburn v. Yamhill County*, 2012 WL 5879444 at 7-11 (D.Or., Nov. 19, 2012) (under *Florence*, a strip "search may still be unconstitutional if it is excessively intrusive in relation to the government's need for the search").

    In assessing the constitutionality of specific search practices, the "**pertinent question is not whether the jail has a general need [for the search in the first instance] but whether the jail's selection of the particular procedures to which it subjected [inmates] is reasonably related to that legitimate end**." *Williams*, 771 F.3d at 954 (6th Cir. 2014) (emphasis added). Where a "search is conducted in a particularly invasive manner, despite the lack of exigent circumstances" necessitating "the degree of invasion," the "search may be unreasonable by virtue of the way in which it is conducted." *Id.* at 952 (6th Cir. 2014) (citing *Stoudemire*, 705 F.3d at 573 (6th Cir. 2013) (Though defendant "had valid reason for searching [the plaintiff], no special circumstances provided additional justification for searching [the plaintiff] where others could see her naked").

### C.   THE MANNER IN WHICH LASD SEARCHED ALL MEMBERS OF CLASS TWO WAS CONSTITUTIONALLY UNREASONABLE AS A MATTER OF LAW

    LASD's practice of requiring female inmates to submit to highly invasive body cavity inspections, in a large-group setting and without privacy, constituted a severe departure from the practices of other women's correctional facilities. While the discussion below cites cases addressing various aspects of CRDF's searches (group size, search methodology, search population), no reported case encompasses anything approaching the full set of conditions present here. LASD's standard practice (memorialized in written policy) reflects the most extreme and

abusive strip search conditions of any reported strip search case. LASD's search policies were unreasonable as a matter of law given the undisputed availability of an easy alternative, one that LASD ultimately (years after this litigation commenced) adopted, which was to enclose the bus bay, install heaters, search in smaller groups (a maximum of 24 at a time), and install privacy curtains.[7]

### 1. *LASD's Body Cavity Inspection Was Not Entirely Visual; No Penological Justification Supports LASD's Highly Invasive Procedure*

Strip searches (regardless of search method) are "an invasion of personal rights of the first magnitude." *Chapman v. Nichols*, 989 F.2d 393, 395 – 396 (10th Cir. 1993); *Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir.1994) ("[O]ne of the clearest forms of degradation in Western Society is to strip a person of his clothes. The right to be free from strip searches and degrading body inspections is thus basic to the concept of privacy.").

In assessing the scope of intrusion, courts distinguish between searches that involve visual scrutiny of body cavities, and those that do not. *Harris v. Miller* 818

---

[7] Numerous cases establish that privacy is a major factor in assessing whether the manner of strip search is constitutional. *See, e.g., Bull,* 595 F.3d at 974-75 (9th Cir. 2010) (emphasizing that San Francisco strip searches were conducted "in a place that afforded privacy"); *Act Up!/Portland v. Bagley*, 988 F.2d 868, 872 (9th Cir. 1993) ("the Fourth Amendment requires that any strip search be conducted in a reasonable manner, and accordingly that officers must respect arrestees' privacy interests') (citing *Vaughan v. Ricketts,* 859 F.2d 736, 741 (9th Cir.1988); *United States v. Cameron*, 538 F.2d 254, 257-58 (9th Cir. 1976) ("body search[es]… must be conducted with regard for the subject's privacy and be designed to minimize emotional and physical trauma"); *Farmer v. Perrill*, 288 F.3d at 1259-61 (10th Cir. 2002) ( strip searches may not "be conducted without regard for privacy without justification"; affirming summary judgment where strip searches were "conducted in an open area visible to a number of other inmates and staff"); *Shroff v. Spellman*, 604 F.3d 1179, 1191 (10th Cir. 2010) (requirement that female inmates expose breast to female guard while pumping milk violated Fourth Amendment); *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013) (summary judgment inappropriately granted on claim "that the searches were group searches that gratuitously exposed to other prisoners the nudity of each prisoner being searched").

F.3d 49, 58 (2nd Cir. 2016) ("A 'strip search,' though an umbrella term[,] generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities. A 'visual body cavity search' extends to visual inspection of the anal and genital areas. A 'manual body cavity search' *includes some degree of touching* or probing of body cavities.") (emphasis added).

