1  Barrett S. Litt, SBN 45527
2  blitt@kmbllaw.com
   Lindsay Battles, SBN 262862
3  Kaye, McLane, Bednarski & Litt, LLP
4  234 Colorado Boulevard, Suite 230
   Pasadena, California 91101
5  Telephone: (626) 844-7660
6  Facsimile: (626) 844-7670

7
8  Donald W. Cook, SBN 116666
   E-Mail: manncook@earthlink.net          Cynthia Anderson-Barker, SBN 175764
9  Attorneys at Law                        E-Mail: cablaw@hotmail.com
   3435 Wilshire Boulevard, Suite 2910     Law Offices Of Cynthia Anderson-Barker
10 Los Angeles, California 90010           3435 Wilshire Boulevard, Suite 2910
11 Phone: (213) 252-9444                   Los Angeles, California 90010
   Facsimile: (213) 252-0091               Phone: (213) 252-9444
12                                         Facsimile: (213) 252-0091
13 Attorneys for Plaintiffs

14

15                    UNITED STATES DISTRICT COURT

16                   CENTRAL DISTRICT OF CALIFORNIA

17

18 MARY AMADOR et al.,                  Case No. CV 10-1649 SVW (RC)
   individually and as class           [Hon. Stephen V. Wilson]
19 representatives
20                    Plaintiffs,       **Plaintiffs' Separate Statement of**
21                                      **Uncontroverted Facts and Conclusions of**
                                        **Law in Support of Plaintiffs' Motion for**
22    vs.                               **Summary Judgment re Plaintiffs' §1983**
                                        **Fourth Amendment Claims**
23
24 SHERIFF LEROY D. BACA,
   individually and in his official     Date:        May 1, 2017
25 capacity, et al,                     Time:        1:30 P.M.
                                        Courtroom:   10A (1st Street)
26                    Defendants.
27

28

I.     **PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS** ........................1

    A. **LASD S**TRIP **S**EARCHES **A**LL **P**OST-**A**RRAIGNMENT **I**NMATES **U**PON **A**DMISSION **T**O **O**R **R**ETURNING **T**O **CRDF** ............................................1

    B. **B**US **B**AY **#3 W**AS THE **P**RIMARY **S**EARCH **L**OCATION FOR **C**OURT **R**ETURNS AND **P**OST-**A**RRAIGNMENT **N**EW **B**OOKINGS ..............................3

    C. **LASD S**EARCHED **C**OURT **R**ETURNS IN **L**ARGE **G**ROUPS; UNTIL **J**ULY **2013, LASD R**OUTINELY **S**EARCHED **G**ROUPS OF **25 – 40 I**NMATES ............................4

    D. **D**UE TO THE **N**UMBER OF **I**NMATES **C**ROWDED **I**NTO THE **S**PACE, **W**OMEN **C**OULD **N**OT **A**VOID **T**OUCHING **E**ACH **O**THER **D**URING **S**EARCHES .................11

    E. **LASD U**TILIZED **H**IGHLY **I**NVASIVE **S**EARCH **P**ROCEDURES **T**HAT **R**EQUIRED **I**NMATES TO **F**ULLY **E**XPOSE THEIR **B**ARE **B**REASTS AND **P**UBIC **R**EGION TO **L**ARGE **G**ROUPS ..........................................14

    F. **LASD'**S **V**ISUAL **B**ODY **C**AVITY **P**ROCEDURE **R**EQUIRED **I**NMATES TO **A**DJUST **T**HEIR **L**ABIA **W**ITH **T**HEIR **F**INGERS TO **E**XPOSE THEIR **V**AGINAL **C**AVITY, IN THE **P**RESENCE OF **L**ARGE **G**ROUPS ..........................21

    G. **I**NMATES **W**ERE **R**EQUIRED TO **L**OOK **B**ETWEEN **T**HEIR **L**EGS **W**HILE **B**ENT **O**VER AND **S**PREADING **T**HEIR **L**ABIA; **T**HEY **C**OULD **N**OT **A**VOID **S**EEING **O**THER **W**OMEN **P**ERFORMING THE **S**AME **H**UMILIATING **P**ROCEDURE ...........27

    H. **T**HE **H**IGHLY **I**NVASIVE **P**ROCEDURE **A**LSO **R**EQUIRED **I**NMATES TO **R**EMOVE **S**OILED **F**EMININE **H**YGIENE **P**RODUCTS IN THE **P**RESENCE OF THE **G**ROUP, **O**FTEN **C**AUSING THEM TO **B**LEED ON **T**HEMSELVES .........................30

    I. **D**URING THE **V**ISUAL **B**ODY **C**AVITY **I**NSPECTION, **M**ENSTRUATING **I**NMATES **C**OMMONLY **B**LED **O**NTO **T**HEMSELVES AND THE **G**ROUND ............34

    J. **LASD'**S **H**ANDLING **O**F **M**ENSTRUATION **D**URING THE **S**TRIP/**V**ISUAL **B**ODY **C**AVITY **P**ROCEDURE **V**IOLATED **A**LL **T**HE **N**ORMS **T**O **W**HICH **W**OMEN **A**RE **S**OCIALIZED **A**ND **C**AUSED **E**XTREME **S**HAME **A**ND **H**UMILIATION ..................48

    K. **LASD O**FTEN **S**UBJECTED **O**BESE AND **P**HYSICALLY **D**ISABLED **I**NMATES TO **A**N **A**LTERNATIVE, AND **M**ORE **D**EGRADING **P**ROCEDURE ...............................50

    L. **U**NTIL **A**PPROXIMATELY **J**ULY **2013, LASD R**EQUIRED **I**NMATES TO **P**LACE **T**HEIR **F**INGERS IN **T**HEIR **M**OUTH **W**ITHOUT **P**ERMITTING **T**HEM TO **S**ANITIZE **T**HEIR **H**ANDS ......................................53

    M. **T**HE **D**URATION OF **S**EARCHES **V**ARIED **D**EPENDING ON THE **N**UMBER OF **I**NMATES **S**EARCHED ..............................................58

N. INMATES EXPERIENCED THE SEARCHES AS HUMILIATING AND TRAUMATIC; INMATES WITH PREVIOUS SEXUAL ABUSE EXPERIENCED THE SEARCHES AS RE-TRAUMATIZING.......................................................58

O. CRDF'S STRIP SEARCH PRACTICES ARE A SIGNIFICANT DEPARTURE FROM ACCEPTED CORRECTIONAL NORMS.......................................................64

P. LASD'S INSTALLATION OF 24 PRIVACY CURTAINS DEMONSTRATES THAT IT WAS ALWAYS POSSIBLE TO PROVIDE FEMALE INMATES WITH INDIVIDUALIZED PRIVACY .......................................................71

Q. LASD'S HANDLING OF COURT RETURNEES IS EVEN LESS SUPPORTED BY VALID CORRECTIONAL JUSTIFICATION BECAUSE COURT RETURNEES REMAINED UNDER CONSTANT LASD SUPERVISION WHEN THEY LEFT CRDF TO MAKE COURT APPEARANCES.......................................................75

R. UNTIL APPROXIMATELY FEBRUARY 2014, BUS BAY #3 WAS AN OUTDOOR GARAGE SPACE THAT WAS NOT SEALED OFF TO BIRDS, INSECTS OR BUS FUMES FROM THE ADJACENT BUS BAY.......................................................76

S. BECAUSE BUS BAY #3 WAS NOT ENCLOSED, INMATES WERE EXPOSED TO THE ELEMENTS, INCLUDING WIND AND UNACCEPTABLY COLD TEMPERATURES .87

T. EXPERT ANALYSIS SHOWS THAT MOST CRDF STRIP SEARCHES OCCURRED IN BUS BAY #3 AND IN COLD OR VERY COLD WEATHER, ESPECIALLY WHEN THE STATE OF UNDRESS INMATES EXPERIENCED IS FACTORED IN .............101

U. IN FEBRUARY 2014, LASD INSTALLED HEATERS AND ENCLOSED BUS BAY #3 BY INSTALLING A STEEL ROOF, DEMONSTRATING THAT IT WAS ALWAYS FEASIBLE TO PROVIDE AN ENCLOSED, CLIMATE CONTROLLED STRUCTURE .......................................................112

V. STRIP SEARCHES PRESENT UNIQUE PRIVACY CONCERNS FOR WOMEN, WHO ARE PARTICULARLY VULNERABLE TO SHAME AND HUMILIATION FROM EXPOSURE OF THEIR PRIVATE PARTS, INCLUDING BREASTS AND GENITALS .......................................................114

W. CORRECTIONAL ADMINISTRATORS HAVE LONG BEEN AWARE THAT VISUAL BODY CAVITY SEARCHING IS HIGHLY TRAUMATIZING TO VICTIMS OF SEXUAL ABUSE, WHO ARE DISPROPORTIONATELY REPRESENTED IN THE FEMALE JAIL POPULATION.......................................................131

X. ADDITIONAL EXPERT TESTIMONY .......................................................136

II. PLAINTIFFS' CONCLUSIONS OF LAW .......................................................139

ii

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT OF UNCONTROVERTED FACTS
## & CONCLUSIONS OF LAW

Plaintiffs hereby submit the following Separate Statement of Uncontroverted Material Facts and Conclusions of Law in support of their Motion for Summary Judgment. With permission from the Court, we have not re-filed voluminous evidence previously filed in connection with Plaintiffs' opposition to Defendants' 2016 Motion for Summary Judgment. Instead of refiling the evidence, we provide references to the previously filed documents.

- All non-confidential exhibits (Exs. 1-799) cited below correspond to exhibits filed at Dkt. 284, Declaration of Lindsay Battles in support of Plaintiffs' Opposition to Defendants 2016 Motion for Summary Judgment. (A corrected version of the Battles declaration was filed at Dkt. 292-2).

- As indicated below, Dkt. 292-1 contains Ex. 606 (Decl. of Drs. Haverty and Kupers), which was inadvertently omitted from Dkt. 284.

- All confidential exhibits (Exs. 800 – 999, Confidential Inmate questionnaire-declarations) correspond to Dkt. 286 (sealed, confidential documents filed in support of Plaintiffs' Opposition to Defendants 2016 Motion for Summary Judgment).

## I. PLAINTIFFS' UNCONTROVERTED MATERIAL FACTS

| A. LASD STRIP SEARCHES ALL POST-ARRAIGNMENT INMATES UPON ADMISSION TO OR RETURNING TO CRDF. | |
|---|---|
| 1. LASD's policy is to strip search/visual body cavity search all court returnees and post-arraignment, new-bookings. | **Dkt. 284-31 (Ex. 307)**; **Dkt. 284-1 (Ex. 150)**, Sgt. Bullocks Dep. Tr., p. 16:9 – 16:15; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 17:10 – 18:8. |
| 2. The highest volume of court returns | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 21:6 – 21:8, 23:1 – 23:21 (CRDF searched an average of |

| | |
|---|---|
| occurs during the late-afternoon and evening hours on Mondays-Fridays. | 150 inmates during the PM shift on weekdays); Dkt. 284-7 (Ex. 162), LASD Sgt. Devane Dep. Tr., p. 18:15 – 18:19 (highest volume from 5:00 p.m. to 9:00 p.m. on weekdays); **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 16:6 – 16:21 (highest volume of court returns between 5:30 p.m. and 10:00 p.m. on weekdays); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., p. 102:17 – 102:25 (often searched around 9:00 – 10:00 p.m.) |
| 3.      According to CRDF personnel, CRDF processed an average of 100 - 120 court returnees each weekday afternoon/evening. | **Dkt. 284-1 (Ex. 150)**, Sgt. Bullocks Dep. Tr., p. 54:21 – 55:10 (estimating 100 – 120 female inmates returning each day as of October 2010); **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 19:17 – 19:22 (estimating an average of more than 100 court returnees searched on average weekday (M-F) on the p.m. shift). |
| 4.      Starting in February 2011, CRDF began tracking the number of court returnees searched upon arrival to the facility in documents referred to as Electronic Uniform Daily Activity Logs (EUDAL). | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 35:6 – 35:25 (CRDF began recording strip search information when electronic logs were implemented), 39:2 – 39:11 (EUDAL logs reflect the number of inmates searched); **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., pp. 33:11 – 33:16 (CRDF tracks "pretty much everything" about strip searches in EUDAL logs), p. 37:2 – 38:13 (deputies count the number of inmates being searched in order to record the search count in the log); **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p.3, ¶6 (EUDAL data includes activity logs for 1,094 days from February 3, 2011 to February 28, 2014**). |
| 5.      Brian Kriegler analyzed the EUDAL data; Dr. Kriegler has a Ph.D. in statistics and is a qualified statistical expert. | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler,p. 2 – 3, ¶¶2-5; pp. 21 – 30. |
| 6.      EUDAL data shows an average of 198 inmates were searched per weekday[1] by CRDF's | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, pp. 6, 16, 17. |

---

[1] Weekday refers to non-holiday, weekdays.

2

| | |
|---|---|
| reception center staff between February 2011 and February 2014. The average number of inmates searched per day increased somewhat in 2014 (245) but otherwise remained at or near 200 per day. | |
| **B. BUS BAY #3 WAS THE PRIMARY SEARCH LOCATION FOR COURT RETURNS AND POST-ARRAIGNMENT NEW BOOKINGS** | |
| 7.      The reception area has two locations for searches: (1) a bus garage adjacent to the inmate reception center (referred to as "Bus Bay 3"); and, (2) a storage location inside the reception area (referred to herein as the "indoor search room"). | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 31:22 – 32:10; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 37:25 – 38:8 (CRDF uses an inside search area as an alternative to the bus bay); **Dkt. 284-24 (Ex. 201)** (photo of Bus Bay No. 3); **Dkt. 284-27 (Ex. 208)** (photo of small storage room). |
| 8.      CRDF personnel preferred to conduct searches in Bus Bay 3 because it was a larger space in which they could search larger groups of inmates. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 28:2 – 28:12. |
| 9.      The indoor search room was used during inclement weather and for smaller groups of inmates. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 32:21 – 33:5; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 20:20 – 21:5 (indoor room used primarily during inclement weather). |
| 10.     The "vast majority" of court returnees were searched in Bus Bay 3. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 89:21 – 90:6; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 17:10 - 17:14. *See also e.g.*, **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 11:19 – 11:21; 20:10 – 21:11 (searched 30 – 40 times; all except 3 searches in the bus bay); **Dkt. 284-12 (Ex. 168)**, Douglas Dep.Tr., pp. 26:22 – 27:5 (typically searched in the bus bay); **Dkt. 284-13** |

| | |
|---|---|
| | **(Ex. 169)**, Gutierrez Dep. Tr., pp. 15:4 – 15:12; 32:12 – 32:22 (witness searched approximately 35 times; only twice indoors); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 37:17 – 37:23 (all searches occurred in bus bay except first search upon booking into the facility). |
| 11.     In February 2011, CRDF began recording the location in which inmates were searched on EUDAL logs. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 35:6 – 35:25 (CRDF began recording strip search information when electronic logs were implemented), 39:2 – 39:11 (EUDAL logs reflect the location where inmates are searched); **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., pp. 33:11 – 33:16 (CRDF tracks "pretty much everything" about strip searches in EUDAL logs), p. 37:2 – 37:21 (EUDAL logs reflect the location where inmates are searched); **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p.3, ¶6 (EUDAL data includes activity logs for 1,094 days from February 3, 2011 to February 28, 2014**).** |
| 12.     According to CRDF's EUDAL logs between February 2011 and February 2014, **82%** of court returns were searched in Bus Bay #3. | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, pp. 4, 13. |
| 13.     According to CRDF's EUDAL logs between February 2011 and February 2014, **76%** of all reception center searches were conducted in Bus Bay #3. | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p. 4, 13. |
| **C. LASD SEARCHED COURT RETURNS IN LARGE GROUPS; UNTIL JULY 2013, LASD ROUTINELY SEARCHED GROUPS OF 25 – 40 INMATES** | |
| 14.     Searches of court returns and post-arraignment new bookings were ordinarily conducted in groups. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 23:19 – 23:21; **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 28:3 – 28:12, 31:17 – 31:23;  **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., pp. 16:22 – 17:2. |
| 15.     Prior to July 2013, CRDF had no rule limiting the number of | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 34:4 – 34:11; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 73:11 – 73:21;  **Dkt. 284-22 (Ex. 180)**, |

| | |
|---|---|
| inmates that could be searched in a group in the bus bay. | LASD Cmdr. Gutierrez Dep. Tr., p. 197:7 – 197:15 (Ex. 311), unit order limiting group size, had no predecessor); **Dkt. 284-31 (Ex. 311)** (CRDF Policy 6-01-020 Frequency of Searches). |
| 16.    LASD personnel, including LASD's 30(b)(6) witness, report that, prior to July 2013, inmates were *typically* searched in groups of 25 - 40 inmates during the afternoon shift on weekdays. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 33:18 – 33:25 (typical group size of 25 – 40); **Dkt. 284-2 (Ex. 151)**, LASD Dep. Burba Dep. Tr., p. p. 42:10-42:15 ("normal[ly] 40ish" inmates). |
| 17.    LASD's 30(b)(6) witness reported that the <u>average</u> group size was approximately 40 inmates between 2008 and 2010. | **Dkt. 284-2 (Ex. 151)**, LASD Dep. Burba Dep. Tr., p. 42:10-42:15 ("normal[ly] 40ish" inmates). |
| 18.    Witness report that they were searched in groups ranging from approximately 20 – 60 inmates, and occasionally larger. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p.  32:12 – 32:14; 173:15 – 173:23 (40 – 50 in the bus bay); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 47:12 – 47:17 (30 – 40); **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 41:18 – 41:20 (40-50 inmates); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 31:20 – 31:25 (30 – 40); **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., p. 24:2 – 24:6 (typically 40, sometimes more); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp.  58:4 – 58:15 (typically 30 inmates searched together); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp. 37:7 – 37:12 (50 or more); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., pp. 51:19 – 52:2, 67:6 – 68:14 (no less than 30; often 50 – 60 court returnees); **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., p. 109:16 – 109:24 (estimating largest group at 40; smallest at 20-30); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 126:13 – 126:16 (approx.. 30 – 40 inmates searched in the bus bay); **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶5, 15 (30–50 women); **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶5 (60 women); **Dkt. 284-40 (Ex. 702)**, Britt Decl.¶4 (30–50 women); **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶9 (60–80 women); **Dkt. 284-43 (Ex. 705)**, Coehlo Decl. ¶3 (30 women); **Dkt.** |

284-44 (**Ex. 707**), Dodd Decl. ¶6 (40 women); **Dkt. 284-46 (Ex. 709)**, Ejedawe Decl. ¶3 (30 women); **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶6 (20–40 women); **Dkt. 284-52 (Ex. 716)**,  Madrid Decl. ¶8 (20–50 women); **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶6 (20–40 women); **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶4 (30–40 women); **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶8 (as many as 50 women); **Dkt. 284-56 (Ex. 721)**, Webb Decl. ¶6 (50 –80 women); **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶7 (40–50 women); **Dkt. 284-59 (Ex. 724)**, Robles Decl., ¶10 (20 – 30); **Dkt. 284-60 (Ex. 725)**, Graham Decl. ¶8 (50).

**<u>Dkt. 286:</u> Ex. 800**, Garcia Decl., p. 3 (30 – 40); **Ex. 801**, Saavedra Decl., p. 4 (30 – 60); **Ex. 802**, Edwards Decl., p. 4 (50); **Ex. 803**, Hawkins Decl., p. 4 (25 – 30); **Ex. 805**, Perez Decl., p. 40 – 50); **Ex. 806**, Serrano Decl., p. 4 (40 – 50); **Ex. 807**, Talin Decl., p. 5 (40 – 50); **<u>Dkt. 286-1:</u> Ex. 808**, Nunez Decl., p3. (50 – 60); **Ex. 809**, Ship Decl., p. 4 (75); **Ex. 810**, Drisdle Decl., p. 7 (30 – 35); **Ex. 811**, Cooper Decl., p. 4 (30 – 40); **Ex. 812**, Johnson Decl., p. 4 (30 – 40); **Ex. 813**, Gutierrez Decl., p. 7 (30 – 40); **Ex. 814**, Caldera Decl., p. 4 (20 – 40); **Ex. 815**, Phillips Decl., p. 7 (30 – 50); **<u>Dkt. 286-2:</u> Ex. 817**, Lewis Decl., p. 4 (30 – 40); **Ex. 818**, **Reed Decl.**, p. 3 (40 – 50); **Ex. 819**, Maxie Decl.,p. 7 (20 – 50), **Ex. 820**, Armstrong Decl., p. 4 (40); **Ex. 821**, Madison Decl., p. 7 (25 – 30); **Ex. 822**, Levi Decl., pr. 4 (50); **<u>Dkt. 286-3:</u> Ex. 823**, Shaheed Decl., p.7 (40); **Ex. 824**, Sullivant Decl., p. 4 (40); **Ex. 825**, Wade Decl., p. 4 (busload); **Ex. 826**, Camacho Decl., p. 4 (30 – 40); **Ex. 827**, Hinojos Decl., p. 4 (75); **Ex. 829**, Lang Decl., p. 6 (40 or more); **<u>Dkt. 286-4:</u> Ex. 830**, Busby Decl., p. 7 (30); **Ex. 831**, Lowe Decl., p. 4 (20 – 40); **Ex. 832**, Bohorquez Decl., p.4 (20); **Ex. 833**, Bunton Decl., p. 3 (50 – 60); **Ex. 834**, J. Murillo Decl., p. 4 (50 – 75); **Ex. 835**, Martinez Decl., p. 5 (30 – 40); **Ex. 836**, Bailey Decl., p. 4 (20 or more); **Ex. 837**, Lobrandon Decl., p. 4 (35 – 40); **<u>Dkt. 286-5:</u> Ex. 838**, Johnson Decl., p. 4 (50 – 60); **Ex. 840**, White Decl., p. 4 (30 – 40); **Ex. 841**, Tuggle Decl., pr. 4 (20 –

25, could be more or less); **Ex. 842**, Abbago Decl., p. 8 (20 – 50); **Ex. 843**, Zadorian Decl., p.4 (30); **Dkt. 286-6: Ex. 844**, Schuster Decl., p. 4 (50 – 60); **Ex. 845**, Walker Decl., p. 7 (30); **Ex. 846**, Rodriguez Decl., p. 4 (30 – 40, busload); **Ex. 848**, Ransome Decl., p. 7 (20 – 30); **Dkt. 286-7: Ex. 849**, Hoy Decl., p.4 (30 – 35); **Ex. 850**, Stevens Decl., p. 3 (20 – 30); **Ex. 850**, Stevens Decl., p. 4 (50); **Ex. 851**, Finley Decl., p.7 (20); **Ex. 852**, Reese Decl., p. 4 (30 – 40); **Ex. 853**, Soma Decl., p. 6 (40 – 50); **Ex. 854**, James Decl., p. 7 (40 – 50); **Ex. 855**, Johnson Decl., p. 4 (30 – 40); **Ex. 856**, Edwards Decl., p. 7 (40 – 50); **Dkt. 286-8: Ex. 857**, Leon Decl., p. 7 (50); **Ex. 858**, Shields Decl., p.4 (75); **Ex. 859**, Stanley Decl., p. 7 (15 – 20); **Ex. 860**, Hunter Decl., p. 4 (20); **Ex. 861**, Charles Decl., p. 6 (40 – 50); **Ex. 862**, Lee Decl., p. 4 (20 – 35); **Dkt. 286-9: Ex. 863**, Harrison Decl., p. 4 (30 – 60); **Ex. 864**, Shirk Decl., p. 7 (60); **Ex. 865**, Phillips Decl., p. 7 (30 – 50); **Ex. 866**, Holley Decl., p. 7 (20); **Ex. 867**, Davis Decl., p. 7 (40 – 50); **Ex. 868**, Murry Decl., p. 7 (25 – 30); **Dkt. 286-10: Ex. 870**, Chapman Decl., p. 7 (35 – 60, could be more); **Ex. 871**, Kimble Decl., p. 7 (50 – 100); **Ex. 872**, Rayos Decl., p. 7 (50); **Ex. 873**, Bui Decl., p. 6 (50 – 60); **Dkt. 286-11: Ex. 875**, Jackson Decl., p. 6 (40 – 50); **Ex. 876**, Martin Decl., p. 7 (30 – 40); **Ex. 877**, Odney Decl., p. 7 (40 – 50); **Ex. 879**, Allen Decl., p. 7 (20 – 50); **Ex. 880** Scharf Decl., p. 7 (at least 30); **Dkt. 286-12: Ex. 881**, Solano Decl., p. 7 (10 – 15); **Ex. 882**, Leonard Decl., p. 7 (85 – 90); **Ex. 883**, Thomas Decl., p. 7 (25 – 30); **Ex. 884**, Finley Decl., p. 3 (60); **Ex. 885**, Poe Decl., p. 4 (30 – 40); **Ex. 886**, Robles Decl., p. 4 (busload); **Dkt. 286-13: Ex. 887**, Garcia Decl., p. 7 (30 – 40); **Ex. 888**, Berger Decl., p. 7 (60 – 70); **Ex. 889**, Michelle Martinez Decl., p. 6 (20 – 30); **Ex. 890**, Green Decl., p. 7 (40 – 50); **Ex. 892**, Irby Decl., p. 6 (50); **Dkt. 286-14: Ex. 893**, Smith Decl., p. 7 (35); **Ex. 894**, Mix Decl., p. 6 (20 – 30); **Ex. 895**, Ballesteros Decl., p. 7 (30 – 40); **Ex. 896**, Davis Decl., p. 7 (as many as 30); **Dkt. 286-15: Ex. 897**, Cheever Decl., p. 7 (20 – 30); **Ex. 898**, Watkins Decl., p. 7 (40 – 50); **Ex. 899**, Sims Decl., p. 7 (20 – 30); **Dkt. 286-16: Ex. 900**,

| | |
|---|---|
| | Gilbreath Decl., p. 7 (50 – 75); **Ex. 901**, Canchola Decl., p. 7 (30); **Ex. 902**, Rodriguez Decl., p. 6 (busload, 30); **Ex. 903**, Smith Decl., p. 6 (50); **Ex. 905**, Lara Decl., p. 4 (40 – 50); **Dkt. 286-17: Ex. 907**, Diiorio Decl., p. 7 (40 – 70); **Ex. 908**, Briseno Decl., p. 7 (50); **Ex. 909**, Batarina Decl., p. 7 (50); **Ex. 911**, Diaz Decl., p.7 (40 in the bus bay; 30 in the indoor search room); **Ex. 912**, Riley Decl., p. 8 (40 – 55); **Dkt. 286-18: Ex. 913**, Lewis Decl., p. 7 (20 – 25); **Ex. 914**, Groomes Decl., p. 7 (30); **Ex. 915**, Howell Decl., p. 7 (50); **Ex. 916**, Miller Decl., p. 7 (50 – 60); **Ex. 917**, Gavaldon Decl., p. 8 (10 – 50); **Ex. 918**, Short Decl., p. 4 (20 or more); **Ex. 919**, Carter Decl., p. 6 (15 – 20); **Dkt. 286-19: Ex. 920**, Delgado Decl., p. 7 (40 – 50); **Ex. 921**, Jordan Decl., p. 7 (at least 40; deputies would not proceed with search until a garage-full had accumulated); **Ex. 922**, Harper Decl., p. 5 (30); **Ex. 923**, Reyes Decl., p. 5 (30 – 40); **Ex. 923**, Reyes Decl., p. 6 (30 – 40); **Ex. 924**, Young Decl., p. 4 (25 – 50); **Ex. 930**, Martin Decl., p. 5 (more than 40); **Dkt. 286-20: Ex. 937**, Ramirez Decl., p. 7 (50 or more); **Dkt. 286-21: Ex. 940**, Burnett Decl., p. 5 (40 – 50); **Ex. 943**, Walton Decl., p. 4 (50 or more inmates); **Ex. 946**, Chambers Decl., p. 4 (40 – 80 inmates); **Ex. 948**, T. Smith Decl., p. 4 (50 – 75 inmates); **Ex. 949**, Foster Decl., p. 4 (at least 25); **Ex. 953**, Dubose Decl., p. 4 (25 – 50); **Ex. 954**, Snowden Decl., p. 4 (30 – 40); **Dkt. 286-22: Ex. 955**, S. Williams Decl., p. 4 (40 – 50); **Ex. 961**, Rivera Decl., p. 7 (approx. 40); **Dkt. 286-23: Ex. 962**, Rhodes Decl., p. 8 (45 – 50); **Ex. 966**, Osborne Decl., p. 7 (on one occasion, 52 inmates); **Dkt. 286-24: Ex. 968**, Garza Decl., p. 9 (approx. 50); **Ex. 969**, Malveaux Decl., p. 5 (50 - 60); **Ex. 970**, Monreal Decl., p. 5 (40-50); **Ex. 971**, Arias Decl., p. 5 (40 - 50); **Ex. 972**, Mendoza Decl., p. 3, 5 (50); **Dkt. 286-25: Ex. 973**, Jones Decl., p. 5 (40 – 50); **Ex. 983**, Cramer Decl., p. 5 (30 – 50). |
| 19.   In February 2011, CRDF began tracking the size of groups on EUDAL Logs. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 35:6 – 35:25 (CRDF began recording strip search information when electronic logs were implemented), 39:2 – 39:11 (EUDAL logs reflect the number of inmates searched); **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. |

| | |
|---|---|
| | Tr., pp. 33:11 – 33:16 (CRDF tracks "pretty much everything" about strip searches in EUDAL logs), p. 37:2 – 38:13 (deputies count the number of inmates being searched in order to record the search count in the log); **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p.3, ¶6 (EUDAL data includes activity logs for 1,094 days from February 3, 2011 to February 28, 2014**).** |
| 20.     EUDAL data shows that, prior to April 2013, 96% of court returns were searched in groups of 10 or more; 79% were searched in groups of 20 or more; 64% in groups of 25 or more, 55% in groups of 30 or more and 37% in groups of 40 or more. | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p. 15. |
| 21.     Prior to April 2013, searches of 97% of all weekdays saw searches of 25 or more; 78% of all weekdays saw searches of 40 or more inmates. | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p. 18. |
| 22.     According to CRDF's EUDAL logs, before April 2013, groups of 50 or more were not exceptional: on many months, hundreds of inmates were searched in groups of 50 or more. Searches of 50 or more occurred in every month except March and September 2011. | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p. 19. |
| 23.     In 2016, LASD's 30(b)(6) witness testified that strip searching groups of 40 would be | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., p. 42:20 – 43:16 ("it wouldn't be efficient, safe, or, obviously the best practice."); 45:2 – 46:8 (strip searches of 40 inmates would be counterproductive to contraband |

9

| | |
|---|---|
| inefficient, unsafe and counterproductive to contraband interception. | interception and unsafe for the facility). |
| 24.     On July 20, 2013, CRDF implemented a written policy limiting strip searches in the bus bay to a maximum of 24 inmates at a time. | **Dkt. 284-31 (Ex. 311)** (CRDF Policy 6-01-020 Frequency of Searches) |
| 25.     After implementation of the policy, most groups were limited to 24 inmates: After April 2013 most, but not all, groups were limited to 24 inmates: 72% were conducted in groups of 20 or more inmates; 94% were conducted in groups of 10 or more; 9% were conducted in groups of 25 or more. | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p. 15. |
| 26.     Although EUDAL data is not available for the period before 2/2011, they can be used to make a statistically reliable estimate, within a statistical, formulaic margin of error, of the number of "large" group strip searches in the bus bay that occurred during the years preceding the EUDAL logs, based on my understanding that County's strip search policy at CRDF remained constant from 2008 | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p. 9. |

| | |
|---|---|
| through March 2013. This analysis has not yet been performed. | |

| **D. Due to the Number of Inmates Crowded Into the Space, Women Could Not Avoid Touching Each Other During Searches** | |
|---|---|
| 27.   During searches, inmates lined-up along the two long walls of the bus bay. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 43:5 – 43:23; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 50:23 – 51:6;   **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 37:3 – 38:12; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 47:12 – 47:23; **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 24:12 – 25:5 (inmates lined up along the two long walls**); Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p. 98:11 – 98:16, 165:3 – 166:2, 217:14 – 217:18 (there were always two lines of inmates on opposite walls); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., 48:13 – 49:11; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., pp. 47:21 – 48:6. |
| 28.   Deputies instructed inmates to stand "shoulder to shoulder." | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 44:22 – 44:24; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 51:16 – 52:3; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 42:19 – 42:25; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 38:6 – 38:12 (deputies instruct inmates to stand so closely they are touching at the shoulders); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 47:12 – 47:23, 60:8 – 60:11, 131:9 – 132:14 (inmates standing "shoulder-to-shoulder," physically touching; remain "shoulder-to-shoulder at all times"; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., p. 29:6 – 29:15; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 42:2-42:9; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 42:19 – 43:12 (inmates stand shoulder-to-shoulder, so close they would brush up against each other); **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 24:12 – 24:18 (inmates standing shoulder-to-shoulder); **Ex 171**, Lopez Dep. Tr., p. 47:12 – 47:19 (inmates "squished" next to each other; used to bump into each other's shoulders), 47:20 – 48:9; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 90:20 – 91:24, 96:12 – 96:16, 98:11 – 98:16, 188:6 – 188:16 (inmates standing shoulder-to-shoulder; <u>required to stand so close they were physically touching</u>); **Dkt. 284-17 (Ex. 173)**, |

Vigil Dep. Tr., pp. 48:13 – 49:11 (as inmates lined up, deputies shouted "shut the fuck up, shoulder-to-shoulder); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., pp. 108:5 – 108:23 (inmates standing so close they are touching); **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., p. 81:9 – 81:12 (shoulder-to-shoulder); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 180:21 – 182:20, 184:23 – 185:6 (inmates lined up shoulder-to-shoulder, physically touching, packed in as tightly as possible; inmates constantly brush up against each other); **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 47:21 – 48:2, 76:22 – 77:12 (inmates stood shoulder-to-shoulder, "scrunched" close together); **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶9; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶7; **Dkt. 284-40 (Ex. 702)**, Britt Decl.¶4; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶10; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶7; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶6; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶6; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶8; **Dkt. 284-56 (Ex. 721)**, Webb Decl. ¶7; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶9.

