Barrett S. Litt, SBN 45527
blitt@kmbllaw.com
Lindsay Battles, SBN 262862
Kaye, McLane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Donald W. Cook, SBN 116666
manncook@earthlink.net
Attorney at Law
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Colleen M. Flynn, SBN 234281
cflynnlaw@yahoo.com
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 9001 0
Phone:  (213) 252-9444
Facsimile: (213) 252-0091

Cynthia Anderson-Barker, SBN 175764
cablaw@hotmail.com
Law Offices Of Cynthia Anderson-Barker
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MARY AMADOR, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> SHERIFF LEROY D. BACA, etc., et al., <br><br> Defendants. | Case No. CV 10-01649 SVW (JEMx) <br><br> [Honorable Stephen V. Wilson] <br><br> **NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT; [PROPOSED] ORDER; DECLARATIONS AND EXHIBITS** <br><br> Date: **August 12, 2019** <br> Time: **___1:30 P.M._** <br> Place: **Courtroom 10A__** |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on August 12, 2019, at 1:30 P.M, or as soon thereafter as this matter may be heard in Courtroom 10A of the United States District Court for the Central District of California, 350 West First Street, Los Angeles, California 90012, Plaintiffs will, and hereby do, move the Court to preliminarily approve the proposed settlement in this case, and to authorize the mailing and other forms of notice to class members.

This motion is unopposed and is based on the accompanying Memorandum of Law, the stipulation of all parties to entry of the proposed Preliminary Approval Order, the proposed Preliminary Approval Order and exhibits thereto filed concurrently, the files and records in this case, and on such further evidence as may be presented at a hearing on the motion.

DATED: July 16, 2019                    Respectfully submitted,

                                              Kaye, McLane, Bednarski & Litt, LLP
                                              By: /s/ Barrett S. Litt
                                                 Barrett S. Litt
                                                 Attorneys for Plaintiffs

                                              By: /s/ Lindsay Battles
                                                 Lindsay Battles
                                                 Attorneys for Plaintiffs

## TABLE OF CONTENTS

I. INTRODUCTION ..................................................................................... 1

II. TERMS OF THE SETTLEMENT .......................................................... 3

III. THE STANDARDS FOR ENTRY OF THE PRELIMINARY APPROVAL ORDER HAVE BEEN MET ............................................. 7

IV. CONCLUSION ....................................................................................... 14

# TABLE OF AUTHORITIES

## Federal Cases

*In re: Cathode Ray Tube (CRT) Antitrust Litig.*
No. 1917, 2016 WL 153265 (N.D. Cal. Jan. 13, 2016) .............................. 11, 12

*Chu v. Wells Fargo Investments, LLC*
Nos. C 05–4526 MHP, C 06–7924, 2011 WL 672645 (N.D. Cal. Feb. 16, 2011) ................................................................................................ 12

*Cotter v. Lyft, Inc.*
176 F. Supp. 3d 930 (N.D. Cal. 2016) ....................................................... 7, 8, 13

*Glass v. UBS Fin. Servs., Inc.*
2007 WL 221862 (N.D. Cal. Jan.26, 2007) ...................................................... 12

*In re High-Tech Employee Antitrust Litig.*
No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2, 2015) ................................................................................................................ 12

*Hopson v. Hanesbrands Inc.*
2009 WL 928133 (N.D. Cal. 2009) ................................................................... 12

*Rodriguez v. West Publishing Corp.*
563 F.3d 948, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) ............................................................................................. 11

*Staton v. Boeing Co.*
327 F.3d 938 (9th Cir. 2003) ............................................................................. 11

*Van Vranken v. Atlantic Richfield Co.*
901 F.Supp. 294 (N.D. Cal.1995) ..................................................................... 12

## State Statutes

Civil Code § 52.1 ............................................................................................... 13

## Rules

Rule 23(C)(4) ..................................................................................................... 10

**Constitutional Provisions**

Fourth Amendment ................................................................................................. 1, 2

**Other Authorities**

*Newberg on Class Actions* § 13:13 (5th ed.) .............................................................. 9

# MEMORANDUM OF POINTS & AUTHORITIES

## I. INTRODUCTION

Plaintiffs are former detainees of the Los Angeles Sheriff's Department's Century Regional Detention Facility (hereafter "CRDF"). Plaintiffs filed this class action lawsuit in 2010 challenging what they contended was the systematic violation of their constitutional rights through the unnecessarily humiliating and dehumanizing manner of strip searching female inmates entering CRDF. The Court entered its final class certification order on November 18, 2016. Dkt. 327. It granted Plaintiffs' motion for summary judgment on liability for the damages classes on June 7, 2017. Dkt. 361 (2017 WL 9472901).