This distinction is constitutionally significant because, to an even greater degree than strip searches in general, body cavity searches are one of the most humiliating and degrading law enforcement practices, involving an extreme intrusion upon personal privacy and profound offense to individual dignity. *See, e.g.*, *Harris,* 818 F.3d at 59 (2nd Cir. 2016) ("Regardless of who performs the search, a visual body cavity search…is invasive: A strip search that involves a stranger peering without consent at a naked individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy.") (internal quotation and citation omitted); *Williams*, 771 F.3d at 952 (6th Cir. 2014) ("A visual strip search is 'an offense to the dignity of the individual' that is 'undoubtedly humiliating and deeply offensive to many'"); *Kennedy v. Los Angeles Police Dep't.,* 901 F.2d 702, 711 (9th Cir.1990) (visual body cavity searches are "dehumanizing and humiliating") (citing *Stoudemire*, 705 F.3d at 572-573); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1446 (9th Cir. 1989) *overruled on other grounds by Bull*, 595 F.3d 964 (9th Cir. 2010) ("feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute"); *Blackburn v. Snow,* 771 F.2d 556, 564 (1st Cir. 1985) ("body cavity searches are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying

13

degradation and submission.' " quoting *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir.1983)).[8]

Federal courts recognize that some body cavity inspection techniques are more invasive than others. *Young v. County of Cook,* 616 F.Supp.2d 834, 840, 850 – 851(N.D. Ill. 2009) distinguished between the "squat-and-cough" technique, which it characterized as substantially more dignified and less invasive than the "bend-and-spread" procedure*,* which requires inmates to bend at the waist and spread buttocks for visual inspection of the rectum. The Court held that group searches of male detainees without privacy screens violated the Fourth Amendment as a matter of law, where some of the searches (those conducted earlier in the class period) used the more invasive "bend-and-spread" procedure. *Young*, 616 F.Supp.2d at 850- 851. LASD's search methodology was substantially more invasive than the "bend-and-spread" methodology in *Young*. CRDF required female inmates to use their hands to both spread their buttocks and to spread their labia to expose their vaginal opening. LASD's invasive "labia lift" procedure was used, without privacy partitions, throughout the Class #1 and Class #2 periods.

Because female inmates were required to manually spread their labia to permit inspection, the search cannot be characterized as entirely visual. Searches that involve any degree of touching – even where the touching is not performed by the correctional officers – are substantially more invasive than entirely visual searches. *Williams*, 771 F.3d at 953 (6th Cir. 2014) ("public exposure of the genitalia accompanied by physical touching is far more intrusive than directing an

---

[8] *See also, e.g., Arruda v. Fair*, 710 F.2d 886, 887 ("We recognize….the severe if not gross interference with a person's privacy that occurs when guards conduct a visual inspection of body cavities."); *Doe v. Renfrow,* 631 F.2d 91, 93 (7th Cir.1980) (*per curiam*) (strip search of a minor student absent reasonable cause violates "any known principle of human decency" and "exceed[s] the 'bounds of reason' by two and a half country miles."); *Safford*, 129 S. Ct. at 2642 (2009) ("strip search can 'result in serious emotional damage'") (citing6 J. School Psychology 7, 13 (1998); *Hunter v. Auger,* 672 F.2d 668, 674 (8th Cir.1982).

14

arrestee to remove her clothing in private for the purpose of 'visually inspecting' the arrestee's genitalia.") (internal quotations omitted); *see also*, *Roberts v. State of R.I.*, 239 F.3d 107, 113 (1st Cir. 2001) (emphasizing that search in question, which it found reasonable, was conducted in private and "entirely visual").

There is no penological justification for performing this procedure *en masse*, particularly without privacy. Requiring female inmates to manipulate their genitals is not standard practice among U.S. jails. UMF 111-116, 131. Within the correctional community, the "cough and squat" procedure is considered more dignified and less invasive than a procedure requiring inmates to spread their labia. UMF 112. And because the squat-and-cough procedure is almost always sufficient to detect contraband, requiring inmates to physically spread their labia is entirely gratuitous, and unsupported by penological justification, except where correctional personnel have reason to believe that a specific individual has concealed contraband. UMF 114. Expert Still is aware of no major U.S. jails, outside of L.A. County, that uses the invasive "labia spread" procedure rather than the common squat-and-cough procedure. UMF 116. In *Salem v. Michigan Dept. of Corrections*, the Sixth Circuit held that a jail's practice of conducting visual body cavity searches by requiring female inmates to sit on chairs, spread their legs and manipulate their genitals to permit inspection of their vagina violated clearly established Fourth Amendment rights. So long as the same goals could have been accomplished by merely requiring inmates to bend at the waist and cough, the search procedure was unnecessary and gratuitously invasive. *Salem*, 643 Fed.Appx. at 529 – 531 (6th Cir. 2016) (denying qualified immunity on the basis that, no later than 2007, "the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others" was clearly established…"); *for background see*, *Salem v. Michigan Dept. of Corrections*, 2015 WL 1966727 at 17-18 (E.D. Mich. May 1, 2015).