**Dkt. 286:** **Ex. 802**, Edwards Decl., p. 5 (inmates stand shoulder-to-shoulder); **Ex. 805**, Perez Decl., p. 5 (inmates stand shoulder-to-shoulder); **Dkt. 286-2: Ex. 818**, Armstrong Decl., p. 4 (inmates stand "really close together"); **Ex. 821**, Madison Decl., p. 7 (inmates stand shoulder-to-shoulder); **Dkt. 286-3: Ex. 825**, Wade Decl., p. 4 (inmates stand shoulder-to-shoulder); **Dkt. 286-4: Ex. 835**, Martinez Decl., p. 5 (inmates stand shoulder-to-shoulder); **Dkt. 286-7: Ex. 852**, Reese Decl., p. 4 (inmates stand as close as they can, arm-to-arm); **Dkt. 286-9: Ex. 867**, Davis Decl., p. 7 (witnesses standing so close they could not move without touching); **Dkt. 286-11: Ex. 880**, standing shoulder-to-shoulder); **Ex. 882**, Leonard Decl., p. 7 (inmates stood only 2 inches apart from each other); **Dkt. 286-13: Ex. 887**, Garcia Decl., p. 7 (inmates stood side-by-side, with shoulders "touching"); **Dkt. 286-16: Ex. 900**, Gilbreath Decl., p. 7 (inmates stood side-by-side); **Dkt. 286-18: Ex. 916**, Miller Decl., p. 7 (inmates stood shoulder-to-shoulder);

| | |
|---|---|
| | **Dkt. 286-19: Ex. 923**, Reyes Decl., p. 6 (inmates stood approximately 2 inches apart); **Dkt. 286-21: Ex. 943**, Walton Decl., p. 4 (50 or more inmates squeezed in "like sardines"); **Dkt. 286-24: Ex. 972**, Mendoza Decl., p. 5 (50 women "all bunched closely"); **Dkt. 286-31: Ex. 998**, Jimenez Decl., p. 5 (standing so close that women's breasts, arms, hips and shoulders would brush against each other). |
| 29.     During searches involving 30 or more inmates, each inmate would have had *less than* 6 inches of space on either side of her body. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 12-13, ¶39. |
| 30.     During searches of 40 or more inmates, each inmate would have had *less than* 3 inches of space on either side of her body. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 12-13, ¶39. |
| 31.     Because they were lined up so closely, inmates could not avoid brushing up against each other while undressing and performing other aspects of the strip search. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 12-13, ¶¶39, 40.**; Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 175:12 – 176:16; 191:16 – 192:4 (because inmates are standing so closely, it is not possible to complete the search exercises without touching other inmates); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 131:9 – 132:14; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 42:19 – 43:12 (inmates stand shoulder-to-shoulder, so close they would brush up against each other); **Ex 171**, Lopez Dep. Tr., p.  47:12 – 47:19 (inmates "squished" next to each other; used to bump into each other's shoulders), 47:20 – 48:9; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 188:17 – 189:1(inmates standing shoulder-to-shoulder; required to stand so close they were physically touching); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., pp. 108:5 – 108:23 (inmates standing so close they are touching);**Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., pp. 139:25 – 140:13; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 180:21 – 182:20, 184:23 – 185:6 (inmates lined up shoulder-to-shoulder, physically |

| | |
|---|---|
| | touching, packed in as tightly as possible; inmates constantly brush up against each other); **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶9 (inmates forced to press up against the women next to them; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶7 (often touching;**Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶10 (sometimes standing so close they are physically touching); **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶6 (inmates pressed against each other); **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶6 (pressed against each other); **Dkt. 284-55 (Ex. 720)**,  Vigil Decl. ¶8; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶9. |
| | **Dkt. 286-2: Ex. 821**, Madison Decl., p. 7 (inmates stand shoulder-to-shoulder, "touching each other"); **Dkt. 286-7: Ex. 853**, Soma Decl., p.6 (inmates standing so close they would be touching at the hips/butt); **Dkt. 286-9: Ex. 867**, Davis Decl., p. 7 (witnesses standing so close they could not move without touching); **Dkt. 286-12: Ex. 882**, Leonard Decl., p. 7 (inmates stood only 2 inches apart from each other); **Dkt. 286-13: Ex. 887**, Garcia Decl., p. 7 (inmates stood side-by-side, with shoulders "touching"); **Dkt. 286-19: Ex. 923**, Reyes Decl., p. 6 (inmates stood approximately 2 inches apart); **Dkt. 286-27: Ex. 983**, Cramer Decl., p. 5 (so close together that inmates are touching). |
| **E.  LASD U**TILIZED **H**IGHLY **I**NVASIVE **S**EARCH **P**ROCEDURES **T**HAT **R**EQUIRED **I**NMATES TO **F**ULLY **E**XPOSE THEIR **B**ARE **B**REASTS AND **P**UBIC **R**EGION TO **L**ARGE **G**ROUPS | |
| 32.    After removing shoes and socks, deputies instructed inmates to simultaneously remove their bra, shirt and pants. <u>At all times inmates were required to remove their bra when they disrobed.</u> | **Dkt. 284-31 (Ex. 312.1)**, p. 1 (CRDF Strip Search Script, "take off your shirt, your bra, and your pants"); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 47:12 – 48:1; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 57:14-57:19; **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 49:13 – 49:18; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 46:11 – 46:13;  **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 39:18 – 40:20; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 49:14 – 49:16; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., p. 21:15 – 21:20; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 42:10 – 42:15; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. |

| | |
|---|---|
| | Tr., p. 44:12 – 44:16; **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., p. 27:7 – 27:20; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 49:17 – 50:7, 50:13 – 50:19; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 98:22 – 100:6, 101:12 – 101:25; **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp. 50:8 – 51:25; **Dkt. 284-19 (Ex. 175),** Battiste Dep. Tr., p. 52:6 – 52:14, 81:9 – 82:4; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 180:21 – 182:20; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 49:10 – 49:16; **Dkt. 284-38 (Ex. 700),** Barranca Decl. ¶12; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶12; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶9; **Dkt. 284-46 (Ex. 709),** Ejedawe Decl. ¶7; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶8–9; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶8-9; **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶6; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶¶10–11; **Dkt. 284-56 (Ex. 721)**, Webb Decl. ¶8); **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶11–12. |
| 33.    After disrobing to their underwear, deputies searched each inmate's hair and underneath their feet. | **Dkt. 284-31 (Ex. 312.1)**, p. 1 (CRDF Strip Search Script); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 48:13 – 49:2; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 57:14 – 58:8; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 98:22 – 100:6. |
| 34.    Next, deputies instructed inmates to turn from the wall – i.e., to face the center of the room – wearing only their underwear. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 48:13 – 49:2;  **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 59:22 – 61:3; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 49:10 – 49:16. |
| 35.    While facing away from the wall (facing towards the center), inmates were required to lift their arms in the air and slide their wristband up and down. | **Dkt. 284-31 (Ex. 312.1)**, p. 2 (CRDF Strip Search Script); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 48:13 – 49:2, 49:18 – 50:9. |
| 36.    While facing the center of the room, deputies instructed inmates to lift their bare breasts, without crossing | **Dkt. 284-31 (Ex. 312.1)**, p. 2 (CRDF Strip Search Script, "Without crossing your arms, lift your breasts."); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 47:12 – 48:1, 49:18 – 51:2; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 60:13 – 60:18; **Dkt. 284-7 (Ex.** |

| | |
|---|---|
| their arms in front of their chest. | **162)**, LASD Sgt. Devane Dep. Tr., p. 54:16-54:22; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 47:16 – 47:20; 188:16 – 188:24 (deputies made remarks like "for those who got saggy breasts, raise them up."); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 50:21 – 51:13, 141:17 – 142:18; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 26:16 – 27:7, 32:24 – 33:17, 111:16 – 111:23; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 46:17 – 47:10 (deputies instruct inmates to lift breasts "even if [they] don't have any"); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 48:9 – 50:22; **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 29:4 – 30:6; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 55:12 – 57:23; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 171:25 – 172:7;  **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., p. 50:13 – 50:25, 74:6 – 74:15; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 60:17 – 61:18, 182:21 – 182:23, 196:23 – 197:7 ("lift your breasts *if you have any*."); **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶10; **Dkt. 284-46 (Ex. 709)**, Ejedawe Decl. ¶10; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶14 (deputies said "I don't care if you have tits or not, lift them"); **Dkt. 284-52 (Ex. 716)**,  Madrid Decl. ¶12; **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶6; **Dkt. 284-56 (Ex. 721)**, Webb Decl. ¶9; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶18; **Dkt. 284-59 (Ex. 724)**, Robles Decl. ¶¶17, 18.<br><br>*See* **3/12/14 Order, Dkt. 8:5-7** ("Inmates with large folds of skin or large breasts are told to lift them so that deputies can confirm that no contraband is tucked underneath."). |
| 37.    Many inmates had never before had to expose their bare breasts to a room of strangers. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 47:8 – 47:13; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 57:25 – 58:4; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 32:24 – 33:17; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 51:14 – 51:18; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 48:9 – 50:24; **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 30:15 – 31:3; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 57:24 – 58:2, 58:16 – 58:19. |
| 38.    While facing the center of the room, | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 49:18 – 51:2; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson |

| | |
|---|---|
| deputies also instructed inmates to lift their stomach and any folds of skin. | Dep. Tr., p. 61:1 – 61:19; **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 54:23 – 55:15 ("We would say 'If you have a large stomach, then please lift that up.'"); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 26:16 – 27:7, 111:16 – 111:23; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 46:17 – 47: 3; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 48:9 – 51:19; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 55:12 – 58:2; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 171:25 – 172:7; **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., p. 50:13 – 50:25, 74:6 – 74:15; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 182:21 – 182:23.<br><br>**Dkt. 286-21: Ex. 944**, Maddox Decl., p. 5 (inmates ordered to lift stomach).<br><br>*See* **3/12/14 Order, Dkt. 8:5-7** ("Inmates with large folds of skin or large breasts are told to lift them so that deputies can confirm that no contraband is tucked underneath."). |
| 39.    Deputies' instructions required inmates to self-identify to the group if they had a large stomach. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 54:12 – 55:15 ("We would say 'If you have a large stomach, then please lift that up.'"); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 57:4 – 57:13, 58:24 – 59:10. |
| 40.    Deputies instructed inmates facing the center of the room to **pull down their underwear** to their knees, *or completely off*, so that deputies could confirm that no contraband was tucked beneath their stomachs. | **Dkt. 284-31 (Ex. 312.1)**, p. 2 (CRDF Search Script, "Drop your underwear to your knees. Leave them there. Open your belly buttons. Lift your stomach or any skin folds."); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 49:18 – 51:2; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 60:16 – 61:3; **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 56:11 – 57:5; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 69:17 – 69:22 (before *and after* 7/2013 policy was issued, inmates were required to pull underwear down to knees); **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 45:21 – 47:13; 188:16 – 189:9; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 140:10 – 140:21, 141:17 – 142:18; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 51:2 – 51:10; **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 69:16 – 70:12; **Dkt.** |

| | |
|---|---|
| | **284-17 (Ex. 173)**, Vigil Dep. Tr., p. 50:13 – 50:25, 74:6 – 74:15 (underwear pulled down every time while facing center of the room); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 185:19 – 185:25.<br><br>**Dkt. 286-21: Ex. 942**, Turner Decl., p.5 (underwear pulled to knees or removed completely); **Dkt. 286-23: Ex. 966**, Osborne Decl., p. 7 (removed completely). |
| 41.    Because inmates were facing the center of the room, they could not avoid seeing each other's bare bodies (including pubic area), stretch marks, breasts missing from mastectomies, breast implants, and gang tattoos they need to conceal for safety reasons. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 45:21 – 47:13; 188:16 – 189:9; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 50:21 – 51:13; 56:1 – 56:7, 57:25 – 58:8, 141:17 – 142:18; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 32:24 – 33:17; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 48:9 – 50:22; **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 29:4 – 30:13; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 55:12 – 55:22; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., 106:15 – 108:9, 208:10 –210:2, 210:20 – 211:9; **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶13, 23; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶11; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶20; **Dkt. 284-43 (Ex. 705)**, Coehlo Decl. ¶3; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶10, **Dkt. 284-46 (Ex. 709)**; Ejedawe Decl. ¶10; **Dkt. 284-48 (Ex. 711)**, Johar Decl. ¶3; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶ 13; **Dkt. 284-51 (Ex. 715)**, Madigan Decl. ¶3; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶13; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶13; **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶6; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶16; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶17; **Dkt. 284-59 (Ex. 724)**, Robles Decl. ¶¶17, 18.<br><br>**Dkt. 286-12: Ex. 884**, Finley Decl., p. 3 (rival gang tattoos); **Dkt. 286-19: Ex. 925**, Zambrana Decl., p. 7; **Ex. 926**, Crumble Decl., p. 7; **Ex. 929**, Bowman Decl., p. 5, **Dkt. 286-21: Ex. 942**, Turner Decl., p.5 (inmates could not avoid seeing the inmates standing right next to them); **Ex. 944**, Maddox Decl., p. 5 ("every woman can see the other women while being searched outside, bending over, and taking off clothes."); **Ex. 946**, Chambers Decl., p. 4 (could not avoid seeing women on the opposite wall and women standing on either side); |

| | |
|---|---|
| | **Ex. 948**, T. Smith Decl., p. 4 (could fully see women on either side); **Ex. 949**, Foster Decl., p. 4 (could see women standing in the same line (on either side) and women standing across from her in the opposite line); **Ex. 952**, Stephenson Decl., p. 4 (inmates could not avoid seeing each other during strip search); **Dkt. 286-22: Ex. 958**, Demery Decl., p. 4 (women could see each other's entire bodies); **Ex. 960**, Worthy Decl., p. 7 (could see women fully undressed); **Dkt. 286-23: Ex. 964**, Miller Decl., p. 8 (saw other women fully undressed, every time); **Dkt. 286-24: Ex. 972**, Mendoza Decl., p. 5 (women could see each other fully naked); **Dkt. 286-26: Ex. 980**, McGlothlin Decl., p. 5 (women can see all parts of each other's bodies; fully naked); **Dkt. 286-31: Ex. 997**, Abalos Decl., p. 5 (inmates could see each other during the entire search). |
| 42.   As CRDF personnel were aware, inmates commonly looked around, including at inmates standing next to them, when they were confused as to how to perform search exercises. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 87:1 – 87:14 ("So they would usually just look at the person next to them and see what they were doing and do it."); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 80:9 – 81:14 (inmates who did not speak English would look around at other women being searched; deputies observed them looking around); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 61:4 – 61:16; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 82:9 – 82:22 (deputies instructed inmates who were confused to "look around and see what [other inmates were] doing."). |
| 43.   Until approximately late-2011, both lines of inmates were <u>directly facing</u> the deputies *and* each other, with bare breasts and pubic region fully exposed for several minutes. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 49:18 – 51:14; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 59:22 – 61:3; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 50:2 – 50:8, 51:1 – 51:14; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 45:21 – 47:13; 188:16 – 189:9; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 50:21 – 51:13, 131:9 – 132:14 (inmates facing each other while lifting breasts); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 32:24 – 33:17, 111:16 – 112:18; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 101:9 – 102:5 (during all searches, both lines of inmates were simultaneously searched); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 48:9 – 50:22; **Dkt. 284-14 (Ex.** |

19

**170)**, S. Martinez Dep. Tr., pp. 29:4 – 30:13; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., 208:10 –210:2, 210:20 – 211:9 (inmates standing in this manner for 3-5 minutes); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., p. 50:13 – 50:25; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 185:19 – 185:25; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 49:10 – 49:16; **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶13, **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶18; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶10; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶13; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶13; **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶6; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶17; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶18; **Dkt. 284-59 (Ex. 724)**, Robles Decl. ¶¶17, 18.

**Dkt. 286-11:** **Ex. 878**, Savoia Decl., p. 7 (directly facing); **Dkt. 286-21:** **Ex. 946**, Chambers Decl., p. 4 (could not avoid seeing women on the opposite wall and women standing on either side); **Ex. 949**, Foster Decl., p. 4 (could see women standing in the same line (on either side) and women standing across from her in the opposite line); **Ex. 950**, R. Davis Decl., p. 4 (two lines directly facing); **Ex. 951**, Douglas Decl., p. 4 (inmates on opposite walls could see each other while unclothed); **Ex. 954**, Snowden Decl., p. 4 (everyone could see everyone else in the room while inmates faced center and lifted breasts); **Dkt. 286-22:** **Ex. 955**, S. Williams Decl., p. 4 (directly facing while completely naked); **Ex. 957**, Barrett Decl., p. 4 (inmates faced each other undressed from top to bottom); **Ex. 958**, Demery Decl., p. 4 (directly facing each other with no bra or panties); **Ex. 959**, J. Smith Decl., p. 5 (directly facing other inmates with underwear pulled off or removed completely); **Ex. 960**, Worthy Decl., p. 7 (could see women fully undressed on the opposite wall; could see other women's vaginas); **Ex. 961**, Rivera Decl., p. 7 (two lines directly facing after removing **all** clothing); **Dkt. 286-23:** **Ex. 964**, Miller Decl., p. 8 (directly facing every time); **Ex. 965**, R. Carrillo Decl., p. 7 (directly facing with underwear down, breasts exposed); **Ex. 966**, Osborne

| | Decl., p. 7 (directly facing while standing naked, underwear completely removed); **Ex. 967**, Dutoit Decl., p. 5 (directly facing with underwear pulled to knees); **Dkt. 286-24: Ex. 969**, Malveaux Decl., p. 5 (directly facing); **Ex. 971**, Arias Decl., p. 5 (directly facing with bra and underwear completely removed); **Ex. 972**, Mendoza Decl., p. 5 (women could see each other fully naked); **Dkt. 286-25: Ex. 973**, Jones Decl., p. 5 (directly facing opposite line while completely naked); **Ex. 976**, Hernandez Decl., p. 7 (directly facing); **Dkt. 286-26: Ex. 981**, Gomez Decl., p. 5 (directly facing without bra or underwear); **Dkt. 286-27: Ex. 983**, Cramer Decl., p. 5 (directly facing every time); **Ex. 986**, Gebhardt Decl., p. 5 (inmates can see everyone on both sides); **Dkt. 286-30: Ex. 994**, Acosta Decl., p. 5 (directly facing); **Ex. 995**, R. Gonzalez Decl., p. 5 (facing with underwear pulled to knees or ankles); **Dkt. 286-31: Ex. 999**, Farish Decl., p. 5 (directly facing). |
|---|---|
| 44.     On July 20, 2013, LASD adopted a policy providing that the two lines of inmates shall alternate in facing the center of the room to perform the above-described search procedures. | **Dkt. 284-31 (Ex. 312)** (6-01-030, Search Commands); **Dkt. 284-31 (Ex. 312.1)** (Search Command Script). |

| **F.  LASD'S VISUAL BODY CAVITY PROCEDURE REQUIRED INMATES TO ADJUST THEIR LABIA WITH THEIR FINGERS TO EXPOSE THEIR VAGINAL CAVITY, IN THE PRESENCE OF LARGE GROUPS** | |
|---|---|
| 45.     After inspecting the front/outside of women's bodies, deputies ordered inmates to face the wall again. | **Dkt. 284-31 (Ex. 312.1)**, p. 2 (Search Command Script, "Pull up your underwear, turn around, and face the wall."); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 51:17 – 52:10, 53:22 – 53:25. |
| 46.     Deputies instruct the group to step back from the wall, pull their underwear to their ankles, | **Dkt. 284-31 (Ex. 312.1)**, p. 3 (Search Command Script) ("When I tell you to, pull down your underwear, take a half step back, spread your feet wide, and bend at your waist, not at your knees. Reach behind with your hands, |

| | |
|---|---|
| bend at the waist and expose their vagina. The search command script implemented in July 2013 reads: "When I tell you to, pull down your underwear, take a half step back, spread your feet wide, and bend at your waist, not at your knees. Reach behind with your hands, spread open your vagina lips, and cough. Look between your legs so you can see when we tell you to get up. Cough until you are told to get up." | spread open your vagina lips, and cough. Look between your legs so you can see when we tell you to get up. Cough until you are told to get up."); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 60:3 – 60:25; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 50:11 – 55:2 (deputies instruct inmates to look between their legs; inmates cannot help but to see women on the opposite wall); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 136:5 – 137:2; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 53:7 – 54:7; Dkt. 284-14 (Ex. 170), S. Martinez Dep. Tr., p. 38:2 – 39:10; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 180:21 – 182:20; **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶14; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶11; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶14; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶21; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶11; **Dkt. 284-46 (Ex. 709)**, Ejedawe ¶8; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶11; **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶11; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶15; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶14; **Dkt. 284-48 (Ex. 711)**, Johar Decl. ¶3; **Dkt. 284-51 (Ex. 715)**, Madigan Decl. ¶3; **Dkt. 284-56 (Ex. 721)**, Webb Decl. ¶9;  **Dkt. 284-59 (Ex. 724)**, Robles Decl. ¶20. |
| 47.    The inmates were often standing so close that they would touch at the hips and/or buttocks when they bent over for the body cavity inspection. | **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 184:15 – 184:22; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶15; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶23; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶9.<br><br>__Dkt. 286-7:__ **Ex. 853**, Soma Decl., p.6 (inmates standing so close they would be touching at the hips/buttocks). |
| 48.    Deputies specifically order inmates to reach behind their bodies and *use their hands to spread apart their labia* so that deputies can see their vaginal opening. | **Dkt. 284-31 (Ex. 312.1)**, p. 3 (Search Command Script, "Reach behind with your hands, *spread open your vagina lips*, and cough."); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 60:3 – 61:14; 62:23 – 63:5; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 68:13 – 68:21; **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 70:13 – 71:4 (inmates are instructed to use their fingers to pull away their vulva, the external part of their genitalia, so that deputies can see the vaginal opening); **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. |

Tr., p. 55:14 - 55:25; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 50:11 – 55:2 (deputies instruct inmates to "pull open" their vagina); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 53:10 – 54:6; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 31:22 – 32:23;  **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p.44:6 – 44:13 (inmates spread cheeks of buttocks and vagina); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 53:7 – 54:7 (deputies say "open your vagina not your asses"); **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., p. 38:2 – 39:10 (deputies screamed "open your vagina wider" "I'm not looking at a butthole – I said open your vagina")**Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 67:7 – 68:7; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p. 120:19 – 121:1; **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., p. 50:8 – 51:14; **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., p. 53:18 – 53:25, 84:12 – 84:19; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 60:17 – 61:18, 180:21 – 182:20; **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶14; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶21; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶11; **Dkt. 284-46 (Ex. 709)**, Ejedawe ¶8; **Dkt. 284-48 (Ex. 711)**, Johar Decl. ¶3; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶11; **Dkt. 284-51 (Ex. 715)**, Madigan Decl. ¶3; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶14; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶11; **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶11; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶14; **Dkt. 284-56 (Ex. 721)**, Webb Decl. ¶9; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶15; **Dkt. 284-59 (Ex. 724)**, Robles Decl. ¶¶20; **Dkt. 284-60 (Ex. 725)**, Graham Decl. ¶17 ("spread your lips"); **Dkt. 284-61 (Ex. 726)**, Tindall Decl., ¶11.

**Dkt. 286-5: Ex. 838**, Johnson Decl., p. 4 (deputies instructed inmates to "take [their] hands and open [their] butt and vagina); **Dkt. 286-7: Ex. 852**, Reese Decl., p. 4 (deputies instructed inmates to "open [their] vagina as much as [they] can; 'I want to see the inside'"); **Dkt. 286-21: Ex. 943**, Walton Decl., p. 6 (deputies instructed inmates to "open up like you do for your man" or "don't be shy, open wider"); **Ex. 947**, Cherry Decl., p. 4 (inmates required to spread vagina and buttocks).

| | |
|---|---|
| | **3/12/14 Order**, Dkt. 8:13-14. |
| 49.    Deputies specifically instruct them to open their "vagina lips," or in some cases, to spread their "pussy" lips. | **Dkt. 284-31 (Ex. 312.1)**, p. 3 (Search Command Script, "Reach behind with your hands, *spread open your vagina lips*, and cough."); **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 68:22 – 69:4; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 53:7 – 54:7 ("spread your lips not your asshole.");**Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 67:7 – 68:7 ("spread your lips not your asshole."); **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p. 211:10 – 211:19 ("spread your pussy lips"); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 60:17 – 61:18, 196:23 – 197:7 ("spread your lips not your asshole."). <br><br> **Dkt. 286-11: Ex. 878**, Savoia Decl., p. 8 ("open your vagina not your asshole"); **Dkt. 286-22: Ex. 961**, Rivera Decl., p. 8 ("open your pussy lips"; "open your vagina lips, not [your] asshole); **Dkt. 286-23: Ex. 964**, Miller Decl., p. 7 (pull your pussy lips open); **Ex. 966**, Osborne Decl., p. 8 ("spread your lips not your ass"); **Dkt. 286-27: Ex. 985**, Olazaba Decl., p. 6 ("spread your pussy lips not your asshole").    . |
| 50.    Many inmates had never before had to expose their genitals to a room of strangers. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 47:8 – 47:13; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 57:25 – 58:8; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 33:19 – 33:22; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 51:20 – 51:23; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 67:9 – 67:19; **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., p. 42:8 – 42:11. |
| 51.    Deputies instruct inmates to *cough* while maintaining this position (bent at the waist, hand spreading vagina and buttocks). | **Dkt. 284-31 (Ex. 312.1)**, p. 3 (Search Command Script, "Reach behind with your hands, *spread open your vagina lips*, and cough."); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 60:3 – 60:25, 61:22 – 62:22; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 50:11 – 55:2; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 55:13 – 55:23, 133:11 – 135:11 (cough while squatting and spreading vagina); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 53:7 – 54:7; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 70:8 – 70:14; **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., p. 53:18 – 53:25, 84:12 – 84:19; **Dkt.** |

24

| | |
|---|---|
| | **284-20 (Ex. 176)**, Barranca Dep. Tr., p. 180:21 – 182:20; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 52:12 – 53:2.<br><br>**Dkt. 286-21:** **Ex. 942**, Turner Decl., p.6 (inmates required to spread butt cheeks and labia while bent over coughing); **Ex. 944**, Maddox Decl., p. 5 ("bend the fuck over and cough").<br><br>**3/12/14 Order, Dkt. 8/11-13** (After lowering their underwear, the women being strip searched are "required to bend over and look back through their legs, spread their body openings, and cough, so that each deputy can visually inspect their body cavities."). |
| 52.   The purpose of requiring inmates to cough is that coughing (in this position) will help expel any foreign objects in the vagina. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 70:2 – 70:12; Dkt. 284-8 (Ex. 163), LASD Sgt. Ford Dep. Tr., pp. 87:23 – 88:20; **Dkt. 284-22 (Ex. 180),** LASD Cmdr. Gutierrez Dep. Tr., pp. 131:20 – 132:10; **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 14, ¶45. |
| 53.   Menstruating inmates may expel blood when they are instructed to cough because coughing forces a contraction of vaginal muscles. | **Dkt. 284:** **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 23, 24. |
| 54.   Witness reports confirm that inmates some inmates did involuntarily expel blood when they were instructed to cough. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 59:20 – 60:9 (witness expelled blood when she coughed); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 39:18 – 40:4; 133:2 – 133:18 (inmate expelled blood when she coughed); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 57:13 – 58:2 (observed inmate expel blood while coughing).<br><br>**Dkt. 286-5:** **Ex. 842**, Abbago Decl., p. 9, (blood running down inmate's leg; inmates leaked blood during the "cough and squat" part of the search; inmates provided with no means to clean themselves up before getting dressed); **Dkt. 286-7: Ex. 850**, Stevens Decl., p. 4 |

| | |
|---|---|
| | (inmate bled on herself during the "cough and squat" part of the search; no way to clean blood off of her hands); **Dkt. 286-14: Ex. 896**, Michelle Davis Decl., p. 6, 7 (blood spatters on inmates clothes and shoes when menstruating women squat and cough); **Dkt. 286-21: Ex. 954**, Snowden Decl., p. 5 -6 (inmate expelled a blood clot while coughing). |
| 55.     Women may involuntarily **urinate** when required to cough in this position. | **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 70:23 – 71:21 (witness observed inmate involuntarily urinate when she coughed). |
| 56.     One witness observed an inmate expel her intra-uterine device while coughing for the visual body cavity inspection. | **Dkt. 284: Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 95:22 – 99:5. |
| 57.     Inmates were required to continue coughing and to maintain this position (bent at the waist, hands reaching back to spread vagina and buttocks) until deputies checked each inmate's body cavities with flashlights. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 61:22 – 62:22 ("we would shine our flashlight towards them, and I would – we would walk by individually, and as we'd walk by, I would always tell them to, when they would bend over to cough, I'd say make sure you look in between your legs…"); **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 69:15 – 69:18; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 50:11 – 55:2; **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., p. 38:2 – 39:10; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 68:15 – 70:18; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., 105:9 – 105:17; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 180:21 – 182:20; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 52:12 – 53:2; **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., p. 128:24 – 130:5.. |
| 58.     Deputies individually inspect each inmate's vaginal cavity during this portion of the search. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 61:22 – 62:22 ("we would shine our flashlight towards them, and I would – we would walk by individually, and as we'd walk by, I would always tell them to, when they would bend over to cough, I'd say make sure you look in between your legs…"); **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 69:11 – 69:14 (indicating that the group of deputies assist each other in searching each |

| | individual); **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 54:6 – 54:17; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 53:7 – 54:7, 58:12 – 59:5; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 68:15 – 70:14; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 180:21 – 182:20; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 52:12 – 53:2. |
|---|---|
| 59.    Deputies simultaneously inspect the vaginal cavity *and the rectum*. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 60:14 – 60:16; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 68:19 – 68:21; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 14:3-14:12; Dkt. 284-12 (Ex. 168), Douglas Dep. Tr., p. 44:6 – 44:13 (deputies instruct inmates to spread cheeks of buttocks and vagina); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 58:12 – 58:15.<br><br>**Dkt. 286-21: Ex. 942**, Turner Decl., p.6 (inmates required to spread butt cheeks and labia while bent over coughing); **Ex. 943**, Walton Decl., p. 4 (inmates required to bend over and spread buttocks while coughing); **Ex. 947**, Cherry Decl., p. 4 (inmates required to spread vagina and buttocks); **Ex. 948**, T. Smith Decl., p. 4 (deputies instructed inmates to open butt cheeks); **Dkt. 286-28: Ex. 988**, Dunne Decl., p. 5 (inmates required to expose anus).<br><br>***See also, 3/12/14 Order, Dkt. 8:13-14.*** |
| 60.    LASD's 30(b)(6) witness, Commander Gutierrez, testified that inmates must maintain the vbc position (bent over, spreading their labia with their fingers with their vagina exposed)  for approximately 3-5 minutes. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr. (v. 2), p. 133:8 – 133:18. |
| G. Inmates Were Required to Look Between Their Legs While Bent Over and Spreading their Labia; They Could Not Avoid Seeing Other Women Performing the Same Humiliating Procedure | |