Plaintiffs contend that, between 2006 and 2015[1], the LASD routinely subjected female inmates to highly invasive body cavity inspections, in large groups (often over 40 women), without individual privacy, and despite the absence of a penological justification and the ready availability of alternatives, in violation of the Fourth Amendment. Plaintiffs specifically challenged as unconstitutional the search procedures common to the whole period, which included practices that required female inmates to (1) manually spread their labia to expose their vaginal opening in the presence of a group; and (2) expose their naked body – including bare pubic region and bare breasts – in the presence of a group. Plaintiffs contended that the use of these specific, highly invasive, gender-specific procedures in a group setting, without individual privacy, despite the known risk of trauma to female inmates and despite the availability of inexpensive, fully secure alternatives that would have provided privacy for the most egregious intrusions was unconstitutional, represented an extreme departure from accepted practice in

---

[1] While the practice goes back to 2006, the complaint was filed in 2010, and thus the class period begins in 2008, specifically March 5, 2008, which is two years before the filing of the complaint. The class period is between March 5, 2008 (two years before the filing of the complaint) and January 1, 2015 (the date body scanners or privacy partitions were available for all CRDF strip searches).

1

women's detention facilities, and were unsupported by a valid penological justification. The County's representative testified that that privacy curtains, which she installed in 2015, were always a viable option and "could have solved the privacy problem years ago [had someone thought of them]."[2]

In addition to these core conditions, applicable to all class members across the full class period, Plaintiffs also challenged several specific practices applicable to specific time periods or subclasses of women. Plaintiffs challenged the practice of requiring menstruating women to publicly identify themselves and remove their tampons or pads in view of other detainees, and before completing the visual-body-cavity inspection, which often caused them bleed on themselves or the ground. Plaintiffs likewise challenged LASD's practice of searching women outside in cold weather conditions. Because the inmates were wearing no clothing, shoes or socks, the air temperature would often have felt as though it were in the 40's or 50's. Plaintiffs also challenged more intrusive practices used during the first several years of the class, including the requirements that women: (1) face each undressed, with bare breasts and underwear pulled to their knees, while performing various steps in the search process (including inspection of the area under their breasts and stomachs and inspection of their mouths); and (2) that two parallel lines simultaneously complete the visual body cavity inspection by bending over and looking through their legs while deputies inspect their rectum and vagina, one-by-one, during which time they could not avoid seeing similarly positioned women on the opposite wall. The Court did not need to reach whether these additional conditions were unreasonable under the Fourth Amendment because it found that the core conditions, common throughout all time periods and applicable to all class

---

[2] While there was initially a claim for injunctive relief, Plaintiffs agreed that the installation of the previously described body scanners and privacy partitions mooted that claim. Thus, the settlement only addresses damages except for the provision for the development of gender responsive policies and the retention of the Moss Group and the Center for Gender and Justice.

members, uniformly violated all class members' constitutional rights.

The parties held three full day in-person settlement conferences before the Hon. George H. King (Ret.), as well as numerous discussions among or between counsel and Judge King. After extensive arms-length negotiations, the parties reached a settlement, which is contingent on this Court's approval. Declaration of Barrett S. Litt (hereafter "Litt Dec."), ¶ 4. Even after settlement in principle was reached, it has taken over a year to agree to the specific settlement terms. The proposed settlement has now been agreed to by all parties. After a bidding process, the parties have agreed to a Class Administrator (JND Legal Administration).