15

There is truly no societal parallel to the kind of forced bodily exposure involved in this case. UMF 272. Unsurprisingly, many inmates compared the experience to rape. UMF 104, 286. Some of those who had been previously raped or abused described the searches as re-traumatizing. UMF 105. Their experience is entirely consistent with extensive research indicating a particularly severe risk of psychological trauma for women with histories of abuse. *See* UMF 286, 296.

### 2. Strip Searching Inmates in Large Groups Constitutes a Profound Violation of Privacy and Departure from the Practices of Most Correctional Facilities

Privacy is a fundamental consideration in assessing the manner of search. "Searches conducted in view of other inmates – who do not share the searching officers' institutional need to view [another prisoner] unclothed – are exceedingly intrusive." *Williams,* 771 F.3d at 953. As the Sixth Circuit explained, "[t]he wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers' institutional need to view her unclothed." *Id.* at 953. (citing *Farmer v. Perrill,* 288 F.3d 1254, 1260 (10th Cir.2002) (opining that 'the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others' is 'well established') and *Amaechi v. West,* 237 F.3d 356, 362 (4th Cir.2001) ('Whether the strip search was conducted in private is especially relevant in determining whether a strip search is reasonable under the circumstances.')). Unless there is a legitimate penological justification for denying inmates privacy, strip searches performed in view of other inmates violate inmates' clearly established Fourth Amendment rights. *Salem*, 643 Fed.Appx. at 530 (6th Cir. 2016) (citing *Williams*, 771 F.3d at 952-956, *Stoudemire*, 705 F.3d at 572-575).

Given the invasiveness of non-private body cavity inspections, coupled with the availability of methods for providing privacy during the searches as an obvious alternative, the jail's need for group searches "must be **unusually dire** before it

can outbalance the affront to plaintiffs' privacy." *Williams*, 771 F.3d at 954 – 955 (6th Cir. 2014) (emphasis added, citing *Florence*, 132 S. Ct. at 1516); *see also*, *Salem*, 643 Fed.Appx. 526, 529 – 531 (6th Cir. 2016) (The "obvious, less invasive alternative [to group searches] is to 'conduct the searches and seizures in private rather than in the presence of other [prisoners].'") (citing *Williams* (6th Cir. 2014) and *Stoudemire*, 705 F.3d at 573); *Stoudemire*, 705 F.3d at 571-575 (6th Cir. 2013) (for strip search where people in hall could see into cell while search occurred, the question was "whether any exigent circumstances compelled [the search]…in view of other inmates and prison personnel"; record provided evidence of "no such exigency")).

In *Williams*, upon remand from the Sixth Circuit, the plaintiff was searched with two inmates standing side-by-side, in a private clothing room, where they were required to squat one-by-one, while still in line so that the other inmates were not able to see each other's genitalia without taking effort to move from their position in line. The district court granted the plaintiff's motion for summary judgment based on its determination that the jail's group search practice was unsupported by a legitimate penological justification *Williams v. City of Cleveland*, ---F.Supp.3d---, 2016 WL 5462957  (N.D. Ohio, Sept. 28, 2016) (Defendant can perform searches one at a time or in multiples with *appropriate privacy partitions* to allow detainees to remove their clothing without being viewed by other detainees, while still being observed by a corrections officer.") (emphasis supplied). Given the availability of partitions as an alternative to small-group searches, the Court found that the practice of searching just three inmates together "did not strike a reasonable balance between [the plaintiff's] privacy interests and the need to provide safety and security at the jail…the visual strip search at the jail violated Plaintiff's constitutional rights. *Id.* at *9.

*Williams* was benign compared to the extreme and uniquely invasive search practices here. Here, unlike in *Williams*, female inmates were required to spread

apart their labia, and were strip searched in substantially larger groups (reduced to a maximum of 24 in 2013 for Class #2) compared to the handful in *Williams*. The LASD's search practices were even more invasive than those challenged in *Young*, which were found unconstitutional as a matter of law. *Young* involved Chicago's practice of searching large groups of *men* without privacy screens, "in full view of the other detainees in the group being searched"; bodily fluids were occasionally present (although their "frequency and prevalence" were disputed); people were very close to each other and at times "would accidentally bump into and touch each other"; and the search method was the "less dignified bend-and-spread method." *Young*, 616 F. Supp. 2d at 850-51 (emphasis supplied). Here, all those conditions existed, and were applied to women inmates with their special vulnerabilities and characteristics).

As correctional expert, Wendy Still explains, conducting any type of strip search in large groups – with or without a visual body cavity inspection– represents an extreme departure from normal, accepted practices in women's correctional facilities. UMF 109. Expert Still is unaware of any women's jails conducting strip searches of any kind (even without vbc), in such large groups (10 or more). UMF 129. The group sizes alone render LASD unique among U.S. correctional facilities and an extreme departure from accepted correctional practices. UMF 109, 129, 130.