27

| | |
|---|---|
| 61.    CRDF personnel specifically instructed inmates to look between their legs while bending at the waist and spreading their labia so that the inmates would know when the deputy had checked them. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 61:22 – 62:22, 63:13 – 64:7 ("And I always will tell them to make sure you look in between your legs; so you can see when I'm telling you to get up. And a lot of times they will look. They will look right at me…"); **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 70:23-71:2; **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 84:10-84:13; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 52:12 – 52:17; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., p. 34:7 – 34:22; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 74:19 – 75:4; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 180:21 – 182:20. |
| 62.    Until at least mid-2011, both lines of inmates  were instructed to simultaneously bend, cough, expose their vagina and look between their legs; | **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 87:18 – 90:11 (within 6 months of the witness's deposition, LASD Sgt. Devane instructed her to modify the search procedure so that the line of inmates on only one wall would perform the visual body cavity inspection, while the other line waited). |
| 63.    During this time period, the two lines of inmates could not avoid seeing each other bent over with their naked buttocks in the air as they simultaneously looked between their legs. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 50:11 – 55:2 (deputies instruct inmates to look between their legs; inmates cannot help but to see women on the opposite wall); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., p. 34:7 – 34:22 (while looking between legs, inmates see women in the opposite line bending over and spreading their vaginas); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., p. 34:7 – 34:22;  **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 45:9 – 45:22 (inmates look between their legs to the person across from them on the opposite wall; inmates see the vagina and buttocks of inmates on the opposite wall); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 58:12 – 61:3**; Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 41:13– 42:11, 99:18 – 100:23; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., 105:9 – 105:17; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 185:7 – 185:18; **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶14; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶21; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶11; **Dkt. 284-48 (Ex. 711)**, Johar Decl. ¶3;  **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶11; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶14; **Dkt. 284-53 (Ex. 717)**, Paiz |

| | |
|---|---|
| | Decl. ¶11;**Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶7; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶15.<br><br>**Dkt. 286-1: Ex. 810**, Drisdle Decl., p. 7; **Dkt. 286-2: Ex. 820**, Armstrong Decl., p. 4; **Dkt. 286-4: Ex. 837**, Lobrandon Decl., p. 4; **Dkt. 286-6: Ex. 844**, Schuster Decl., p. 4; **Ex. 846**, Rodriguez Decl., p. 4; **Ex. 856**, Edwards Decl., p. 7; **Dkt. 286-8: Ex. 858**, Shields Decl., p. 4; **Ex. 861**, Charles Decl., p. 6; **Dkt. 286-9: Ex. 867**, Davis Decl., p. 7; **Dkt. 286-13: Ex. 889**, Michelle Martinez Decl., p. 6; **Ex. 891**, Reynolds Decl., p. 7; **Dkt. 286-14: Ex. 896**, Davis Decl., p. 7; **Dkt. 286-15: Ex. 898**, Watkins Decl., p. 7; **Dkt. 286-16: Ex. 902**, Rodriguez Decl., p. 6; **Dkt. 286-17: Ex. 910**, Bradley Decl., p. 7; **Dkt. 286-19: Ex. 921**, Jordan Decl., p. 7; **Dkt. 286-21: Ex. 944**, Maddox Decl., p. 5 ("every woman can see the other women while being searched outside, bending over, and taking off clothes."); **Dkt. 286-25: Ex. 973**, Jones Decl., p. 5 (could see other inmates when they bend over and cough); **Dkt. 286-27: Ex. 982**, Pickett Decl., p. 5.<br><br>*See also*, **3/12/14 Order, Dkt. 8/18-21** ("When they are told to bend over and look through their legs and manipulate their buttocks and labia, [the women being strip searched] cannot avoid seeing the women across from them doing the same thing."). |
| 64.     In late-2011, some deputies modified the process by instructing one line of inmates to face the wall while the other line looked through their legs. When implemented, this modification eliminated having inmates on opposite walls looking between their legs, at each other, while exposing their vaginas. | **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 87:18 – 90:11 (within 6 months before the witness's deposition on 12/7/2011, LASD Sgt. Devane instructed her to modify the search procedure so that the line of inmates on only one wall would perform the visual body cavity inspection, while the other line waited). |

| H. The Highly Invasive Procedure Also Required Inmates to Remove Soiled Feminine Hygiene Products in the Presence of the Group, Often Causing them to Bleed on Themselves | |
| --- | --- |
| 65. The "great majority" of inmates are between the ages of 18 – 50 years old. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 67:12 – 67:15. |
| 66. On a given day, approximately 12% of female inmates are menstruating. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 24. |
| 67. In a group of 24 women between 18 – 50, 2 – 3 women will be menstruating; in a group of 40 inmates, approximately 5 inmates will be menstruating. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 24. |
| 68. As CRDF personnel acknowledge, during some searches, "almost every" inmate is menstruating. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 56:22 – 57:5 ("we've had court line searches where almost everyone is [menstruating]."). |
| 69. Before conducting the VBC described above, deputies instructed menstruating women to raise their hand if they are wearing a tampon, sanitary napkin "or have anything in their vagina," requiring them to publicly identify that they are menstruating to the entire group. | **Dkt. 284-31 (Ex. 312.1)** (Search Command Script, "If you are wearing a pad, tampon, or have anything between your legs or in your vagina, raise your hand."); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 54:15 – 55:18; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 62:14 – 63:7 (deputies asked inmates to raise their hand if they have "anything between your legs *or up your vagina*) (emphasis supplied); **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 58:4- 58:11; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 42:2 – 43:6, 44:4 – 44:22; 131:9 – 133:1; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 51:21 – 52:23, 61:3 – 61:6 (women can see which inmates are menstruating because they must raise their hands to identify themselves); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 133:19 – 134:3; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 48:13 – 48:21 (deputies instruct |

| | |
|---|---|
| | women to raise hand if they are menstruating; remove soiled pad); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 54:15 – 55:18; **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., pp. 83:5 – 84:3; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 62:1 – 62:7; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., pp. 49:25 – 49:5, 51:2 – 51:25.<br><br>***See also*, 3/12/14 Order, Dkt. 8:24-28.** |
| 70.    Deputies then ordered inmates to remove their soiled tampon or pad in the view of the group: "If you have anything between your legs or inside of you, please take it out now." | **Dkt. 284-31 (Ex. 312.1)** (Search Command Script, "…take out whatever you have in between your legs and place it in the wrapper."); **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 64:15 – 64:20; **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 58:4- 58:11 (In effect, deputies say "If you have anything between your legs or inside of you, please take it out now."); **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 42:2 – 43:6, 44:4 – 44:22; 131:9 – 133:1; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 56:1 – 56:7; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 62:6 – 63:12, 63:23 – 65:10; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., pp. 49:25 – 49:5, 51:2 – 51:25.<br><br>**Dkt. 286-23:** Ex. 966, Osborne Decl., p. 7 (inmate required to "hold a bloody tampon [out] in front of [herself]" with blood dripping down her legs; **Dkt. 286-27:** Ex. 984, Duhaney Decl., p. 5 (removed sanitary napkin in front of other women).<br><br>**3/12/14 Order, Dkt. 8:28-9:1.** |
| 71.    Inmates are afforded no privacy during the process of removing the soiled tampons or pads. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 63:23 – 64:4; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 42:2 – 43:6, 44:4 – 45:20; 131:9 – 133:1; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 52:20 – 53:6; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 56:1 – 56:7; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 63:23 – 65:10; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., pp. 49:25 – 49:5, 51:2 – 51:25; **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶18; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶8; **Dkt. 284-40 (Ex. 702)**, Britt Decl.¶4; **Dkt. 284-41 (Ex. 703)**, Burke Decl. ¶3; **Dkt. 284-42 (Ex.** |

| | |
|---|---|
| | **704)**, Cholewiak Decl. ¶24; **Dkt. 284-47 (Ex. 710)**, Garcia Decl. ¶4; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶10; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶17; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶10; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶12; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶13–14; **Dkt. 284-59 (Ex. 724)**, Robles Decl. ¶¶14, 15. |
| 72.     When removing saturated tampons/pads, women often get menstrual blood on their fingers and/or the ground. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 22; *see also*, **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p.  47:21 – 47:24, 87:22 – 88:2 (blood on fingers); **Dkt. 284-58 (Ex. 723)**, Gutierrez Decl., ¶14. <br><br> **<u>Dkt. 286:</u> Ex. 804**, Thatcher Decl., p. 7 (menstruating women get blood on their hands while removing feminine hygiene products and have no way to wash them before continuing the search); **Ex. 807**, Talin Decl., p. 6 (blood "went everywhere" as inmate was required to remove tampon and perform <u>VBC</u> (cough/squat); **<u>Dkt. 286-1:</u> Ex. 808**, Nunez Decl., p. 4 (witness had to remove blood-stained underwear in front of other inmates; blood on witness's hand); **<u>Dkt. 286-23:</u> Ex. 962**, Rhodes Decl., p. 6, 9 (inmate dripped blood onto adjacent inmate's personal belongings while removing tampon); **Ex. 966**, Osborne Decl., p. 7 (inmate required to "hold a bloody tampon [out] in front of [herself]" with blood dripping down her legs).    . |
| 73.     Removing tampons is a procedure normally done in a private bathroom or toilet stall. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 22. |
| 74.     Removing a heavily saturated tampon is a messy process that can result in transferring blood to the fingers, legs and in some cases, even flicking blood on nearby surfaces (ground or walls). Heavily menstruating women may | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 23. |

| | |
|---|---|
| expel blood *the moment a tampon is removed* which is why such removal is normally done while sitting over a toilet seat, in a private context. | |
| 75. Witnesses confirm that never before in their lives have they had to attend to soiled feminine hygiene products in the presence of strangers. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 44:23 – 45:9; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 52:24 – 53:6; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., p. 31:2 – 31:21; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 56:11 – 56:14; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 66:19 – 67:6. |
| 76. Inmates were not permitted to replace the pad or tampon until after the visual body cavity inspection was complete, as described below. | **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 65:9 – 65:13; **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 62:8 – 62:18; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 59:21 – 60:4 (menstruating inmates were permitted to replace feminine hygiene products after all inmates had been searched and given permission to put clothing back on); **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 59:4 – 59:8; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 48:23 – 49:8; 134:13 – 134:21 (not permitted to replace pad until visual body cavity inspection is complete); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 65:11 – 65:16; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 63:2 – 63:7; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 53:6 – 53:15; **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶18 (women left without a pad for 3 min.); **Dkt. 284-40 (Ex. 702)**, Britt Decl.¶4 (5 min.); **Dkt. 284-42 (Ex. 704),** Cholewiak Decl. ¶24 (5 min.); **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶10 (not permitted to replace pad or tampon until search visual body cavity search was complete); **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶17 (inmates could be required to wait as long as 15 min. while deputies completed the visual body cavity inspection); **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶10; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶12-13; **Dkt. 284-56 (Ex. 721)**, Webb Decl. ¶10; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶13–14.<br><br>**<u>Dkt. 286-21:</u> Ex. 943**, Walton Decl., p. 4, 5 (witness |

| | |
|---|---|
| | dripped blood onto the ground while waiting to replace sanitary napkin); **Dkt. 286-23: Ex. 966**, Osborne Decl., p. 8 (waited 3 minutes); **Dkt. 286-26: Ex. 979**, K. Gonzalez Decl., p. 7 (upset having to wait to replace pad while blood ran down her leg).<br><br>**3/12/14 Order, Dkt. 9:1-3** ("Inmates must … wait until the genital search process is complete before they may replace the soiled [menstrual] pad or tampon with the clean one.") |
| 77.     Inmates were required to wait several minutes without sanitary protection before they were permitted to replace their sanitary napkin. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 59:16 – 59:19 (ten minutes); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp. 74:23 – 75:5 (waited up to 20 minutes); **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr. (v. 2), pp. 133:8 – 133:18; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶17 (up to 15 min.); **Dkt. 284-40 (Ex. 702)**, Burke Decl., ¶4 (5 minutes).<br><br>**Dkt. 286-11: Ex. 878**, Savoia Decl., p. 7 (3-8 minutes); **Dkt. 286-22: Ex. 955**, S. Williams Decl., p. 5 (5 minutes); **Ex. 960**, Worthy Decl., p. 7, 8 (inmate bleeding heavily due to fibroid tumors waited 10 minutes to replace sanitary napkin); **Dkt. 286-23: Ex. 963**, Dale Decl., p. 6 (at least 5 minutes); **Ex. 965**, R. Carrillo Decl., p. 7 (est. 10 min.); **Ex. 966**, Osborne Decl., p. 7 (3 minutes); **Dkt. 286-24: Ex. 971**, Arias Decl., p. 6 (approx. 3 minutes); **Dkt. 286-27: Ex. 984**, Duhaney Decl., p. 6 (2-5 minutes); **Ex. 987**, Brown Decl., p. 6 (5 minutes); **Dkt. 286-29: Ex. 991**, Cleveland Decl., p. 6 (5-10 minutes); **Ex. 993**, Peavie Decl., p. 6 (about 3 minutes); **Dkt. 286-31: Ex. 999**, Farish Decl., p. 6 (sometimes more than 5 minutes). |
| **I.   DURING THE VISUAL BODY CAVITY INSPECTION, MENSTRUATING INMATES COMMONLY BLED ONTO THEMSELVES AND THE GROUND** ||
| 78.     As deputies acknowledged, and numerous inmates observed, some inmates were heavily bleeding and bled on themselves. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 57:6 – 58:1 (some women are bleeding so heavily that deputies must give them a towel to clean up blood off of their body); 64:24 – 65:2 (deputy has observed inmates pass blood clots, bleed onto their legs or onto the ground); **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. |

Tr., p. 65:23 - 66:1 (has observed inmates menstruating heavily); 67:2 – 67:19 (deputy has observed inmates drip blood down their leg); **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 52:25 – 55:16 (witness observed deputies require inmate to complete VBC after the inmate informed them she was bleeding heavily; inmate expelled blood clots onto the ground and onto her own clothing; deputies denied her request for clean pants); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 37:24 – 38:23, 52:15 – 52:20, 65:17 – 66:17 (dried and fresh blood on the floor; witness bled heavily during the strip search and bled onto her leg; observed inmate bleeding heavily due to recent childbirth); **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶14 (inmate bleeding upon returning from the hospital after giving birth; blood dripped down her legs during the search).

**Dkt. 286:** **Ex. 803**, Hawkins Decl., p. 5 (some women bleeding so badly that made a mess); **Ex. 807**, Talin Decl., p. 6 (blood "went everywhere" as inmate was required to remove tampon and perform VBC (cough/squat); **Dkt. 286-1: Ex. 809**, Ship Decl., p. 5 (witness bled heavily during searches; bled on herself and on the floor); **Dkt. 286-2: Ex. 819**, Maxie Decl., p. 7, 9 (heavily bleeding inmate passed blood clots during search; inmates had to wait 15-30 minutes before replacing pad); **Dkt. 286-3: Ex. 825**, Wade Decl., p. 5 (hemorrhaging after miscarriage); **Dkt. 286-4: Ex. 833**, Bunton Decl., p. 4, 5 (inmate experiences heavy bleeding due to medical condition; during VBC, blood ran down inmates leg; blood "all over the place"; inmates bleeding all over themselves); **Ex. 834**, J. Murillo Decl., p. 5 (deputies required inmates to remove pads regardless of how heavily they are bleeding); **Ex. 835**, Martinez Decl., p. 6 (deputies did not accommodate inmates who were bleeding heavily); **Dkt. 286-17: Ex. 908**, Briseno Decl., p. 6, 7, 9 (inmate next to witness passed a blood clot onto the floor; deputies still would not permit her to replace her sanitary napkin); **Dkt. 286-18: Ex. 913**, Lewis Decl., p. 6, 7 (inmate next to witness expelled a blood clot that

| | |
|---|---|
| | splattered onto witness's bare foot); **<u>Dkt. 286-21:</u> Ex. 943**, Walton Decl., p. 4-5 (inmates not exempted from search even when they were dripping menstrual blood); **Ex. 945**, G. Murillo Decl., p. 6 (observed inmate dripping "every[where]"); **Ex. 951**, Douglas Decl., p. 5-6 (observed heavily bleeding inmate bleed down her legs and through her pants; deputies refused to give her a clean pair of pants); **Ex. 954**, Snowden Decl., p. 5 -6 (during the VBC, inmate expelled a blood clot; blood was running between her thighs); **<u>Dkt. 286-22:</u> Ex. 960**, Worthy Decl., p. 5, 7, 8 (inmate was bleeding heavily due to fibroid tumors; despite informing deputies, she was forced to proceed with the search, exposing pads soiled in blood to more than 30 inmates); **<u>Dkt. 286-23:</u> Ex. 962**, Rhodes Decl., p. 6, 9 (inmate dripped blood onto adjacent inmate's personal belongings while removing tampon); **<u>Dkt. 286-23:</u> Ex. 966**, Osborne Decl., p. 7 (inmate required to "hold a bloody tampon [out] in front of [herself]" with blood dripping down her legs); **<u>Dkt. 286-24:</u> Ex. 970**, Monreal Decl., p. 6 (deputies refused to exempt heavily bleeding inmate from search). |
| 79.    As deputies acknowledge, inmates bled on themselves or on the ground in view of deputies and other inmates. | **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 67:2 – 67:6; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 27:18 – 28:3, 59:20 – 60:9, 77:6 – 77:9, 87:12 – 87:21, 149:9 – 149:22, 150:3 – 150:20 (witness has personally dropped blood on the floor; deputies did not immediately clean up the blood on the floor; deputies do not provide inmates with paper towels to clean up menstrual blood; deputies did not permit inmates to move away from blood on the floor; inmate had to stand in her own blood twice); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 61:7 – 62:5 (witness observed inmate bleed onto her legs and onto the ground; menstruating women not permitted to immediately wash up); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 38:8 – 39:15, 40:5 – 40:10, 134:23 – 135:19; 141:17 – 142:6 (witness dropped blood onto her clothes, which were lying on the ground behind her during the search; transferred blood from her clothes to her face); **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. |

36

52:25 – 55:16 (inmate expelled blood clots onto the
ground and onto her own clothing; blood running down
her thigh; deputies denied her request for clean pants);
**Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 57:13 –
58:2 (observed inmate leak blood onto her leg; deputy
remarked "Oh, God. That's gross. Here, clean yourself
up"); **Dkt. 284-14 (Ex. 170), S.** Martinez Dep. Tr., pp.
43:11 – 43:25, 51:8 – 51:11, 107:13 – 108:2, 114:25 –
115:8 (inmate observed inmates bleed onto their legs and
onto the ground; no opportunity to clean up before
putting clothes on; blood not cleaned up during search);
**Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 37:24 –
38:23, 52:15 – 52:20, 65:17 – 66:17 (witness bled
heavily during the strip search and bled onto her leg;
observed inmate bleeding heavily due to recent
childbirth); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp.
58:20 – 59:1; 75:12 – 76:5 (witness began bleeding
during strip search; deputies denied witness's request for
paper towels to clean up blood running down her leg;
inmate bled on leg an onto the floor; has observed blood
on the floor of the bus bay); **Dkt. 284-19 (Ex. 175)**,
Battiste Dep. Tr., pp. 142:8 – 142:15, 147:12 – 147:16
(drops of menstrual blood); **Dkt. 284-21 (Ex. 177)**,
Cholewiak Dep. Tr., p. 100:13 – 100:22 (observed blood
running down inmate's leg; droplets of blood on the
floor); **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶¶18
(observed inmate bleed onto the floor); **Dkt. 284-40 (Ex.
702)**, Britt Decl.¶4; **Dkt. 284-42 (Ex. 704)**, Cholewiak
Decl. ¶¶18, 24; **Dkt. 284-49 (Ex. 713)**, Lawton Decl.
¶10; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶17; Dkt. 284-
56 (Ex. 721), Webb Decl. ¶10); **Dkt. 284-53 (Ex. 717)**,
Paiz Decl. ¶¶10 (observed inmate bleed onto the floor);
**Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶12-13; **Dkt. 284-57
(Ex. 722)**, Williams Decl. ¶10, 13–14; **Dkt. 284-61 (Ex.
726)**, Tindall Decl. ¶10 (observed inmates with blood
running down their legs).

**Dkt. 286: Ex. 800**, Jessica Garcia Decl., p. 4 (inmates
drip blood  onto their clothes or feet while waiting to
replace their sanitary napkin); **Ex. 803**, Hawkins Decl.,

p. 5 (some women bleeding so badly that made a mess); **Ex. 804**, Thatcher Decl., p. 7 (menstruating women get blood on their hands while removing feminine hygiene products and have no way to wash them before continuing the search); **Ex. 807**, Talin Decl., p. 6 (blood "went everywhere" as inmate was required to remove tampon and perform <u>VBC</u> (cough/squat); **Ex. 808**, Nunez Decl., p. 4 (witness had to remove blood-stained underwear in front of other inmates; blood on witness's hand); **Ex. 809**, Ship Decl., p. 5 (<u>witness bled heavily during searches; bled on herself and on the floor</u>); **Ex. 818**, Reed Decl., p. 4; **<u>Dkt. 286-2: Ex. 819</u>**, Maxie Decl., p. 9 (heavily bleeding inmate passed blood clots during search); **Ex. 821**, Madison Decl., p. 6, 7 (witness dripping blood onto the ground); **<u>Dkt. 286-3: Ex. 824</u>**, Sullivant Decl., p. 5 (witness dripped blood onto the ground during the search); **Ex. 829**, Lang Decl., p. 11 (blood ran down legs); **<u>Dkt. 286-4: Ex. 833</u>**, Bunton Decl., p. 4, 5 (inmate experiences heavy bleeding due to medical condition; during VBC, blood ran down inmates leg; blood "all over the place"; inmates bleeding all over themselves); **<u>Dkt. 286-5: Ex. 842</u>**, Abbago Decl., p. 9, (blood running down inmate's leg; inmates leaked blood during the "cough and squat" part of the search; inmates provided with no means to clean themselves up before getting dressed); **Ex. 843**, Zadorian Decl., p. 5 (inmates bled down their legs); **<u>Dkt. 286-6: Ex. 845</u>**, Walker Decl., p. 7 (witness bled down her legs); **<u>Dkt. 286-7: Ex. 850</u>**, Stevens Decl., p. 4 (inmate bled on herself during the "cough and squat" part of the search; no way to clean blood off of her hands); **Ex. 852**, Reese Decl., p. 5, **Ex. 853**, Soma Decl., p. 6 (blood made a mess and ran down her legs; deputies denied her request to replace her pad more quickly); **<u>Dkt. 286-8: Ex. 859</u>**, Stanley Decl., p. 7 (witness dripped blood during VBC); **<u>Dkt. 286-9: Ex. 864</u>** Shirk Decl., p. 7 (blood ran down inmates' legs); **Ex. 868**, Murry Decl., p. 7 (blood ran down inmate's leg); **<u>Dkt. 286-10: Ex. 872</u>**, Rayos Decl., p. 7 (inmate had to remove tampon in front of 50 minutes; blood ran down her legs onto the floor); **Ex. 874**, McNight Decl., p. 6

(observed blood running down inmates' legs); **Dkt. 286-11: Ex. 875**, Tatiana Jackson Decl., p. 6 (inmate bled on the floor); **Ex. 879**, Allen Cruz Decl., p. 7, 8 (menstruating women waited 3-7 minutes to replace pad; deputies were rude to menstruating women); **Dkt. 286-12: Ex. 884**, Finley Decl., p. 3, 4, 5 ("obvious" when a woman was on her period; blood ran down inmate's leg during search); **Ex. 886**, Robles Decl., p. 5 (inmate bled on herself while waiting 5-7 minutes to replace sanitary napkin); **Dkt. 286-13: Ex. 888**, Berger Decl., p. 7, 8 (women bled onto their legs); **Ex. 890**, Green Decl., p. 7 (witness dripped blood on her feet and legs while waiting to replace pad); **Ex. 891**, Reynolds Decl., p. 7 (witness dripped blood on her clothes; when she put her shirt on, blood got on her face); **Dkt. 286-14: Ex. 896**, Michelle Davis Decl., p. 6, 7 (blood spatters on inmates clothes and shoes when menstruating women squat and cough); **Dkt. 286-15: Ex. 898**, Watkins Decl., p. 7, 9 (instructed to place bloody pad on the ground; had to stand naked in front of everyone else blood running down legs; deputies denied witness's request to replace pad more quickly due to heavy bleeding); **Dkt. 286-16: Ex. 901**, Canchola Decl.; **Ex. 902**, Rodriguez Decl., p. 6 (witness bled all over herself and the floor when she bent over to cough); **Ex. 904**, Manjarrez Pereda Decl., p. 7 ("most embarrassing time of my life"); **Dkt. 286-17: Ex. 906**, Clark Decl., p. 7 (bleeding heavily; blood running down leg); **Ex. 907**, Diiorio Decl., p. 6, 7, 9 (inmates waited 5-7 minutes to replace sanitary napkin; bled onto the floor); **Ex. 908**, Briseno Decl., p. 6, 7, 9 (inmate next to witness passed a blood clot onto the floor; deputies still would not permit her to replace her sanitary napkin); **Ex. 910**, Bradley Decl., p. 7; **Ex. 911**, Diaz Decl., p. 7, 8, 9 (after inmates removed "homemade" tampons, they had to wait for 15 minutes before receiving a new pad; inmates bleed all over while waiting); **Ex. 912**, Riley Decl., p. 7 (deputies instructed inmates to place soiled pads on the ground; when witness tossed her soiled pad, it hit another inmate's foot; blood dripping down legs, onto the ground and onto her clothes); **Dkt. 286-18: Ex.**

**913**, Lewis Decl., p. 6, 7 (inmate next to witness expelled a blood clot that splattered onto witness's bare foot; ); **Ex. 914**, Groomes Decl., p. 5, 7, 9 (blood dripped on her leg but deputies would still not permit her to replace her pad); **Ex. 916,** Miller Decl., p. 7, 8 (blood running down inmate's leg; inmate requested for something to clean it up; in response, deputies told her to "shut up"); **Dkt. 286-19: Ex. 921**, Jordan Decl., p. 6 (inmates instructed to place soiled feminine hygiene products on the ground; blood on the ground; women complaining that they were bleeding on the ground); **Ex. 924,** Young Decl., p. 4 (deputies required women to remove underwear even if they were soiled with blood; told women to "keep their mouth close[d]" even if they were dripping blood); **Dkt. 286-21: Ex. 940**, Burnett Decl., p. 6 (inmates couldn't replace pads until all women in the group had finished the VBC; blood running down witness's legs); **Ex. 943**, Walton Decl., p. 5 (witness dripped blood onto the ground while waiting to replace sanitary napkin); **Ex. 945**, G. Murillo Decl., p. 6 (observed inmate dripping "every[where]"); **Ex. 949**, Foster Decl., p. 5 - 6 (bled on legs); **Ex. 951**, Douglas Decl., p. 5-6 (observed heavily bleeding inmate bleed down her legs and through her pants; deputies refused to give her a clean pair of pants); **Ex. 954**, Snowden Decl., p. 5 -6 (during the VBC, inmate expelled a blood clot; blood was running between her thighs); **Dkt. 286-22: Ex. 956**, Solis Decl., p. 5 (bled on leg); **Ex. 958**, Demery Decl., p. 3 (bleeding from vagina in view of other inmates); **Dkt. 286-23: Ex. 962**, Rhodes Decl., p. 6 (inmate dripped blood onto adjacent inmate's personal belongings while removing tampon); **Ex. 966**, Osborne Decl., p. 7 (inmate required to "hold a bloody tampon [out] in front of [herself]" with blood dripping down her legs); **Dkt. 286-24: Ex. 969**, Malveaux Decl., p. 7 (inmate bled onto the floor and her own feet); **Dkt. 286-25: Ex. 975**, L. Lewis Decl., p. 5 (inmate bled "all over the ground"); **Dkt. 286-26: Ex. 979**, K. Gonzalez Decl., p. 7 (upset having to wait to replace pad while blood ran down her leg); **Dkt. 286-27: Ex. 986**, Gebhardt Decl., p.

| | |
|---|---|
| | 6 (bled on the floor; not allowed to clean herself up); **Ex. 987**, Brown Decl., p. 5, 6 (women on their period bled "everywhere"; saw women with blood dripping down their legs).<br><br>*See* **3/12/14 Order, Dkt. 9:3-4** (While waiting for the search process to conclude, "inmates [who are menstruating] often bleed on themselves or on the ground in view of the deputies and other inmates.") |
| 80.   Deputies in fact observed inmates drip blood down their leg and pass blood clots onto the ground or onto clothing on the ground. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 64:24 – 65:2 (deputy has observed inmates pass blood clots, bleed onto their legs or onto the ground); **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 65:23 – 66:1 (has observed inmates menstruating heavily); 67:2 – 67:4 (deputy has observed inmates drip blood down their leg). |
| 81.   Menstruating inmates were not provided with soap and water to immediately clean themselves up. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 27:18 – 28:3, 59:20 – 60:9, 77:6 – 77:9, 87:12 – 87:21, 149:9 – 149:22, 150:3 – 150:20 (witness has personally dropped blood on the floor; deputies did not immediately clean up the blood on the floor; deputies do not provide inmates with paper towels to clean up menstrual blood; deputies did not permit inmates to move away from blood on the floor; inmate had to stand in her own blood twice); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 62:3 – 62:10, 64:3 – 64:6; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 52:25 – 55:16 (inmate expelled blood clots onto the ground and onto her own clothing; blood running down her thigh; deputies denied her request for clean pants); **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 43:11 – 43:25, 51:8 – 51:11, 107:13 – 108:2, 114:25 – 115:8 (inmate observed inmates bleed onto their legs and onto the ground; no opportunity to clean up before putting clothes on; blood not cleaned up during search); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp. 58:20 – 59:1; 75:12 – 76:5 (witness began bleeding during strip search; deputies denied witness's request for paper towels to clean up blood running down her leg; inmate bled on leg an onto the floor; has observed blood on the floor of the bus bay). |

| | |
|---|---|
| | **Dkt. 286: Ex. 804**, Thatcher Decl., p. 7 (menstruating women get blood on their hands while removing feminine hygiene products and have no way to wash them before continuing the search); **Dkt. 286-5: Ex. 842**, Abbago Decl., p. 9, (blood running down inmate's leg; inmates leaked blood during the "cough and squat" part of the search; inmates provided with no means to clean themselves up before getting dressed); **Dkt. 286-7: Ex. 850**, Stevens Decl., p. 4 (inmate bled on herself during the "cough and squat" part of the search; no way to clean blood off of her hands); **Dkt. 286-18: Ex. 916,** Miller Decl., p. 7, 8 (blood running down inmate's leg; inmate requested for something to clean it up; in response, deputies told her to "shut up"); **Dkt. 286-21: Ex. 951**, Douglas Decl., p. 5-6 (observed heavily bleeding inmate bleed down her legs and through her pants; deputies refused to give her a clean pair of pants); **Dkt. 286-27: Ex. 986**, Gebhardt Decl., p. 6 (bled on the floor; not allowed to clean herself up). |
| 82.    Some deputies made derogatory remarks to menstruating women, calling them names like "nasty." | **Dkt. 284-59 (Ex. 724)**, Robles Decl., ¶11 (deputies ask, "who is on their fucking period?"; deputy remarked about heavily menstruating woman: "shit, it's like a waterfall"); **Dkt. 284-60 (Ex. 725)**, Graham Decl. ¶¶10, 14 (deputies commented on how disgusted they were that witness was menstruating).

**Dkt. 286: Ex. 803**, Hawkins Decl., p. 5 (deputies denigrated women who dripped blood, calling them "dirty" and "nasty"); **Ex. 809**, Ship Decl., p. 4 (deputies called inmate "nasty" because she was bleeding heavily; deputies threatened menstruating women: "don't drip any blood while they're looking [while the deputies are conducting the VBC] or [you] will be the last to get a bunk for the night…"); p. 5 (witness was bleeding heavily; deputies called her "nasty" because she bled on herself and the floor during the body cavity search); **Dkt. 286-2: Ex. 819**, Maxie Decl., p. 9 (deputies "degraded" inmate because she was bleeding heavily and passing blood clots onto the floor); **Dkt. 286-7: Ex. 853**, Soma |

| | |
|---|---|
| | Decl., p. 6 (inmate waited 15-20 minutes to replace pad; blood made a mess and ran down her legs; deputies made comments about her bleeding yet denied her request to replace her pad more quickly); **Dkt. 286-8: Ex. 862**, Lee Decl., p. 4 (deputies told women "we don't care if you bleed all over yourself,"); **Dkt. 286-11: Ex. 879**, Allen Cruz Decl., p. 8 (deputies were rude to menstruating women); **Dkt. 286-12: Ex. 883**, Thomas Decl., p. 8 (remarked on how heavily inmates were bleeding); **Dkt. 286-14: Ex. 893**, Takisha Smith Decl., p. 7 (inmates required to throw soiled pads/tampons behind them; deputies slam women into the wall when soiled pads/tampons land on their shoes); **Dkt. 286-18: Ex. 916**, Miller Decl., p. 8 (inmate with blood running down her leg asked for something [to clean it up]; deputies told her to "shut up and turn around"); **Dkt. 286-21: Ex. 939**, Figueroa Decl., p. 7 (deputies made comments about menstruating women like "damn you stink" or "you fucking stink"); **Ex. 954**, Snowden Decl., p. 5 -6 (during the VBC, inmate expelled a blood clot; blood was running between her thighs; deputies sighed, laughed, and said "ugh"). |
| 83.    When blood runs onto the floor, deputies instruct inmate workers to spray "extra cleaner" on the blood. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 76:12 – 76:20 (inmate workers are responsible for cleaning up bodily fluids); **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 96:9 – 96:25 (when menstrual blood runs down inmates' legs and onto the floor, deputies request trustees spray extra "cleaner" on the floor where there is blood). |
| 84.    Witnesses commonly observe dried and/or fresh menstrual blood on the floor of the bus bay. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 27:18 – 28:14, 60:1 – 60:9, 77:6 – 77:9, 87:17 – 87:21, 149:9 – 149:22, 150:3 – 150:12 (witness observed blood on the floor; witness has personally dropped blood on the floor; deputies did not immediately clean up the blood on the floor; deputies do not provide inmates with paper towels to clean up menstrual blood; deputies did not permit inmates to move away from blood on the floor; inmate had to stand in her own blood twice); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 61:7 – 62:5 (witness observed inmate bleed onto the ground); **Dkt. 284-12 (Ex. 168)**, |

Douglas Dep. Tr., pp. 52:25 – 55:16 (inmate expelled blood clots onto the ground and onto her own clothing; deputies denied her request for clean pants); **Dkt. 284-14 (Ex. 170)**, Martinez Dep. Tr., pp. 43:11 – 43:25, 51:8 – 51:11, 107:13 – 108:2, 114:25 – 115:8 (inmate observed inmates bleed onto their legs and onto the ground; no opportunity to clean up before putting clothes on; blood not cleaned up during search; blood stain on the ground); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp., 37:24 – 38:23, 52:15 – 52:20, 66:17 – 67:17 (dried and fresh blood on the floor; witness bled heavily during the strip search and bled onto her leg; observed inmate bleeding heavily due to recent childbirth); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp. 75:12 – 76:6 (inmate bled on leg an onto the floor; has observed blood on the floor of the bus bay); **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., pp. 147:12 – 147:16 (drops of menstrual blood); **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 100:13 – 100:22 (droplets of blood on the floor); **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶18; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶10; **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶8; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶13; **Dkt. 284-58 (Ex. 723)**, Gutierrez Decl., ¶6.