## II. TERMS OF THE SETTLEMENT

The terms of the settlement are set forth in greater detail in the exhibits attached to the Proposed Preliminary Approval Order (specifically in the Settlement Agreement), which exhibits are as follows:

| | |
|---|---|
| Exhibit A | Settlement Agreement |
| Exhibit B | Proposed Class Notice |
| Exhibit C | Claim Form |
| Exhibit D | JND Class Administration Bid and Credentials |

In summary, the settlement's basic terms, as they relate to Damages Class Members, are that Defendants will provide payment of a total of Fifty-Three Million dollars ($53,000,000) equally spread over a three-year period into a Class Fund. From that amount, the following awards will be made, subject to court approval:

a. Incentive awards to the 9 Named Plaintiffs in the amount of $10,000 each (for a total of 90,000).

b. As a form of indirect compensation to absent Class Members, up to $3 million of the Class Fund will be used to fund contracts between the County of Los Angeles, on the one hand, the Moss Group and the Center for Gender and Justice ("CGJ"), on the other hand (the "Moss/CGJ Contracts"). Both organizations have significant experience in assisting

3

      local, state, and national correctional agencies in the development of gender-responsive and trauma-informed practices, programming, and services. The purpose of the contracts shall be to help develop a strengthened model of gender-responsive policy and operational practice at all LASD facilities that house female inmates (including CRDF and Twin Towers), while enhancing the culture of safety and respect for both staff and the inmate population. The contracts will include preliminary assessment/evaluation, and may also include the provision of expertise, leadership, technical assistance, and services in the following areas: system analysis/operations, policy review and development, strategic planning, program development/inmate services, training/culture, and ongoing assessment. The Moss/CGJ contracts shall be secured in furtherance of the Los Angeles County Board of Supervisors' effort to facilitate the design and implementation of gender-responsive systems within the Los Angeles County criminal justice system, as reflected in the Board of Supervisors' February 2019 motion titled "Building a Gender-Responsive Criminal Justice System."

c. Payment of the third-party class settlement administration costs to the chosen class administrator, JND Legal Administration, estimated at a maximum of approximately $464,000 for a claims rate of up to 33% (which, based on counsel's experience in jail cases, is substantially higher than the expected claims rate). However, depending on the response rate to the notice, Plaintiffs' counsel may request that JND do greater outreach, which would increase the cost.[3]

d. Plaintiffs will file a motion for attorney's fees and costs to be approved by the court. The agreement provides that Plaintiffs' counsel may request up to 1/3 of the class fund but not more, plus reimbursement of litigation

---

[3] Plaintiffs' counsel wish to advise the court that they contracted with JND, with whom they have worked on other class actions, to do class members outreach prior to reaching a settlement agreement to do class outreach. Plaintiffs' counsel considered it vital to a successful settlement process to reach a significant number of class members pre-notice in order to demonstrate that they would be in a position to proceed with at least several hundred, and potentially over 1000, individual damages cases if the case did not settle on a class basis even without the benefit of class notice. This cost was incurred by Plaintiff's counsel, who will seek reimbursement from the Class Fund in the motion for attorney's fees and costs. JND was chosen as the Class Administrator for the case through a competitive bidding process, in which it was the judgment of Plaintiffs' counsel that the JND bid presented the best value for the class.

costs.

e. The remainder of the Class Fund (estimated as a minimum of slightly under $31 Million) shall be distributed to the class members (including Named Plaintiffs/Class Representatives) under a formula contained in ¶¶ 5-13 of the Settlement Agreement (Exhibit A to the proposed Preliminary Approval Order), particularly ¶ 7.

The distribution formula awards a certain number of points for each strip/visual body cavity search. The number of points per search ranges between 70 – 100, based on the time period in which the search occurred. The points vary according to time period because the invasiveness of the search conditions varied over time, with the worst conditions occurring prior to July 2011. Each search conducted at a temperature of 70 degrees or less receives an additional 10-points. The per-search points are assigned to each class member, up to their 50th search.[4] This cap is to ensure that outliers who have outsized claims do not distort the meaningfulness of the recovery to the remaining class members. (Such outliers would be entitled to opt out and pursue their own claims if they so chose.)

Once the claims period closes, the claims administrator will calculate the total points for each class member and total points for all claiming class members who submitted timely claims.[5] Each class member's recovery will be determined based on that class member's percentage of the total points for all class members. Despite the foregoing, no class member who qualifies for payment will receive less than a total of $200. (This minimum payment amount would apply only in the event of an unexpectedly high claims rate).