### 3. Given Readily Available Alternatives, LASD Lacked a Legitimate Penological Justification for Conducting Invasive Body Cavity Inspections In A Large-Group Setting.

Given the unique privacy concerns and risk of trauma, individualized, private searches through curtains, partitions, private rooms or scanners are how most large jails conduct visual body cavity searches. UMF 120. Privacy partitions (or curtains) are almost universally considered to be the reasonable correctional practice for strip searches of female inmates. UMF 118.

For many years, Rikers Island, New York City's main jail complex, has conducted individual strip searches of female inmates. UMF 121. Philadelphia similarly conducts strip searches individually, in an enclosed area with a curtain. UMF 128. Cook County, Illinois (Chicago) likewise used privacy partitions before transitioning to body scanners in 2011. Cook County's 13 individual partitions were installed so that each woman being searched was not visible to other inmates. AFMs 122-124. LASD Commander (and former Captain of CRDF) Maria Gutierrez testified that LASD looks to Cook County for best practices because Cook County manages one of the largest jails in the U.S. UMF125. (See UMF Nos. 121 -129 for additional information concerning the practices of other jail facilities). Expert Still is aware of no jail that conducts visual body cavity searches of female inmates in groups without individualized privacy (i.e. privacy partitions) and, in fact, is aware of no jails that conduct any form of strip search (even without vbc) in the presence of large groups (10 or more). UMFs 109, 117, 129, 130.

LASD has asserted no "unusually dire" need for conducting invasive body cavity inspections of female inmates, in large groups, without privacy partitions. Indeed, LASD has effectively conceded that there is no sound correctional justification for its practice of searching female inmates without privacy partitions. Former Captain of CRDF, and LASD Commander, Maria Gutierrez (LASD's 30(b)(6) witness) testified that privacy curtains were always a viable option. In January 2015, LASD installed **24** privacy curtains along each long wall of the bus bay. UMFs 139, 140. The curtains present no security concerns, and provide a readily available means to conduct effective searches, while ensuring inmate privacy. UMF 145, 146. Commander Gutierrez emphasized that the curtains were designed to allow staff conducting the searches to view the inmates the same way as before the installation of the curtains. *Id*. Any contention that it was necessary to search without screens is belied by these changes, which Cmdr. Gutierrez conceded could have been implemented at any time, but were not. *See Young*, 616

F. Supp. 2d at 862 (later installation of privacy screens rebutted Defendants'
contention that the "use of privacy screens was not feasible").

LASD's assertion that privacy curtains were only feasible after the switch to
body scanners (January 2015) does not withstand scrutiny. Cmdr. Gutierrez
volunteered that the privacy curtains "could have solved the privacy problem years
ago (had someone thought of them)." UMF 148 - 149. She testified regarding
whether searches in groups of 24 (12 per side), using the privacy curtains
ultimately installed, would have always been a feasible and secure option:

> "Q: Well, wouldn't it [installing privacy curtains] have always been the
> answer to the problem before scanners were available as to how to increase
> privacy? A: "I agree. You know if again if that thought would have come up
> 20 years ago we wouldn't probably be here today…in hind sight it would
> have been a wonderful thing."). UMF 148.[9]

Of course, the explanation is that LASD did not then have the will to change.

Plaintiffs' correctional expert, Wendy Still, agrees that privacy curtains were
always feasible. Once CRDF limited group sizes to 24 inmates, each line

---

[9] After she made that statement, defense counsel immediately took a break to confer with
the witness; upon her return, Cmdr. Gutierrez "clarified" that curtains could have
decreased visibility. However, upon further questioning, she ultimately agreed that such
searches would have "gone fine" assuming CRDF maintained a ratio of 1 staff person to
3 inmates, which was a normal staffing ratio. Cmdr. Gutierrez's "clarification" does not
create a disputed issue of fact given her subsequent testimony right afterwards
reconfirming that the privacy curtains would have worked. *See also, e.g., Yeager v.
Bowlin*, 693 F.3d 1076, 1080 (9th Cir. 2012) (under the "sham affidavit rule," a party
"cannot create an issue of fact by an affidavit contradicting his prior deposition
testimony" where the inconsistency is "clear and unambiguous"). Cmdr. Gutierrez's
"clarification" was manifestly inconsistent with her previous and subsequent statements.
Her initial statement, quoted above, was not based on a question that put words in her
mouth; it was her words that the privacy curtains "could have solved the privacy
problems years ago."