**<u>Dkt. 286-1:</u> Ex. 813**, Gutierrez Decl., p. 6 (menstrual blood); **Ex. 815**, Phillips Decl., p. 6 (menstrual blood); **<u>Dkt. 286-2:</u> Ex. 816,** Cortez Decl., p. 6 (blood); **Ex. 822**, Levi Decl., p. 5 (blood); **<u>Dkt. 286-3:</u> Ex. 826**, Camacho Decl., p. 5 (blood on walls and floor); **Ex. 827**, Hinojos Decl., p. 5 (<u>stepped in dried blood</u>); **<u>Dkt. 286-4:</u> Ex. 830**, Busby Decl., p. 6 (blood); **Ex. 831**, Lowe Decl., p. 5 (blood); **<u>Dkt. 286-5:</u> Ex. 841**, Tuggle Decl., p. 5 (blood); **<u>Dkt. 286-6:</u> Ex. 845**, Walker Decl., p. 6 (blood); **Ex. 846**, Rodriguez Decl., p. 5 (blood drops); **Ex. 847**, McDonald Decl., p. 5 (menstrual blood); **Ex. 848**, Ransome Decl., p. 6 (menstrual blood); **<u>Dkt. 286-7:</u> Ex. 853**, Soma Decl., p. 7 (dirty pads; bodily fluids); **Ex. 854**, James Decl., p. 6 (menstrual blood); **Ex. 856**, Edwards Decl., p. 6 (blood); **<u>Dkt. 286-8:</u> Ex. 857**, Leon Decl., p. 6 (<u>menstrual blood; floor never cleaned</u>); **Ex.**

**859**, Stanley Decl., p. 6 (blood); <u>**Dkt. 286-9:**</u> **Ex. 864**, Shirk Decl., p. 6 (blood spots); **Ex. 875**, Jackson Decl., p. 5 (menstrual blood); **Ex. 865**, Tasia Phillips Decl., p. 6 (blood); **Ex. 868**, Murry Decl., p. 6 (blood); <u>**Dkt. 286-10:**</u> **Ex. 869**, Yates Decl., p. 6 (dried blood); **Ex. 870**, Chapman Decl., p. 6 (blood); **Ex. 871**, Kimble Decl., p. 6 (blood); **Ex. 872**, Rayos Decl., p. 6 (blood stains, blood); **Ex. 873**, Bui Decl., p. 6 (menstrual blood); **Ex. 874**, McNight Decl., p. 5 (blood); <u>**Dkt. 286-11:**</u> **Ex. 876**, Martin Decl., p. 6 (blood); **Ex. 879**, Allen Cruz Decl., p. 6 (menstrual blood); <u>**Dkt. 286-12:**</u> **Ex. 882**, Leonard Decl., p. 6 (menstrual blood); <u>**Dkt. 286-13:**</u> **Ex. 887**, Garcia Decl., p. 6 (stains from menstrual blood); **Ex. 889**, Martinez Decl., p. 5 (dried); **Ex. 890**, Green Decl., p. 6 (blood drops); **Ex. 891**, Reynolds Decl., p. 6 (blood; soiled feminine hygiene products); **Ex. 892**, Irby Decl., p. 5 (blood); <u>**Dkt. 286-14:**</u> **Ex. 893**, Takisha Smith Decl., p. 6 (menstrual blood); **Ex. 896**, Michelle Davis Decl., p. 6 (menstrual blood splatters on clothes and shoes on the ground); <u>**Dkt. 286-15:**</u> **Ex. 897**, Cheever Decl., p. 6 (blood); **Ex. 898**, Watkins Decl., p. 6 (blood, "bio-hazardous waste such as soiled feminine hygiene products); **Ex. 899**, Sims Decl., p. 6 (blood); <u>**Dkt. 286-16:**</u> **Ex. 902**, Rodriguez Decl., p. 7 (witness once bled on floor); **Ex. 904**, Manjarrez Pereda Decl., p. 6 (menstrual blood); <u>**Dkt. 286-17:**</u> **Ex. 908**, Briseno Decl., p. 6 (menstrual blood clot); **Ex. 909**, Batarina Decl., p. 6 (blood); **Ex. 911**, Diaz Decl., p. 6 (blood); **Ex. 912**, Riley Decl., p.4 (blood); <u>**Dkt. 286-18:**</u> **Ex. 913**, Lewis Decl., p. 9 (woman standing next to witness expelled a blood clot during the search, which landed on witness's bare foot); **Ex. 915**, Howell Decl., p. 6 (bloody tissue, tampons and sanitary napkins on the floor); **Ex. 916**, Miller Decl., p.6 (blood); **Ex. 917**, Gavaldon Decl., p. 6 menstrual blood); <u>**Dkt. 286-19:**</u> **Ex. 921**, Jordan Decl., p. 6 (blood from soiled feminine hygiene products); **Ex. 923**, Reyes Decl., p. 6 (menstrual blood); <u>**Dkt. 286-20:**</u> **Ex. 934**, Thalacker Decl., p. 6 (blood); **Ex. 935**, Dale Decl., p. 3 (blood on the ground); <u>**Dkt. 286-21:**</u> **Ex. 940**, Burnett Decl., p. 4 (blood on the floor); **Ex. 941**, Durr Decl., p. 5 (blood);

|  |  |
|---|---|
|  | **Ex. 945**, G. Murillo Decl., p. 5 (blood stains on the ground); **Dkt. 286-22: Ex. 956**, Solis Decl., p. 5 (blood); **Ex. 960**, Worthy Decl., p. 6 (menstrual blood); **Ex. 961**, Rivera Decl., p. 6 (blood spots); **Dkt. 286-23: Ex. 962**, Rhodes Decl., p. 6, 9 (inmate dripped blood onto adjacent inmate's personal belongings while removing tampon); **Ex. 963**, Dale Decl., p. 5 (blood on the ground); **Ex. 964**, Miller Decl., p. 6 (blood); **Ex. 965**, R. Carrillo Decl., p. 6 (blood); **Ex. 966**, Osborne Decl., p. 6 (dried blood); **Ex. 967**, Dutoit Decl., p. 3, 5 (asked deputies why there was menstrual blood on the floor); **Dkt. 286-24: Ex. 968**, Garza Decl., p. 8 (blood); **Ex. 970**, Monreal Decl., p. 4 (blood stains where inmates are required to stand barefoot); **Ex. 971**, Arias Decl., p. 5 (menstrual blood); **Ex. 972**, Mendoza Decl., p. 5 (menstrual blood); **Dkt. 286-25: Ex. 973**, Jones Decl., p. 4, 5 (menstrual blood where inmates had to stand); **Dkt. 286-27: Ex. 981**, Gomez Decl., p. 5 (menstrual blood stains); **Ex. 984**, Duhaney Decl., p. 5 (menstrual blood); **Dkt. 286-28: Ex. 990**, Kelley Decl, p. 5 (blood); **Ex. 991**, Cleveland Decl., p. 5 (blood spots); **Dkt. 286-29: Ex. 993**, Peavie Decl., p. 5 (menstrual blood on the floor); **Dkt. 286-30: Ex. 995**, R. Gonzalez Decl., p. 4 (blood stains). |
| 85.    As CRDF personnel acknowledge, during searches, inmates sometimes urinated, vomited or suffered diarrhea in the presence of the group. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 72:13 – 72:22 ("We've had inmates who either have problems controlling bodily functions, if they're incontinent or that sort of thing…Not where it's – they're just urinating everywhere, but there is urine either on them or on their clothes or that sort of thing."); p. 74:7 – 74:17 (acknowledging that inmates have vomited during the strip search); 73:20 – 74:1 (has observed inmates with diarrhea who have soiled underpants); **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 76:13 – 77:5, 150:21 – 151:10 (witness <u>observed inmate urinate during strip search</u>; deputies did not immediately clean up the urine); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 40:12 – 42:6 (witness observed inmate vomit during search; deputies did not clean up the vomit before finishing the search; deputies harassed the inmate |

who vomited by calling her "nasty"); **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 39:7 – 40:15, 96:9 – 98:8 (witness observed inmates vomit during the strip search on at least two occasions; vomit was not cleaned up immediately and remained on the floor for the remainder of the search); **Dkt. 284-14 (Ex. 170),** S. Martinez Dep. Tr., pp. 36:5 – 36:25, 53:19 – 55:15, 57:23 – 58:1 (witness lost control of her bowels during search; leaked excrement onto the floor; deputies proceeded with the search despite feces on the floor), 52:25 - 53:13, 117:4 – 117:10 (witness observed inmates vomit during search on two occasions, deputies did not stop the search to clean up the vomit); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 70:23 – 72:13 (observed woman accidently urinate when instructed to cough); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 177:13 – 177:20 (observed inmate urinate on herself during strip search).

**Dkt. 286:** **Ex. 808**, Nunez Decl., p. 5 (due to medical condition, witness frequently urinated during visual body cavity search); **Dkt. 286-4:** **Ex. 834**, J. Murillo Decl., p. 5 (observed inmate lose control of her bowels during search, leaking feces on the floor; witness requested to move away from the feces and was told to "shut up"); **Dkt. 286-7:** **Ex. 850**, Porschette Stevens Decl., p. 5 (observed women who were kicking drugs throw up); **Dkt. 286-9:** **Ex. 864**, Shirk Decl., p. 6 (observed inmate urinate on floor during search because deputies would not let her go to the restroom); **Ex. 865**, Tasia Phillips Decl., p. 9 (observed woman having seizure vomit everywhere; deputies ignored her); **Dkt. 286-10:** **Ex. 874**, McNight Decl., p. 5 (witness vomited due to smell; observed deputy spit); **Dkt. 286-12:** **Ex. 882**, Leonard Decl., p. 6 (observed inmate urinate during search); **Dkt. 286-20:** **Ex. 938**, Gardner Decl., p. 5 ("some women pee"); **Dkt. 286-22:** **Ex. 955**, S. Williams Decl., p. 5 (some women "threw up"); **Dkt. 286-27:** **Ex. 986**, Gebhardt Decl., p. 5 (observed vomit); **Dkt. 286-29:** **Ex. 992**, Strange Decl., p. 5 (observed inmate throw up; observed inmate urinate); **Ex. 993**, Peavie Decl., p. 5

| | (observed women urinate on themselves). |
|---|---|
| **J. LASD'S HANDLING OF MENSTRUATION DURING THE STRIP/VISUAL BODY CAVITY PROCEDURE VIOLATED ALL THE NORMS TO WHICH WOMEN ARE SOCIALIZED AND CAUSED EXTREME SHAME AND HUMILIATION** | |
| 86.    Tomi-Ann Roberts is a social psychologist with 25 years' experience studying women's perceptions of their bodies and reproductive health. In addition to scholarly and academic work, she serves as a board member of the Society for Menstrual Cycle Research, the American Psychological Association Division 35: Society for the Psychology of Women and has served as an Expert Advocate for two terms with *UbyKotex*, where she conducted a massive survey of American and Canadian girls' and young women's attitudes towards menstruation and vaginal health. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 1 – 2 (including Exhibit A, curriculum vitae). |
| 87.    Menstruation carries a strong cultural taboo commanding that it not be seen, discussed or in most ways openly acknowledged, even among women themselves. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 13 – 16. |
| 88.    Secrecy is | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, |

| | |
|---|---|
| emphasized in socializing girls and women to manage their menstrual periods. Open acknowledgement that one is having one's period is almost never done. | pp. 13 – 16. |
| 89.     The emphasis on secrecy surrounding menstruation is paired with an attitude that menstruation is dirty and disgusting. The marketing of menstrual products characterizes menstruation as unclean and polluting, offering "sanitary" and "hygiene" products, designed to enable women to feel "clean and fresh." | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 14. |
| 90.     Even modern, secular societies tend to view menstruation as "unclean." The negative beliefs about menstruation are manifested in such attitudes as revulsion towards even unused feminine hygiene products, and especially towards menstrual blood. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 14 – 16. |
| 91.     American women take great precautions to ensure that they do not bleed on themselves or on their clothing in public, for fear that others will | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 15 – 16. |

| | |
|---|---|
| perceive them as dirty or disgusting. Women tend to be very private about anything that has been "contaminated" with menstrual blood and will often go to great lengths to conceal blood soiled clothing and bedding. Women are equally discrete about the handling of soiled menstrual hygiene products. | |
| 92.    In the opinion of social psychologist Tomi-Ann Roberts, the experience of women who were not menstruating observing those who were endure the strip search experience likely would have produced extreme anxiety and transferred humiliation. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 21 - 25. |

| **K. LASD OFTEN SUBJECTED OBESE AND PHYSICALLY DISABLED INMATES TO AN ALTERNATIVE, AND MORE DEGRADING PROCEDURE** | |
|---|---|
| 93.    Due to physical disability or obesity, some inmates were unable to perform the visual body cavity inspection by bending at the waist and reaching behind their body to spread their labia. | **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., pp. 52:21 – 54:23; 58:24 – 59:20; **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 87:11 – 88:12; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p.74:1 – 75:1; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 55:6 – 59:1, 70:18 – 72:10, 84:2 – 85:11 (witness with partially paralyzed arm could not reach behind her body and spread open her vagina with both arms; on approximately 10 occasions, deputies forced her to sit on the ground and expose her vaginal cavity from the front; witness was menstruating during at least two of these incidents; witness observed deputies force disabled |

| | |
|---|---|
| | inmates to sit on the floor to complete VBC on approximately 15 occasions); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 59:11 – 60:16 (inmate with catheter to collect fluid leaking from a tumor was required to sit on the ground to complete VBC); **Ex. 178**, Barranca Dep. Tr., pp. 189:17 – 190:7; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 72:17 – 74:18, 82:23 – 84:10 (wheelchair bound inmate required to get out of wheelchair and sit on ground to complete VBC); **Dkt. 284-16 (Ex. 172),** Paiz Dep. Tr., pp. 212:17 – 213:9 (required overweight inmate to perform VBC by sitting on the ground); **Dkt. 284-53 (Ex. 717),** Paiz Decl., ¶12; **Dkt. 284-55 (Ex. 720)**, Vigil Decl., ¶15; **Dkt. 284-57 (Ex. 722)**, Williams Decl., ¶16 (deputies ordered severely overweight and handicapped women to sit on the bare cement, spread their legs and raise their feet off the ground;  deputies told nearby women "help her out" in a ridiculing manner).<br><br>**Dkt. 286-1: Ex. 815**, Phillips Decl., p. 8 (deputies forced an a wheelchair bound, heavy-set woman to sit on the ground naked); **Dkt. 286-6: Ex. 846**, Rodriguez Decl., p. 5 (deputies required inmates to sit on the floor and spread shier legs); **Dkt. 286-13: Ex. 891**, Reynolds, deputies make women sit down and open their legs while sitting on the nasty ground); **Dkt. 286-16: Ex. 902**, Rodriguez Decl., p. 8 (inmates that couldn't stand were forced to sit on the "filthy" floor and open their legs/cough while sitting down); **Dkt. 286-17: Ex. 912**, Riley Decl., p. 7 (witness forced to lie on the floor and spread her legs because she was experiencing back pain); **Dkt. 286-19: Ex. 923**, Reyes Decl., p. 5 ("when certain women have a disability, handicap or injury, and cannot perform certain task the[y] were forced to sit on the ground humiliating them giving them a hard time. Some women cry."); **Dkt. 286-20: Ex. 934**, Thalacker Decl., p. 8 (inmate with prosthetic limb required to sit on ground and spread legs for VBC search). |
| 94.    CRDF used an alternate visual body | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 87:7 – 88:12; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson |

| | |
|---|---|
| cavity inspection procedure for physically disabled and obese inmates; the alternative procedure required inmates to sit or lie on the ground, bare-bottomed, with their legs spread and bent at the knees so deputies could inspect their vaginas from the front; deputies conducted this alternative procedure in the presence and view of other inmates being searched. | Dep. Tr., p.74:1 – 75:1; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., pp. 52:21 – 54:23; 58:24 – 59:20; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 55:6 – 59:2, 70:18 – 72:9, 84:2 – 85:11; 136:20 – 137:25 (witness with partially paralyzed arm could not reach behind her body and spread open her vagina with both arms; on approximately 10 occasions, deputies forced her to sit on the ground and expose her vaginal cavity from the front; witness was menstruating during at least two of these incidents; witness observed deputies force disabled inmates to sit on the floor to complete VBC on approximately 15 occasions); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 44:19 – 45:13 (inmate required to sit on the ground, bare bottomed), 59:12 – 60:16 (inmate with catheter to collect fluid leaking from a tumor was required to sit on the ground to complete VBC), 106:13 – 106:23; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 72:17 – 74:18, 82:23 – 84:10 (wheelchair bound inmate required to get out of wheelchair and sit on ground to complete VBC; inmate with piercing required to sit on floor to complete VBC); **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 212:17 – 213:9 (required overweight inmate to perform VBC by sitting on the ground); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 189:17 – 190:7; **Dkt. 284-53 (Ex. 717)**, Paiz Decl., ¶12 (physically disabled inmates required to complete search by sitting on the bare cement, spreading their legs, and raising their feet off the ground); **Dkt. 284-55 (Ex. 720)**, Vigil Decl., ¶15 (overweight inmates who cannot expose their body cavities by bending over are required to lie on their backs on bare cement and spread their legs in the air); **Dkt. 284-57 (Ex. 722)**, Williams Decl., ¶16 (deputies ordered severely overweight and handicapped women to sit on the bare cement, spread their legs and raise their feet off the ground; deputies told nearby women "help her out" in a ridiculing manner).

**Dkt. 286-1: Ex. 815**, Phillips Decl., p. 8 (deputies forced an a wheelchair bound, heavy-set woman to sit on the ground naked); **Dkt. 286-6: Ex. 846**, Rodriguez Decl., p. |

| | |
|---|---|
| | 5 (deputies required inmates to sit on the floor and spread shier legs); **Dkt. 286-13: Ex. 891**, Reynolds Decl., deputies make women sit down and open their legs while sitting on the ground); **Dkt. 286-16: Ex. 902**, Rodriguez Decl., p. 8 (inmates that couldn't stand were forced to sit on the "filthy" floor and open their legs/cough while sitting down); **Dkt. 286-17: Ex. 912**, Riley Decl., p. 7 (witness forced to lie on the floor and spread her legs because she was experiencing back pain); **Dkt. 286-19: Ex. 923**, Reyes Decl., p. 5 ("when certain women have a disability, handicap or injury, and cannot perform certain task the[y] were forced to sit on the ground humiliating them giving them a hard time. Some women cry."); **Dkt. 286-20: Ex. 934**, Thalacker Decl., p. 8 (inmate with prosthetic limb required to sit on ground and spread legs for VBC search); **Dkt. 286-22: Ex. 956**, Solis Decl., p. 6 (inmate who weighed 300 lbs. ordered to sit on the floor and spread her legs); **Ex. 961**, Rivera Decl., p. 8 (inmate with broken arm forced to sit on the ground naked during strip search); **Dkt. 286-23: Ex. 963**, Dale Decl., p. 6 (heavy women required to sit on the ground); **Ex. 964**, Miller Decl., p. 7; **Ex. 967**, Dutoit Decl., p. 6 (required overweight woman to sit on floor and open legs to expose vagina; same for woman with mental illness); **Dkt. 286-25: Ex. 975**, L. Lewis Decl., p. 8 (deputies forced an obese woman to lie on the ground and spread her legs in the air; she cried); **Dkt. 286-31: Ex. 999**, Farish Decl., p. 6 (deputies require overweight women to sit on the ground and expose their vagina from the front). |
| 95.    CRDF personnel maintain that inmates were sometimes provided with a chair on which they would sit, face forward and spread their labia from the front. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 87:7 – 88:12; Dkt. 284-6 (Ex. 161), LASD Dep. Matson Dep. Tr., p. 74:1 – 75:1; **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., pp. 52:21 – 54:23; 58:24 – 59:20. |
| **L. UNTIL APPROXIMATELY JULY 2013, LASD REQUIRED INMATES TO PLACE THEIR FINGERS IN THEIR MOUTH WITHOUT PERMITTING THEM TO SANITIZE THEIR HANDS** | |

| | |
|---|---|
| 96. During the search, deputies instructed inmates to insert their fingers in their mouths, pull their upper and lower gums away from their teeth and run their fingers between their lips and gums. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 51:17 – 52:15; **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., p. 62:8 – 62:11; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 51:14 – 51:16; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., p. 42:7 – 42:17; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 47:12 – 47:17 (inmates instructed to run their index finger in their mouth); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 60:1 – 61:3; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 1213:13 – 124:17; **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., p. 53:6 – 53:10; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 61:19 – 61:25; **Dkt. 284-31 (Ex. 312.1)**, p. 1 (Search Command Script, "When a deputy approaches, you will run your fingers across the top and bottom of your gums."). |
| 97. Inmates with dentures were required to remove them and place them on the ground on top of their clothing. | **Dkt. 286-15: Ex. 897**, Cheever Decl., p. 8 (required to remove dentures after touching genital area); **Dkt. 286-18: Ex. 916**, Miller Decl., p. 8 (required to remove partial dentures from mouth after touching used feminine hygiene products); **Dkt. 286-19: Ex. 921**, Jordan Decl., p. 8 (inmate required to remove dentures); **Dkt. 286-20: Ex. 924**, Young Decl., p. 5 (inmates required to remove dentures after touching the dirty wall); **Dkt. 286-22: Ex. 956**, Solis Decl., p. 5 (required to remove dentures); **Dkt. 286-24: Ex. 971**, Arias Decl., p. 6, 7 (removed dentures after spreading buttocks). |
| 98. Before July 2013, CRDF did not provide inmates with a way to sanitize their hands before touching their mouths. | **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., p. 69:20 – 70:1 (no hand sanitizer provided during searches), 12:2 – 12:13 (frequently assigned as the reception sergeant between February 2010 and May 2012); **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., pp. 223:5 – 224:1. |
| 99. Inmates were commonly required to place unsanitary fingers inside of their mouth. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 47:25 – 49:23 (inmate complained to deputies because she did not want to touch the inside of her mouth after touching a sanitary napkin; deputy pushed the inmate into the wall); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 57:5 – 57:17; 58: 21 – 59:5 (inmates required to touch their mouth after touching the "dirty wall"); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., p. 22:8 – 22:20; 42:18 – 43:8 |

(inmates required to touch the inside of their mouth after touching the walls of the bus bay); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 65:18 – 66:7 (inmates required to touch the inside of their mouth with dirty hands); **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., p. 31:11 – 31:19 (inmate sometimes required to touch mouth after touching vagina; no opportunity to wash hands with soap and water); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 61:4 – 61:14, 77:22 – 78:9, 79:10 – 79:14 (inmates required to touch mouth with dirty hands; no opportunity to wash hands; sometimes required to touch their mouth *after visual body cavity inspection*); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 183:17 – 183:20; **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶15; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶12; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶19; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶10; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶14; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶14; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶18; **Ex .722**, Williams Decl. ¶18.

**<u>Dkt. 286-1:</u> Ex. 808**, Nunez Decl., p. 4 (inmates required to run fingers inside mouth after removing soiled sanitary napkins); **Ex. 809**, Ship Decl., p. 5 (menstruating inmate required to touch inside of mouth after touching vaginal area); **Ex. 815**, Phillips Decl., p. 8 (same); **<u>Dkt. 286-2:</u> Ex. 819**, Maxie Decl., p. 8 (touch mouth after touching soiled sanitary napkins); **<u>Dkt. 286-3:</u> Ex. 826**, Camacho Decl., p. 5 (same); **Ex. 827**, Hinojos Decl., p. 5 (touched mouth after touching soiled sanitary napkins <u>and</u> genitals); **Ex. 828**, Qualls Decl., p. 5 (touch mouth after touching soiled sanitary napkins); **<u>Dkt. 286-4:</u> Ex. 830**, Busby Decl., p. 8 (touch mouth after touching "private area"); **Ex. 833**, Bunton Decl., p. 4 (touched mouth after touching used feminine hygiene products or genital area); **Ex. 835**, Martinez Decl., p. 6; **Ex. 837**, Lobrandon Decl., p. 5 (touch mouth after touching used feminine hygiene products); **<u>Dkt. 286-5:</u> Ex. 838**, Johnson Decl., p. 5 (touched mouth after touching bloody underwear); **Ex. 840**, White Decl., p. 5 (touch mouth after visual body cavity search, requiring

inmates to touch their vaginal area); **Ex. 842**, Abbago Decl., p. 9 (touched mouth after having to touch dirty wall while trying to balance for inspection of feet); **Dkt. 286-6: Ex. 844**, Schuster Decl., p. 5 (touched mouth after touching soiled sanitary napkin); **Ex. 845**, Walker Decl., p. 8; **Ex. 846**, Rodriguez Decl., p. 5 (touched mouth after touching soiled feminine hygiene products); **Ex. 847**, McDonald Decl., p. 6 (touched mouth after touching soiled feminine hygiene products); **Dkt. 286-7: Ex. 849**, Hoy Decl., p.5 (touched mouth after removing bloody pad); **Ex. 850**, Stevens Decl., p. 4 (sometimes had to touch mouth after touching genitals); **Ex. 852**, Reese Decl., p. 5 (touched mouth with dirty hands); **Ex. 853**, Soma Decl., p. 8 (sometimes deputies required inmates to touch their mouth *after* touching genitals during the visual body cavity search); **Ex. 854**, James Decl., p. 8 (touched mouth after removing soiled tampon); **Ex. 856**, Edwards Decl., p. 7 (touched mouth after removing soiled tampon); **Dkt. 286-8: Ex. 857**, Leon Decl., p. 8 (touched mouth after touching soiled sanitary napkin); **Ex. 861**, Charles Decl., p. 8 (touched mouth after holding on to the "nasty filthy wall" for feet inspection); **Ex. 862**, Lee Decl., p. 5 (deputies required inmate to reach inside of her mouth and remove dental plates then place them on the floor with her clothes and property); **Dkt. 286-9: Ex. 863**, Harrison Decl., p. 5 (touched mouth after removing soiled sanitary napkin); **Ex. 864**, Shirk Decl., p. 8 (had to touch mouth after removing soiled tampon); **Ex. 865**, Phillips Decl., p. 8 (touch mouth after touching soiled feminine hygiene products *and* genitals); **Ex. 866**, Holley Decl., p. 8 (touched mouth after touching used feminine hygiene products); **Ex. 867**, Davis Decl., p. 8 (required to remove dentures); **Ex. 868**, Murry Decl., p. 8 (touched mouth after touching used tampons); **Dkt. 286-10: Ex. 870**, Chapman Decl., p. 8 (touched mouth after touching used feminine hygiene products); **Ex. 872**, Rayos Decl., p. 8 (touched mouth *after visual body cavity search* and after touching used feminine hygiene products); **Ex. 873**, Bui Decl., p. 7; **Ex. 874**, McNight Decl., p. 7 (touching

56

mouth *after touching genitals* (after VBC) and after
touching hair); **Dkt. 286-11: Ex. 875**, Jackson Decl., p. 7
(touch mouth after touching soiled feminine hygiene
products); **Ex. 876**, Martin Decl., p. 8 (touched mouth
*after visual body cavity inspection*); **Ex. 879**, Allen
Decl., p. 8 (touched mouth after touching soiled sanitary
napkin); **Ex. 880**, Scharf Decl., p. 8 (same); **Dkt. 286-
12: Ex. 882**, Leonard Decl., p. 8; **Ex. 883**, Thomas
Decl., pp. 7, 8 (touched mouth after touching soiled
feminine hygiene products); Ex. 884, Finley Decl., p. 4;
**Ex. 885**, Poe Decl., p. 5 (touched mouth after handling
used feminine hygiene products *and after touching
vaginal area for visual body cavity inspection*); **Dkt.
286-13: Ex. 887**, Garcia Decl., p. 8 (touched mouth after
handling used feminine hygiene products); **Ex. 888**,
Berger Decl., p. 8 (same); **Dkt. 286-14: Ex. 896**, Davis
Decl., p. 8 (same); **Dkt. 286-15: Ex. 897**, Cheever Decl.,
p. 8 (required to remove dentures after touching genital
area); **Ex. 898**, Watkins Decl., p. 8 (touched mouth after
touching used feminine hygiene products); **Dkt. 286-16:
Ex. 900**, Gilbreath Decl.; Ex. 902, Rodriguez Decl., p. 8
(touched mouth after removing feminine hygiene
products); **Ex. 904**, Pereda Decl.;**Ex. 905**, Lara Decl., p.
5; **Dkt. 286-17: Ex. 906**, Clark Decl., p. 9 (touched
mouth after touching sanitary napkin); **Ex. 907**, Diiorio
Decl., p. 8; **Ex. 908**, Briseno Decl., p. 8; **Ex. 911**, Diaz
Decl., p. 8 (touch mouth *after visual body cavity
inspection*); **Dkt. 286-18: Ex. 913**, Lewis Decl., p. 8
(touched mouth after removing soiled sanitary napkins
*and after visual body cavity inspection*); **Ex. 914**,
Groomes Decl., p. 8 (touch mouth after removing
feminine hygiene products); **Ex. 916,** Miller Decl., p. 8
(required to remove partial dentures from mouth after
touching used feminine hygiene products); **Ex. 917**,
Gavaldon Decl., p. 7 (touched mouth after removing
used feminine hygiene products); **Ex. 919**, Carter Decl.,
p. 7 (inmates had to touch mouth after touching dirty
wall); **Dkt. 286-19: Ex. 920**, Delgado Decl., p. 8; **Ex.
921**, Jordan Decl., p. 8 (inmate required to remove
dentures); **Ex. 923**, Reyes Decl., p. 5 (touched mouth

| | |
|---|---|
| | after touching used feminine hygiene products); **Ex. 924**, Young Decl., p. 5 (<u>inmates required to remove dentures after touching the dirty wall</u>); **Ex. 925**, Zambrana Decl., p. 7 (touched mouth after touching soiled feminine hygiene products); **Ex. 928**, Martin Decl., p. 6 (touched mouth after removing soiled tampon); **Ex. 929,** Bowman Decl., p. 6 (touched mouth after removing soiled feminine hygiene products); **Dkt. 286-21: Ex. 945**, G. Murillo Decl., p. 6 (inmate required to touch the inside of her mouth after touching unsanitary walls); **Ex. 947**, Cherry Decl., p. 5 (sometimes required to touch inside of mouth after touching vagina); **Dkt. 286-22: Ex. 955**, S. Williams Decl., p. 5 (due to variation in sequence, inmates sometimes had to touch mouth after touching genitals); **Ex. 961**, Rivera Decl., p. 8 (inmates required to put fingers in mouth after touching their genitals); **Dkt. 286-23: Ex. 966**, Osborne Decl., p. 8 (required to touch inside of mouth after handling blood-soiled tampon). |
| 100.   In July 2013, CRDF issued a policy requiring deputies to provide inmates with hand sanitizer before the mouth inspection. | **Dkt. 284-31 (Ex. 312.1)** (Search Command Script), p. 1. |
| **M. The Duration of Searches Varied Depending on the Number of Inmates Searched** | |
| 101.   Searches involving approximately 40 inmates normally took up to 20 minutes. | **Dkt. 284-8 (Ex. 163)**, LASD Sgt. Ford Dep. Tr., p. 95:8 – 95:20 (20 minutes); **Dkt. 284-2 (Ex. 151)**, LASD Dep. Burba Dep. Tr., p. 42:10 – 42:18 (20 minutes); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 66:12 – 66:22 (15-20 minutes for a group of 40 inmates); **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p. 215:12 – 215:15. |
| 102.   Searches could take longer than 20 minutes where inmates were having difficulty understanding or complying with instructions. | **Dkt. 284-2 (Ex. 151)**, LASD Dep. Burba Dep. Tr., p. 44:22 – 45:19. |
| **N. Inmates Experienced the Searches as Humiliating and** | |

| TRAUMATIC; INMATES WITH PREVIOUS SEXUAL ABUSE EXPERIENCED THE SEARCHES AS RE-TRAUMATIZING. | |
|---|---|
| 103.   Inmates' overall experience of how strip searches occurred at CRDF was that they were intensely humiliating, degrading and dehumanizing. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 95:25 – 96:8, 97:11 – 97:15; 100:6 – 100:18; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 67:13 – 68:8, 91:10 – 91:17; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 33:24 – 34:5, 47:8 – 47:15 ("felt like an animal"), 74:20 – 74:24 (felt violated), 107:6 – 107:12 (felt ashamed and degraded); **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 51:2 – 51:13 ("Most of the time I was trying to black my thoughts out. I felt humil – embarrassed, I felt disgusted, and I felt degraded."); **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., p. 42:8 – 42:19 – 43:10 (searches provoked a sense of shame; "brought back" the experience of having been sexually molested as a child), 65:22 – 65:24 (humiliating, degrading); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 75:6 – 75:11 (searches made witness feel "violated," "small," "dirty" and "nasty."); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., p. 28:9 – 28:19, 76:21 – 77:3 (searches left witness feeling demoralized and humiliated); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., pp. 97:13 – 99:3 (experienced strip searches as dehumanizing and violative; "most dehumanizing experience other than being raped."); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 191:15 – 191:24 (very embarrassed to see people she knew). <u>**Dkt. 286:**</u> **Ex. 807**, Talin Decl., p. 7 ("most humiliating thing I have ever experienced; cried); <u>**Dkt. 286-1:**</u> **Ex. 808**, Nunez Decl., p. 5 (most horrible experience witness has had; crying during the entire procedure); **Ex. 811**, Cooper Decl., p. 6 (crying because of the way deputies talked to inmates); <u>**Dkt. 286-2:**</u> **Ex. 817,** Lewis Decl., p. 7 (rape victim; searches were re-traumatizing); **Ex. 821**, Madison Decl., pp. 7, 9 (very degrading, "I will never forget as long as I live"; inmates cried out from the humiliation); **Ex. 822**, Levi Decl., p. 6 ("I am an old woman; felt like a nobody"); <u>**Dkt. 286-3:**</u> **Ex. 827**, Hinojos Decl., p. 6 (felt "worthless" and "powerless" when deputies abused and harassed other inmates; has cried; knows that inmates discuss how peoples private |

parts look); **Dkt. 286-4: Ex. 834**, J. Murillo Decl., p. 6 (humiliated; "I am a very big woman so I was very ashamed to be naked in such a big crowd"); **Ex. 837**, Lobrandon Decl., p. 6 ("I felt less than a woman. I felt like an animal…No woman should experience that type of humiliation); **Dkt. 286-6: Ex. 844**, Schuster Decl., p. 6 ("worst experience of my life," "not even childbirth can compare"); **Ex. 846,** Rodriguez Decl., p. 13 (inmates cried because of how they were treated by deputies); **Ex. 847**, McDonald Decl., p. 6 (most humiliating and degrading experience of my life); **Dkt. 286-7: Ex. 850**, Stevens Decl., p. 5 ("we were treated like trash"; "worst thing [witness] had ever been through"); **Ex. 852**, Reese Decl., p. 6 (cried every search; many other girls cried too); **Ex. 854**, James Decl., p. 9 (the searches "made me feel worthless as a woman," cried after every search); **Dkt. 286-8: Ex. 862**, Lee Decl., p. 4 (deputies' verbal abuse was "like being raped"; felt as though she was reliving rape; felt "less than human"); **Dkt. 286-9: Ex. 867**, Davis Decl., p. 9 (deputies laughed at inmates who cried; felt "less than human"); **Dkt. 286-10: Ex. 874**, McNight Decl., (strip searches were the "most degrading thing [she] has ever seen" and have "changed [her] forever"; treated like animals; cried every time she was searched); **Dkt. 286-11: Ex. 875**, Jackson Decl., p. 8 (witness felt "torn from [her] body"); **Ex. 878**, Savoia Decl., p. 9 ("most degrading and humiliating process of my life"); **Dkt. 286-12: Ex. 881**, Solano Decl., p. 9 (witness felt "worthless as a woman"); **Dkt. 286-13: Ex. 887**, Garcia Decl., p. 9 (cried; degrading); **Ex. 889**, Michelle Martinez Decl., p. 8 (searches were re-traumatizing); **Ex. 890**, Green Decl., p. 9 (cried because she had to expose scars and rectal bleeding); **Dkt. 286-16: Ex. 902** (searches are re-traumatizing); **Ex. 904**, Manjarrez Pereda Decl., p. 7 (having to perform search while menstruating was "most embarrassing time of my life"); **Ex. 907**, Diiorio Decl., p. 9 (humiliated; "I felt like a hunk of ugly old fat, embarrassed to be bleeding"); **Dkt. 286-17: Ex. 911**, Diaz Decl., p. 9 (returned from court anxious, depressed and scared; dreaded going to