The Class Fund is non-reversionary. However, to ensure that there is not a windfall to claiming class members in the event of a very low claims rate, there will be a donation to *cy pres* organizations to be agreed on to the extent that the

---

[4] The "50-search cap" applies to less than .04% of the class.
[5] The Settlement Agreement provides how to determine what claims are timely.

total value of claims is less than the agreed upon "Minimum Remainder" of $31 Million. The value of the claims for purposes of this provision is based on the following chart.

| CY PRES FORMULA | |
|---|---|
| # SEARCHES | AMOUNT |
| 1-3 | $5,000 |
| 4-6 | $10,000 |
| 7-10 | $15,000 |
| 11+ | $20,000 |

This issue is addressed more fully in Section VI of the Settlement Agreement.

Defendants have the right to withdraw from the settlement if more than 250 class members opt out of the settlement.

The settlement provides for the Class Administrator (JND Legal Administration, see Fn. 3) to issue notice to all class members via a combination of text message, email, and first class mail notice. Initial notice will be sent by US mail unless JND is able to locate both a mobile phone number and email address, in which case it will initially be sent by both of those means, with follow up notice by regular mail for those who do not file claims in response to text message/email notice. All class members for whom JND can locate email address or phone numbers will receive follow-up notice by email and text. JND will also public notice in Prison Legal News (a publication widely distributed to inmates throughout the country) and selective social media/online outreach directly targeting class members' Facebook and/or Instagram accounts. The full details of the agreement and the proposed schedule are contained in the proposed Preliminary Approval Order and exhibits thereto, which is filed contemporaneously with this motion.

This motion is unopposed, and the Defendants concur in entry of the proposed Preliminary Approval Order.

The proposed Preliminary Approval Order assumes entry of the order no later than August 19, 2019. If an order is not entered by that time, the dates will have to be extended. The draft preliminary approval order indicates the time needed between the various events if the times do need to change.

## III. THE STANDARDS FOR ENTRY OF THE PRELIMINARY APPROVAL ORDER HAVE BEEN MET

The following from the court in *Cotter v. Lyft, Inc.* well explains the preliminary approval inquiry:

> "District courts have interpreted Rule 23(e) to require a two-step process for the approval of class action settlements: the Court first determines whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, whether final approval is warranted. At the final approval stage, it is well-established that the Court must balance the following non-exhaustive factors to evaluate the fairness of the proposed settlement:
> "the strength of the plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.
> It is less clear what factors should guide the Court's evaluation of the proposed settlement at the preliminary approval stage. Some district courts ... have stated that the relevant inquiry is whether the settlement 'falls within the range of possible approval or within the range of reasonableness. In determining whether the proposed settlement falls within the range of reasonableness, perhaps

> the most important factor to consider is plaintiffs' expected recovery balanced against the value of the settlement offer. Determining whether the settlement falls in the range of reasonableness also requires evaluating the relative strengths and weaknesses of the plaintiffs' case; it may be reasonable to settle a weak claim for relatively little, while it is not reasonable to settle a strong claim for the same amount."

*Cotter v. Lyft, Inc.*, 176 F. Supp. 3d 930, 935 (N.D. Cal. 2016) (internal citation and quotation omitted).

*Newberg on Class Actions* summarizes the standards for entry of a preliminary approval order as follows:

> "[T]he goal of preliminary approval is for a court to determine whether notice of the proposed settlement should be sent to the class, not to make a final determination of the settlement's fairness. Accordingly, the standard that governs the preliminary approval inquiry is less demanding than the standard that applies at the final approval phase. Some courts go so far as to state that a proposed settlement is 'presumptively reasonable at the preliminary approval stage, and there is an accordingly heavy burden of demonstrating otherwise.' Nevertheless, most courts will not simply 'rubber-stamp' a motion for preliminary approval, and review is more than 'perfunctory.'
>
> Bearing in mind that the primary goal at the preliminary review stage is to ascertain whether notice of the proposed settlement should be sent to the class, courts sometimes define the preliminary approval standard as determining whether there is '"probable cause" to submit the [settlement] to class members and [to] hold a full-scale hearing as to its fairness.' More specifically, courts will grant preliminary

8

approval where the proposed settlement 'is neither illegal nor collusive and is within the range of possible approval.' Courts in most circuits use some variation of this test. The test grew out of a statement in an early version of the *Manual for Complex Litigation* calling for approval if 'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible [judicial] approval.' Many courts continue to utilize that phrasing of the test.