completed a set of search exercises while the other line faced the wall (also an approach that was always available). UMF 150.Thus, one line faced the center of the while the lifting of breasts and stomach folds, and genital inspections occurred while the other half stood facing the opposite wall (wearing underpants, exposing only their legs and back) and unable to observe the most intimate aspects of the searches while facing each other. *Id.* Since CRDF readily adapted to searches limited to 24 inmates, and Cmdr. Gutierrez agreed that privacy curtains were always a viable option, CRDF could have conducted searches of groups of 24 as it did beginning in 2013 when the 24 squares were drawn, with the addition of privacy curtains, thereby providing privacy protection. *Id.* Inmates would have only seen others' legs and backs while facing the wall in their underwear. *Id.*

Further, it was feasible (and arguably more efficient) to conduct searches of 12 inmates at a time using 12 privacy partitions (instead of 24 at a time). UMF 151. Wendy Still explains that doing so would not increase the processing time since the elements of the search are comprised of individual inspection of each inmate's clothing, property, hair, mouth, neck/ears, feet, body and body cavities. *Id.* In a nutshell, 5-8 deputies could search 12 women in approximately half the time required to search 24 women. *Id.* Moreover, after July 2013, deputies were effectively searching only 12 inmates at a time (groups of 24, with 12 on each wall, only one line of inmates completing each set of search exercises at a time). Twelve searches at a time using privacy curtains was a readily available option if there was any reason (which there was not) that doing 24 at a time posed problems. *Id.*

Whether CRDF chose to do 12 or 24 inmates at a time, privacy curtains could have been utilized with either group size, and, therefore, CRDF could, and should, have been providing such readily available privacy during the whole class period. UMF 152. Security would not have been compromised. Many of the worst aspects of CRDF's search practices (both the public view of the intimate searches process and of women inmates menstruating and changing pads or tampons) would

have been eliminated.  *Id.* Any nominal increase in search time (and the evidence does not show there would have been such an increase) would not justify the extreme privacy invasions. *See Jordan v. Gardner*, 986 F.2d 1521, 1523-30 (9th Cir. 1993) (failure to modify strip search policy to avoid interrupting lunch breaks of female guards demonstrated "an exaggerated regard for pragmatic interests of lesser significance and a lack of proper concern for the serious infringement of a countervailing constitutional interest.").

After Cmdr. Gutierrez's testimony, there is no meaningful dispute that privacy curtains were always a readily available option, as the foregoing discussion establishes. Similarly, there was no financial or structural obstacle to earlier installation of privacy curtains.  UMF 144. The cost of materials was $495.68; the total cost of installation (including labor) was $7,056.93; the installation was "not complicated," and indeed was "simple." UMFs 141-143.

## 4.   *Characteristics of the Female Jail Population Underscore the Need for Individual Privacy*

The characteristics of the population being searched – specifically sex, gender and age – are relevant considerations in evaluating the scope of intrusion for the Fourth Amendment "reasonableness" analysis. Fourth Amendment standards are "fluid concepts that take their substantive content from the particular contexts" in which they are being assessed.  *Safford*, 129 S.Ct. 2633 at 2639 (2009).[10] In the school setting, the Supreme Court has long recognized that the "reasonableness" of special needs searches (administrative searches that do not

_____

[10] *See e.g. Mashburn v. Yamhill County*, 2012 WL 5879444 at *7 – 11 (D.Or., Nov. 19, 2012); *Justice v. City of Peachtree City*, 961 F.2d 188, 193 (11th Cir. 1992) (requiring particularized and objective basis for searches of juveniles at a police station given the "degrading and frightening" nature of strip searches and *the potential for serious trauma to juveniles*."); *Smook v. Mennehaha County*, 457 F.3d 806, 811 (8th Cir. 2006) (recognizing greater privacy interest of juvenile detainees; "the adverse psychological effect of a strip search is likely to be much more severe upon a child") (citing *N.V. and S.G. v. Connecticut*, 382 F.3d 225, 232 (2nd Cir. 2004).

22

involve individualized reasonable suspicion) must account for the gender of the population being searched in assessing the permissible scope of intrusion. *Id.* (Despite reasonable suspicion that student was distributing over-the-counter medication, strip search of a female student was unreasonable; searches "will be permissible in [their] scope when the measures adopted are reasonably related to the objectives of the search *and not excessively intrusive in light of the* **age and sex** *of the student* and the nature of the infraction.") (emphasis supplied, quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 342 (1985)).

As correctional administrators recognize, strip/vcb searches present unique privacy concerns for female inmates due to physiological differences (e.g. menstruation), gender socialization, socio-cultural attitudes towards women's bodies and bodily functions, and the disproportionately high percent of women – particularly incarcerated women – who have been victims of physical and sexual abuse. UMFs 86-91, 243-270, 296-308. While exposure of their private parts, particularly genitals, is humiliating for virtually everyone (UMFs 245-248), women are uniquely and negatively impacted by such privacy violations, and are particularly vulnerable to intense shame, humiliation and trauma from bodily exposure. UMFs 251-270).