court); **Dkt. 286-18: Ex. 919**, Carter Decl., p. 8 ( I felt as though I was nothing; searches were "something I will never forget"); **Dkt. 286-19: Ex. 921**, Jordan Decl., p. 9 (cried; worst aspect of jail); **Ex. 927**, Watson Decl., p. 6 (searches felt like being raped); **Dkt. 286-20: Ex. 931**, Gladden Decl., p. 6 (shamed, humiliated, and disgusted); **Ex. 934**, Thalacker Decl., p. 8 ("dehumanizing" process; inmates were treated "like animals"); **Ex. 938**, Gardner Decl., p. 7 (so humiliated; very sad to see women break down in tears because they were "treated like animals"; some women break down during searches because they have been raped or abused [and feel re-traumatized]); **Dkt. 286-21: Ex. 940**, Burnett Decl., p. 5, 7 (observed inmate start crying because she could not bring herself to do the body cavity search; felt like an animal); **Ex. 948**, T. Smith Decl., p. 6 (still cannot "feel good" about her body because of how she was humiliated during the strip searches; has nightmares); **Ex. 950**, R. Davis Decl., p. 5-6 (searches were degrading and inhumane); **Dkt. 286-22: Ex. 955**, S. Williams Decl., p. 5 (some women "threw up" and cried from embarrassment); **Ex. 956**, Solis Decl., p. 6 (humiliated and ashamed; searches shattered her self-esteem); **Ex. 960**, Worthy Decl., p. 9 (degraded, humiliated, embarrassed); **Ex. 961**, Rivera Decl., p. 9 (humiliated, degraded, cried); **Dkt. 286-23: Ex. 966**, Osborne Decl., p. 9 (I was hurt emotionally "because I am a big girl"; "it made me feel less of a human being"); **Dkt. 286-24: Ex. 970**, Monreal Decl., p. 7 (witness "felt so violated [she] cried" even after returning to her cell); **Ex. 971**, Arias Decl., p. 7 (humiliating; so embarrassed she cried; sometimes screams in her sleep); **Dkt. 286-25: Ex. 974**, Hansford Decl., p. 7 (treated like animals, not humans); **Ex. 975**, L. Lewis Decl., p. 9 ("I felt violated, like less than a person."); **Dkt. 286-26: Ex. 980**, McGlothlin Decl., p. 6 (inmate ashamed because she had an abscessed boil on her vagina; deputies forced her to complete the search in view of others); **Dkt. 286-27: Ex. 983**, Cramer Decl., p. 6 (witness felt scared, humiliated, powerless and hopeless); **Dkt. 286-23: Ex. 988**, Dunne Decl., p. 7 (cried every time; prayed every time; searches

| | |
|---|---|
| | were humiliating and disgusting); **Dkt. 286-29: Ex. 991**, Cleveland Decl., p. 7 (felt "less than human, like an animal"); **Dkt. 286-30: Ex. 996**, Wilson Decl., p. 7 (felt "less than human," searches were demoralizing). |
| 104.   Some inmates compare the sense of violation from the CRDF strip search experience to rape. | **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 67:13 – 68:4 ("I feel like I'm being raped."); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., pp. 97:13 – 99:3 ("most dehumanizing experience other than being raped."); **Dkt. 284-44 (Ex. 707)**, Dodd Decl., ¶14 ("It feels like being raped…"); **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl., ¶13 ("Every time I am strip searched I feel as though I am being raped"); **Dkt. 284-55 (Ex. 720)**, Vigil Decl., ¶14 ("I felt as though I had been raped every time I endured this process."). <br><br> **Dkt. 286-8: Ex. 862**, Lee Decl., p. 4 (deputies' verbal abuse was "like being raped"; felt as though she was re-living rape; felt "less than human"); **Dkt. 286-19: Ex. 927**, Watson Decl., p. 6 (searches felt like being raped); **Dkt. 286-22: Ex. 955**, S. Williams Decl., p. 6 (felt as though she had "been raped"); **Ex. 960**, Worthy Decl., p. 9 (felt as though she had been both emotionally and sexually abused). |
| 105.   Inmates who have been previously raped and/or sexually abused experienced the strip searches as re-traumatizing | **Dkt. 284-14 (Ex. 170)**, Sally Martinez Dep. Tr., p. 42:8 – 42:19, 49:21 – 50:12 (searches "brought back" the experience of having been sexually molested as a child); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., pp. 97:13 – 99:3 (strip searches are re-traumatizing in that they evoke feelings of powerlessness and fears of being along with people; "most dehumanizing experience other than being raped."). <br><br> **Dkt. 286-2: Ex. 817**, Lewis Decl., p. 7 (rape victim; searches were re-traumatizing); **Dkt. 286-8: Ex. 862**, Lee Decl., p. 4 (deputies' verbal abuse was "like being raped"; felt as though she was re-living rape; felt "less than human"); **Dkt. 286-13: Ex. 889**, Michelle Martinez Decl., p. 8 ("I was humiliated and degraded as a rape victim. I felt like I was reliving that rape all over again. It's wrong how they do us."); **Dkt. 286-16: Ex. 902**, Rodriguez Decl., p.8 (rape victim; searches were re- |

| | |
|---|---|
| | traumatizing); **Dkt. 286-28: Ex. 990**, Kelley Decl, p. 7 (during searches, experienced flashbacks of having been raped). |
| 106.   Inmates often cried during the search process. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 86:1 – 87:3; 183:19 – 184:8 (witness cried three times due to searches; observed inmate crying); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 84:21 – 85:18; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 61:11 – 63:12, 107:6 – 107:12; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 52:15 – 52:23 (inmate cried; has observed other inmates crying); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 70:23 – 71:19; **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 42:20 – 43:10, 62:16 – 63:23; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 72:17 – 74:18, 84:11 – 85:10; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p. 188:2 – 188:5; **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., p. 28:9 – 28:19 (witness cried every time because she felt demoralized and humiliated); **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., p. 56:3 – 56:10, 107:14 – 107:20; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 156:17 – 157:18; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., pp. 73:14 – 74:7; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶20; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶28; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶12; **Dkt. 284-46 (Ex. 709)**, Ejedawe ¶9; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶16; **Dkt. 284-52 (Ex. 716)**,  Madrid Decl. ¶21; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶16; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶20. <br><br> **Dkt. 286-1: Ex. 808**, Nunez Decl., p. 3, 5 (witness cried; deputies harassed inmate in response to her crying); **Dkt. 286-9: Ex. 867**, Janis Davis Decl., p. 9 (deputies laughed at women when they cried); **Dkt. 286-16:  Ex. 902**, Rodriguez Decl., p. 8 (searched after having a c-section – cries when she talks about it); **Dkt. 286-17: Ex. 911**, Diaz Decl., p. 8 (obese inmate crying because deputies "made a spectacle" out of her);. **Dkt. 286-20:  Ex. 933**, Flores Decl., p. (always cried); **Dkt. 286-22: Ex. 955**, S. Williams Decl., p. 5 (some women "threw up" and cried from embarrassment); **Ex. 961**, Rivera Decl., p. 9 (cried); **Dkt. 286-24: Ex. 970**, Monreal Decl., p. 7 |

| | |
|---|---|
| | (witness "felt so violated [she] cried" even after returning to her cell); **Ex. 971**, Arias Decl., p. 7 (humiliating; so embarrassed she cried; sometimes screams in her sleep); **Ex. 972**, Mendoza Decl., p. 5 (women could see each other fully naked). |
| 107.   Inmates reported feeling depression and low self-esteem after searches. | **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 52:8 – 52:14, 59:6 – 59:19; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 140:7 – 140:10 (on a scale of 1-10, emotional distress was "beyond" a 10); **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., pp. 82:23 – 83:9, 83:17 – 84:4 (low self-esteem, self-consciousness about body after searches; felt sick after the searches; feels sick talking about the searches); **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl., ¶13. <br><br> **Dkt. 286-21:** **Ex. 948**, T. Smith Decl., p. 6 (nightmares from the humiliating she suffered during searches); **Dkt. 286-22:** **Ex. 956**, Solis Decl., p. 6 (shattered self-esteem); **Dkt. 286-24:** **Ex. 970**, Monreal Decl., p. 7 (witness "felt so violated [she] cried" even after returning to her cell); **Ex. 971**, Arias Decl., p. 7 (humiliating; so embarrassed she cried; sometimes screams in her sleep); **Dkt. 286-29:** **Ex. 992**, Strange Decl., p. 7 (inmate was devastated after every court date; so traumatized from the searches that she isolated herself for hours or days); **Dkt. 286-31:** **Ex. 998**, Jimenez Decl., p. 7 (after searches, felt worthless and depressed). |
| **O. CRDF'S STRIP SEARCH PRACTICES ARE A SIGNIFICANT DEPARTURE FROM ACCEPTED CORRECTIONAL NORMS** | |
| 108.   Wendy Still is a qualified expert in the areas of correctional practices, particularly regarding women inmates. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 1-4, ¶¶2-13. |
| 109.   Conducting any type of strip search, including a visual body cavity search, in large groups (24 or even more | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 12, ¶38 |

| | |
|---|---|
| inmates) represents an extreme departure from normal, accepted correctional practices. | |
| 110.   Requiring female inmates to remove tampons or pads in the presence of a large group is humiliating and constitutes a significant departure from the practices of female correctional institutions, which universally recognize the privacy concerns surrounding menstruation. The humiliation can also act as a trauma trigger. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 14, ¶42. |
| 111.   The search procedure utilized at CRDF was invasive to the extreme: inmates were not only required to submit to a visual body cavity inspection, considered one of the most invasive types of searches, they are required to submit to an exceptionally invasive form of visual body cavity inspection in that deputies require them to bend over and use their hands to spread their buttocks and labia. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 41-42, ¶111. |
| 112.   Within the correctional community, a visual body cavity | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 41-42, ¶111. |

| | |
|---|---|
| inspection requiring spreading of the vagina and buttocks is considered significantly more invasive and less dignified that the "cough and squat" procedure. | |
| 113.   Having women inmates physically manipulate their vagina and labia is not a standard practice used for visual body cavity searches by correctional facilities. The typical correctional VBCS procedure is done through a squat-and-cough procedure (wherein inmates squat-and-cough without spreading their labia). | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 14-15, ¶45. |
| 114.   Because the squat-and-cough procedure is almost always sufficient, requiring inmates to physically spread their labia is entirely gratuitous. There is no legitimate correctional reason to require inmates to physically spread their labia with their fingers to expose their vagina, except where correctional personnel have reason to believe that some form of contraband remains concealed. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 14-15, ¶45. |
| 115.   There is no legitimate correctional | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 14-15, ¶45. |

| | |
|---|---|
| reason to require inmates to physically spread their labia with their fingers to expose their vagina, except where correctional personnel have reason to believe that some form of contraband remains concealed. | |
| 116.   Correctional expert, Wendy Still, is aware of no jails outside of LA County that conduct VBCS using LASD's intrusive procedure wherein inmates are required to physically manipulate their genitals; most jails that conduct VBCS use the less intrusive squat-and-cough procedure, which is considered equally effective and more dignified. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 17, ¶55. |
| 117.   Wendy Still is aware of no jail that conducts VBCS of female inmates *in a group setting without individualized privacy*, regardless of how jails accomplish the VBCS ("squat-and-cough" vs. more invasive "labia lift" procedure), | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 17-18, ¶56. |
| 118.   Individualized, private searches is how a reasonable and typical VBCS of female inmates is conducted. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 17-18, ¶56. |

67

| | |
|---|---|
| 119.   Although jails and prisons normally attempt to provide privacy during strip searches to men, it is a particular priority when women inmates are involved; with female inmates, it is imperative to make special efforts to provide privacy to avoid triggering traumatic responses based on past experiences of physical or sexual abuse. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 20, ¶63. |
| 120.   Most large jail systems provide privacy by way of curtains partitions, private rooms or body scanners. Privacy partitions are almost universally considered to be the reasonable correctional practice that ensures a woman's privacy is respected. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 16 -17, 18, ¶¶53, 57. |
| 121.   For many years, Rikers Island, New York City's main jail complex, has conducted individual strip searches of female jail inmates. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., pp. 143:22 – 144:1, 229:21 – 229:24; **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 18, ¶57. |
| 122.   Cook County (Chicago) transitioned to body scanners in 2011; before installing scanners, Cook County conducted searches of female inmates using privacy partitions that prevented inmates from seeing each | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 18, ¶58. |

68

| | |
|---|---|
| other during searches. | |
| 123.  Cook County's 13 individualized partitions were installed so that each woman being searched was not visible to any other inmate and could only be viewed by staff conducting the searches. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 18, ¶58. |
| 124.  Cook County personnel have testified in other litigation that the privacy cubicles presented no safety concerns. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 18, ¶58. |
| 125.  LASD Commander Maria Gutierrez testified in this case that LASD looks to  Cook County, Illinois for best practices because Cook County manages one of the largest jails in the U.S. | **Dkt. 284-22 (Ex. 180)**, Cmdr. Gutierrez Dep. Tr., p. 64:13 – 64:24 ("Because I know that we had command staff go there to visit the facility and that's part of our [] we do that quite often. We go and look for best practices across the country. So Cook County Sheriff's Department has the second largest in the Country. We look to those best practices…") |
| 126.  California's Folsom prison also conducts individualized private strip searches of female inmates. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., p. 144:2 – 144:4. |
| 127.  In 1987, the Federal Bureau of Prisons modernized their facilities, stalling privacy partitions in all of their prisons. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 19, ¶61. |
| 128.  Philadelphia, another of the largest jails in the country, does strip searches individually in an enclosed area with a | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 18, ¶57. |

| | |
|---|---|
| curtain | |
| 129.   Based on her survey of large, urban jails, Wendy Still is aware of no jail systems that require female inmates to completely undress, exposing their pubic region, in the presence of large groups (10 or more). | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 20-21, ¶64 (chart). |
| 130.   Based on her survey of large, urban jails, Wendy Still is aware of no jail systems that conduct VBCs of female inmates, in large groups, without privacy partitions. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 20 - 21, ¶¶64 (chart). |
| 131.   Based on her survey of large, urban jails, Wendy Still is aware of no jail systems that require female inmates to manually spread the lips of their labia to expose their vagina in view of other inmates. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 20 - 21, ¶¶64 (chart). |
| 132.   Based on her survey of large, urban jails, Wendy Still is aware of no other systems that require menstruating inmates to remove their tampons or sanitary napkins in view of other inmates as part of a VBCS. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 20-21, ¶64 (chart). |
| 133.   CRDF also failed | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. |

70

| | |
|---|---|
| to take common sense measure to prevent inmates from coming in contact with menstrual blood or other bodily fluids during the search process. | 42, ¶112. |

| | |
|---|---|
| **P. LASD'S INSTALLATION OF 24 PRIVACY CURTAINS DEMONSTRATES THAT IT WAS ALWAYS POSSIBLE TO PROVIDE FEMALE INMATES WITH INDIVIDUALIZED PRIVACY** | |
| 134.   Until January 2015, there were no privacy curtains or partitions in Bus Bay # 3. | **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶9; **Ex., 717**, Paiz Decl. ¶6; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶8; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶10; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶7; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶6; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶9; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶8; **Dkt. 284-40 (Ex. 702)**, Britt Decl.¶4; **Dkt. 284-56 (Ex. 721)**, Webb Decl. ¶4; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶7). |
| 135.   LASD first considered installing privacy curtains in approximately 2010. | **Dkt. 284-1 (Ex. 150)**, Sgt. Bullocks Dep. Tr., pp. 48:2 – 49:6; **Dkt. 284-4 (Ex. 155)**, LASD Dep. J. Johnston Dep. Tr., p. 40:11 – 40:25. |
| 136.   In approximately 2010, a team of LASD employees visited the San Diego County jail to investigate their use of privacy partitions in the strip search area. | **Dkt. 284-1 (Ex. 150)**, Sgt. Bullocks Dep. Tr., pp. 48:2 – 49:6. |
| 137.   LASD concluded that it would not be feasible to implement a system using privacy *curtains* identical to the system used by San Diego. | **Dkt. 284-1 (Ex. 150)**, Sgt. Bullocks Dep. Tr., pp. 52:7 – 57:22. |
| 138.   LASD did not investigate the use of privacy partitions or | **Dkt. 284-1 (Ex. 150)**, Sgt. Bullocks Dep. Tr., p. 61:13 – 61:16. |

| | |
|---|---|
| curtains at any other jail facilities aside from San Diego. | |
| 139.   In late-2014, Commander Maria Gutierrez developed a plan for installing privacy curtains. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., pp. 135:21 – 136:3. |
| 140.   In February 2015, LASD installed **24** privacy curtains in Bus Bay #3. | **Dkt. 284-30 (Ex. 214) -2** (photo of 24 curtains on both sides of the bus bay); **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 120:11 – 121:5; 85:22 – 86:18 (authenticating Dkt. 284-32 (Ex. 423)); **Dkt. 284-29 (Ex. 212)** (photo of privacy curtains); **Dkt. 284-32 (Ex. 423)**, p. 2 (Maximo Report re Bus Bay #3 modifications); **Dkt. 284-32 (Ex. 424)**, pp. 31 – 35. |
| 141.   The total cost of materials required for the privacy curtains was **$495.68**. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 124:16 – 126:7; **Dkt. 284-32 (Ex. 424)**, pp. 31 – 35. |
| 142.   The total cost of labor for installation of the curtains was **$6561.25**. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 124:16 – 126:7; **Dkt. 284-32 (Ex. 424)**, pp. 31 – 35. |
| 143.   The installation of privacy curtains as a "simple" and "not [a] complicated" project. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo (Director of LASD's Facilities Services Bureau) Dep. Tr., pp. 123:9 – 124:5. |
| 144.   No structural features of Bus Bay #3 would have precluded installation of the curtain rods prior to January 2015. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo (Director of LASD's Facilities Services Bureau) Dep. Tr., pp. 128:22 – 129:4. |
| 145.   The curtains were designed to ensure privacy for the inmate without blocking the visibility of staff conducting the searches. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., pp. 138:17 – 139:25 ("they're still enough privacy for the inmate…yet it's clearly visible to the staff as they're watching…"), 144:9 – 145:16 ("…we purposely planned it that way… [so] that it would still give the women privacy from each other but that the staff could see |

| | |
|---|---|
| | everyone clearly."). |
| 146.   During searches, inmates can be observed *the same way* as they were observed prior to the installation of curtains. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., p. 139:21 – 139:25. |
| 147.   Prior to the installation of curtains in 2015, LASD had never attempted to install curtains that would have provided privacy while enabling deputies to safely conduct group strip searches. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., pp. 137:16 – 138:15. |
| 148.   According to Commander Gutierrez, LASD's 30(b)(6) witness, curtains such as those that were installed could have solved the privacy problem years ago. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., p. 146:2 – 146:25 (Q: Well, wouldn't it have always been the answer to the problem before scanners were available as to how to increase privacy? A: "I agree. You know if again if that thought would have come up 20 years ago we wouldn't probably be here today…in hind sight it would have been a wonderful thing."), 146:23 – 153:20 defense counsel confers with witness off record; witness clarifies that curtains could have decreased visibility, but ultimately agrees that searches would have gone fine, and that attentive staff would have been able to do a "good job" using 24 privacy curtains). |
| 149.   Correctional expert Wendy Still concurs with Cmdr. Gutierrez's assessment that privacy curtains would always have been feasible. In her professional opinion, and based on decades of experience as a jail and prison administrator and consultant, there is no meaningful question CRDF could have | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 24, ¶71. |

| | |
|---|---|
| provided privacy by limiting group sizes to 24 inmates and installing 24 privacy curtains (as it ultimately did), at no significant monetary cost and with no compromise of security. | |
| 150.   Since it is undisputed that CRDF installed 24 privacy curtains, and undisputed that CRDF readily adapted to searches of 24 inmates in July 2013, there is no question that CRDF could have used privacy curtains to conduct searches of groups of 24 inmates in the identical manner it had been conducting searches since July 2013. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 22 -24, ¶¶68-71. |
| 151.   If, for some reason, CRDF did not believe it could handle 24 inmates using privacy curtains, CRDF could have searched groups of 12 inmates using privacy curtains without significantly increasing the total time required to process all inmates. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 23 - 24, ¶¶69-70. |
| 152.   In Wendy Still's opinion, regardless of whether CRDF chose to search groups of 12 or 24, CRDF could have utilized privacy curtains for the | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 23 - 24, ¶70. |

| | |
|---|---|
| entire class period. There would have been no compromise in security, and many of the worst aspects of the practice would have been eliminated. | |

| **Q. LASD'S HANDLING OF COURT RETURNEES IS EVEN LESS SUPPORTED BY VALID CORRECTIONAL JUSTIFICATION BECAUSE COURT RETURNEES REMAINED UNDER CONSTANT LASD SUPERVISION WHEN THEY LEFT CRDF TO MAKE COURT APPEARANCES.** | |
|---|---|
| 153.   There is no sound correctional justification for subjecting court returnees to such invasive searches because they remain within the custody of LASD when they leave for court and medical appointments and do not have unsupervised contact with the public. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 42, ¶114. |
| 154.   Court and medical returnees remain under LASD supervision during transport and appearances/appointment. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 14:6 – 17:1; 168:7 – 24; 170:18 – 170:25; 191:2 – 191:15; **Dkt. 284-10 (Ex. 166)**, Maxie Dep.Tr., pp. 17:17 – 18:1; 20:12 – 27:17; **Dkt. 284-11 (Ex. 167)**,  Reynolds Dep. Tr., pp. 16:6 – 18:5, 137:25 – 139:18; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 16:14 – 21:2; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 19:8 – 19:13; 22:5 – 23:2; 23:23 – 25:5; 27:16 – 29:7;  **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 22:14 – 24:18; 25:19 – 22, 26:14, 27:14. |
| 155.   Inmates are handcuffed (or arm cuffed) to each other during transportation; they remain handcuffed until they are placed in a holding tank at court lock-up. | **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 16:14 – 21:2; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 14:6 – 15:9; 168:7 – 24; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 17:17 – 18:1; 20:12 – 20:14; **Dkt. 284-11 (Ex. 167)**,  Reynolds Dep. Tr., pp. 16:6 – 18:5, 137:25 – 139:18; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 19:8 – 19:13; 22:5 – 23:2; 23:23 – 25:5; 27:16 – 29:7; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 22:14 – |

75

| | |
|---|---|
| | 24:18; 25:19 – 25:22, 26:11 - 27:14; **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 177:18 – 178:13; **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., pp. 64:7 – 65:20; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., pp. 41:8 – 41:10 (handcuffed during bus transportation to Lynwood). |
| 156.   Pat-down searches are conducted when inmates arrive at court. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 15:10 – 15:25;168:7 – 24; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 20:17 – 21:4; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 16:14 – 23:20; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 16:6 – 16:19, 18:2 – 18:5, 137:25 – 139:18. |
| 157.   Handcuffs are only removed while inmates wait in courthouse holding tanks. | **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 16:14 – 21:2; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 20:12 – 27:17; **Dkt. 284-11 (Ex. 167)**,  Reynolds Dep. Tr., pp. 16:6 – 18:5, 137:25 – 139:18; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 19:8 – 19:13; 22:5 – 23:2; 23:23 – 25:5; 27:16 – 29:7; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 22:14 – 24:18; 25:19 – 25:22, 26:11 - 27:14. |
| 158.   Inmates are also handcuffed during transportation from court back to CRDF. | **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 16:14 – 21:23; **Dkt. 284-11 (Ex. 167)**,  Reynolds Dep. Tr., pp. 137:25 – 139:18; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 19:8 – 19:13; 22:5 – 23:2; 23:23 – 25:5; 16:15 – 26:18; 27:16 – 29:7; **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., p. 66:22 – 66:25. |
| 159.   No unsupervised contact with the public is permitted. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 14:6 – 17:1; 168:7 – 24; 191:2 – 191:15 (no contact with the public after arriving at court); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 20:12 – 27:17; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 20:15 – 21:2; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 19:8 – 19:13; 22:5 – 23:2; 23:23 – 25:5; 27:16 – 29:7; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 22:14 – 24:18; 25:19 – 25:22, 26:11 - 27:14. |
| **R. Until Approximately February 2014, Bus Bay #3 Was an Outdoor Garage Space That Was Not Sealed Off to Birds, Insects or Bus Fumes from the Adjacent Bus Bay** | |

| | |
|---|---|
| 160.   Until early-2015, Bus Bay #3 was used as both a working bus garage and the primary location for group searches. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., pp, 168:23 – 170:18, 237:14 – 237:18; **Dkt. 284-32 (Ex. 403)** (March 2, 2015 letter acknowledging that Bus Bay 3 is used as a working bus bay); **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 177:7 – 177:11 (witnesses observed buses in Bus Bay #3); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 89:15 – 90:17 (observed bus transporting inmates to prison park in Bus Bay #3 while inmates board). |
| 161.   Until approximately February 2014, Bus Bay #3 was not an enclosed structure. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., p. 139:10 – 139:12 (the roof was installed for the purpose of enclosing the bus bay); 80:21 – 81:3 (discussing instructions to sheet metal supervisor regarding enclosure of the Bus Bay); 85:23 – 86:18 (authenticating Dkt. 284-32 (Ex. 423)); **Dkt. 284-32 (Ex. 423)** (Maximo Report of Bus Bay Work Orders), p. 1 ("Enclose bus bay and add a roof"). |
| 162.   Prior to 2014 renovations, and prior to decommissioning Bus Bay 3 as a working bus garage, the space did not meet environmental or construction code requirements for any type of permanent structure, let alone a structure to be occupied by nude, female inmates during visual body cavity searches. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 27, ¶81. |
| 163.   Bus Bay #3 was not sealed to birds. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., p. 117:12 – 117:22 (even after 2014 renovations, Bus Bay #3 was not sealed to birds). |
| 164.   CRDF deputies acknowledged the presence of bird feathers in the bus bay. | **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 99:9 – 99:11 (bird feathers). |
| 165.   Inmates observed birds in the bus bay, bird nests, bird feathers and | **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 37:18 - 38:7 (observed bird droppings along the perimeter of the bus bay); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. |

| | |
|---|---|
| bird droppings on the floor where they were required to stand bare foot. | 36:23 – 36:1, 40:2 – 40:10 (bird feathers and droppings); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 44:25 – 46:14, 142:9 – 142:11 (witness observed birds overhead in the bus bay; bird droppings on the floor); **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶11 (bird feathers and droppings) |
| | **Dkt. 286-1: Ex. 813**, Gutierrez Decl., p. 6 (bird feathers, bird droppings); **Ex. 815**, Phillips Decl., p. 6 (birds, bird feathers, bird droppings); **Dkt. 286-3: Ex. 827**, Hinojos Decl., p. 5 (bird nests, bird droppings, bird feathers – stepped in bird droppings); **Dkt. 286-6: Ex. 847**, McDonald Decl., p. 5 (bird droppings, birds flying around); **Ex. 848**, Ransome Decl., p.6 (bird droppings); **Dkt. 286-7: Ex. 851**, Finley Decl., p. 6 (bird feathers, bird feces); **Ex. 854**, James Decl., p. 6 (bird droppings, bird feathers); **Dkt. 286-9: Ex. 864**, Shirk Decl., p. 5, 6 (bird falling out of nest, baby birds); **Ex. 865**, Tasia Phillips Decl., p. 6 (dead bird that had fallen out of nest); **Ex. 867**, Davis Decl. p. 6 (always bird feathers); **Ex. 868**, Murry Decl., p. 6 (bird nests); **Dkt. 286-10: Ex. 869**, Yates Decl., p. 6 (bird droppings, bird feathers); **Ex. 871**, Kimble Decl., p. 6 (bird feathers); **Ex. 873**, Bui Decl., p. 5 (bird feathers, bird nest); **Ex. 874**, McNight Decl., p. 5 (dead birds); **Dkt. 286-11: Ex. 875**, Jackson Decl., p. 5 (bird feathers); **Ex. 878**, Savoia Decl., p. 6 (droppings); **Ex. 880**, Scharf Decl., p. 6 (birds); **Dkt. 286-12: Ex. 882**, Leonard Decl., p. 6 (bird feathers, bird droppings); **Dkt. 286-13: Ex. 888**, Berger Decl., p. 6 (birds); **Ex. 892**, Irby Decl., p. 5 (bird droppings); **Dkt. 286-14: Ex. 895**, Ballesteros Decl., p. 6 (birds nest, bird feathers); **Ex. 896**, Michelle Davis Decl., p. 6 (bird nests overhead); **Dkt. 286-15: Ex. 897**, Cheever Decl., p. 6 (bird feathers); **Dkt. 286-16: Ex. 903**, Glenda Smith Decl., p. 5 (bird feathers); **Ex. 904**, Manjarrez Pereda Decl., p. 6 (bird droppings); **Dkt. 286-17: Ex. 909**, Batarina Decl., p. 6 (bird droppings, bird nests); **Ex. 910**, Bradley Decl., p. 5, 6 (birds, bird feathers), **Ex. 912**, Riley Decl., p. 4, 6 (bird droppings); **Dkt. 286-18: Ex. 914**, Groomes Decl., p. 6 (bird feathers); **Ex. 916**, Miller |

Decl., p. 6 (bird droppings); **Ex. 917**, Gavaldon Decl., p. 6 (bird feathers); **Ex.  918**, Short Decl., p. 6 (bird droppings); **Dkt. 286-19: Ex. 920**, Delgado Decl., p. 6 (bird feathers);  **Ex. 921**, Jordan Decl., p. 6 (bird nests, bird droppings); **Ex. 926**, Crumble Decl., p. 6 (bird nests); **Ex. 928**, Martin Decl., p. 4, 5 (feathers); **Dkt. 286-20: Ex. 934**, Thalacker Decl., p. 6 (dead baby birds, bird droppings); **Ex. 935**, Dale Decl., p. 3 (bird droppings, feathers); **Ex. 936**, R. Williams Decl., p. 4 (nests); **Ex. 938**, Gardner Decl., p. 4, 5 (many bird nests, droppings); **Dkt. 286-21: Ex. 941**, Durr Decl., p. 4 (feathers; plastic tarp ruined from bird nests); **Ex. 944**, Maddox Decl., p. 5 (birds and bird droppings); **Ex. 945**, G. Murillo Decl., p. 5 (bird droppings); **Dkt. 286-22: Ex. 960**, Worthy Decl., p. 6 (bird nests, bird feces, bird feathers); **Ex. 961**, Rivera Decl., p. 6 (birds, bird feathers, bird "poop"); **Dkt. 286-23: Ex. 963**, Dale Decl., p. 5 (bird feathers and droppings); **Ex. 964**, Miller Decl., p. 5 (bird nests, baby birds, feathers, bird droppings); **Ex. 966**, Osborne Decl., p. 6 (bird poop and "a lot" of feathers); **Ex. 967**, Dutoit Decl., p. 3, 4, 5 (bird feces, feathers); **Dkt. 286-24: Ex. 969**, Malveaux Decl., p. 5 (feathers, bird droppings); **Ex. 970**, Monreal Decl., p. 5 (bird droppings, feathers); **Ex. 972**, Mendoza Decl., p. 5 (feathers); **Dkt. 286-25: Ex. 974**, Hansford Decl., p. 5 (feathers); **Ex. 975**, L. Lewis Decl., p. 5, 6 (standing under bird nest; bird poop); **Ex. 976**, Hernandez Decl., p. 6 (feathers); **Ex. 977**, Anderson Decl., p. 4, 5 (feathers, bird feces); **Dkt. 286-26: Ex. 980**, McGlothlin Decl., p. 4 (bird nests); **Ex. 981**, Gomez Decl., p. 5 (feathers); **Dkt. 286-27: Ex. 984**, Duhaney Decl., p. 5 (nests, feathers); **Ex. 985**, Olazaba Decl., p. 5 (feathers, bird droppings); **Ex. 986**, Gebhardt Decl., p. 5 (feathers); **Dkt. 286-28: Ex. 989**, Mack Decl., p. 5 (feathers, bird droppings); **Dkt. 286-29: Ex. 991**, Cleveland Decl., p. 5 (bird droppings); **Ex. 993**, Peavie Decl., p. 5 (feathers); **Dkt. 286-30: Ex. 994**, Acosta Decl., p. 5 (nests); **Ex. 996**, Wilson Decl., p. 5 (feathers); **Dkt. 286-31: Ex. 997**, Abalos Decl., p. 5 (feathers); **Ex. 999**, Farish Decl., p. 5 (bird trapped inside bus bay; deputy was laughing while

| | trying to pepper spray the bird). |
|---|---|
| 166.   John Carrillo, LASD's Director of the Facilities Services Bureau, and 30(b)(6) designee, acknowledged that birds were able to enter Bus Bay No. 3 until August 26, 2015, when foam sealant was applied for the purpose of keeping out birds. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 116:15 – 117:22; **Dkt. 284-32 (Ex. 423)**, p. 2 (reference 432813, "spray foam sealant around roof edge to keep birds out."); |
| 167.   Deputies observed ants in the bus bay. | **Dkt. 284-6 (Ex. 161)**, LASD Dep. Matson Dep. Tr., pp. 97:1 – 97:3. |
| 168.   Inmates observed ants and other insects; ants sometimes crawled on inmates feet and clothing during searches. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 79:20 – 80:7 (ants during almost every search); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 41:12 – 41:17, 70:9 – 70:11 (ants along the wall where inmates were required to stand; ants present during every search); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 47:17 – 48:7, 64:24 – 65:3 (dead insects including water bugs, ants); **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 34:19 – 35:11, 88:10 – 89:17 (ants every time; ants crawled on witness's toes; complained to deputies but told to turn around and face the wall); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 36:23 – 37:6, 40:12 – 41:18 (ant trail along the wall adjacent to Bus Bay 2; inmates tried to move their feet away from the ant trails); **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 51:19 – 52:8; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 37:24 – 38:5, 38:24 – 40:16, 40:25 – 41:3, 142:2 – 142:23 (ants along the perimeter of the bus bay; ants crawled in witness's feet; spider); **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., pp. 195:23 – 196:9 (ants and little bugs); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp. 76:6 – 76:10 (ants crawling on the wall); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., p. 104:13 – 104:16 (ants); **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., pp. 142:8 – 142:18 (ants crawling on the ground); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 152:13 – 153:22; 195:2 – 195:3 (bugs, spiders, ants); **Dkt. 284-38 (Ex. 700)**, |

Barranca Decl., ¶11; **Dkt. 284-45 (Ex. 708)**, Dowen Decl. ¶4;  **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶5; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶5; **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶9;  **Dkt. 284-55 (Ex. 720)**, Vigil ¶7; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶5; **Dkt. 284-58 (Ex. 723)**, Gutierrez Decl., ¶6;  **Dkt. 284-59 (Ex. 724)**, Robles Decl. ¶6; **Dkt. 284-60 (Ex. 725)**, Graham Decl. ¶6 (ants and beetles); **Dkt. 284-61 (Ex. 726)**, Tindall Decl., ¶4 (flies).