…

"The general test—holding that a settlement will be preliminarily approved if it 'is neither illegal nor collusive and is within the range of possible approval'—contains both procedural and substantive elements. The procedural element focuses on the nature of the settlement negotiations and the possibility of collusion, while the substantive element focuses on the terms of the agreement itself. …".

*Newberg on Class Actions* §13:13 (5th ed.) (footnote references and footnotes omitted).

Applying the factors for preliminary approval, this case qualifies for such approval. The following facts are uncontested or stipulated to in the parties' accompanying stipulation for purposes of the settlement and pleadings related to it:

1. The settlement terms were negotiated at arms' length with the assistance of an experienced mediator and jurist, retired United States District Judge George King, after three in person mediation sessions. Litt Dec., ¶ 4.

2. This case was litigated extensively and vigorously. Plaintiffs conducted extensive discovery, both documents and numerous

depositions. There were four class certification motions, each of which was litigated in depth. There were two full rounds of summary judgment litigation, the second of which involved cross summary judgment motions, resulting in the grant of summary judgment on liability to Plaintiffs. Litt Dec., ¶ 5.

3. There were arms' length negotiations and no collusion, as evidenced by the extensive discovery and mediation process. (See Litt Dec. ¶¶ 4,5.)

4. The proposed settlement provides a slight benefit to the class representatives ($10,000 in addition to their class member formula award). The proposal for incentive awards was at Class Counsel's initiative and the proposed incentive awards to each class representative reflects counsel's assessment of the value of their contributions to the case, the risk taken by them and the size of the settlement. No agreements were made with class representatives prior to settlement to seek incentive awards. Litt Dec., ¶ 7.

5. While there is a larger than normal number of class representatives, that is due to Class Counsel's judgment that there were several categories of class representatives needed in order to have both those in custody with standing to seek injunctive relief, and those not in custody in order to have damages class representatives who were not in custody and therefore not subject to PLRA restrictions. Further, the Court's 2016 Rule 23(C)(4) class certification order required Plaintiffs to add additional class members to represent subclasses specific to various time periods, as well as a subclass of women who were searched while menstruating.

6. Plaintiffs proposal for $10,000 for each of the nine class representatives in light of the factors to be considered in determining

the reasonableness of incentive awards. The Named Plaintiffs either initiated the lawsuit (Plaintiff Mary Amador), entered the lawsuit while still imprisoned thereby risking retaliation (Plaintiffs Lora Barranca, Diane Vigil and Diana Paiz) or were added to the lawsuit to fill potential class representative gaps to account for time period based classes or subclasses (Plaintiffs Felice Cholewiak, Evangelina Madrid, Alisa Battiste, Nancy Briseno and Myeshia Williams). All nine plaintiffs were deposed and responded to discovery requests. All of the plaintiffs submitted declarations disclosing intimate details of their experiences and publicly revealing themselves as having spent time in jail, which were used in support of the class certification motions, summary judgment motions and motions to amend. The class substantially benefited from these class representatives' efforts, resulting in one of the largest jail class action settlements ever recorded and the first based exclusively on an unconstitutional manner of strip search. The requested $10,000 incentive award is well within the range of reasonable incentive awards. *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (identifying factors to consider in evaluating the reasonableness of incentive awards); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958–59, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (incentive awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general"); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 153265, at *2–3 (N.D. Cal. Jan. 13, 2016). The awards here – totaling $90,00 – represent a very small proportion (less than .17% ) of the Class Fund, also a factor in