As Plaintiffs' experts explain, the vast majority of female inmates, regardless of personal background, would likely have experienced extreme shame, anxiety, humiliation, and even self-disgust while being ordered to undress in front of others, lift their breasts, bend over, spread their labia, and in many cases, expose intimate menstrual processes. UMFs 271 – 290. Such search practices would have been among the most degrading, demeaning and humiliating experience that most women, regardless of race or socio-economic status, have ever experienced. UMF 272, 285. The use of female officers to search does not meaningfully mitigate the shame that most women would have experienced. UMF 273 – 291.

The majority of female inmates have in fact experienced physical or sexual abuse. UMFs 296, 297, 298 – 307. Bureau of Prisons Statistics demonstrate that as many as 6 in 10 female inmates experienced physical or sexual abuse. UMF 300. LASD Commander Gutierrez testified that 70% of LASD's women inmates are victims of sexual or physical trauma. UMF 304. Thus, it is imperative to minimize psychological trauma by avoiding actions that are experienced as abusive. UMFs 307, 308. The correctional community has long understood that previously sexual traumatized women are far more vulnerable to violations of personal privacy, which are often experienced as re-traumatization, and carry significant negative psychological consequences, including severe emotional disturbances (not limited to PTSD), depression and anxiety. UMFs 296, 297, 303 – 307.

The Ninth Circuit recognizes that full account must be taken of the special characteristics that render female inmates particularly susceptible to psychological trauma from certain types of searches. In *Jordan*, 986 F.2d at1523-30 (9th Cir. 1993) (en banc), inmates challenged cross-gender clothed body searches at the Washington Corrections Center for Women ("WCCW"). Although the decision involves cross-gender pat downs (not at issue here), and is grounded in Eighth Amendment standards, it recognizes that gender is relevant to how inmates experience strip searches. *Id.* at 1525. *Jordan* noted (as is the case here) that "many of the inmates at WCCW have histories of sexual or physical abuse by men" and that "that physical, emotional, and psychological differences between men and women 'may well cause women, and especially physically and sexually abused women, to react differently to searches of this type than would male inmates subjected to similar searches by women.'"

The *Jordan* trial testimony described the "shocking histories of verbal, physical, and, in particular, sexual abuse endured by many of the inmates prior to their incarceration at WCCW," including rapes, physical beatings, attempted murder, torture, and incest. Ten expert witnesses, including psychologists and

correctional experts, "described the psychological fragility of and disorders found in abused women", indicated that the "unwilling submission to bodily contact with the breasts and genitals by men would likely leave the inmate 'revictimiz[ed], resulting in a number of symptoms of post-traumatic stress disorder" and were "unanimously of the view that some would suffer substantially."  Thus, the district court found that "'[t]here is a high probability of great harm, including severe psychological injury and emotional pain and suffering, to some inmates from these searches, even if properly conducted.'" *Id.*  at 1525. In sum, *Jordan* requires prison officials to recognize potential psychological effects resulting from their treatment of female prisoners. The psychological impact of CRDF's extremely invasive search procedures on female inmates must thus be considered in assessing the reasonableness of the searches here. *Cf.*, *Ellison v. Brady*, 924 F.2d 872, 879-80 (9th Cir. 1991) (Plaintiff establishes "pima facie case of hostile environment sexual harassment when she alleges conduct which a *reasonable woman* would consider sufficiently severe or pervasive to … create an abusive working environment") (emphasis supplied).[11]

CRDF's strip search practices were entirely devoid of the kinds of privacy and dignity protections necessary to mitigate the traumatic nature of strip searches on female inmates, and normally available to women inmates in U.S. jails and prisons. UMF 309.  In the opinion of correctional expert, Wendy Still, and Drs. Haverty and Kupers, CRDF's practice of searching large groups of female inmates without individualized privacy would re-traumatize any female inmate who had

---

[11] *Jordan* limited its holding to the Eighth Amendment and did not reach the Fourth Amendment. *Jordan*, 986 F.2d at 1524. While the gravamen of such cases as *Michenfelder v. Sumner,* 860 F.2d 328 (9th Cir.1988) rested on" invasions of privacy," the gravamen in *Jordan* was "that the cross-gender clothed body searches inflict great pain and suffering, "thereby implicating the Eighth Amendment. Although this case presents a Fourth Amendment, not an Eighth Amendment, claim, that strengthens the claim, given that the Fourth Amendment's reasonableness test is far less stringent than the rigorous Eighth Amendment test.

been a victim of physical or sexual abuse. UMF 309 – 310, 312. The degrading and dehumanizing manner of the CRDF searches would have a devastating emotional impact on inmates with histories of abuse. *Id.* The use of female officers does not alter the analysis for previously-traumatized inmates' vulnerable to re-traumatization. UMF 313.