**Dkt. 286:** **Ex. 802**, Edwards Decl., p. 5 (ants); **Ex. 803**, Hawkins Decl., p. 4 (ants where inmates were standing and crawling on the walls); **Ex. 805**, Perez Decl., p. 4 (ants, gnats); **Ex. 807**, Talin Decl., p. 5 (ants); **Dkt. 286-1: Ex. 808**, Nunez Decl., p. 4 (ants, spiders); **Ex. 809**, Ship Decl. , p. 5 (roaches); **Ex. 810**, Drisdle Decl., p. 6 (flies, gnats); **Ex. 811**, Cooper Decl., p. 5 (bugs); **Ex. 812**, Johnson Decl., p. 5 (ants); **Ex. 813**, Gutierrez Decl., p. 6 (ants); **Ex. 814**, Caldera Decl., p. 5 (ants, spiders); **Ex. 815**, Phillips Decl., p. 6 (insects); **Dkt. 286-2: Ex. 817**, Lewis Decl., p. 5 (ants, spiders); **Ex. 818**, Reed Decl., p. 5 (ants, mosquitos); **Ex. 819**, Maxie Decl., p. 6 ("normal outside insects," including ants, roaches and silverfish); **Ex. 821**, Madison Decl., p. 6 (ants, insects);**Ex. 822**, Levi Decl., p. 5 (ants, flies), **Dkt. 286-3: Ex. 825**, Wade Decl., p.5, 6 (ants); **Ex. 826**, Camacho Decl., p. 5 (ants, spiders); **Ex. 827**, Hinojos Decl., p. 5 (ants crawling on feet); **Ex. 828**, Qualls Decl., p. 5 (dead insects); **Ex. 829**, Lang Decl., p. 5 (ants); **Dkt. 286-4: Ex. 830**, Busby Decl., p. 6 (ants crawled on witness); **Ex. 831**, Lowe Decl., p. 5 (ants); **Ex. 833**, Bunton Decl., p. 4 (bugs); Ex. 834, J. Murillo Decl., p. 5 (roaches); **Ex. 835**, Martinez Decl., p. 6 (gnats); **Ex. 836**, Bailey Decl., p. 5 (ants); **Ex. 837**, Lobrandon Decl., p. 5 (flies, ants, gnats); **Dkt. 286-5:**  **Ex. 840**, White Decl., p. 5 (insects); **Ex. 841**, Tuggle Decl., p.5 (ants); **Ex. 842**, Abbago Decl., p. 7 (ants); **Dkt. 286-6: Ex. 844**, Schuster Decl., p. 5 (beetles, cockroaches, insects); **Ex. 845**, Walker Decl., p. 6 (roaches, insects); **Ex. 847**, McDonald Decl., p.5 (ants all over clothes); **Ex. 848**, Ransome Decl., p.6 (ants);

**Dkt. 286-7: Ex. 850**, Stevens Decl., p. 4 (beetles); **Ex. 851**, Finley Decl., p. 6 (ants); Ex. 852, Reese Decl., p. 5 (bugs); **Ex. 853**, Soma Decl., p. 7 (ants); **Ex. 854**, James Decl., p. 6 (ants, spiders); **Ex. 856**, Edwards Decl., p. 6 (spiders); **Dkt. 286-8: Ex. 858**, Shields Decl., p. 5 (ants on legs, feet and clothes); **Ex. 859**, Stanley Decl., p. 6 (roaches); **Ex. 861**, Charles Decl., p. 7 (bugs, insects); **Ex. 862**, Lee Decl., p. 5 (ants, roaches, insects); **Ex. 863**, **Dkt. 286-9:** Harrison Decl., p. 5 (insects); **Ex. 864**, Shirk Decl., p. 5, 6 (ants, bugs, spiders); **Ex. 867**, Davis Decl., p. 5, 6 (ants); Ex. 868, Murry Decl., p. 6 (insects); **Dkt. 286-10: Ex. 869**, Yates Decl., p. 6 (ants); **Ex. 870**, Chapman Decl., p. 6 (ants crawled on inmates' feet and legs); **Ex. 871**, Kimble Decl., p. 6 (bugs); **Ex. 873**, Bui Decl., p. 5 (ants); **Ex. 874**, McKnight Decl., p. 5 (ants, spiders, roaches, ant traps); Ex. 875, Jackson Decl., p. 4 (bugs); **Dkt. 286-11: Ex. 876**, Martin Decl., p. 6 (always ants); **Ex. 877**, Odney Decl., p. 6 (ants); **Ex. 878**, Savoia Decl., p. 6 (ant trails); **Ex. 879**, Allen Cruz Decl., p. 6 (ants); **Ex. 880**, Scharf Decl., p. 6 (insects); **Dkt. 286-12: Ex. 881**, Solano Decl., p.6 (ants); **Ex. 882**, Leonard Decl., p. 6 (bugs, ants); **Ex. 883**, Thomas Decl., p. 6 (ants); **Ex. 885**, Poe Decl., p. 5 (ants, spiders, flies, roaches); **Ex. 886**, Talia Robles Decl., p. 5 (ants); **Dkt. 286-13: Ex. 887**, Garcia Decl., p. 6, (ants); **Ex. 888**, Berger Decl., p. 6 (ants); **Ex. 889**, Michelle Martinez Decl., p. 5 ("just a lot of ants…"); **Ex. 890**, Green Decl. p. 6 (flies, bugs); **Ex. 892**, Irby Decl., p. 5 (ants); **Dkt. 286-14: Ex. 893**, Smith Decl., p. 6 (ants, roaches); **Ex. 896**, Michelle Davis Decl., p. 6 (ants); **Dkt. 286-15: Ex. 897**, Cheever Decl., p. 6 (ants on feet and clothes); **Ex. 899**, Sims Decl., p. 6 (bugs); **Dkt. 286-16: Ex. 902**, Rodriguez Decl., p. 7 (insects); **Ex. 903**, Glenda Smith Decl., p. 5 (insects); **Ex. 904**, Manjarrez Pereda Decl., p. 6 (insects); **Ex. 905**, Lara Decl., p. 5 (flies, gnats); **Dkt. 286-17: Ex. 906**, Clark Decl., p. 6 (spiders); **Ex. 908**, Briseno Decl., p. 6 (flies); **Ex. 909**, Batarina Decl., p. 6 (ants, gnats); **Ex. 910**, Bradley Decl., p. 5 (ants); **Ex. 911**, Diaz Decl., p. 6 (gnats); **Ex. 912**, Riley Decl., p. 4, 6 (spiders, ants, cockroaches); **Dkt. 286-18: Ex. 913**,

Lewis Decl., p. 6 (ant trails); **Ex. 914**, Groomes Decl., p. 6 (flies); **Ex. 915**, Howell Decl., p. 6 (ants); **Ex. 918**, Short Decl., p. 6 (flies); **Dkt. 286-19: Ex. 921**, Jordan Decl., p. 6 (flies); **Ex. 923**, Reyes Decl., p. 6 (spiders, cobwebs, flies); **Ex. 925**, Zambrano Decl., p. 6 (ants); **Ex. 928**, Martin Decl., p. 4, 5 (ants crawled on clothes; attracted to food on the ground); **Dkt. 286-20: Ex. 932**, Rippetoe Decl., p. 5 (ants crawling on walls); **Ex. 934**, Thalacker Decl., p. 6 (ants); **Ex. 935**, Dale Decl., p. 3 (ants crawling on feet; little black bugs); **Ex. 938**, Gardener Decl., p. 4, 5 (ants crawling on feet); **Dkt. 286-21: Ex. 941**, Durr Decl., p. 4 (ants); **Ex. 944**, Maddox Decl., p. 5 (ants); **Ex. 945**, G. Murillo Decl., p. 5 (ants); **Ex. 946**, Chambers Decl., p. 5 (bugs); **Ex. 947**, Cherry Decl., p. 5 (ants on the floor and walls); **Ex. 949**, Foster Decl., p. 5 (ants and roaches); **Ex. 950**, R. Davis Decl., p. 5 (flies, spider); **Ex. 952**, Stephenson Decl., p. 5 (insects); **Dkt. 286-22: Ex. 955**, S. Williams Decl., p. 5 (insects); **Ex. 956**, Solis Decl., p. 5 ("a lot of ants"); **Ex. 958**, Demery Decl., p. 5 (ants); **Ex. 961**, Rivera Decl., p. 6 (ants); **Dkt. 286-23: Ex. 962**, Rhodes Decl., p. 6 (ants); **Ex. 963**, Dale Decl., p. 5 (ants and "little black bugs"); **Ex. 964**, Miller Decl., p. 6 (ants, spiders); **Ex. 965**, R. Carrillo Decl., p. 6 (bugs); **Dkt. 286-24: Ex. 968**, Garza Decl., p. 8 (bugs); **Ex. 972**, Mendoza Decl., p. 5 (little bugs); **Dkt. 286-25: Ex. 975**, L. Lewis Decl., p. 6 (ants); **Ex. 976**, Hernandez Decl., p. 6 (ants, flies); **Ex. 977**, Anderson Decl., p. 4 (spiders, cobwebs); **Dkt. 286-26: Ex. 978**, Connor Decl., p. 5 (insects, roaches); **Ex. 980**, McGlothlin Decl., p. 4 (ants and spiders); **Ex. 981**, Gomez Decl., p. 5 (insects on the wall and floor); **Dkt. 286-27: Ex. 982**, Pickett Decl, p. 4, 5 (ants); **Ex. 984**, Duhaney Decl., p. 5 (bugs); **Ex. 986**, Gebhardt Decl., p. 5 (flies); **Dkt. 286-28: Ex. 988**, Dunne Decl., p. 4 (ants); **Dkt. 286-29: Ex. 991**, Cleveland Decl., p. 5 (ants); **Ex. 992**, Strange Decl., p. 4, 5 (insects); **Dkt. 286-30: Ex. 995**, R. Gonzalez Decl., p. 5 (ants, gnats, roaches); **Ex. 996**, Wilson Decl., p. 5 (ants); **Dkt. 286-31: Ex. 997**, Abalos Decl., p. 5 (ants); **Ex. 999**, Farish Decl., p. 5 (insects).

| | |
|---|---|
| 169.   Deputies did not permit inmates to move away from the ants and sometimes reprimanded inmates who complained about the ants or tried to shake them out of their clothing while redressing after strip searches. | **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp.  35:22 – 37:13, 88:14 – 89:17 (witness informed deputies of ants; deputies told her to "turn around and face the wall" and would not permit her to move); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 40:19 – 41:18 (inmate complained about ants crawling where inmates were required to stand; deputies did not permit her to move).<br><br>**Dkt. 286-3: Ex. 827**, Hinojos Decl., p. 5 (ants crawling on feet but not allowed to move); **Dkt. 286-9: Ex. 867**, (Davis Decl.) p. 5 (deputies sent inmate to the end of the line for complaining about ants crawling all over her feet during the search); **Dkt. 286-12: Ex. 887**, Garcia Decl., p. 6, (inmates were not permitted to move away from ants crawling on their feet); **Dkt. 286-15: Ex. 897**, Cheever Decl., p. 6 (inmates not permitted to move away from ants); **Dkt. 286-21: Ex. 943**, Walton Decl., p. 5 (bugs, spiders, flies, roaches). |
| 170.   Inmates also observed worms and slugs during strip searches. | **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., p. 104:4 – 104:16 (worms, slugs).<br><br>**Dkt. 286-17: Ex. 909**, Batarina Decl., p. 6 (worms). |
| 171.   Inmates observed evidence of rodents, including rodent droppings and rodent traps. | **Dkt. 284-25 (Ex. 203)** (photo showing rodent trap); **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 92:24 – 94:12 (rat trap always in the bus bay); **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p.  213:10 – 213:14 (rodent traps); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp., 152:13 – 153:22, 154:3 – 154:9, 155:10-155:23, 178:13 – 179:2  (inmates have to stand near a rodent trap); **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶5 (rodent droppings).<br><br>**Dkt. 286-9: Ex. 863**, Harrison Decl., p. 5 (rodent droppings); **Ex. 866**, Holley Decl., p. 6 (rodent traps); **Dkt. 286-10: Ex. 874**, McKnight Decl., p. 5 (rodent traps, mice); **Dkt. 286-11: Ex. 875**, Jackson Decl., p. 5 (rat traps in the corner of the bus bay); **Dkt. 286-12: Ex. 882**, Leonard Decl., p. 6 ("mice traps"); **Ex. 884**, Finely Decl., pg. 4 (rodent droppings); **Dkt. 286-15: Ex. 898**, Watkins Decl., p. 6 (rodent droppings); **Ex. 909**, Batarina Decl., p. 6 (rodent traps); **Dkt. 286-20: Ex. 936**, |

| | |
|---|---|
| | R. Williams Decl., p. 5 (rodent traps); **Ex. 938**, Gardner Decl., p. 5 (rat traps in the corner) **Dkt. 286-23: Ex. 965**, R. Carrillo Decl., p. 6 (rodent trap); **Dkt. 286-28: Ex. 986**, Gebhardt Decl., p. 5 ("black" rodent houses); **Dkt. 286-30: Ex. 995**, R. Gonzalez Decl., p. 5 (rodent trap). |
| 172.   The bus bay floor is made of porous, gray cement. | **Dkt. 284-22 (Ex. 180)**, LASD Cmdr. Gutierrez Dep. Tr., p. 186:4 – 186:10; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 27:7 – 27:12 ([like] a "driveway," concrete); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 41:18 – 41:20 (concrete); **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 22:14 – 22:16; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., pp.  42:6 – 42:10 ("cold concrete floor").<br><br>***See* 3/12/14 Order, Dkt. 7:13.** |
| 173.   During strip searches, inmates observed oil spots on the ground of Bus Bay #3. | **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 40:5 – 40:10; 41:5 – 41:7, 127:5 – 127:7, 128:5 – 128:22 (oil spot); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., pp. 104:4 – 104:12 (oil stains); **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶10; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶11; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶9; **Dkt. 284-54 (Ex. 719)**, Van Gilder ¶12; **Dkt. 284-58 (Ex. 723)**, Gutierrez Decl., ¶6.<br><br>**Dkt. 286-1: Ex. 808**, Nunez Decl., p. 4 (oil stains); **Ex. 810**, Drisdle Decl., p. 6; **Ex. 814**, Caldera Decl., p. 5 (oil stains); **Dkt. 286-2: Ex. 816**, Cortez Decl., p. 6 (oil on the floor); **Ex. 819**, Maxie Decl., p. 6 (oil spots); **Dkt. 286-3: Ex. 826**, Camacho Decl., p. 5 (oil stains); **Ex. 828**, Qualls Decl., p. 5; Stevens Decl., p. 4; **Dkt. 286-7: Ex. 850**, Stevens Decl., p. 4 (oil on the ground); **Ex. 853**, Soma Decl., p. 7 (dirty oil); **Dkt. 286-9: Ex. 866**, Holley Decl., p. 6 (oil leaks from buses); **Ex. 868**, Murry Decl., p. 6 (oil stains); **Dkt. 286-10: Ex. 872**, Rayos Decl., p. 6 (oil on the floor); **Ex. 873**, Bui Decl., p. 5 (grease); **Dkt. 286-12: Ex. 884**, Finley Decl., p. 4 (oily ground); **Ex. 885**, Poe Decl., p. 5 (stained ground); **Ex. 894**, Mix Decl., p. 5 (grease stains on the cement; **Dkt. 286-22: Ex. 958**, Demery Decl., p. 5 (oil); **Ex. 960**, Worthy Decl., p. 6 (motor oil); **Dkt. 286-26: Ex. 978**, Connor |

| | |
|---|---|
| | Decl., p. 4 (floor was "oily"). |
| 174.   Before October 2013, inmates were required to place their shirts, pants and bras directly on the ground. | **Dkt. 284:** Dkt. 284-6 (**Ex. 161**), LASD Dep. Matson Dep. Tr., pp. 57:14 – 58:1; **Dkt. 284-7 (Ex. 162)**, LASD Sgt. Devane Dep. Tr., pp. 46:20 – 47:12; **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 39:18 – 40:16; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 135:14 – 135:18; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., p. 134:16 – 134:19;  **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 42:20 – 43:23; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., p. 45:19 – 46:12; **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 51:21 – 53:14 (ground is unsanitary; clothing gets mixed up);  **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp. 49:20 – 50:4; **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., p. 52:6 – 52:14; **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶12; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶8; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶12; **Dkt. 284-44 (Ex. 707)**, Dodd Decl. ¶9; **Dkt. 284-46 (Ex. 709)**, Ejedawe Decl. ¶7; **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶8– 9; **Dkt. 284-52 (Ex. 716)**, Madrid Decl. ¶10; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶8-9; **Dkt. 284-54 (Ex. 719)**, Van Gilder Decl. ¶6; **Dkt. 284-55 (Ex. 720)**, Vigil Decl. ¶¶10–11; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶11–12; **Dkt. 284-59 (Ex. 724)**, Robles Decl. ¶6. |
| 175.   Deputies also required inmates to remove sterile bandages covering injuries, wounds or infections and place them on the ground. | **Dkt. 284-14 (Ex. 170),** S. Martinez Dep. Tr., p. 31:11 – 35:24 (witness had severe MRSA infection on her arms, covered by medicated bandages; deputies required inmate to remove the bandages, exposing the open MRSA wounds, and place them on the ground; bandages remained off for the remainder of the search). |
| 176.   On July 20, 2013, CRDF adopted a policy requiring clothing to be placed on tables during searches. | **Dkt. 284-31 (Ex. 314)**, (6-01-050, Property & Clothing). |
| 177.   As LASD employees acknowledge, the space was not sealed off from vehicle fumes. | **Dkt. 284-32 (Ex. 418)**, p. 3 (11/18/2013 email from John Carillo to Marin and Johnston); **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 46:10 – 46:16 (Q: "was closing off [the bus bay] part of the [renovation] project…?"; A: "According to the email, yes."); **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶5 (smelled of vehicle |

| | |
|---|---|
| | emissions); **Dkt. 284-49 (Ex. 713)**, Lawton Decl. ¶5 (smelled of vehicle emissions); **Dkt. 284-50 (Ex. 714)**, Lashcheva Decl., ¶8 (smelled with vehicle emissions). |
| | **Dkt. 286-23:** **Ex. 962**, Rhodes Decl., p. 6 (exhaust fumes). |
| 178. As CRDF deputies acknowledge, the bus bay has an unpleasant smell during searches. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 70:13 – 71:5 (describing the smell of the bus bay as "not a pleasant smell. Smells of body odor); **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., p. 93:11 – 94:13 (the bus bay had a foul odor because of the number of inmates packed into the bus bay for searches, some of whom had not been able to shower). |
| 179. In August and September 2013, CRDF installed air fresheners in Bus Bay #3. | **Dkt. 284-32 (Ex. 423)**, pp. 1 – 2. |
| **S. BECAUSE BUS BAY #3 WAS NOT ENCLOSED, INMATES WERE EXPOSED TO THE ELEMENTS, INCLUDING WIND AND UNACCEPTABLY COLD TEMPERATURES** | |
| 180. One long side of Bus Bay #3 was comprised of chain-link fence (sometimes referred to as the "screen side"). | **Dkt. 284-4 (Ex. 155)**, LASD Dep. J. Johnston Dep. Tr., pp. 17. 17:21 – 18:4 (modifications to Bus Bay #3 included the installation of "siding" on the "screen side."). |
| 181. Before September 2009, the "screen side" was partially covered by a tarp. | **Dkt. 284-2 (Ex. 151)**, LASD Dep. Burba Dep. Tr., pp. 26:19 – 27:8, 31:4 – 31:6; **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 91:10 – 91:23, p. 85:23 – 86:18 (authenticating Dkt. 284-32 (Ex. 423)); **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 23:7 – 25:5, 25:13 – 27:1 (before white paneling was installed, there were tarps hung on the fence; despite the tarps, inmates could see buses parked in the adjacent bus stall); **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p. 179:4 – 179:25; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 137:10 – 138:15, 138:23 – 140:6 (during previous incarcerations, there was no tarp and no white paneling; a tarp was installed before the white paneling was installed; CRDF eventually installed the paneling and tarp); **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶6; **Dkt. 284-44 (Ex. 707)**, |

87

| | |
|---|---|
| | Dodd Decl. ¶7;  **Dkt. 284-52 (Ex. 716)**, Madrid Dec. ¶6.<br><br>**Dkt. 286-2: Ex. 816**, Cortez Decl., p. 6 (no tarp or white paneling covering the fence at the beginning of the witness's incarceration; tarps were later installed; white paneling was eventually installed (after tarps); **Dkt. 286-4: Ex. 830**, Busby Decl., p. 5, 6 (no white paneling, no tarps); **Ex. 837**, Lobrandon Decl., p. 5 (thin tarps around the side of the bus bay); **Dkt. 286-6: Ex. 846**, Rodriguez Decl., p. 5 (tarps on the side of the bus bay); **Ex. 848**, Ransome Decl., p. 6 ("only a fence"); **Dkt. 286-7: Ex. 849**, Hoy Decl., p. 5; **Ex. 851**, Finley Decl., p. 6 (no tarp or white paneling prior to September 2008); **Ex. 856**, Edwards Decl., p. 6 (no white paneling, only a blue tarp with holes); **Dkt. 286-8: Ex. 859**, Stanley Decl., p. 6 (witness does not remember tarp or paneling); **Ex. 862**, Lee Decl., p. 5 (before paneling was installed, tarps covered half of the fence; there were open areas; <u>people on buses parked in the adjacent stall could see in</u>); **Ex. 863**, Harrison Decl., p. 5 (tarps did not cover the entire fence; <u>inmates could see into the adjacent stall where buses parked</u>); **Dkt. 286-12: Ex. 883**, Thomas Decl., p. 6 (witness remembers no white paneling); **Ex. 884**, Finley Decl., p. 4 (no paneling; there was a tarp near the end of the witness's incarceration that covered only part of the chain link fence (the bottom)); **Ex. 885**, Poe Decl., p. 5 (no white paneling); **Ex. 886**, Robles Decl., p. 5 (there was a tarp, but it did not cover the entire fence); **Dkt. 286-15: Ex. 899**, Sims Decl., p. 6 (witness does not remember tarps or paneling); **Dkt. 286-16: Ex. 902**, Rodriguez Decl., p. 7 (before paneling was installed, there was a "torn" tarp); Ex. 905, Lara Decl., (no covering on the side of the bus bay; it was "all open"). |
| 182.   The tarp did not fully block the view from the adjacent bus bay; in fact, there were occasions when inmates were strip searched in view of vehicles parked in the | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp.  23:7 – 25:5, 25:13 – 27:1 (before white paneling was installed, there were tarps hung on the fence; despite the tarps, inmates could see buses parked in the adjacent bus stall).<br><br>**Dkt. 286-8: Ex. 862**, Lee Decl., p. 5 (before paneling was installed, tarps covered half of the fence; there were |

| | |
|---|---|
| adjacent bus bay. | open areas; people on buses parked in the adjacent stall could see in); **Dkt. 286-9: Ex. 863**, Harrison Decl., p. 5 (tarps did not cover the entire fence; inmates could see into the adjacent stall where buses parked); **Dkt. 286-10: Ex. 869**, Yates Decl., p. 6 (witness heard inmates on a bus in the adjacent stall shouting when the women took off their clothing); **Ex. 874**, McNight Decl., p. 5 (inmate could see buses pulling up in the adjacent depot and could only conclude that persons on the bus could see her naked body); **Dkt. 286-16: Ex. 904**, Pereda Decl., p. 6 (inmate could see another bus next to the bus stall where she was being searched); **Dkt. 286-18: Ex. 919**, Carter Decl., p. 5 (if a bus pulled up, people could see in); **Dkt. 286-19: Ex. 927**, Watson Decl., p. 5 (tarps partly covered the bus bay but men on buses could see inmates being searched). |
| 183.   In September 2009, CRDF partially covered the chain link fence, or "screen side," with wood siding. | **Dkt. 284-26 (Ex. 207)** (photo depicting wood siding on "screen side"); **Dkt. 284-2 (Ex. 151)**, LASD Dep. Burba Dep. Tr., pp. 26:19 – 27:8, 31:5 – 31:6; **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 91:10 – 91:23, p. 85:23 – 86:18 (authenticating Dkt. 284-32 (Ex. 423)); **Dkt. 284-4 (Ex. 155)**, LASD Dep. J. Johnston Dep. Tr., pp. 17:21 – 18:20, 24:18 – 25:13 (side paneling installed in the latter part of 2009; ceiling tarp subsequently installed, but near the same time); **Dkt. 284-32 (Ex. 423)** (Maximo Report of Bus Bay Work Orders), p. 1 ("install T1-11 on the wall"). *See also*, **Order, Dkt. 7/10-13.** |
| 184.   The top Bus Bay #3 was also comprised of chain link fence; it had no roof. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., p. 85:23 – 86:18 (authenticating Dkt. 284-32 (Ex. 423)); **Dkt. 284-4 (Ex. 155)**, LASD Dep. J. Johnston Dep. Tr., pp. 24:18 – 25:13 (LASD installed a tarp "to keep the rain out…Keep elements out so we can do the strip search."); **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p. 179:4 – 179:25; **Dkt. 284-32 (Ex. 423)** (Maximo Report of Bus Bay Work Orders). |
| 185.   Before November 2009, inmates could see directly to the sky. | **Dkt. 284-23 (Ex. 200)** (aerial photo of CRDF, depicting blue tarp covering Bus Bay No. 3 in Nov. 2009); **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 23:7 – 23:12, |

25:6 – 25:12; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 35:19 – 37:1 (witness recalled no tarp over the ceiling/roof; could look up and see the sky); **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp. 27:4-28:6 (there was not always a tarp on the ceiling of bus bay 3); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 34:11 – 35:8 (witness remembers no blue tarp on top of bus bay [witness incarcerated between July 2008 and December 2010]); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp.40:17 – 40:24 (witness could see the sky and birds).

**Dkt. 286-1: Ex. 810**, Drisdle Decl., p. 5 (no tarp on ceiling); **Ex. 813**, Gutierrez Decl. p. 5 (no tarp on ceiling); **Dkt. 286-2: Ex. 816**, Cortez Decl., p. 5 (ceiling tarp not always present; witness incarcerated September 2008 through July 2011); **Dkt. 286-3: Ex. 823**, Shaheed Decl., p. 5 (no ceiling tarp; witness brought to CRDF in June 2009); **Dkt. 286-4: Ex. 830**, Busby Decl., p. 5 (no ceiling tarp in 2007 - 2008); **Ex. 837**, Lobrandon Decl., p. 5 (no ceiling tarp in 2009); **Dkt. 286-5: Ex. 842**, Abbago Decl., p. 7 (no ceiling tarp 2007 - 2009); **Ex. 843**, Zadorian Decl., p. 5 (ceiling tarp missing all of the time; 2008 incarceration); **Dkt. 286-6: Ex. 844**, Schuster Decl., p. 5 (no ceiling tarp in 2007); **Ex. 846**, Rodriguez Decl., p. 5 (no ceiling tarp);  **Ex. 848**, Ransome Decl., p. 5 (no ceiling tarp in 2009); **Dkt. 286-7: Ex. 849**, Hoy Decl., p. 5 (no ceiling tarp in September 2009); **Ex. 851**, Finley Decl., p. 5 (no tarp in approximately September 2008); **Ex. 853**, Soma Decl., p. 5 (no tarp on the ceiling in 2006 through 2008); **Ex. 856**, Edwards Decl., p. 5 (no ceiling tarp in late-2007 through spring-2008); **Dkt. 286-8: Ex. 859**, Stanley Decl., p. 5 (no ceiling tarp in fall 2008); **Ex. 862**, Lee Decl., p. 5 (no ceiling tarp in 2008); **Dkt. 286-9: Ex. 863**, Harrison Decl., p. 5 (never tarps on the ceiling; incarcerated in March/April 2006); **Dkt. 286-12: Ex. 885**, Poe Decl., p. 5 (no ceiling tarp in 2008, early-2009); **Dkt. 286-15: Ex. 899**, Sims Decl., p. 5 (no ceiling tarp in April through December 2006); **Dkt. 286-21: Ex. 949**, Foster Decl., p. 5 (could see the sky; no tarp on top); **Ex. 952**, Stephenson Decl., p. 5 (could see the

| | |
|---|---|
| | sky); **Dkt. 286-22: Ex. 960**, Worthy Decl., p. 5 (no ceiling tarp in 2008 – 2009); **Dkt. 286-25: Ex. 973**, Jones Decl., p. 4 (no tarp; could "look right at the sky"). |
| 186.   On November 3, 2009, CRDF installed a blue tarp over the ceiling to help shield inmates from rain during searches; the tarp was secured with zip ties. | **Dkt. 284: Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 38:6 – 38:10; **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., p. 85:23 – 86:18 (authenticating Dkt. 284-32 (Ex. 423)); **Dkt. 284-4 (Ex. 155)**, LASD Dep. J. Johnston Dep. Tr., pp. 24:18 – 25:13 (LASD installed a tarp "to keep the rain out…Keep elements out so we can do the strip search."); **Dkt. 284-23 (Ex. 200)** (aerial photo of CRDF, depicting blue tarp covering Bus Bay No. 3 in Nov. 2009); **Dkt. 284-23 (Ex. 200)** (aerial photo of CRDF, depicting blue tarp covering Bus Bay No. 3 in Nov. 2009); **Dkt. 284-24 (Ex. 201)** (photo of Bus Bay No. 3); **Dkt. 284-32 (Ex. 423)** (Maximo Report of Bus Bay Work Orders), p. 1 ("Enclose bus bay and add a roof"). |
| 187.   Despite the tarp, mist and drizzle entered the bus bay during searches; rain water accumulated on puddles on the ground. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p. 29:7 – 30:15; 128:11 – 128:18 **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp.  31:6 – 31:20 (spray and mist came into the bus bay through holes in the fencing); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 74:7 – 74:23 (portions of the floor were wet from the rain); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp.  40:17 – 42:5 (puddles accumulated on the floor; deputies continued with the search; misting during search).<br><br>**Dkt. 286: Ex. 803**, Hawkins Decl., p. 3 (rain water on the ground); **Dkt. 286-2: Ex. 816**, Cortez Decl., p. 6 (dirty rain water on the ground); **Dkt. 286-3: Ex. 827**, Hinojos Decl., p. 5 (dirty water fell from tarp into witness's eyes); **Dkt. 286-4: Ex. 833**, Bunton Decl., p. 4 (rain water on the ground); **Dkt. 286-5: Ex. 840**, White Decl., p. 5 (wet spots on the ground); **Dkt. 286-6: Ex. 844**, Schuster Decl., p. 5 ("stream of liquid" on the ground); **Ex. 847**, McDonald Decl., p. 5, 7 (bus bay was sometimes damp from the weather); **Dkt. 286-7: Ex. 852**, Reese Decl., p. 5 (made to stand in dirty water); **Dkt. 286-12: Ex. 882**, Leonard Decl., p. 7 (floor wet from the rain); **Ex. 884**, Finley Decl., p. 4 (puddles of |

| | |
|---|---|
| | water on the floor); **Dkt. 286-14: Ex. 894**, Mix Decl., p. 4 (tarps hanging low due to rain); **Dkt. 286-16: Ex. 905**, Lara Decl., p. 5 (water on the floor); **Ex. 908**, Briseno Decl., p. 5, 6, 7 (water fell on the floor; puddles of water on the floor where witnesses were required to stand barefoot; water fell down on inmates during strip search); **Dkt. 286-31: Ex. 999**, Farish Decl., p. 4 (water dripping from tarps). |
| 188.   CRDF deputies acknowledge that rain water accumulated on top of the tarp. | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 40:16 – 40:18. |
| 189.   Between 2009 and 2014, the tarps had to be replaced numerous times due to damage caused by wind and sun exposure. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., p. 85:23 – 86:18 (authenticating Dkt. 284-32 (Ex. 423)), 89:24 – 90:3, 95:14 – 95:23, 96:2 – 96:23, 100:11 – 101:10; **Dkt. 284-32 (Ex. 423)** (Maximo Report of Bus Bay Work Orders). |
| 190.   In April 2013, CRDF resorted to placing 50 lb. bags of salt on top of the tarps to hold them down against the wind. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 132:19 – 134:16. |
| 191.   Witnesses have been searched when the tarps were partially unsecured, torn, damaged by holes or missing altogether presumably while CRDF was in the process of repairing damaged tarps. | **Dkt. 284-9 (Ex. 165)**, Thomas Depo. Tr., pp. 26:4 – 27:1 (gaps in the side tarp permitted witness to see into the adjacent bus bay; witness observed bus parked in adjacent bus bay, including silhouettes of persons riding on the bus); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 35:19  - 36:15, 126:7 – 126:15 (no ceiling tarp, tarp on the side of the bus bay was "tattered"  with holes); **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. 22:25 – 23:25 (side tarps were not completely fastened; tarps were flapping and tattered), 67:8 - 67:17 (searched while ceiling tarp was unsecured; inmates could see the sky), 98:11 – 98:20; **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp.  28:3 -29:5, 81:2 – 81:16 (not always a tarp on the ceiling; ceiling tarp may have had holes, rips or gaps because witness could see the sky); **Dkt. 284-12 (Ex. 168)**, Gutierrez Dep. Tr., pp. 34:11 – 36:17 (side tarps had gaps/holes and did not fully block view between Bus Bay No. 3 and the adjacent bay; witness observed police |

cruisers and buses parked in the adjacent bus bay); **Dkt. 284-13 (Ex. 169)**, Gutierrez Depo. Tr., pp. 34:11 – 36:17 (side tarps had gaps/holes and did not fully block view between Bus Bay No. 3 and the adjacent bay; witness observed police cruisers and buses parked in the adjacent bus bay); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., pp. 36:11 – 37:16 (side tarp was falling off the fence; side tarp was "falling apart"; witness could see through the fence to the adjacent bus bay; inmate could see bus that had just dropped her off at CRDF, parked in the adjacent bus bay); **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p. 180:4 – 180:10, 192:12 – 192:19 (sometimes side tarps were not tightly secured to the chain link fence); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp. 73:20 – 74:6, 79:3 – 79:12 (side tarp would blow in the wind because it was not fully secured to the fence; ceiling tarp missing entirely on one date); **Dkt. 284-19 (Ex. 175)**, Battiste Dep. Tr., pp. 73:3 – 73:19 (witness did not recall presence of any tarp above the white paneling); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 137:10 – 138:15, 139:11 – 140:6 (blue tarp and paneling were missing at times witness was strip searched); **Dkt. 284-59 (Ex. 724)**, Robles Decl. ¶9 (gaps in ceiling tarp; blue sky visible).