evaluating the reasonableness of proposed incentive awards. *See, e.g..,  id.* at *3 (0.196%.of class fund); *Hopson v. Hanesbrands Inc*., 2009 WL 928133, *10 (N.D. Cal. 2009) (1.25% of the settlement amount). Numerous cases have approved incentive awards of $10,000 or more. See, e.g., *Cathode Ray Tube (CRT) Antitrust Litig., supra* ($25,000 for each of ten class representatives in $127.45 Million settlement); *Glass v. UBS Fin. Servs., Inc.,* 2007 WL 221862, at *16 (N.D. Cal. Jan.26, 2007) (approving payments of $25,000 to each named plaintiff); *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 299 (N.D. Cal.1995) (awarding $50,000 to a lead plaintiff); *In re High-Tech Employee Antitrust Litig*., No. 11-CV-02509-LHK, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (awarding $120,000 and $80,000 to class representatives in a case that settled for $415 million, noting such awards were in line with "megafund" cases, and collecting cases); *Glass v. UBS Fin. Servs., Inc*., No. C-06-4068 MMC, 2007 WL 221862, at *17 (N.D. Cal. Jan. 26, 2007) aff'd, 331 F. App'x 452 (9th Cir. 2009) (approving award of $25,000 for each of four class representative in a six-year case settling for $45 million where named plaintiffs provided help with informal discovery, insight into an industry, and "placed something at risk by putting their names on a complaint against one of the largest brokerage houses in America"); *Chu v. Wells Fargo Investments, LLC*, Nos. C 05–4526 MHP, C 06–7924, 2011 WL 672645, *5 (N.D. Cal. Feb. 16, 2011) (awarding $10,000 to two plaintiff representatives involved in case for five years and $4,000 to three representative plaintiffs participating in case for two years, from a $6.9 million settlement fund).

7. The class size has been determined to be approximately 93,000-94,000 individuals. Litt Dec., ¶ 6. A claims rate of approximately 20%

        is generally considered a good claims rate in Plaintiffs' counsel's extensive experience in jail cases. (See Litt Declaration, ¶ 8.) Assuming such a rate here, there would be approximately 20,000 claims, and a mean recovery over $1500 per claiming class member, which would place it at the high end of class member recoveries in strip search class actions. Litt Dec., ¶ 10.

8. The accepted bid for class administration costs cap costs at $464,000 for a claims rate of up to 35% but could be more or less depending on a variety of factors. Litt Declaration, ¶ 14.

Examining what the *Cotter* Court looked to as the most important factor to consider ("plaintiffs' expected recovery balanced against the value of the settlement offer"), the proposed settlement is an excellent settlement. Plaintiffs do not doubt that awards for many individual class members would have been five figures, and for some six figures, but only after individual damages trials. General damages were not available for the class as a whole based on the court's rulings. Statutory damages were potentially available, but only if Civil Code § 52.1 were ruled available; that code section has been the subject of considerable legal debate, and its contours are not yet clearly set. This settlement qualifies as among the highest ever in the country for strip searches, and to Plaintiffs' counsel's knowledge is the first successful strip search class action based solely on a challenge to the manner of search (as opposed to challenging the legality of a search at all, on which there have been many successful challenges).

A factor driving settlement from Plaintiffs' perspective is that, even given summary judgment on liability, this case could have spread out over several years litigating individual damages claims, and only a far smaller percentage of the class would likely have come forward to pursue individual damages in comparison to the number that will file claims. In addition, absent settlement, there is no question that Defendants would have appealed the grant of summary judgment.

Given all of these factors, it was the judgment of Plaintiffs' counsel that the settlement represents a fair compromise reflecting "plaintiffs' expected recovery balanced against the value of the settlement offer." Accordingly, the proposed settlement is certainly "within the range of possible approval." (*Newberg, supra.*)

## IV.   CONCLUSION

For the foregoing reasons, Plaintiffs ask that the Court preliminarily approve the settlement, and sign the proposed Preliminary Approval Order (with any revisions the Court deems necessary). The Proposed Preliminary Approval Order contains a provision approving the parties' request to issue notice using a combination of mail, email and text message (and specifically approving the parties' request for text message notice). The Proposed Order contains dates that have been worked out among the parties and reviewed by the Class Administrator. They assume that the order will be entered by August 12, 2019. If it is later, the dates may need to be modified to allow sufficient time to follow the schedule.

DATED: July 16, 2019

Respectfully submitted,
KAYE, McLANE, BEDNARSKI & LITT, LLP

By: /s/ Barrett S. Litt
    Barrett S. Litt

By: /s/ Lindsay Battles
    Lindsay Battles
    Attorneys for Plaintiffs