CRDF's failure to provide individual privacy during highly invasive body cavity inspections constitutes an extreme departure from accepted correctional practice. UMFs 117 – 128. The correctional community has long understood that, without adequate measures to protect privacy and dignity, strip searches may significantly and unjustifiably traumatize female jail inmates. Correctional administrators know that strip searches without adequate privacy and dignity may traumatize female inmates, and can cause feelings of abuse. UMF 305. While jails and prisons normally attempt to provide men privacy during searches, privacy measures are imperative for women. UMFs 307 – 308.

The location in which most female inmates were searched – Bus Bay No. 3 – only compounds the unreasonableness of the search conditions. *See Vaughan v. Ricketts*, 859 F.2d 736, 740-41 (9th Cir. 1988) (citing *Bell*) (recognizing that "the place in which the search was conducted must be considered in judging the search's reasonableness"). No other jail conducted invasive and humiliating searches in an outdoor garage space also used to park buses. CRDF officials confirm numerous inmate reports that there were at least some occasions when ants were present during searches, birds were able to enter the garage, and there were bird droppings and/or feathers on the ground. UMF 163 – 171.

### D. SEARCH CONDITIONS APPLICABLE TO SPECIFIC CLASSES/SUBCLASSES

Plaintiffs contend that the conditions discussed above, applicable to members of all classes, were sufficient, standing alone, to render the searches unreasonable under Fourth Amendment standards. Should the Court disagree,

Plaintiffs contend each of the following conditions, applicable to specific classes (or subclasses), in conjunction with the preceding conditions, render the searches unreasonable as a matter of law.

### 1. Class #1: Two Lines at a Time, March 2008 – July 2011 (Class #1)

Before approximately late-2011, CRDF simultaneously searched both lines of inmates, which forced inmates to stand facing each other with no clothing, no bra and their underpants pulled to their knees (and during the body cavity inspection, ensured that inmates could not help but see inmates on the opposite wall submitting to a visual body cavity inspection). This extremely intrusive practice was unsupported by any penological justification as demonstrated by CRDF's abandonment of this policy in late-2011, at which time certain (not all) deputies began conducting the searches one-line-at-a-time. UMFs 44, 64.

### 2. Subclass to Class #1: LASD's (Very) Large Group Search Practices Were Constitutionally Unreasonable

Before April 2013, CRDF routinely searched groups of 40 inmates, and often many more. The large searches not only amplified privacy concerns, but ensured that inmates could not avoid touching during searches. CRDF squeezed in so many inmates that they were required to stand within 2-3 inches of each other and could not help but brush against each other while performing the search exercises. LASD's EUDAL logs establish both that group searches involving 40 or more inmates were common (the great majority over 24 without privacy, and approximately 1/3 were 40 or more). In *Young v. County of Cook,* less egregious conditions involving men were found unconstitutional as a matter of law. *Young*, 616 F.Supp.2d at 851 (… "the class members, who were undergoing one of the most intrusive types of searches the government may permissibly conduct, were subjected to conditions that greatly enhanced their discomfort and humiliation. They were herded together with dozens of other men and forced to strip and bend

27

over or squat in front of a large group, with less than a foot of space between them.").

LASD's practice of searching groups of more than 24 *women* was wholly unsupported by any penological justification. LASD Commander Maria Gutierrez, unaware that LASD regularly searched groups of 40 plus, explained that such searches "wouldn't be efficient, safe, or, obviously the best practice" and would be *counterproductive* to contraband interception. UMF 23. Reducing the group size was always an available option. In July 2013, LASD instituted a "corrective action plan" to address this litigation and implemented new unit orders, including limiting group size to 24, creating 24 numbered squares (ensuring equal spacing between inmates), requiring that inmates' clothing be placed on tables (instead of the ground) and requiring provision of hand sanitizer before inmates placed their fingers in their mouths. UMFs 24, 25, 100, 176. LASD does not contend, nor could it, that these changes have resulted in any security issues. There is no legitimate reason why they could not have been implemented before April/July 2013. Not only were these women searched in large groups, but with no justification, they had to put their clothes on the ground, rather than a table that was later installed, which often contained excreted bodily fluids, and at a minimum was inherently unsanitary.