**<u>Dkt. 286:</u> Ex. 805,** Perez Decl., p. 5 (half of ceiling not covered by the tarp); **Ex. 806,** Serrano Decl., p. 5 (ceiling tarp missing on at least one day); **Ex. 807,** Talin Decl., p. 6 (ceiling tarp missing on at least some days); **<u>Dkt. 286-1:</u> Ex. 809,** Ship Decl., p. 5 (ceiling tarp missing "plenty of times"); **Ex. 810,** Drisdle Decl., p. 5, 6 (side tarps flapped in the wind; ceiling tarp missing); **Ex. 813,** Gutierrez Decl., p. 5 (ceiling tarp missing; side tarp had holes; witness could see incoming buses and parked cars in the adjacent bus bay); **Ex. 814,** Caldera Decl., p. 5 (ceiling tarp came off when it rained); **Ex. 815,** Phillips Decl., p. 5 (ceiling tarp flapping around or missing altogether); **<u>Dkt. 286-2:</u> Ex. 819,** Maxie Decl., p. 5 (rips, tears and holes in the tarp; side tarp sometimes ripped or tattered); **Ex. 821,** Madison Decl., p. 5 (no ceiling tarp); **Ex. 822,** Levi Decl., p. 5 (ceiling tarp

damaged; did not protect witness from elements); **Dkt. 286-3: Ex. 823**, Shaheed Decl., p. 5 (no covering on the ceiling); **Ex. 824**, Sullivant Decl., p. 5 (no tarp on the ceiling); **Ex. 825**, Wade Decl., p. 5 (ceiling tarp was missing in part of December 2010; tarp appeared to be of "cheap quality" and did not keep out wind); **Ex. 827**, Hinojos, p. 5 (ceiling tarp missing at least some dates); **Ex. 828**, Qualls Decl., p. 5 (nothing on ceiling except "gate"; tarps missing in 2010); **Ex. 829**, Lang Decl., p.3 ("open" areas in tarp); **Dkt. 286-4: Ex. 833**, Bunton Decl., p. 4 (ceiling tarp sometimes missing); **Ex. 834**, J. Murillo Decl., p. 5 (side tarp sometimes missing; sometimes holes in side tarp; no ceiling tarp in 2010); **Dkt. 286-5: Ex. 838**, Johnson Decl., p. 5 (ceiling tarp covered only half of the bus bay); **Ex. 839**, Kariger Decl., p. 5 (dirty side tarp had rips and holes; side tarp blew in witness's face); **Ex. 843**, Zadorian Decl., p. 5 (ceiling tarp missing); **Dkt. 286-6: Ex. 844**, Schuster Decl., p. 5 (holes in the side tarp; no ceiling tarp; witness could observe helicopters flying overhead); **Ex. 845**, Walker Decl., p. 5 (tarp sometimes missing, flapping around); **Ex. 847**, McDonald Decl., p. 5 (tarps torn; holes in tarps); **Dkt. 286-7: Ex. 851**, Finley Decl., p. 5 (no tarp around September 2008; tarp sometimes flapping around); **Ex. 852**, Reese Decl., p. 5 (ceiling tarp missing in 2008, holes in tarp); **Ex. 853**, Soma Decl., p. 5, 7 (side tarps were not securely fastened and would sometimes flap open in the wind); **Ex. 854**, James Decl., p. 6 (side tarp was "usually" ripped or torn); **Ex. 856**, Edwards Decl., p. 6 ("always" tears and holes in the side tarp); **Dkt. 286-8: Ex. 857**, Leon Decl., p. 5 (ceiling tarp covered only "half" of the roof; torn, flapping damaged); **Ex. 859**, Stanley Decl., p. 6 (side tarp missing at least once); **Ex. 861**, Charles Decl., p. 5 (rips and tears in the tarp); **Dkt. 286-9: Ex. 865**, Phillips Decl., p. 5, 6 (ceiling tarp was flapping and torn, very damaged; ceiling tarp missing at least once; side tarp damaged and torn; inmates could see through side tarp); **Ex. 866**, Holley Decl., p. 5, 6 (ceiling tarp was "weather damaged"; side tarp hanging down (not securely fastened)); **Ex. 867**,

Davis Decl., p. 6 (side tarp blowing and moving; depending on where they were standing, inmates could see directly through the tarped wall [into the adjacent bay]); **Dkt. 286-10: Ex. 869**, Yates Decl., p. 5, 6, 7 (side tarp not securely fastened and would blow open in the wind; tarp was damaged; [side] tarp did not block view from men "on the bus" [in adjacent bus bay]); **Ex. 870**, Chapman Decl., p. 5 (ceiling tarp sometimes missing; flapping around); **Ex. 871**, Kimble Decl., p. 5 (ceiling tarp flying loosely in the air); **Ex. 873**, Bui Decl., p. 4 (torn tarp); **Ex. 875**, Jackson Decl., p. 5 (side tarp damaged; inmates could see through the chain link fence); **Ex. 874**, McNight Decl., p. 5 (side tarp blowing off; witness could see buses pulling into the adjacent bus stall); **Dkt. 286-11: Ex. 876**, Martin Decl., p. 5 (tarp flapping); **Ex. 879**, Allen Decl., p. 5 (tarp flapping); **Dkt. 286-12: Ex. 881**, Solano Decl., p. 5, 6 (ceiling tarp damaged, flapping around and torn; inmates could see through the damaged side tarp); **Ex. 882**, Leonard Decl., p. 5, 6 (ceiling tarp sometimes missing; other times damaged, flapping around and torn; side tarp did not cover the entire space; side tarp filthy and flapping in the wind); **Ex. 883**, Thomas Decl., p. 5 (ceiling tarp was torn in some places); **Dkt. 286-13: Ex. 891**, Reynolds Decl., p. 5, 6 (ceiling tarp missing at least sometimes; damaged and flapping around; side tarp sometimes missing); **Ex. 892**, Irby Decl., p. 4 (ceiling tarp torn); **Dkt. 286-14: Ex. 895**, Ballesteros Decl., p. 6 (side tarp flapping in the wind); **Dkt. 286-15: Ex. 897**, Cheever Decl., p. 5 (tarp fell on inmates and deputy); **Ex. 898**, Watkins Decl., p. 5, 6 (holes in ceiling tarp; inmates could see through holes in the side tarp); **Dkt. 286-16: Ex. 900**, Gilbreath Decl., p. 5 (tarp halfway covering ceiling; hanging down half way); **Ex. 902**, Rodriguez Decl., p. 5, 7 (tarp sometimes missing; gaps in side tarp did not block view from adjacent bus bay; inmates could see buses pulling into the adjacent bay including male bus drivers); **Dkt. 286-17: Ex. 908**, Briseno Decl., p. 5, 6 (ceiling tarp falling down; very damaged; hole in the side tarp); **Ex. 912**, Riley Decl., p. 5 (tarp sometimes missing;

| | |
|---|---|
| | damaged); **Dkt. 286-18: Ex. 913**, Lewis Decl., p. 6 (tarp flapping and torn); **Ex. 914**, Groomes Decl., p. 6 (holes in side tarp permitted inmates to see through [to the adjacent bus stall]); **Ex. 915**, Howell Decl., p. 5 (damaged and flapping on several occasions); **Ex. 916**, Miller Decl., pg. 5 (tarp did not fully cover the ceiling); **Ex. 917** Gavaldon Decl., p. 5, 6 (ceiling tarp sometimes missing; side tarp or paneling sometimes missing); **Ex. 918**, Short Decl., p. 7 (ceiling tarp sometimes missing); **Dkt. 286-20: Ex. 920**, Delgado Decl., p. 5 (tarp did not cover the whole ceiling; damaged and flapping); **Ex. 921**, Jordan Decl., p. 5, 6 (holes in the tarps); **Ex. 923**, p. 3 (tarp loose, flapping and torn); **Dkt. 286-21: Ex. 941**, Durr Decl., p. 4 (plastic tarp ruined from bird nests); **Ex. 942**, Turner Decl., p. 4 (searched while tarp was flapping around, damaged and torn); **Ex. 944**, Maddox Decl., p. 5 (tarp missing); **Ex. 946**, Chambers Decl., p. 5 (searched while tarp was falling apart or missing; searched while ceiling tarp was missing); **Dkt. 286-22: Ex. 958**, Demery Decl., p. 5 (searched when ceiling tarp was missing); **Ex. 961**, Rivera Decl., p. 5 (searched when tarp was torn, damaged and/or flapping around); **Dkt. 286-23: Ex. 966**, Osborne Decl., p. 5 (tarp was torn and flapping over inmates); **Dkt. 286-24: Ex. 972**, Mendoza Decl., p. 4 (sometimes ripped); **Dkt. 286-25: Ex. 975**, L. Lewis Decl., p. 5 (tarp torn); **Dkt. 286-26: Ex. 979**, K. Gonzalez Decl., p. 4 (tarp flapping around); **Dkt. 286-27: Ex. 983**, Cramer Decl., p. 4 (damaged, flapping, torn); **Dkt. 286-28: Ex. 990**, Kelley Decl. p. 4 (tarp damaged with lots of holes; sometimes missing); **Dkt. 286-31: Ex. 999**, Farish Decl., p. 4 (flapping; sometimes missing). |
| 192.   Before January 2014, there were no heaters (or even heat lamps) in the bus bay. | **Dkt. 284-1 (Ex. 150)**, Sgt. Bullocks Dep. Tr., pp. 25:9 – 26:3 (CRDF considered installing heaters but opted against it for budgetary reasons); **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., p. 41:20 – 41:22; **Ex. 432** (Maximo Report re Bus Bay modifications; reflecting heater installation project). |
| 193.   The temperature in the bus bay felt similar to | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 28:25 – 29:6; **Dkt. 284-11 (Ex. 167)**, Reynolds Dep. Tr., pp. |

| | |
|---|---|
| the outdoor air temperature. | 67:19 – 67:21, 68:17 – 68:22; **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 37:21 – 38:14; Dkt. 284-15 (Ex. 171), Lopez Dep. Tr., p. 42:6 – 42:11 (air temperature similar to outside temperature). |
| 194.   Inmates could feel wind blowing through the bus bay. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., p., 91:7 – 91:21; **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 157:7 – 157:13. |
| 195.   LASD's 30(b)(6) witness described the bus bay as "very windy," particularly in the evening. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 95:14 – 95:23; 134:5 – 134:24. |
| 196.   Inmates searched in Bus Bay #3 described the temperature as often cold or very cold and windy. | **Dkt. 284-9 (Ex. 165)**, Thomas Dep. Tr., pp. 28:20 – 28:24; 126:9 – 126:21 (sometimes extremely cold); **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., pp. 44:16 – 44:18, 45:16 – 46:6, 156:8 – 156:24 (uncomfortably cold); **Dkt. 284-12 (Ex. 168)**, Douglas Dep. Tr., pp.  30:10 – 30:23 (shivering from the cold); **Dkt. 284-13 (Ex. 169)**, Gutierrez Dep. Tr., pp. 38:8 – 38:14 (goose bumps); **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp.  23:2 – 23:15 (very cold); **Dkt. 284-16 (Ex. 172)**, Paiz Dep. Tr., p. 185:7 – 185:25 (cold enough to develop goose bumps); **Dkt. 284-17 (Ex. 173)**, Vigil Dep. Tr., pp. 76:11 – 76:20 (shivering; felt less than 60 degrees); **Dkt. 284-18 (Ex. 174)**, Madrid Dep. Tr., pp. 59:21 – 60:13; 103:12 – 104:3 (searched outside at night with cold air on skin); **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., pp. 175:23 – 176:7 (the bus bay is freezing at night; inmates are usually shivering); **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., p. 42:6 -42:10, 74:23 – 75:21 (bus bay is freezing cold; "I have never felt so cold in my life); **Dkt. 284-38 (Ex. 700)**, Barranca Decl. ¶20; **Dkt. 284-39 (Ex. 701)**, Battiste Decl. ¶17; **Dkt. 284-42 (Ex. 704)**, Cholewiak Decl. ¶29; **Dkt. 284-45 (Ex. 708)**, Dowen Decl., ¶4 (freezing); **Dkt. 284-48 (Ex. 711)**, Johar Decl., ¶3 (freezing); **Dkt. 284-49 (Ex. 713)**, Lawton Decl.¶ 5; **Dkt. 284-53 (Ex. 717)**, Paiz Decl. ¶5; **Dkt. 284-55 (Ex. 720)**; Vigil Decl. ¶7; **Dkt. 284-57 (Ex. 722)**, Williams Decl. ¶6. |

**Dkt. 286:** **Ex. 800**, Ernestine Garcia Decl., p. 4 (always cold); **Ex. 802**, Edwards Decl., p. 5 (cold and windy in the winter); **Ex. 803**, Hawkins Decl., p. 3, 5; **Ex. 804**, Thatcher Decl., p. 7 (cold); **Ex. 805**, Perez Decl., p. 5 (sometimes cold); **Ex. 806**, Serrano Decl., p. 5 (sometimes cold); **Dkt. 286-1:** **Ex. 808**, Nunez Decl., p. 4 (very cold); **Ex. 812**, Johnson Decl., p. 5 (cold, very windy); **Ex. 813**, Gutierrez Decl., p. 7 (sometimes very cold); **Ex. 814**, Caldera Decl., p. 5 (cold, windy); **Ex. 815**, Phillips Decl., p. 7 (cold because witness always returned from court on the late bus and was typically searched between 8pm – 9pm); **Dkt. 286-2:** **Ex. 816**, Cortez Decl., p. 7 (cold); **Ex. 817**, Lewis Decl., p. 5 (cold); **Ex. 818**, Reed Decl., p. 5 (cold); **Ex. 819**, Maxie Decl., p. 7 (sometimes cold); **Ex. 820**, Armstrong Decl., p. 5 (sometimes really cold); **Ex. 821**, Madison Decl., p. 7 (very cold and windy during the winter); **Ex. 822**, Levi Decl., p. 5 (cold and windy; inmates shaking); **Dkt. 286-3:** **Ex. 823**, Shaheed Decl., p. 7 (cold during the winter); **Ex. 826**, Camacho Decl., p. 5 (sometimes very cold); **Ex. 807**, Talin Decl., p. 5, 6 (shivering; teeth chattering, "freezing" cold); **Ex. 825**, Wade Decl., p.5 (tarp did not keep out wind, chill or rain; it was always cold); **Ex. 827**, Hinojos Decl., p. 5 (cold); **Ex. 828**, Qualls Dec., p. 5 (typically cold); **Ex. 829**, Lang Decl., p. 6 (sometimes cold); **Dkt. 286-4:** **Ex. 830**, Busby Decl., p. 7 (cold); **Ex. 831**, Lowe Decl., p. 5 (cold); **Ex. 832**, Bohorquez Decl., p. 5 (felt cold; windy); **Ex. 834**, J. Murillo Decl., p. 5 (very cold); **Ex. 835**, Martinez Decl. p. 6 (very cold standing on the cement); **Ex. 836**, Bailey Decl., p. 5 (cold on one date); **Ex. 837**, Lobrandon Decl., p. 5 (sometimes ice cold and windy); **Dkt. 286-5:** **Ex. 838**, Johnson, Decl., p. 5 (cold); **Ex. 839**, Kariger Decl., p.5 (sometimes cold; inmate prayed that search would proceed quickly); **Ex. 842**, Abbago Decl., p. 7 (<u>very cold in the winter; staff disregarded inmate complaints</u>); **Ex. 843**, Zadorian Decl., p. 5 (cold and windy); **Dkt. 286-6:** **Ex. 844**, Schuster Decl., p. 5 (so cold in the winter that witness experienced shivering and chattering teeth); **Ex. 845**, Walker Decl., p. 7 (sometimes cold); **Ex. 846**,

Rodriguez Decl., p. 5 (freezing once); **Ex. 847**, McDonald Decl., p. 5, 7 (cold); **Dkt. 286-7: Ex. 849**, Hoy Decl., p. 5 (cold); **Ex. 850**, Stevens Decl., p. 4 (very cold); **Ex. 851**, Finley Decl., p. 7 (very cold); **Ex. 852**, Reese Decl., p. 5 (very cold, sometimes windy); **Ex. 853**, Soma Decl., p. 6 (cold); **Ex. 854**, James Decl., p. 7 (cold); **Ex. 855**, Tiffany Johnson Decl., p. 5 (cold and windy); **Ex. 856**, Edwards Decl., p. 7 (cold in the winter); **Dkt. 286-8: Ex. 857**, Leon Decl., p. 7 (usually cold depending on the time returning from court); **Ex. 859**, Stanley Decl., p. 7 (chilly and cold); **Ex. 860**, Hunter Decl., p. 5 (cold); **Ex. 862**, Lee Decl., p. 5 (windy); **Dkt. 286-9: Ex. 863**, Harrison Decl., p. 5 (cold, windy); **Ex. 864**, Shirk Decl., p. 7 (cold); **Ex. 865**, Tasia Phillips Decl., p. 7 (cold and windy); **Ex. 867**, Janis Davis, p. 7 (cold); **Dkt. 286-10: Ex. 870**, p. 7 (always cold); **Ex. 872**, Rayos Decl., p. 7 (the floor was very cold); **Ex. 873**, Bui Decl., p. 6 (cold); **Ex. 874**, McNight Decl., p. 5, 6 (freezing during the winter months); **Dkt. 286-11: Ex. 875**, Tatiana Jackson Decl., p. 6 (has been very cold; breezy); **Ex. 876**, Martin Decl., p. 7 (sometimes cold); **Ex. 880**, Scharf Decl., p. 7 (cold); **Dkt. 286-12: Ex. 882**, Leonard Decl., p. 7 (sometimes extremely cold); **Ex. 883**, Thomas Decl., p. 7 (cold); **Ex. 886**, Robles Decl., p. 5 (cold at night; okay during the day); **Dkt. 286-13: Ex. 887**, Rachel Garcia Decl., p. 7 (cold depending on season); **Ex. 888**, Berger Decl., p. 7 (some nights were cold); **Ex. 889**, Michelle Martinez Decl., p. 6 (sometimes cold); **Ex. 890**, Green Decl., p. 7 (sometimes freezing, windy); **Ex. 892**, Irby Decl., p. 6 (freezing cold); **Dkt. 286-14: Ex. 894**, Mix Decl., p. 6 (cold); **Ex. 896**, Michelle Davis Decl., p. 7 (most days cold); **Dkt. 286-15: Ex. 897**, Cheever Decl., p. 7 (sometimes freezing); **Dkt. 286-16: Ex. 900**, Gilbreath Decl., p. 7 (cold); **Ex. 903**, Glenda Smith Decl., p. 6 (sometimes very cold); **Ex. 904**, Manjarrez Pereda, p. 7 (cold); **Ex. 905**, Lara Decl., p. 5 (cold); **Dkt. 286-17: Ex. 907**, DiIorio Decl., p. 5, 6 (once it was bone chilling freezing); **Ex. 910**, Bradley Decl., p. 7 (always cold); **Ex. 912**, Riley Decl., p. 8 (sometimes cold); **Dkt. 286-18:**

| | |
|---|---|
| | **Ex. 913**, Lewis Decl., p. 7 (most nights were cold); **Ex. 914**, Groomes Decl., p. 7 (cold);  **Ex. 917,** Gavaldon Decl., p. 5, 8(very cold and windy); **Ex. 918**, Short Dec., p. 4 (so cold at night witness would shake); **Dkt. 286-19: Ex. 920**, Delgado Decl., p. 7 (so cold inmates were shaking); **Ex. 921**, Jordan Decl., p. 7 (most searches were very cold); **Ex. 923**, Reyes Decl., p.3, 6 (freezing cold); **Dkt. 286-21: Ex. 953**, Dubose Decl., p. 5 (felt freezing); **Ex. 954**, Snowden Decl., p. 5 (very cold); **Dkt. 286-22: Ex. 956**, Solis Decl., p. 5 (cold and windy, sometimes raining); Ex. 957, Barrett Decl., p. 5 (cold and windy); **Ex. 958**, Demery Decl., p. 5 (very cold each time); **Ex. 960**, Worthy Decl., p. 7 ("freezing cold"); **Ex. 961**, Rivera Decl., p. 7 (very cold); **Dkt. 286-23: Ex. 963**, Dale Decl., p. 5 (very cold and windy); **Dkt. 286-24: Ex. 969**, Malveaux Decl., p. 4 ("real cold"); **Ex. 972**, Mendoza Decl., p. 5 (real cold); **Dkt. 286-25: Ex. 974**, Hansford Decl., p. 5 (freezing); **Ex. 977**, Anderson Decl., p. 4 ("so cold," cold enough one would need a sweatshirt and jacket to be warm); **Dkt. 286-26: Ex. 978**, Connor Decl., p. 4 ("cold temperature"); **Ex. 979**, K. Gonzalez Decl., p. 5 (freezing); **Dkt. 286-27: Ex. 984**, Duhaney Decl., p. 4, 5 (cold, windy); **Dkt. 286-30: Ex. 996**, Wilson Decl., p. 5 (very cold, sometimes drizzle). |
| 197.   The cement floor felt cold during searches. | **Dkt. 284-14 (Ex. 170)**, S. Martinez Dep. Tr., pp. 22:25 – 23:1; **Dkt. 284-20 (Ex. 176)**, Barranca Dep. Tr., p. 196:16 – 196:17; **Dkt. 284-21 (Ex. 177)**, Cholewiak Dep. Tr., pp.  42:6 – 42:10 ("cold concrete floor"). <br><br> **Dkt. 286-4: Ex. 835**, Martinez Decl. p. 6 (very cold standing on the cement); **Dkt. 286-10: Ex. 872**, Rayos Decl., p. 7 (the floor was very cold); **Dkt. 286-21: Ex. 947**, Cherry Decl., p. 5 (inmates stood on "cold" concrete); **Dkt. 286-22: Ex. 961**, Rivera Decl., p. 7 (floor was cold). |
| 198.   CRDF initially had no rules prohibiting searches in the bus bay when it was cold outside; deputies used their | **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 33:17 – 34:22 (temperature rule was not in effect during LASD Dep. Luther's entire tenure at CRDF; deputies used their discretion in deciding whether to conduct searches outside). |

| | |
|---|---|
| discretion. | |
| 199. At some point, no later than October 2010, CRDF adopted an informal rule of moving searches indoors if the temperature was 68 degrees or lower. | **Dkt. 284-2 (Ex. 151)**, LASD Dep. Burba Dep. Tr., p. 49:2 – 49:17 (Rule 30(b)(6) witness testified to temperature rule in October 2010).<br><br>*See also,* **3/12/14 Order, Dkt. 72-4** ("Women who enter and exit CRDF are strip searched in Bus Bay 3, at least when the temperature in the area is above 68 degrees Fahrenheit."). |
| 200. The 68-degree rule was not memorialized in the form of a written policy or directive, as acknowledged by CRDF personnel, including LASD's 30(b)(6) witness, | **Dkt. 284-2 (Ex. 151)**, LASD Dep. Burba Dep. Tr., p. 49:2 – 49:17; **Dkt. 284-5 (Ex. 160)**, LASD Dep. Luther Dep. Tr., pp. 35:7 – 35:10 (Deputy does not recall receiving a written policy when the 68-degree rule was implemented). |
| 201. On July 20, 2013, CRDF issued a written policy requiring that searches be moved indoors if the temperature were less than 70 degrees. | **Dkt. 284-31 (Ex. 316)** (6-01-070, Climate Control (for Strip Searches)). |
| **T. EXPERT ANALYSIS SHOWS THAT MOST CRDF STRIP SEARCHES OCCURRED IN BUS BAY #3 AND IN COLD OR VERY COLD WEATHER, ESPECIALLY WHEN THE STATE OF UNDRESS INMATES EXPERIENCED IS FACTORED IN** | |
| 202. Gwelen Paliaga is a registered mechanical engineer with over 14 years of experience in building science and engineering. Mr. Paliaga received an MS in Building Science from UC Berkeley and a BS in Physics from UC Santa Cruz. He is a specialist in low energy design, human factors, and focuses on design | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 3. |

| | |
|---|---|
| solutions that optimize energy performance and consider the needs of building occupants. | |
| 203.   Since 2005, Gwelen Paliaga has been a voting member of ASHRAE Standard 55 (Standard pertaining to Thermal Comfort) and was committee chair from 2010-2015. He was a voting member of ASHRAE TC 2.1 (Physiology and Human Environment) from 2005-2010 and currently serves on the IEQ (Indoor Environmental Quality) Committee of ASHRAE Standard 189.1 (High Performance Green Buildings) and is founding chair of ASHRAE Standard 216 (Thermal Comfort Performance of Ceiling Fans). | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 3. |
| 204.   Human thermal comfort is a psycho-physical process influenced by the heat balance of the human body, and our perception and subjective evaluation of that balance.  Human thermal comfort science combines physiology, environmental psychology, and heat | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 5. |

| | |
|---|---|
| transfer physics. | |
| 205.   ASHREA 55 is the thermal comfort standard adopted by the American Society of Heating, Refrigerating and Air-Conditioning Engineers (ASHREA). The stated purpose of ASHRAE 55 is "The purpose of this standard is to specify the combinations of indoor thermal environmental factors and personal factors that will produce thermal environmental conditions acceptable to a majority of the occupants within the space." | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 5. |
| 206.   ASHREA Standard 55 incorporates well-established models for predicting human comfort.  The acceptable temperature range depends on five factors, **including the amount of clothing worn** by occupants. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 5. |
| 207.   ASHRAE 55 and ISO 7730 are widely referenced and universally accepted as the standard of care for designing and operating comfortable thermal environments in commercial buildings, residential buildings, and vehicles. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 5. |

| | |
|---|---|
| 208.   LASD acknowledges that ASHRAE 55 is the standard of care for the heating and cooling of occupied spaces. Despite this recognition, LASD <u>did not</u> consider the absence of clothing in assessing the appropriate temperature for a room where strip searches are conducted. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr., pp. 111:11 – 112:20 (LASD's Rule 30(b)(6) witness regarding renovations to Bus Bay #3 testified that ASHRAE provides "industry standards" for heating and air-conditioning of occupied spaces; though LASD recognized that ASHREA 55 provided the standard, they did not consider the absence of clothing in determining the appropriate temperature for a space where strip searches are conducted). |
| 209.   The American Society of Civil Engineers endorses the use of ASHREA 55's PMV model in outdoor as well as indoor environments. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 6. |
| 210.   The use of ASHREA 55 models will under-predict discomfort for the first 10-15 minutes after an individual disrobes because short-term occupant discomfort (up to 15 minutes) is much higher than steady state discomfort when a step change to cold conditions occurs. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 27. |
| 211.   In the opinion of Gwelen Paliaga, strip searches in bus bay three were conducted in weather that the majority of searched individuals would have experienced | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 27. |

| | |
|---|---|
| as unacceptable and extremely cold. | |
| 212.   Conditions experienced were predominantly well outside ASHREA Standard 55 and ISO 7730 acceptable comfort ranges, and well beyond any range a responsible engineer would use as the basis of a design for an occupied space. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 27. |
| 213.   Evaluating thermal comfort levels using ASHREA 55 methods, and using conservative assumptions for both metabolic rate (1.5) and air speed (still air), 88% of the search events are colder than the ASHRAE 55 acceptable comfort zone. Using conservative assumptions, the minimum acceptable temperature was approximately 77°. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 18, 19, 28. |
| 214.   Using highly conservative assumptions, 50,173 search events, or 43% of the total events are outside of the ASHRAE 55 range (less than PMV of -3) on the cold side and result in 100% of occupants being dissatisfied. *Over 45,000 searches* (out of approximately 116,000) | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 19, 28. |

| | |
|---|---|
| *where the actual temperature(based on a three hour moving average) was 65° or less.* | |
| 215.   Conditions colder than PMV of -3 would feel colder than 35° feels to a typically clothed person (i.e. one wearing footwear and normal clothing including a jacket or sweater), due to the body's heat loss. (This heat loss explains the differences in the experience of cold compared to actual temperature discussed throughout the Paliaga report and the facts referenced from it in these Additional Material Facts). | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 28. |
| 216.   These results show a significant level of cold discomfort that any typical person would find unacceptable; these results are consistent with inmate testimony indicating significant cold discomfort. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 28. |
| 217.   Using highly conservative assumptions, another 25,807 events, 22% of the total events, result in greater than 87% of occupants being dissatisfied, and would have "felt like" 35-45°F | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 28. |

| | |
|---|---|
| feels to a typically clothed person (i.e. one wearing footwear and normal clothing including a jacket or sweater). Another 10,144 events, 9% of the total events, result in greater than 60% of occupants being dissatisfied, and would have "felt like" 45-50˚F feels to a typically clothed person (i.e., one wearing footwear and normal clothing including a jacket or sweater). These three categories total 86,124 events, or 75% of the total, and show very significant cold discomfort. | |
| 218.   Using highly conservative assumptions, 16,659 events, 14% of the total events, result in greater than 20% of occupants being dissatisfied, still colder than the ASHRAE 55 acceptable comfort zone. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 28. |
| 219.   The above-listed results are very conservative and under-predict the discomfort that most likely occurred. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 28. |
| 220.   Local discomfort was likely significantly higher than ASHRAE 55 predicts because inmates' bare feet were in contact | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 28. |

| | |
|---|---|
| with a concrete floor and because the floor was likely colder than 66.2°F when the outdoor temperature dropped below 66.2°F. | |
| 221.   Using a metabolic rate of 1.5 is very conservative and likely under-predicts cold discomfort. A rate of 1.5 assumes that inmates spent 1/3 of the time walking about, 1/3 standing/filing (standing with movement), and 1/3 standing relaxed. Because inmates were seated on buses or holding cells prior to the search (lowering their metabolic rate), and because they spent virtually no time walking during the search, a metabolic rate of 1.5 overstates their metabolic activity. A more realistic assumption is a metabolic rate of 1.35, which assumes that that inmates spent 2/3 of the search time at a rate of 1.4 (standing/filing) and 1/3 of the search time at a rate of 1.2 (standing, relaxed). | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, pp. 27 -28. |
| 222.   Assuming "still air" (20 ft/min) is extremely conservative and under-predicts cold | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 28. |

| | |
|---|---|
| discomfort. Because of the partially open wall and roof of Bus Bay 3, air speeds likely exceeded 20 ft/min when wind was blowing.  Given structural features of the bus bay, and witness testimony indicating that the space was often windy, a more realistic, though still conservative assumption is that the airspeed in the bus bay was 10% of the outdoor wind speed (i.e. outdoor speed was reduced by 90%). | |
| 223.   Evaluating thermal comfort levels using more realistic, "best estimate," assumptions for air speed and metabolic rate, 94% of the search events are colder than the ASHRAE 55 acceptable comfort zone.  Using realistic assumptions, the minimum acceptable temperature was 81°. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 23, 29. |
| 224.   Using realistic or "best estimate" assumptions, 70,592 search events, or 61% of the total events are outside the ASHRAE 55 range (less than PMV of -3) on the cold side and result in 100% of occupants being dissatisfied. Conditions | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 29. |

| | |
|---|---|
| colder than PMV of -3 would feel colder than 35˚F feels to a typically clothed person (i.e., one wearing footwear and normal clothing including a jacket or sweater). | |
| 225.   Using realistic or "best estimate" assumptions, another 19,206 events, 16% of the total events, result in greater than 87% of occupants being dissatisfied, and "felt like" 35-45˚F to a typically clothed person (i.e., one wearing footwear and normal clothing including a jacket or sweater). Another 7,846 events, 7% of the total events, result in greater than 60% of occupants being dissatisfied, and would have "felt like" 45-50˚F feels to a typically clothed person (i.e., one wearing footwear and normal clothing including a jacket or sweater). These three categories total 97,644 events, or 84% of the total, and show very significant frequently occurring cold discomfort. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 29. |
| 226.   Using realistic or "best estimate" | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 29. |

| | |
|---|---|
| assumptions, another 4,606 events, 14% of the total events, result in greater than 20% of occupants being dissatisfied, still colder than the ASHRAE 55 acceptable comfort zone. | |
| 227.   The above-listed results (realistic or "best estimate" assumptions) are Gwelen Paliaga's best estimate of the experience of the inmates during strip searches. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 29. |
| 228.   Weather data reveals that more than 50% of inmates were searched outdoors when the temperature (using a 3h moving avg) was 68 degrees or less. | **Dkt. 284-33 (Ex. 602)**, Declaration of Gwelen Paliaga, p. 19, 24. |
| 229.   Although EUDAL data is not available for the period before 2/2011, and were not part of the foundational analysis of thermal comfort expert, they can be used to make a statistically reliable estimate, within a statistical and formulaic margin of error, of the numbers of people who were strip searched in cold conditions from March 2008 – February 2011. This would be done by transferring the Paliaga analysis to the | **Dkt. 284-34 (Ex. 603)**, Declaration of Dr. Brian Kriegler, p. 9, ¶16. |

| | |
|---|---|
| prior period, overlaying available weather data on it, and adjusting for differences in the number of inmates. This analysis has not yet been performed. | |
| **U. IN FEBRUARY 2014, LASD INSTALLED HEATERS AND ENCLOSED BUS BAY #3 BY INSTALLING A STEEL ROOF, DEMONSTRATING THAT IT WAS ALWAYS FEASIBLE TO PROVIDE AN ENCLOSED, CLIMATE CONTROLLED STRUCTURE** | |
| 230.   LASD first considered installing a roof in approximately 2009 - 2010. | **Dkt. 284-1 (Ex. 150),** Sgt. Bullocks Dep. Tr., pp. 35:12 – 36:6 (first discussed installing a roof "last year"; deposition taken in October 2010); **Dkt. 284-4 (Ex. 155)**, Johnston Dep. Tr., pp. 33:3 – 36:4 (considered installing a roof in 2010). |
| 231.   No roof was installed at that time due to purported "budgetary" issues. | **Dkt. 284-1 (Ex. 150)**, Sgt. Bullocks Dep. Tr., pp. 38:15 – 39:6. |
| 232.   CRDF first considered installing heaters in approximately 2008. | **Dkt. 284-4 (Ex. 155)**, LASD Dep. J. Johnston Dep. Tr., p. 31:1 – 31:22. |
| 233.   CRDF reconsidered installing heaters in approximately June or July of 2010. | **Dkt. 284-4 (Ex. 155)**, LASD Dep. J. Johnston Dep. Tr., p. 33:3 – 34:2. |
| 234.   CRDF did not install heaters at that time due to purported budgetary considerations. | **Dkt. 284-1 (Ex. 150)**, Sgt. Bullocks Dep. Tr., pp. 25:9 – 26:13. |
| 235.   In February 2014, LASD partially enclosed Bus Bay #3 by installing a roof and metal siding above the white, wood siding. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo Dep. Tr.**, p**, LASD Dir. J. Carrillo Dep. Tr., p. 139:10 – 139:12; **Dkt. 284-32 (Ex. 423)**, p. 1 (Maximo Rpt.); **Dkt. 284-28 (Ex. 211),** p. 7-8 (photos depicting renovations and heaters). |
| 236.   On February 2014, | **Dkt. 284-32 (Ex. 423)**, p. 1. |

| | |
|---|---|
| LASD installed heaters in Bus Bay #3. | |
| 237.   The total cost (materials and labor) of installing heaters and enclosing Bus Bay #3 was $43,042.44. | **Dkt. 284-32 (Ex. 423)**, p. 1 (lines 2726719, 2726746, 2784179). |
| 238.   The installation of the roof was "definitely" a "straightforward project,"  and there was "nothing complicated about it." | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo (Director of LASD's Facilities Services Bureau) Dep. Tr., p. 140:24 – 141:3. |
| 239.   Installation of the heaters was not only not complicated, but, in fact, **it was "easy."** | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo (Director of LASD's Facilities Services Bureau) Dep. Tr., p. 136:15 – 136:24; 138:5 – 138:8. |
| 240.   No structural or architectural factors prevented the installation of heaters prior to the 2014 renovations. | **Dkt. 284-3 (Ex. 154)**, LASD Dir. J. Carrillo (Director of LASD's Facilities Services Bureau) Dep. Tr., p. 136:15 – 136:24; 138:10 – 138:20. |
| 241.   In the opinion of correctional expert, Wendy Still, there is no conceivable penological justification for enclosing the bus bay and providing heaters prior to February 2014. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 26, ¶78. |
| 242.   Leaving aside all other conditions, searching inmates outdoors – where there is exposure to the elements, bird droppings, and insects, and where inmates were required to place their clothing on the | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 40, ¶109. |