### 3. *Subclass to Classes # 1 and 2: The Manner in Which LASD Searched Menstruating Women was Constitutionally Unreasonable*

CRDF's practices with regard to menstruating inmates throughout the whole time period were so extreme as to render them standing alone unreasonable as a matter of law. The requirement that female inmates change sanitary napkins in public, and submit to searches that necessarily cause them to bleed on themselves in the presence of a group, is an extreme departure from civilized standards. In *Wilkes v. Borough of Clayton*, 696 F. Supp. 144 (D.N.J. 1988), the court granted summary judgment to an arrestee who challenged the requirement of visual

inspection by a women deputy (not in a public group, as here) when changing her sanitary napkins, or using the toilet:

"One strains to conjure up an activity more private than the changing of a sanitary napkin….. ¶ …What many do not choose to reveal to the most intimate of their family and friends is instead, by policy, laid open for careful scrutiny by the watchful eye of the law… [I]t is indisputable that our society considers these tasks uniquely intimate and private."

U.S. jails almost universally recognize the privacy concerns surrounding menstruation. UMF 110. Based on her survey of urban jails, Wendy Still is aware of **no** other systems that require menstruating inmates to remove their tampons or sanitary napkins in view of other inmates, or of jails that require menstruating inmates to handle feminine hygiene products visible to groups of inmates; they occur with individual privacy. UMFs 110, 132. No other jails' practices cause women to bleed on their hands, legs or the floor, in the view of others. UMFs 117 – 120, 130- 132. The privacy concerns surrounding menstruation are one significant reason why virtually all jails provide *female* inmates with *individual* privacy during searches.

> ### 4.    *Subclass to Classes #1 and #2: Searches Involving Extreme Cold Discomfort Were Constitutionally Unreasonable*

Thousands of inmates were searched in conditions that would have produced cold discomfort far outside of acceptable ranges established by ASHRAE. *See* UMFs 202- 226. This factor, considered alongside the significant privacy violations discussed above, rendered the searches even more egregious. Plaintiffs have found no cases addressing strip searches under remotely comparable conditions, undoubtedly because it is unheard of. Some cases have found Eighth Amendment violations in cold weather, especially when combined with other conditions. *See, e.g., Chandler v. Moore,* 2 F.3d 847,848 (8th Cir.1993) (reversing dismissal of complaint that plaintiff was forced to stand outside in the rain and cold

without adequate protective clothing; "needlessly subjecting inmates to freezing weather without adequate protective clothing could amount to cruel and unusual punishment"); *Mitchell v. Maynard,* 80 F.3d 1433, 1443 (10th Cir.1996) (finding actionable Eighth Amendment claim where inmate alleged lack of heat in combination with numerous other conditions); *Wilson v. Seiter,* 501 U.S. 294, 304, 111 S.Ct. 2321 (1991)) (noting that "a low cell temperature at night combined with a failure to issue blankets" may establish an Eighth Amendment violation).[12]

No legitimate penological justification supported LASD's practice of searching inmates in unacceptably cold conditions. Just as it was always feasible to provide privacy curtains, it was always readily feasible to conduct searches in an enclosed, heated space. Between November 2013 and February 2014, LASD enclosed BB3 by installing a sheet metal roof, sheet metal wall and heaters. UMF 235, 236. This was a simple, inexpensive fix that dramatically changed the negative impact of the strip searches, and was readily achievable at any time. The total cost of the enclosure project, including the installation of heaters was $43,042.44. UMF 224. The enclosure was "definitely" a "straightforward project;" there was "nothing complicated about it." UMF 238. Similarly, installation of heaters was "easy." UMF 239. No structural or architectural factors prevented installation of the heaters prior to the 2014 renovations. UMF 240.

## IV.   CONCLUSION

For the forgoing reasons, Plaintiffs' motion should be granted.

---

[12] As noted previously, the Eighth Amendment is far more stringent than the applicable reasonableness standard here, and so these cases are cited only to show that, even under that high bar, unacceptably cold conditions are a key consideration that, especially when combined with other conditions, can establish the objectively deliberately indifferent standard in Eighth Amendment conditions of confinement cases. Reasonableness is a far more lax standard. Forcing inmates to endure the humiliating and degrading search procedures described above, when combined with the extreme cold conditions to which they were routinely subjected, was completely unreasonable, especially given that it was completely unnecessary and gratuitous, and easy alternatives were available.

Dated March 10, 2017                    Respectfully submitted,

                                        KAYE, McLANE, BEDNARSKI & LITT, LLP
                                        MANN & COOK
                                        CYNTHIA ANDERSON-BARKER


                                        By: _/s/ Barrett S. Litt _____
                                            Barrett S. Litt

                                        By: _/s/ Lindsay Battles_____
                                            Lindsay  Battles
                                            Attorneys for Plaintiffs