113

| | |
|---|---|
| ground – is an extreme departure from any accepted norms for routine strip searches. | |
| **V. STRIP SEARCHES PRESENT UNIQUE PRIVACY CONCERNS FOR WOMEN, WHO ARE PARTICULARLY VULNERABLE TO SHAME AND HUMILIATION FROM EXPOSURE OF THEIR PRIVATE PARTS, INCLUDING BREASTS AND GENITALS** | |
| 243.   Terry Kupers is a psychiatrist and a qualified expert in the psychological issues surrounding incarceration, criminal punishment and inmates. particularly regarding women inmates | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, pp. 1 -2. |
| 244.   Caprice Haverty is a licensed psychologist with more than 25 years of clinical and forensic experience in the areas of sexual abuse and sexual trauma. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 1. |
| 245.   It is a long-accepted premise in Western and American culture that individual human beings have a basic need to be able to control the boundary between the public and private parts of their lives. Having control of the boundary is a basic component of self-dignity and mental health. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 18 - 23. |
| 246.   Violations of the | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, |

114

| | |
|---|---|
| boundary between public and private aspects of one's life (i.e. forced exposure of private aspects of one's life) are often referred to in the professional literature as "boundary violations." | p. 23 - 26. |
| 247. Because it is an accepted and deeply held tenet of Western and American culture that one's "private parts," particularly one's genitals, are private, public exposure of such private parts is a boundary violation that may undermine self-dignity and mental health. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 21. |
| 248. Virtually every person in contemporary American society would experience shame and humiliation as a result of exposure of their private parts, particularly genitals. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 21. |
| 249. Generally speaking, the socially accepted forms of exposure of one's genitalia are consensual sex and medical visits. In the context of medical visits where genitalia are exposed, great lengths are taken to protect privacy to the maximum extent possible, to limit the | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 25 – 26. |

115

| | |
|---|---|
| physical exposure through the use of covering items, and to act professionally and sensitively towards the patient. | |
| 250.   Individuals who are already stigmatized because of obesity, physical deformities, or because they think of their bodies as ugly typically cover their bodies to avoid feeling shame from public exposure. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, pp. 25 – 26. |
| 251.   Women are particularly vulnerable to shame and humiliation from exposure of their private parts, including breasts and genitals. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, pp. 25 – 26. |
| 252.   As explained by psychologist Tomi-Ann Roberts, strip and body cavity searches "present unique privacy concerns for women that arise from gender socialization, socio-cultural representations of women's bodies and socio-cultural attitudes towards menstruation – concerns generally absent for men being subjected to strip and body cavity searches. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 16, 17. |
| 253.   Literature on the subject of women's body | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 7 -13. |

| | |
|---|---|
| image confirms that women commonly feel intense shame and self-consciousness when their bodies are exposed, singled out or examined. | |
| 254.   The shame and self-consciousness women experience derives from the way in which women, unlike men are socialized to feel about their bodies. Women, more so than men, are socialized to value their physical appearance as the single most important element of their self-worth. From a very young age, girls are socialized to believe that their desirability and life opportunities depend on how closely they prescribe culturally prescribed standards of feminine beauty as presented through mass media. These idealized standards feminine beauty are unattainable for most women, resulting in a tendency towards women's negative self-evaluation of their bodies. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 5-7. |
| 255.   Body dissatisfaction is felt generally and chronically by almost all American | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 5-7. |

117

| | |
|---|---|
| women. Eighty-percent of American women, are dissatisfied with how their body looks. Research confirms that body dissatisfaction is equally prevalent among women among of different racial and socio-economic backgrounds. | |
| 256. Literature confirms that American women commonly experience "body shame" when their bodies are exposed, singled out or examined. Whereas body dissatisfaction is chronic, body shame is acute. Body shame involves extremely negative emotion and self-evaluation and is commonly accompanied by an intense desire to hide (or hide one's body). Body shame relates to one's very core sense of self, leading shamed individuals to feel worthless. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 7 - 9. |
| 257. Research confirms that American women experience body shame and other negative emotions when required to expose their bodies, even where they are not required to expose their bodies to other persons. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 7 - 9. |

| | |
|---|---|
| In an experiment that measured emotional reactions to wearing different pieces of clothing in a dressing room, women reported feeling ashamed, disgraced, anxious and disgusting while wearing a swimsuit as compared with a sweater. There can be no doubt that their reactions would have been at as negative, and likely far more negative, if asked to expose their bodies to other persons or in a group setting. | |
| 258.   Women are uniquely, negatively impacted by body exposure. In the same study, being in a swimsuit caused men to feel self-consciousness and foolishness, but it did not impact their feelings beyond this. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 7 - 9. |
| 259.   Research investigating women's experiences in locker rooms confirms that nearly all women experience body shame in contexts where they expose their bodies to others, even when this exposure is only among other women. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 8 - 9. |
| 260.   Women go to great | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, |

| | |
|---|---|
| lengths to cover up their bodies, even in locker rooms, changing in a closed toilet stall or while under a towel. | pp. 8 - 9. |
| 261.   Class members in this case report that they avoid exposing their bodies to other female inmates when changing clothing, showering and using the toilet. | **Dkt. 284-10 (Ex. 166)**, Maxie Dep. Tr., p. 57:18 – 57:24 (inmates reports that she did not use the restroom in courthouse holding cells due to the lack of privacy; she waited until returning to her cell where she would be more comfortable); **Dkt. 284-15 (Ex. 171)**, Lopez Dep. Tr., p. 123 (although witness and cellmate change clothing in the same room, they turn around while the other person is changing to give each other privacy). |
| 262.   While American women experience negative emotions in exposure of even non-intimate body parts, they experience even greater shame and anxiety when required to expose intimate body parts such as their breasts, vulvas and vaginas. This has to do not only with socio-cultural expectations of privacy, but also with socio-cultural representations of women's inmate body parts and the specific ways in which women, in particular are socialized to feel about their intimate body parts. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 9 - 13. |
| 263.   Literature on the subject confirms that it is a cultural mandate for American women to cover their breasts. In | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 9-10. |

| | |
|---|---|
| addition, as with media representations of feminine beauty in general, mass media barrages women with images of sexualized, idealized breasts, causing many women to feel self-consciousness in connection with their own breasts. Due to the cultural norms of concealment, coupled with cultural attitudes conveyed through mass media, few American women would not experience shame and anxiety in a situation requiring exposure of their breasts. | |
| 264.   Literature on the subject also confirms that it is a cultural mandate that women conceal their genitals. Even the word vagina is not deemed appropriate for public discourse. In addition, socio-cultural representations of the vagina often characterize it as a part of the female body that is shameful, unclean and disgusting. Women are socialized to believe that their genitals are disgusting, shameful and undesirable. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 10 – 13. |
| 265.   Because of cultural | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, |

| | |
|---|---|
| attitudes towards female genitalia, many women never touch their vaginas or vulvas. | p. 11. |
| 266.   Women almost universally avoid exposing their intimate parts to unfamiliar persons, including other women, even in situations such as locker rooms, spas or restrooms. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 11 - 12. |
| 267.   Even women incarcerated in prisons or jails go to great lengths to protect their privacy within the confines of the specific correctional system, and tend to cover their intimate body parts as much as possible, even in a jail or prison setting. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 45, ¶121. |
| 268.   Research on women's exposure of their bodies in voluntary settings – i.e. in a medical office – demonstrates that American women are uncomfortable exposing their genitals to unfamiliar people. Gynecologists go to great lengths to ensure privacy and to minimize shame. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 12. |
| 269.   Given the shame and self-consciousness that occurs during voluntary exposure in a clinical or medical setting, most women | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 12. |

122

| | |
|---|---|
| would likely experience significantly more negative emotions in the context of an involuntary exposure. | |
| 270.   In contrast to women, most men – although they may feel embarrassment – are unlikely to experience genital exposure as shameful or to experience negative emotion after such exposure. This is in part due to the fact that male genitalia are not represented as unclean or secret. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 13. |
| 271.   In the opinion of social psychologist Tomi-Ann Roberts, the vast majority of women being subjected to strip searches/body cavity searches in the context of large groups would have experienced severe anxiety, shame and even self-disgust, and this holds true across racial and socio-economic lines. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 17. |
| 272.   In the opinion of social psychologist Tomi-Ann Roberts, the class members' strip/body cavity search experience is likely one of the most traumatizing of these women's lives, as there is no parallel in any | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 17. |

123

| | |
|---|---|
| socialized settings to the types of conditions of forced bodily exposure involved in this case. | |
| 273.   The fact that female deputies conducted the searches would not have meaningfully mitigated the body shame and negative feelings that most women would have felt from forced body exposure in a group. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 17. |
| 274.   In the opinion of social psychologist Tomi-Ann Roberts, class members have been, like all Americans, exposed to the media message that their bodies are not acceptable the way they are. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 17. |
| 275.   In the opinion of social psychologist Tomi-Ann Roberts, even though everyone in the strip search area was a woman, most if not all class members would experience shame and self-consciousness. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 17. |
| 276.   In the opinion of social psychologist Tomi-Ann Roberts, class members' humiliation would be further intensified by the large group format of the search, involving | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 17 -18. |

| | |
|---|---|
| anywhere from 20 – 50 inmates, the total impersonality (or worse) of the treatment and the forced public exposure. | |
| 277.   In the opinion of social psychologist Tomi-Ann Roberts, given the self-consciousness women commonly feel about the appearance of their bodies, and particularly their breasts, the experience of having to expose their breasts, would have been shaming and mortifying. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 18. |
| 278.   In the opinion of social psychologist Tomi-Ann Roberts, class members' group exposure of their lower abdomen and pubic regions was likely an experience they had never had before, and would have been a humiliating, mortifying and even traumatizing experience for them. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 19. |
| 279.   In the opinion of social psychologist Tomi-Ann Roberts, the negative emotions resulting from the group strip searches was exacerbated by the requirement to lift one's breasts and rolls of fat in the view of the group. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 19 -20. |
| 280.   The mortification and/or trauma was | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 19 -20. |

125

| | |
|---|---|
| exacerbated by the way in which the search focuses attention on the areas that make women feel particularly self-conscious and ashamed (i.e. deputies specifically instructed inmates to lift their breasts and rolls of fat, requiring them to publicly identify if they had large stomachs before deputies scrutinized their bodies, one-by-one, in the presence of a large group). Having to self-identify as "fat" would surely be shattering given social and cultural expectations for feminine beauty. | |
| 281.   In the opinion of social psychologist Tomi-Ann Roberts, the visual body cavity search process – requiring class members to drop their underwear, bend over at the waist, reach behind their bodies and spread the lips of their labia and buttocks to expose their vagina and anal aperture so that their body cavities could be inspected, one-by-one, by deputies using flashlights while looking between their legs – would have been intensely humiliating and | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 20 - 21. |

| | |
|---|---|
| shame inducing. | |
| 282.   In the opinion of social psychologist Tomi-Ann Roberts, the humiliation and shame of the visual body cavity search process  was greater for women menstruating, given that they had to publicly **identify themselves,** remove their menstrual products, wait without no feminine hygiene products until the search process was complete before replacing them. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 21 -22. |
| 283.   In the opinion of social psychologist Tomi-Ann Roberts, the negative emotions associated with the strip search experience likely would have profoundly disturbed the cognitive capacity of most inmates. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 21. |
| 284.   In the opinion of social psychologist Tomi-Ann Roberts, the class members' common reports that the strip searches felt degrading, dehumanizing, violative, and traumatizing echo and are consistent with the social and psychological literature and render those class member reports reliable and of the type of | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 25 - 26. |

| | |
|---|---|
| information on which social psychologists rely. | |
| 285.   In the opinion of social psychologist Tomi-Ann Roberts, the LASD women's strip search practices at issue would have been among the most degrading, demeaning and humiliating experience that most women – regardless of race or socio-economic status – ever experienced. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, p. 26. |
| 286.   In the opinion of social psychologist Tomi-Ann Roberts, only rape comes to mind as a more extreme violation of women's bodies than the LASD women's strip search practices at issue. It is not surprising that at least several witnesses explicitly compared the violation experienced during strip searches to the violation of rape. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 26 - 27. |

| | |
|---|---|
| 287.   In the opinion of social psychologist Tomi-Ann Roberts, the LASD strip search practices at issue are by far the most extreme and humiliating institutionalized practice inducing shame and humiliation in women, and violating their bodily integrity, that she has ever encountered or heard of. | **Dkt. 284-35 (Ex. 604)**, Decl. of Dr. Tomi-Ann Roberts, pp. 27. |
| 288.   In the opinion of Drs. Kupers and Haverty, CRDF conducted searches in a manner that resulted in unnecessary and excessively severe boundary violations. Women were forced to sacrifice their privacy in the most extreme terms. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 40 - 41. |
| 289.   In the opinion of Drs. Kupers and Haverty, all female inmates would likely have experienced extreme shame and humiliation while being ordered to undress in front of others, lift their breasts, bend over, and spread their labia. Many of these women have never exposed their genitalia in public and have not even been nude in public.  Such feelings of shame on account of | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 41. |

129

| the strip searches and the way they are conducted are widely reflected in the questionnaires, depositions and declarations of the women inmates. | |
|---|---|
| 290.   In the opinion of Drs. Kupers and Haverty, strip searches under these circumstances would have been extremely psychologically damaging to all inmates, regardless of personal history, because privacy, integrity of personal boundaries and protection from shaming are crucial prerequisites to sound mental health for anyone. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 41. |
| 291.   The fact that women are conducting the strip searches does not negate the shame and humiliation, nor does it eliminate the significant psychological damage resulting in an extreme boundary violation. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 41. |
| 292.   This severe boundary violation compounds the pain and suffering as well as the psychological harm the population likely already experienced before they ever came to jail. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 41. |
| 293.   The predictable result of the strip searches | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 44 - 45. |

| | |
|---|---|
| is a great amount of pain and suffering on the part of the women and, too often, emotional turmoil and lasting disability. | |
| 294.   The result of searches include immense pain and suffering as well as psychological damage reflected in a myriad of reported symptoms: crying, fear, nightmares, embarrassment, headaches, depression, anxiety, etc. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 45. |
| 295.   In the opinion of Drs. Haverty and Kupers, searches conducted in Bus Bay #3 were often crowded, unhygienic, and exposed to the elements, which adds to the negative emotional effect of the searches. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 43-44. |
| W. CORRECTIONAL ADMINISTRATORS HAVE LONG BEEN AWARE THAT VISUAL BODY CAVITY SEARCHING IS HIGHLY TRAUMATIZING TO VICTIMS OF SEXUAL ABUSE, WHO ARE DISPROPORTIONATELY REPRESENTED IN THE FEMALE JAIL POPULATION | |
| 296.   Substantial research establishes that visual body cavity searching is extremely invasive and highly traumatizing to victims of sexual abuse. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 38 – 39, 42, including ¶113. |
| 297.   Significant research also establishes that female inmates are especially vulnerable for being re-traumatized by | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 38 – 39, 42, ¶113; **Ex. 606**, Decl. of Drs. Haverty and Kupers, pp. 26 - 33.. |

| searching. | |
|---|---|
| 298.   Up to 33% of women (generally) report being molested as children or raped at some time in their lives. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 31. |
| 299.   Research confirms that even larger proportion of female jail inmates have been previously sexually abused. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 26-33. |
| 300.   In 1999, a Bureau of Prisons report found that nearly 6 of 10 women in state prisons experienced physical or sexual abuse; 3/4 of those women had been sexually abused. In 1998, the National Institute of Justice found that more than 43% of inmates had been physically or sexually abused prior to their admission to prison. A 1998 sample of California prisoners found that 80% had been sexually and/or physically abused. The reported figures of sexual abuse are likely underestimates of the pervasiveness of abuse in the backgrounds of women prisoners. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 26-33. |
| 301.   A Bureau of Justice Statistics study conducted in 2004 found | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 38, ¶101. |

| | |
|---|---|
| that 42 percent of female State prisoners and 28 percent of female Federal prisoners reported that they had been sexually abused before their current sentence, as compared to 6 percent of male State prisoners and 2 percent of male Federal prisoners. A BJS survey of jail inmates, conducted in 2002, found that 36 percent of female inmates reported sexual abuse prior to incarceration, compared to 4 percent of male inmates. | |
| 302.   The population of women incarcerated in jail is approximately identical in demographics and in histories of past sexual abuse to the population in prison. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 26-33. |
| 303.   Correctional administrators have long been aware that significant proportions of the female jail population have been sexually abused and/or suffer from mental illness. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 38 – 39, 42, including ¶113 (correctional administrators aware well before 2006 when CRDF opened as a women's facility). |
| 304.   LASD Commander, and former Captain of CRDF, Maria Gutierrez testified that 70% of the women in the Los Angeles County Jail are victims of sexual or | **Dkt. 284-22 (Ex. 180)**, Cmdr. Gutierrez Dep. Tr., p. 232:11 – 232:21. |

| | |
|---|---|
| physical trauma. | |
| 305.   Correctional administrators have also long understood that strip searches may be particularly traumatizing for inmates with histories of sexual abuse or mental illness. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 42, ¶113. |
| 306.   Women with backgrounds of severe trauma during childhood and adolescence, who are re-traumatized as adults, are prone to developing chronic and severe emotional disturbances, including but not limited to PTSD, depression and anxiety. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 29. |
| 307.   For these reasons, without adequate measure to protect inmates' privacy and dignity, strip searches may significantly and unjustifiably traumatize female jail inmates. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 42, ¶113. |
| 308.   To avoid or minimize the potential for a traumatic effect on women inmates subject to strip searches, there must be a scrupulous effort to avoid actions that are experienced as abusive because of the particular vulnerability of the population. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 33-37. |
| 309.   CRDF's strip | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. |

| | |
|---|---|
| search practices were entirely devoid of the kinds of privacy and dignity protections both necessary to mitigate the traumatic nature of strip searches on female inmates and normally available to women inmates in jails and prisons throughout the country. | 42, ¶113. |
| 310.   CRDF's practice of searching large groups of female inmates without individualized privacy would re-traumatize any female inmate who had been a victim of physical or sexual abuse. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 42, ¶113 ("The degrading and dehumanizing manner in which VBCS are performed at CRDF and the lack of privacy can have a devastating emotional impact on female inmates and act as a trigger to re-traumatize victims of prior sexual abuse and do not comport with generally accepted correctional standards."); **Ex. 606**, Decl. of Drs. Haverty and Kupers, p. 42. |
| 311.   The fact that female deputies conducted the strip searches does not change the fact that previously-traumatized inmates are very vulnerable to re-traumatization, particularly to the extent searches may be experienced as abusive. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 42. |
| 312.   According to Wendy Still and Stephanie Covington, international expert on female trauma, CRDF's VBCS, as they were being performed, were a violation of human dignity, totally | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, pp. 38 – 39, ¶103. |

| | |
|---|---|
| outrageous and a form of physical and sexual abuse. | |
| 313.   In the opinion of Drs. Haverty and Kupers, the group strip searches of women at CRDF would be less traumatizing and damaging to the women inmates were they conducted in private. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 42. |
| **X. ADDITIONAL EXPERT TESTIMONY** | |
| 314.   Prior to July 2013, CRDF had no specific, formalized strip search policies or procedures, and did not require supervisorial presence during strip searches. Training and supervision was insufficient, and allowed room for great variance in the strip search practices, and allowed room for abuse, a problem identified in various of the County's own documents (Merrick Bobb Report, and Citizen's Commission On Jail Violence). The training and supervision did not meet accepted correctional standards. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, ¶¶88 – 95. |
| 315.   While Wendy Still expresses opinions on individual aspects of the search process as unacceptable and outside | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, ¶¶117 – 118. |

| | |
|---|---|
| of accepted practice, her ultimate opinion is that, based on the totality of the search conditions (including the handling of menstruation, the requirement of physical manipulation of the labia, the complete absence of privacy (including full exposure and searches of genitals, lifting of breasts and stomach) when there were readily available alternatives, the exceptionally large group sizes (which increased the privacy invasion), the necessity that women would end up touching each other, searches outside with exposure to the elements (including ants, birds and bird droppings), the lack of hygiene (property and clothes on floor, hands in mouth and vagina without sanitization), psychological vulnerability of women inmates), LASD's practices were alone as a very extreme departure from the manner of strip search at any other jail facility of which she is aware. | |
| 316.   The presence of a large percentage of strip | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 45, ¶119. |

| | |
|---|---|
| searches in very cold conditions adds to and reinforces that conclusion. | |
| 317.   If the extensive reports of abusive language (substantiated by the Merrick Bobb 26th Report and the Citizen's Commission on Jail Violence) are considered, that reinforces her opinion. | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 40, ¶¶96-100. |
| 318.   According to correctional expert Wendy Still, in assessing the reasonableness of search practices, relevant considerations include: (1) the invasiveness of the search procedure (2) specific relevant features and vulnerabilities of the inmate population to be searched, (3) the presence or absence of privacy measures (4) any health/safety concerns (5) any other conditions relevant to inmates physical comfort during the search  (6) whether persons conducting the search at all times demonstrate professionalism and respect; and (7) the risk of contraband acquisition considering the degree to which inmates have had | **Dkt. 284-36 (Ex. 605)**, Declaration of Wendy Still, p. 41, ¶109. |

| | |
|---|---|
| unsupervised contact with the general public. | |
| 319.   According to correctional expert Wendy Still, based on the above factors, prior to the installation of scanners, CRDF's searches did not comport with basic correctional standards, violated constitutional standards and violates basic human rights. The search conditions would shock the conscious of any reasonable person and correctional professional. | **Dkt. 292-1 (Ex. 606)**, Decl. of Drs. Haverty and Kupers, p. 41, 110¶. |

## II.   PLAINTIFFS' CONCLUSIONS OF LAW

1.      Summary judgment is appropriate where "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

2.      The moving party satisfies its initial burden by showing "that there is an absence of evidence to support the nonmoving party's case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). Thereafter, the burden shifts to the non-moving party to designate specific facts showing there is a genuine issue for trial on claims for which the opposing party must offer facts providing sufficient evidence "for a jury to return a verdict for that party." *Anderson v. Liberty Lobby*, *Inc.*, 477 U.S. 242, 249 (1986).

3.      Strip searches are governed by Fourth Amendment "reasonableness" standards. *Florence v. Board of Freeholders of the County of Burlington*, 132 S.Ct. 1510, 1516 (2012).

4.      A search is constitutionally reasonable only when the jail's "need for the particular search" outweighs "the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559 (1979) (emphasis supplied); *see also*, *Salem v. Michigam Dept. of Corrections*, 643 Fed.Appx. 526, 529 – 531 (6th Cir. 2016). In making this determination, courts consider the scope of the intrusion, the manner in which the search is conducted, the place in which the search is conducted, and the justification for both the initiation of the search and for the specific search procedures, with reference to any "obvious" alternatives. *Williams v. City of Cleveland*, 771 F.3d 945, 954 (6th Cir. 2014); *Florence*, 132 S.Ct. at 1516 (*Bell v. Wolfish*'s balancing test is the "starting point" for assessing the constitutionality of strip searches; *Turner v. Saffley* provides the standard for evaluating asserted justifications).

5.      Searches are *justified* only where they are "reasonably related to legitimate penological interests." *Florence*, 132 S.Ct. at 1515 (quoting *Turner*, 482 U.S. 78, 89 (1987)).

6.      "[O]bvious, easy alternatives," accompanied by only a "*de minimis* cost to valid penological interests," indicate that institutional needs do **not** outweigh the burdens on detainees, and therefore the policy is unreasonable; they are evidence of an 'exaggerated response' to prison concerns" and that the policy does not satisfy the "reasonably related test." *Turner*, 482 U.S. 78, 89 - 91 (1987); *see also, Bell*, 441 U.S. at 539 n.20 (availability of "alternative and less harsh methods" would suggest a punitive purpose).

7.      The practices of other institutions are relevant in assessing whether readily available alternatives exist. *Turner*, 482 U.S. at 97-99 (citing federal Bureau of Prisons regulations as one measure of whether there were ready alternatives, and citing them to find the marriage ban there was an "exaggerated response" to legitimate security concerns); *see also*, *Williams*, 771 F.3d at 954 (6th

Cir. 2014) (alternative search practices of other facilities relevant to whether search is justified).

8.      Even where a legitimate penological purpose supports the *initiation* of a search, the search itself may be unlawful based on the scope of intrusion and lack of penological justification for the manner in which the search was conducted. *Bell*, 441 U.S. at 559, 560 ("the manner in which [the search] is conducted" and "the justification for initiating it" are two different aspects of whether a search is reasonable.") (emphasis supplied); *Florence*, 132 S. Ct. 1510 at 1516,1517; *United States v. Falkes*, 770 F.3d 748, 758 (9ᵗʰ Cir. 2014) (otherwise justified strip search must be performed in a reasonable manner); *Williams* 771 F.3d at 951 (6ᵗʰ Cir. 2014); *Stoudemire  v. Michigan Dep't of Corr.*, 705 F.3d 560, 573 (6th Cir. 2013) (*Florence* "does not mean that the strip searches may be conducted in any manner whatsoever that the facility chooses."); *Mashburn v. Yamhill County*, 2012 WL 5879444 at 7-11 (D.Or., Nov. 19, 2012) (under *Florence*, a strip "search may still be unconstitutional if it is excessively intrusive in relation to the government's need for the search").

9.      In assessing the constitutionality of specific search practices, the "**pertinent question is not whether the jail has a general need [for the search in the first instance] but whether the jail's selection of the particular procedures to which it subjected [inmates] is reasonably related to that legitimate end**." *Williams*, 771 F.3d at 954 (6ᵗʰ Cir. 2014) (emphasis added).

10.      The distinction between strip searches and visual body cavity searches is constitutionally significant because, to an even greater degree than strip searches in general, body cavity searches are one of the most humiliating and degrading law enforcement practices, involving an extreme intrusion upon personal privacy and profound offense to individual dignity. *See, e.g.*, *Harris,* 818 F.3d at 59 (2ⁿᵈ Cir. 2016) ("Regardless of who performs the search, a visual body cavity search…is invasive: A strip search that involves a stranger peering without consent at a naked

individual, and in particular at the most private portions of that person's body, is a serious invasion of privacy.") (internal quotation and citation omitted); *Williams v. City of Cleveland*, 771 F.3d at 952 (6th Cir. 2014) ("A visual strip search is 'an offense to the dignity of the individual' that is 'undoubtedly humiliating and deeply offensive to many'"); *Kennedy v. Los Angeles Police Dep't.,* 901 F.2d 702, 711 (9th Cir.1990) (visual body cavity searches are "dehumanizing and humiliating") (citing *Stoudemire*, 705 F.3d at 572-573); *Thompson v. City of Los Angeles*, 885 F.2d 1439, 1446 (9th Cir. 1989) *overruled on other grounds by Bull v. City & Cnty. of San Francisco*, 595 F.3d 964 (9th Cir. 2010) ("feelings of humiliation and degradation associated with forcibly exposing one's nude body to strangers for visual inspection is beyond dispute"); *Blackburn v. Snow,* 771 F.2d 556, 564 (1st Cir. 1985) ("body cavity searches are 'demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission.'" quoting *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir.1983)).

11.     A visual body cavity inspection that requires inmates to manually spread their buttocks or genitals is substantially more invasive than the "squat-and-cough" technique and must be justified by a valid penological interest. *Young v. County of Cook,* 616 F.Supp.2d 834, 840, 850 – 851(N.D. Ill. 2009).

12.     **Unless there is a legitimate penological justification for denying inmates privacy, strip searches performed in view of other inmates violate inmates' clearly established Fourth Amendment rights.** *Salem*, 643 Fed.Appx. 526, 530 (6th Cir. 2016), (citing *Williams*, 771 F.3d at 952-956, *Stoudemire*, 705 F.3d at 572-575).

13.     A jail's need for group searches "must be **unusually dire** before it can outbalance the affront to plaintiffs' privacy." *Williams*, 771 F.3d at 954 – 955 (6th Cir. 2014) (emphasis added, citing *Florence*, 132 S. Ct. at 1516); *see also*, *Salem*, 643 Fed.Appx. at 529 – 531 (6th Cir. 2016) (The "obvious, less invasive

1    alternative [to group searches] is to 'conduct the searches and seizures in private

2    rather than in the presence of other [prisoners].'") (citing *Williams* (6th Cir. 2014)

3    and *Stoudemire*, 705 F.3d at 573); *Stoudemire*, 705 F.3d 560, 571-75 (6th Cir.

4    2013) (for strip search where people in hall could see into cell while search

5    occurred, the question was "whether any exigent circumstances compelled [the

6    search]…in view of other inmates and prison personnel"; record provided evidence

7    of "no such exigency")).

8         14.    The characteristics of the population being searched – specifically sex,

9    gender and age – are relevant considerations in evaluating the scope of intrusion

10   for the Fourth Amendment "reasonableness" analysis. *See e.g., Safford Unified*

11   *School District #1 v. Redding*, 557 U.S. 364, 371, 129 S.Ct. 2633, 2639 (2009).

12

13   Dated March 10, 2017                    Respectfully submitted,

14                                           KAYE, McLANE, BEDNARSKI & LITT, LLP
                                             MANN & COOK
15                                           CYNTHIA ANDERSON-BARKER

16

17                                           By: _/s/ Barrett S. Litt _____

18                                               Barrett S. Litt

19                                           By: _/s/ Lindsay Battles_____

20                                               Lindsay  Battles
                                                 Attorneys for Plaintiffs
21

22

23

24

25

26

27

28