Barrett S. Litt, SBN 45527
blitt@kmbllaw.com
Lindsay Battles, SBN 262862
Kaye, McLane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Donald W. Cook, SBN 116666
E-Mail: manncook@earthlink.net
Attorneys at Law
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Cynthia Anderson-Barker, SBN 175764
E-Mail: cablaw@hotmail.com
Law Offices Of Cynthia Anderson-Barker
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY AMADOR, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>SHERIFF LEROY D. BACA,., et al.,<br><br>Defendants. | Case No. CV 10-01649 SVW (JEMx)<br><br>[Honorable Stephen V. Wilson]<br><br>**NOTICE OF MOTION AND MOTION FOR AWARD OF ATTORNEYS' FEES AND COSTS; [PROPOSED] ORDER; DECLARATIONS AND EXHIBITS**<br><br>**Date:      July 20, 2020**<br>**Time:      1:30 P.M.**<br>**Place:     Courtroom 10A** |

TO DEFENDANTS AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, on July 20, 2020, at 1:30 p.m., or as soon thereafter as this matter may be heard in Courtroom 10A of the United States District Court for the Central District of California, 350 West First Street, Los Angeles, California 90012, Plaintiffs will, and hereby do, move the Court to award Class counsel 33% of the Class Fund of $53 Million, plus litigation and class administration costs.

This motion is based on the accompanying Memorandum of Law, the settlement terms as reflected in the previously filed settlement agreement (Exhibit A to Plaintiffs' Motion for Preliminary Approval of Settlement), the declarations and exhibits filed in connection with this motion, the files and records in this case, and on such further evidence as may be presented at a hearing on the motion.

DATED: February 9, 2020  Respectfully submitted,

Kaye, McLane, Bednarski & Litt, LLP

By: /s/ Barrett S. Litt
  Barrett S. Litt
  Attorneys for Plaintiffs

i

# <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ....................................................................................1

II.     ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE
        ATTORNEYS' FEE AWARD ...................................................................2

        A.    The Complexity Of The Issues .............................................3
        B.    The Risks Of Non-Payment Were Substantial ....................8
        C.    The Result Obtained For The Class .....................................9
        D.    Benefits Generated Beyond The Settlement Fund............10
        E.    The Burdens On, And Effort Expended By, Counsel..........11
        F.    Counsel's Skill And Experience..........................................12
        G.    The Reaction Of The Class .................................................13

III.    PERCENTAGE OF THE FUND IS THE APPROPRIATE
        METHODOLOGY TO DETERMINE A REASONABLE FEE.................14

IV.     THE 33% OF THE FUND REQUESTED BY PLAINTIFFS' COUNSEL IS
        REASONABLE, AND SUPPORTED BY A LODESTAR CROSS-CHECK.
        .................................................................................................16

V.      COUNSEL'S RATES AND HOURS ARE REASONABLE. ....................22

        A.    Plaintiffs' Rates Are Reasonable. ......................................22
        B.    The Hours Spent On The Case Are Reasonable ................24

VI.     THE COSTS ARE REASONABLE. ..........................................25

VII.    CONCLUSION .........................................................................25

# <u>TABLE OF AUTHORITIES</u>

### Federal Cases

*In re Activision Sec. Litig.*
  723 F. Supp. 1373 (N.D. Cal. 1989) 723 F.Supp. ............................... 17

*Amador v. Baca*
  2017 WL 9472901 (C.D. Cal. June 7, 2017) ...................................... 4

*Amador v. Baca*
  No. CV-10-1649 SVW, 2014 WL 10044904 (C.D. Cal. Dec. 18,
  2014) .......................................................................................... 6

*Ambriz v. Arrow Fin. Servs., LLC*
  No. CV07-5423-JFW(SSX), 2008 WL 2095617 (C.D. Cal. May
  15, 2008) ................................................................................... 25

*Anderson v. Nextel Retail Stores, LLC*
  No. 07-CV-4480-SVW, 2010 WL 11506729 (C.D. Cal. June 30,
  2010) .......................................................................................... 19

*Barnes v. D.C.*
  793 F. Supp. 2d 260 (D.D.C. 2011) ................................................. 10

*Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*
  520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997) ................. 4

*Beaver v. Tarsadia Hotels*
  2017 WL 4310707 (S.D. Cal. Sept. 28, 2017) ................................. 20

*Bell v. Wolfish*
  441 U.S. 520 (1979) ....................................................................... 5

*Blum v. Stenson*
  465 U.S. 886, 104 S. Ct. 1541, 79 L. Ed. 2d 891 (1984) ................. 15

*Boyd v. Bank of Am. Corp.*
  2014 U.S. Dist. LEXIS 162880 (C.D. Cal. Nov. 18, 2014) .............. 22

*Bynum v. D.C.*
  412 F. Supp. 2d 73 (D.D.C. 2006) ................................................. 17

*Camden I Condominium Ass'n v. Dunkle*
    946 F.2d 768 (11th Cir.1991) ................................................................. 15

*In re Cendant Corp. PRIDES Litigation*
    243 F.3d 722 (3rd Cir.2001) ................................................................... 21

*Charlebois v. Angels Baseball LP*
    993 F. Supp. 2d 1109 (C.D. Cal. 2012) ................................................. 23

*Cotton v. Hinton*
    559 F.2d 1326 (5th Cir. 1977) ................................................................. 3

*Craft v. County of San Bernardino*
    468 F.Supp.2d 1172 (C.D.Cal.2006) ........................................... 5, 10, 21

*Craft v. Cty. of San Bernardino*
    624 F. Supp. 2d 1113 (C.D. Cal. 2008) .......................................... 17, 21

*Davis v. Mutual Life Ins. Co.*
    6 F.3d 367 (6th Cir. 1993) ..................................................................... 22

*Di Giacomo v. Plains All Am. Pipeline*
    Nos. H–99–4137, H–99–4212, 2001 U.S. Dist. LEXIS 25532,
    2001 WL 3463337 (S.D.Tex. Dec.18, 2001) ....................................... 21

*In re Enron Corp. Securities, Derivative & ERISA Litigation*
    586 F.Supp.2d 732 (S.D.Tex. 2008) ..................................................... 14

*Fischel v. Equitable Life Assur. Soc'y of U.S.*
    307 F.3d 997 (9th Cir. 2002) ................................................................. 18

*Florence v. Board of Freeholders of the County of Burlington*
    132 S.Ct. 1510 (2012) .....................................................................*passim*

*Gaskill v. Gordon*
    160 F.3d 361 (7th Cir. 1998) ................................................................. 15

*Hageman v. AT&T Mobility LLC*
    2015 WL 9855925 (D. Mont. Feb. 11, 2015) ...................................... 21

*In re Immune Responses Sec. Litig.*
    497 F. Supp. 2d 1166 (S.D. Cal. 2007) ................................................ 25

iv

*Lopez v. Youngblood*
  2011 U.S. Dist. LEXIS 99289 (E.D. Cal. Sept. 1, 2011) ................................. 18

*Lopez v. Youngblood*
  609 F. Supp. 2d 1125 (E.D. Cal. 2009) ................................................. 5

*Maley v. Del Glob. Techs. Corp.*
  186 F. Supp. 2d 358 (S.D.N.Y. 2002) ................................................ 21

*Mauss v. NuVasive, Inc.*
  No. 13CV2005 JM (JLB), 2018 WL 6421623 (S.D. Cal. Dec. 6,
  2018) ................................................................................. 18

*McKibben v. McMahon*
  2019 WL 1109683 (C.D. Cal. Feb. 28, 2019) ....................................... 23

*In re Merry–Go–Round Enterprises, Inc.*
  244 B.R. 327 (Bankr.D.Md.2000) ................................................... 21

*Missouri v. Jenkins*
  491 U.S. 274, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ........................... 22

*Moore v. James H. Matthews & Co.*
  682 F.2d 830 (9th Cir. 1982) ......................................................... 24

*Moreno v. City of Sacramento*
  534 F.3d 1106 (9th Cir. 2008) ........................................................ 24

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap
  Antitrust Litig.*
  2017 WL 6040065 (N.D. Cal. Dec. 6, 2017) ....................................... 21

*Nichols v. SmithKline Beecham Corp.*
  2005 WL 950616 (E.D.Pa.,2005) .................................................... 20

*In re Omnivision Technologies, Inc.*
  559 F. Supp. 2d 1036 (N.D. Cal. 2009) ................................... 1, 17, 18

*Parker v. Vulcan Materials Co. Long Term Disability Plan*
  2012 WL 843623 (C.D.Cal. Feb. 16, 2012) ......................................... 23

*Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*
  483 U.S. 711 (1987) (Delaware Valley II) (plurality opinion) ................... 22

*Powell v. Barrett*
  541 F.3d 1298 (11th Cir. 2008) ............................................................... 4

*In re Quintus Sec. Litig.*
  148 F.Supp.2d 967 (N.D.Cal.2001) .......................................................... 3

*In re Remeron Direct Purchaser Antitrust Litigation*
  2005 WL 3008808 (D.N.J. 2005) ...................................................... 15, 20

*In re Rite Aid Corp. Sec. Litig.*
  146 F.Supp.2d 706 (E.D.Pa.2001) .......................................................... 21

*In re Rite Aid Corp. Sec. Litig.*
  362 F.Supp.2d 587 (E.D.Pa.2005) .......................................................... 21

*Rodriguez et al. v. County of Los Angeles et al.*
  CV 10-6342-CBM ..................................................................... 13, 14

*Rodriguez v. West Publishing*
  563 F.3d 948(9th Cir. 2009) ................................................................. 14

*Romero v. Producers Dairy Foods, Inc.*
  2007 WL 3492841 (E.D. Cal. Nov. 14, 2007) ......................................... 17

*Salem v. Michigan Dep't of Corr.*
  No. 13-14567, 2016 WL 7409953 (E.D. Mich. Dec. 22, 2016) ...................... 5

*Shields-Nordness v. Galindo*
  No. 18-CV-1426, 2019 WL 1003114 (D. Minn. Mar. 1, 2019) ..................... 10

*Spann v. J.C. Penney Corp.*
  211 F. Supp. 3d 1244 (C.D. Cal. 2016) .................................................. 20

*Staton v. Boeing Co.*
  327 F.3d 938 (9th Cir. 2003) ............................................................... 16

*Steiner v. Am. Broad. Co.*
  248 Fed.Appx. 780 (9th Cir. 2007) ........................................................ 22

*Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*
  2005 WL 1213926 (E.D.Pa.) ............................................................... 21

*Swedish Hosp. Corp. v. Shalala*
  1 F.3d 1261 (D.C.Cir.1993) ................................................................. 15

*Thornberry v. Delta Air Lines, Inc.*
  676 F.2d 1240 (9th Cir. 1982), *cert. granted, judgment vacated on
  other grounds,* 461 U.S. 952, 103 S. Ct. 2421, 77 L. Ed. 2d 1311
  (1983) ................................................................................................. 25

*In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions
  Act (FACTA) Litig.*
  295 F.R.D. 438 (C.D. Cal. 2014) ...................................................... 14

*In re Vitamins Antitrust Litig.*
  Civ.A.No. 99-197, MDL No. 1285, 2001 WL 34312839 (D.D.C.
  July 16, 2001) ................................................................................... 20

*Vizcaino v. Microsoft Corp.*
  290 F.3d 1043 (9th Cir. 2002) ................................................... *passim*

*In re Washington Pub. Power Supply Sys. Sec. Litig.*
  19 F.3d 1291 (9th Cir. 1994)., 19 F.3d ............................................ 18

*Williams v. City of Cleveland*
  907 F.3d 924 (6th Cir. 2018) ................................................. 5, 10, 16

*Williams v. MGM-Pathe Commun. Co.*
  129 F.3d 1026 (9th Cir.1997) ............................................................ 16

*In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*
  364 F.Supp.2d 980 (D.Minn.2005) .................................................... 21

*Young v. County of Cook*
  *No. 06-CV-552* (2010) ......................................................... 9, 10, 23, 25

*Young v. Cty. of Cook*
  No. 06 C 552, 2017 WL 4164238 (N.D. Ill. Sept. 20, 2017) ............................. 17

**State Cases**

*In re Buspirone Antitrust Litig.*
  Civ.A.No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003) ........................................ 20

*In re Cardizem CD Antitrust Litig.*
  Civ.A.No. 99-MD-1278 (E.D.Mich. Nov. 26, 2002) ........................................ 20

vii

# Federal Statutes

42 U.S.C. §1988.................................................................................... 3, 22

# Rules

Rule 23(b)(2) ............................................................................................ 6

Rule 23(h) .............................................................................................. 25

Rule 26 ................................................................................................... 11

# Constitutional Provisions

Fourth Amendment ................................................................................. 5

# Other Authorities

"Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules" ("FJC Report") ........................................................................................... 16

5 *Newberg on Class Actions*, at §15:87 ................................................ 19

*Newberg on Class Actions* §16:5 (5th ed.) ......................................... 25

S.Rep.No. 94-1011 ................................................................................. 3

Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response* ........................................ 15

*Solis v. Baca*
    Case No. CV 06-1135.......................................................................... 9

Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions* ................................... 20

# MEMORANDUM OF POINTS & AUTHORITIES

## I.    INTRODUCTION

Class Counsel request an award of 33 % of the Class Fund of $53 Million (which totals $17,490,000) plus litigation and expert costs in the amount of $176,174.02 (exclusive of class administration costs, which would be separately awarded). Plaintiffs' counsel recognize that this percentage exceeds the Ninth Circuit's benchmark but submit that the very substantial risk of loss, the novelty and complexity of the issues and the exceptional results achieved for the class justify such an award. As we elaborate in Section IV, "nearly all common fund awards range around 30%." *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2009). A slight increase from that 30% is justified here.

As the Court is aware, Plaintiffs are former inmates of the Los Angeles County Sheriff's Department's women's jail known as Century Regional Detention Facility (hereafter "CRDF"). Plaintiffs filed this class action lawsuit in 2010 challenging the systematic violation of their constitutional rights through a humiliating, debasing and unnecessary manner of strip searching inmates entering the facility. The Court entered its final class certification order in 2016 and granted Plaintiffs' summary judgment on damages liability in 2017. Protracted settlement discussions followed, resulting in the settlement pending before the Court, on which it granted preliminary approval on November 7, 2019, and scheduled final approval for the same time as the hearing on this motion, July 20, 2020.[1]

In summary, the settlement's basic terms, as they relate to Damages Class Members, are that Defendants will provide payment of a total of Fifty-Three

---

[1] While there was initially a claim for injunctive relief, Plaintiffs agreed that the installation of body scanners and privacy partitions mooted that claim. It was established in discovery that, before the ultimate elimination of the strip search practices at issue, Defendants substantially changed their practices as a result of this litigation. See Dec. of Barrett S. Litt ("Litt Dec.), ¶ 70__.

1

Million dollars ($53,000,000) equally spread over a three-year period into a Class Fund. From that amount, the following awards will be made, subject to court approval: 1) incentive awards to the 9 Named Plaintiffs in the amount of $10,000 each (for a total of 90,000); 2) payment of litigation and third-party class settlement administration costs, estimated at a maximum of approximately $464,000 (although, depending on the response rate to the notice, Plaintiffs' counsel may request greater outreach at a slightly increased cost); 3) an award of attorneys' fees, not to exceed 1/3 of the class fund; and 4) distribution of the remainder of the Class Fund to the class members (including Named Plaintiffs/Class Representatives) under a formula contained in ¶¶ 5-13 of the Settlement Agreement, which generally allocates damages based on time period of the search and to a secondary extent based on weather conditions.

In support of this motion, in addition to Mr. Litt's detailed declaration presenting the challenges in the case, its history, other comparable cases and data on civil rights fee awards in complex civil rights cases, Plaintiffs also submit the Declaration of William B. Rubenstein, the current author of *Newberg on Class Actions*, who addresses class fee principles and the propriety of the requested percentage fee, and the attendant multiplier because "the award sought is consistent with awards in similar cases and … is supported by the significant risks that Class Counsel took and the extraordinary results that they achieved in this matter" (Rubenstein Dec. p.1); and the Declarations of Richard M. Pearl, the author of "California Attorney's Fees", and Carol A. Sobel, who has been acknowledged by many California courts as an attorney fee expert,  both of whom address the reasonableness of the requested rates and provide comparable awarded rates.

## II.    ANALYSIS OF THE FACTORS IN DETERMINING AN APPROPRIATE ATTORNEYS' FEE AWARD.

2

In *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50, 27 (9th Cir. 2002), the court identified the following factors when selecting a percentage fee award in a common fund case: (1) the results achieved for the class; (2) the risk of the litigation (including complexity of litigation); (3) benefits generated by class counsel beyond the settlement fund; (4) the comparison between the proposed fee and market rate; and (5) the burdens of the litigation for class counsel (including contingency basis, length of litigation, expenses to counsel, and opportunity cost of foregone work)). In addition, other courts have identified the additional factors of (6) counsel's skill and experience; (7) the reaction of the class; and (8) comparison with counsel's lodestar. *See, e.g., In re Quintus Sec. Litig.,* 148 F.Supp.2d 967, 973-74 (N.D.Cal.2001). We address these factors although not in that precise order in analyzing the requested fee.

## A. THE COMPLEXITY OF THE ISSUES

This was unquestionably a complex case. First, class actions are generally one of the most complex types of litigation. See Litt Dec., §II(C). *See, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("class action suits have a well-deserved reputation as being most complex," which is "attest[ed]" to by the "requirement that counsel for the class be experienced"); Declaration of William B. Rubenstein, ¶27 (noting that this Court required special briefing as to the *Wal-Mart* decision's impact on the claims and this Court's observation that there had been seven "rounds of briefing concerning certifying or decertifying the proposed class and seven hea[r]ings or status conferences on the same issue"). Second, civil rights cases, even if not class actions, are generally considered complex litigation, a conclusion confirmed by the 1976 legislative history of the civil rights attorneys' fee statute (42 U.S.C. §1988), which states, "It is intended that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by the same standards which prevail in other types of equally complex federal litigation, such as antitrust cases." S.Rep.No. 94-1011, 1976 U.S.Code Cong. & Admin.News at 5913. Third,

3

*Monell* liability and causation often pose particularly difficult issues. *See, e.g., Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997), Justice Breyer, dissenting (*Monell* "has produced a highly complex body of interpretive law"); see also Rubenstein Dec. ¶27. Finally, in jail and prison litigation, the Supreme Court has left "no doubt" that courts are to be "extremely deferential" to prison administrators. *See Amador v. Baca*, 2017 WL 9472901, at *4 (C.D. Cal. June 7, 2017) (the Supreme Court has emphasized the "substantial deference that must be given to prison officials in this [the strip/visual body cavity search] context"). See "Litt Dec.", §II (D), for elaboration. See also Litt Dec. §§II(A, B); Rubenstein Dec., ¶27 (noting that §1983 litigation of the type here "is notoriously complex because of, *inter alia*, the standards for municipal liability, the doctrines involving governmental immunities, and the deference given to prison administrators").

The issues in this case involved complex and largely uncharted questions of constitutional law in the jail context where such deference to jail administrators is required. For many years, strip search litigation had been successful in the context of strip searching new admittees to the general population without reasonable suspicion. Beginning with *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008), some Courts of Appeal questioned that analysis, resulting in the Supreme Court's decision in *Florence v. Board of Freeholders of the County of Burlington*, 132 S.Ct. 1510, 1516 (2012), which reversed decades of Circuit decisions and concluded that no reasonable suspicion was necessary to strip search new admittees to the general population. Mr. Litt, who has handled class strip search litigation since the 1990's, notes the decline in successful cases after *Florence*. Litt Dec., ¶ 43. Prof. Rubenstein charted the change in the number and success of strip search class actions before and after *Florence.* Rubenstein Dec., ¶ 31, 31(a)-(d). He concluded that "the *Florence* case has so significantly impacted strip-search litigation that this settlement stands out as an absolute milestone." *Id.*

1
2
3
4
5
6
7
8

    This case asserted that LASD's policy and practice of strip searches at CRDF violated class members' Fourth Amendment rights because the manner of strip search was unreasonable. *See Bell v. Wolfish*, 441 U.S. 520, 559-560 (1979) (reasonableness of strip search assessed based on, *inter alia,* "the manner in which [the search] is conducted" and "the justification for initiating it"). To Plaintiffs' counsel's knowledge, this is the first and only class action where Plaintiffs prevailed on a claim in which the sole issue was whether the manner of strip search was lawful. See Litt Dec. §III.[2]

9
10
11
12
13
14
15
16
17
18

    The fact that this is the sole case to successfully challenge the manner of strip search on a class-wide basis speaks volumes as to the difficulty and complexity of the case. Plaintiffs had to demonstrate not only that the practices were standardized but that they were so unnecessary, intrusive and unrelated to any legitimate penological objective as to place them beyond the broad discretion of jail officials. They further had to demonstrate readily available alternatives that would meet the Jail's legitimate security needs. For the most part, Plaintiffs were breaking new ground in their legal arguments. While those arguments were based on established general principles, the issues were novel, and required substantial creativity and careful analysis to reach the across the board success obtained. *See*

19
20
21
22
23
24
25
26
27
28

---

[2] There have been several cases finding the particular manner of an individual search unreasonable. While some district court cases had found the blanket policy of group strip searches unconstitutional on summary judgment (see *Craft v. County of San Bernardino,* 468 F.Supp.2d 1172, 1176 (C.D.Cal.2006) and *Lopez v. Youngblood*, 609 F. Supp. 2d 1125 (E.D. Cal. 2009)), that was in the context where the searches were successfully challenged on the pre-*Florence* ground that strip searches upon admission to the general population required reasonable suspicion. Since *Florence*, Plaintiffs are aware of two class action challenges to the manner of strip search. In one, *Williams v. City of Cleveland*, 907 F.3d 924 (6th Cir. 2018), the Sixth Circuit reversed a grant of summary judgment on the ground that there was a legitimate penological justification for searching in groups of 2-3 inmates where individual searches would result in delays in the intake process. The other case remains pending, but class certification was denied (without prejudice) based on a failure to demonstrate numerosity and adequacy of the class representatives. *See Salem v. Michigan Dep't of Corr.*, No. 13-14567, 2016 WL 7409953, at *7 (E.D. Mich. Dec. 22, 2016). See also Litt Dec., ¶¶ 41-46.

*also* Rubenstein Dec., ¶¶ 31-32 (successful class strip search litigation has become far less successful after the Supreme Court's *Florence* decision.)

In addition, Plaintiffs had to successfully certify the class. As the Court will recall, there were four class certification related motions in this case. The first, filed pre-*Florence*, was never ruled on. At the Court's direction, Plaintiffs again moved for class certification. The Court granted Rule 23(b)(2) certification but denied 23(b)(3) certification with permission to refile. Plaintiffs then succeeded in persuading the Court to grant (b)(3) certification. *See Amador v. Baca*, No. CV-10-1649 SVW, 2014 WL 10044904, at *9 (C.D. Cal. Dec. 18, 2014) (the court "was too demanding in its previous order. The Ninth Circuit—and respected jurists across the country—have energetically endorsed the concept [of issue certification on liability]. And such enthusiastic embrace compels reconsideration in this case."). Later, after summary judgment on injunctive relief was granted to Defendants because the challenged strip search practices ceased when Defendants installed scanners, the Court *sua sponte* decertified the class, which required Plaintiffs to file (ultimately successfully) for a new 23(b)(3)/(c)(4) certification.[3]

Establishing liability based on undisputed facts presented a huge challenge, and required an exhaustive compilation and analysis of the relevant LASD documents and many depositions. Defendants vigorously contested liability and contended they were entitled to summary judgment. Plaintiffs deposed the key County officials throughout the chain of command, including a critical 30(b)(6) deposition. Plaintiffs retained numerous experts – 1) Wendy Still, who demonstrated that Defendants' strip search practices were a complete outlier from

---

[3] The Court's *sua sponte* decertification posed significant challenges that were never presented to the Court. The decertification required Plaintiffs' counsel to assess whether that order stopped the *American Pipe* tolling of the class claims, potentially threatening the claims of class members, and to assess whether they should file a 23(f) appeal to protect class member rights. This was again a novel issue on which there was little law. Plaintiffs ultimately concluded that they would not appeal because the decertification was without prejudice, and therefore tolling would continue to apply. Litt Dec. § VI(D)(7).

accepted jail management; 2) Dr. Tomi Ann-Roberts, a professor specializing in the social and cultural aspects of menstruation and its public disclosure, who demonstrated that Defendants' menstrual practices during the strip searches were far outside any cultural norms, and would produce strong feelings of shame and humiliation; 3) Terry Kupers and Caprice Haverty, a psychiatrist and psychologist specializing in jail/prison issues, who demonstrated the adverse psychological impact of Defendants' strip search practices on the inmates; 4) Gwelen Paliaga, an expert on acceptable thermal conditions for normal human activity, who demonstrated that more often than not class members were being searched in cold temperature conditions far outside those accepted for normal human habitation; and 5) Brian Kriegler, who comprehensively analyzed LASD data to identify class members based on their movements and locations, identified search times and cross-tabulated LASD class member data with weather data in order to provide foundational information for Gwelen Paliaga's analysis. See Litt Dec. § VII(D) for a detailed description of Plaintiffs' efforts.

Another example of complexity, and counsel's skill, was in reaching a settlement, the potential for which the Court initially expressed some skepticism. Plaintiffs' counsel pursued the novel approach of reaching out to class members and setting up social communication with potential class members pre-settlement. The purpose was to convince Defendants that the alternative to settlement was to litigate a huge number of individual damages claims, many of which would have potential for six figure verdicts and substantial Plaintiffs' attorneys' fees, and for which potential Plaintiffs were already identified. Plaintiffs' counsel presented detailed projections of the cost to Defendants of such a course. Plaintiffs also carefully analyzed the summary judgment's prospects of standing up on appeal. There were three in-person mediation sessions with retired District Judge George King, plus numerous phone calls with him and with defense counsel. Plaintiffs

explored a variety of settlement options, including a Ninth Circuit or private appeal with high-low options, before settlement was reached. Litt Dec., ¶¶ 129-132.

Finally, the Court's initial rejection of the settlement because it found that funds should not go for ensuring gender responsive policies posed a challenge that Plaintiffs successfully overcame by reaching agreement with Defendants that all funds after fees and costs would be disbursed to class members.[4] .

## B. THE RISKS OF NON-PAYMENT WERE SUBSTANTIAL

Plaintiffs' counsel faced a substantial risk of non-payment. The risk lay in establishing that the underlying conduct was illegal and, if so, what the appropriate remedy was. See Section II(A), *supra.* It is not accidental that this has been the only full manner of strip search class challenge to date that was successful. Additionally, seeking seven figure amounts of money from government entities carries inherent risks because factors other than economic risk-benefit analysis (i.e., politics) are involved. See Litt Dec. ¶ 40; Rubenstein Dec., ¶27 (noting that the risks here included no antecedent government case, its novelty and complexity, intervening and potentially harmful Supreme Court precedent on both merits and class issues, defendants' resources, the litigation's high stakes and high expense).

Further, achieving class status presented a substantial risk. As noted, a distinct minority of class actions are successful. In this case, the history of the class litigation demonstrates the risks. Had Plaintiffs not succeeded in their class certification efforts, their success would have been limited at best to the Named

---

[4] As was explained at the hearing on the initial preliminary approval motion, Plaintiffs' counsel considered gender responsive policies to be in the class' interest because they had concluded that a lack of understanding of basic gender issues was a driving factor in allowing the challenged policies to develop. After the Court's ruling, Plaintiffs' counsel effectively reached agreement that would increase the funds to class members by $3.000,000, Although funding for such policies will not come from the settlement, a result of Plaintiffs' counsel's efforts is that Plaintiffs' proposals in that regard appear to have helped move forward long-standing consideration within the Board of Supervisors to develop a proactive gender responsive criminal justice policy.

Plaintiffs, and any recovery would have been modest. Class actions are inherently risky for a variety of reasons. This case was taken with full recognition that, because there were not cases previously certifying a manner of search class, the case was on the high end of the risk spectrum, and with the expectation that, if successful, it would result in a significant fee enhancement. Litt Dec. §II (D); Rubenstein Dec. ¶ 27. This risk was enhanced by this Court's grant of summary judgment to Defendants on a Los Angeles County group strip search class action in *Solis v. Baca,* Case No. CV 06-1135 SCW(CTx) early during this case.

### C. THE RESULT OBTAINED FOR THE CLASS

This case was hard fought, as we have already described. The class members are by definition low income individuals of little means. All work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered into only after plaintiffs won summary judgment on liability and contested class certification. Even then it required extensive settlement efforts. And, as Prof. Rubenstein notes in his declaration, "Class Counsel have established that the defendants engaged in unconstitutional behavior with regard to one of the most vulnerable populations in the country – female inmates.  There are few more important tasks for lawyers than helping to uncover unconstitutional state action so as to bring our governmental practices further in line with our ideals." Rubenstein Dec., ¶ 29 (last bullet point).

The financial terms of the settlement are exceptional. Only one other strip search case settled for a comparable amount of money – *Young v. County of Cook* (2010) ($55,000 Million for a class of approximately 250,000 class members, in contrast to the approximately 93,000 class members here). See Litt Dec. §IV, ¶¶ 50-62, for discussion of and comparison with the other four strip search settlements above $25 Million, and the contrasting circumstances of those cases. The other settlements all involved relatively straightforward claims based on the law at the time – either strip searches upon entry to the general population when the law was

9

clear that was unconstitutional, differential treatment of similarly situated male and female inmates (strip searching women but not men) (*Young*), or strip searching inmates post-release, i.e., *after* they had been ordered released from jail (*Williams* and *Craft*).[5] This case involved completely unsettled law and achieved the highest per class member recovery of any large strip search settlement. Litt Dec., ¶58. Assuming an average claims rate of 20% (in the mid-range of large strip search settlement claims rates, Litt Dec. ¶49), the mean recovery (after fees and costs) will be over $1500. Many women strip searched multiple times may receive into five figures, an exceptional amount in a large strip search class settlement. See also Rubenstein Dec., ¶29 (exceptional results include significant monetary relief, 100% of class eligible for award, all cash compensation, ease of claim process, adversarial litigation with no hint of collusion, changes in LASD strip search practices and advancing the public interest).

### D. Benefits Generated Beyond The Settlement Fund.

The litigation also resulted in significant benefits for future women inmates in LASD custody. First, LASD made numerous changes that were the direct result of this litigation – including, in 2011, elimination of two lines of women facing each other while undressed; and in 2013 limiting searches to no more than 24 at a time, enclosing the bus bay and installing heaters to eliminate cold weather strip

---

[5] Although there were not Circuit decisions on the post-release strip searches, they were so obviously unjustified that every court to address the issue had no difficulty finding them facially unconstitutional. *See, e.g., Barnes v. D.C.*, 793 F. Supp. 2d 260, 288 (D.D.C. 2011). Mr. Litt was counsel in *Barnes*, and Defendants there made no effort to seek reconsideration of summary judgment after *Florence*, which makes sense in light of the fact that "eight Justices of the Supreme Court agreed that it is an open question whether it is 'reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population.' *Florence*, 566 U.S. at 341." *Shields-Nordness v. Galindo*, No. 18-CV-1426 (PJS/DTS), 2019 WL 1003114, at *9 (D. Minn. Mar. 1, 2019). Post-release strip searches were more egregious because a judicial officer had ordered release.

searches, which was the case more often than not before then. LASD completely ceased strip searching inmates willing to be scanned beginning 2015. There is no question that this litigation was a significant factor in that change, as was evidenced by Defendants' reliance on this change in seeking summary judgment for the current practices. Absent this change, Defendants faced a likely injunction and tens of thousands of additional damages class members. Substantial evidence linked these changes to this litigation. See Litt Dec., §VII, ¶¶ 133-137.

Finally, the settlement helped spur the Board of Supervisors' February 2019 motion titled "Building a Gender-Responsive Criminal Justice System," which, *inter alia*, calls for the hiring of "expert consultants on gender responsive programming" for CRDF and for any future new women's facility. That motion followed the Board of Supervisors' review of the terms of the proposed settlement.

### E.  The Burdens On, And Effort Expended By, Counsel.

Including the investigation time, and pre-litigation settlement efforts, counsel litigated this case for what will be over ten years by the time of the final approval order. A partial list of the work performed (or to be performed) includes: 1) extensive investigation of the underlying circumstances, including communicating directly with class members; 2) preparation of the complaint and amended complaint and extensive legal research related to framing the issues; 3) the Rule 26 conference and report; 4) extensive litigation defending against Defendants' efforts to dismiss the complaint, and to oppose amendments to the complaint; 5) the entry of a stay and subsequent litigation over the impact of the *Florence* decision on this case (including whether it required dismissal of the case); 6) propounding discovery related to liability, which included extensive analysis of the relevant documents and at least 15 depositions taken by Defendants as well as defending Defendants' depositions of the Named Plaintiffs; 7) organizing a complex operation to reach out to class members, to obtain questionnaires and declarations from them, and to maintain contact with them

which information was used extensively in the class and summary judgment litigation, which included several rounds of oral argument; 8) locating and working extensively with a variety of experts (described previously) to present detailed expert declarations/reports for the class and summary judgment litigation; 9) litigating four motions to certify and decertify the classes; 10) litigating cross motions for summary judgment which included just in Plaintiffs' Undisputed Facts over 300 facts and citations to literally hundreds of different references; 11) after summary judgment was granted, presentation of a post-summary judgment litigation plan; 12) hundreds of hours interacting with class members which included interviews, 240 declarations, questionnaires, letters, and Facebook outreach; 13).extensive settlement negotiations, which included preparing a 46 page single spaced mediation statement and dozens of hours of in person or telephonic discussions, in order to reach a settlement in principle; and 14) further extensive settlement discussions, themselves lasting over one year and involving countless conferences between Plaintiffs' and defense counsel, to reach agreement on the precise terms of the settlement agreement.

The total hours devoted to the case through January 20, 2020 approaches 9000 hours. See Litt Dec., ¶167. Obviously, undertaking a case of this magnitude requires that counsel turn down other cases. And, of course, this case was taken on a purely contingent fee basis, where counsel not only fronted all costs but went without any compensation throughout the decade it was litigated. *Id.*, ¶ 40.

## F. Counsel's Skill And Experience

Class Counsel are highly experienced litigators in the fields of civil rights and class actions. The first set of counsel is Mr. Litt and attorneys in his office. Mr. Litt is a well-known civil rights lawyer in the Los Angeles area, and has extensive class action and civil rights experience, as his Declaration and CV attest. He likely has more civil rights class action experience than any attorney practicing in the Central District. The attorneys associated with him who worked on the case

(primarily Paul Estuar when he was with Mr. Litt and Lindsay Battles throughout) are highly experienced class action litigators. Mr. Litt has been named a Super Lawyer continuously since 2005 and is listed in Best Lawyers In America. Mr. Litt's Declaration and CV contain a variety of attestations to his skill, experience and reputation from judges in this District. *See, e.g.*, *Rodriguez et al. v. County of Los Angeles et al.*, CV 10-6342-CBM (AJWx) (Mr. Litt "is considered one of the leading civil rights attorneys in the country"). His CV identifies numerous certified class actions in which he has been the, or one of the, lead counsel as well as pending class actions. He has been lead counsel in three of the five largest strip search settlements in the country. Litt Dec. §IV. Mr. Estuar has been named as a Super Lawyer continuously from 2012-2020 and worked extensively on class litigation when he was with Mr. Litt. Ms. Battles has been named as a Super Lawyer Rising Star continuously from 2012-2019 and a Super Lawyer in 2020, has worked with Mr. Litt on most of his civil rights class actions since she came to work with him in 2008, and was critical to this case's success. Litt Dec. ¶166. The other set of counsel are Donald W. Cook (continuously named as a Super Lawyer from 2016-2020) and attorneys in or associated with his office, Cynthia Anderson Barker and Colleen Flynn, all of whom are experienced civil rights attorneys. See Litt Dec. ¶ 67; Sobel Dec. ¶¶51-63. Plaintiffs' counsel performance in this case, and its successful outcome, attest to their skill level.

### G. THE REACTION OF THE CLASS

There is not yet a final report of the number of claims, opt-outs, or objections filed, which information will be provided in connection with the final approval hearing. However, as of February 6, 2020, the Claims Administrator reports receiving 17,141 claims, approximately 18% of the class members, a high percentage for this stage of the claim process. To date, there has been one opt-out, and two filed objections. Litt Decl., ¶63. "The negligible number of opt-outs and objections indicates that the class generally approves of the settlement." *In re Toys*

*R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295 F.R.D. 438, 456 (C.D. Cal. 2014) (citing *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming the approval of a class action settlement where 90,000 members received notice and 45 objections were received); *Rodriguez v. West Publishing*, 563 F.3d 948, 967(9th Cir. 2009) ("The court had discretion to find a favorable reaction to the settlement among class members given that, of 376,301 putative class members to whom notice of the settlement had been sent, 52,000 submitted claims forms and only fifty-four [.014 percent] submitted objections"). Here, the percentage of objections to date is about .002% (approximately 1/7 the percentage in *Rodriguez*).

## III.   PERCENTAGE OF THE FUND IS THE APPROPRIATE METHODOLOGY TO DETERMINE A REASONABLE FEE.

While the Court has discretion to use either a percentage of the fund or a lodestar approach, the "the primary basis of the [class] fee award remains the percentage [of the class fund] method." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002); *see also, e.g., In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 748 (S.D.Tex. 2008) ("Most federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes.").

The percentage of the fund approach is generally preferred because it most closely aligns the interests of counsel and the class as compared to the lodestar method, i.e., class counsel directly benefit from increasing the size of the class fund and working efficiently. *See, e.g., Vizcaino.*, 290 F.3d at 1050 ("lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a

reasonable fee, since the lodestar method does not reward early settlement.") [6]; Silber and Goodrich, *Common Funds and Common Problems: Fee Objections and Class Counsel's Response,* 17 RevLitig 525, 534 (1998) (the percentage approach avoids numerous drawbacks of the lodestar approach and is preferable because "the attorneys will receive the best fee when the attorneys obtain the best recovery for the class"). *See also Blum v. Stenson*, 465 U.S. 886, 900, 104 S. Ct. 1541, 1550, 79 L. Ed. 2d 891 (1984) (approving percentage of fund method). See Litt Dec. §VII for elaboration of the drawbacks of the lodestar method elaborated by Silber and Goodrich, the *Manual for Complex Litigation* and elsewhere.

Many courts agree that alignment of the class' and class counsel's interests is best accomplished by awarding a percentage of the fund in the normal contingent fee range. Thus, in defining a 'reasonable fee' in representative actions, the law should 'mimic the market.' *Gaskill v. Gordon*, 160 F.3d 361, 363 (7th Cir. 1998) ("When a fee is set by a court rather than by contract, the object is to set it at a level that will approximate what the market would set."). Attorneys "regularly contract for contingent fees between 30% and 40%." *In re Remeron Direct Purchaser Antitrust Litigation,* 2005 WL 3008808, 16 (D.N.J. 2005)(citing cases), indicating that the requested 33% fee here is reasonable in relation to the market for contingent fees. Silber and Goodrich advocate for a 33% fee award as both reasonable and in line with the general market for contingent fee work.

---

[6] *See also Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261, 1266-67 & fn.3, 1271 (D.C.Cir.1993) (the lodestar approach "encourages significant elements of inefficiency" by giving attorneys an "incentive to spend as many hours as possible" and "a strong incentive against early settlement"; the percentage approach "more accurately reflects the economics of litigation practice"; "the monetary amount of the victory is often the true measure of success, and therefore it is most efficient that it influence the fee award"; accordingly, "we join the Third Circuit Task Force and the Eleventh Circuit, among others, in concluding that a percentage-of-the-fund method is the appropriate mechanism for determining the attorney fees award in common fund cases"); *Camden I Condominium Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir.1991) ("the percentage of the fund approach is the better reasoned in a common fund case.").

For purposes of determining the size of the fund from which a percentage is taken, all funds – including attorneys' fees, litigation costs and class administration costs – are included in determining the size of the fund. *See Williams v. MGM-Pathe Commun. Co.*, 129 F.3d 1026 (9th Cir.1997) (reversing award of attorneys' fees because trial court failed to base fee award on the entire settlement, rather than the amount claimed); *Staton v. Boeing Co.*, 327 F.3d 938, 967 (9th Cir. 2003) ("constructing a hypothetical 'fund' by adding together the amount of money Boeing would pay in damages to members of the class …, the amount of fees provided to various counsel, the cost of the class action notices paid for by Boeing, and a gross amount of money ascribed to all the injunctive relief contained in the agreement"; court accepted the concept but not its application there). Unlike, for example, *Williams, supra,* there is no reversion of unclaimed funds here.

## IV.   THE 33% OF THE FUND REQUESTED BY PLAINTIFFS' COUNSEL IS REASONABLE, AND SUPPORTED BY A LODESTAR CROSS-CHECK.

Plaintiffs' counsel seek an award of $17,490,000 (33% of the available fund of $53 Million), plus costs. Given the risks in the case, the novelty and complexity of the issues, the highly contested nature of this litigation throughout, and the exceptional result, this is a reasonable fee. As we elaborate below, one-third of the class fund is a reasonable and recognized award in such circumstances. In addition to the studies to that effect cited by Silber and Goodrich[7], numerous court decisions

---

[7] Silber and Goodrich, discussed in the previous section, reviewed two studies of fee awards in common fund cases. One study was the Federal Judicial Center 1996 report, titled "Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules" ("FJC Report"), which studied the outcomes of four federal districts and concluded that 31.7% or less of the filed class cases resulted in successful class outcomes for plaintiffs. This does not account for the degree of success (i.e., some cases could have resulted in minimal or partial success, and they would still be in the successful claim category). Thus, an exceptional successful outcome such as that obtained in this case is the exception, not the rule. The FJC Report also examined the awarded fees and concluded that "attorneys' fees were generally in the traditional range

16

have so concluded, including specifically in the strip search arena. *See, e.g., Bynum v. D.C.*, 412 F. Supp. 73 (D.D.C. 2006) (awarding 1/3 of $12 Million fund); *Young v. Cty. of Cook*, No. 06 C 552, 2017 WL 4164238, at *1 (N.D. Ill. Sept. 20, 2017) (noting the availability of 1/3 of the fund as attorney fees in the civil rights case [which in fact was the fee awarded, resulting in a multiplier of approximately 3.0, Litt Dec. ¶57], and awarding 1/3 in the follow-on insurance litigation). See also *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113 (C.D. Cal. 2008) (awarding 25% of fund in early settlement, resulting in multiplier in excess of 5).

While the Ninth Circuit has set a benchmark of 25% as a percentage of the fund (*see. e.g., Six Mexican Workers v. Arizona* Citrus *Growers,* 904 F.2d 1301, 1311 (9th Cir.1990), this is an across the board benchmark, which is often adjusted upward or downward depending upon an assessment of the particular circumstances and results of the case. "[I]n most common fund cases, the award exceeds that [25%] benchmark." *In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1047 (N.D. Cal. 2009). Courts in the Ninth Circuit and other circuits have frequently awarded a percentage of the fund in the 30—33% range. *See, e.g., Romero v. Producers Dairy Foods, Inc.*, 2007 WL 3492841, at *4 (E.D. Cal. Nov. 14, 2007) ("Empirical studies show that, regardless whether the percentage method or the lodestar method is used, fee awards in class actions average around one-third of the recovery" *citing Newberg* (4th Ed.)); *In re Activision Sec. Litig.*, 723 F. Supp. 1373, 1373 (N.D. Cal. 1989) ("nearly all common fund awards range around 30%"; "absent extraordinary circumstances that suggest reasons to lower or

---

of approximately one-third of the total settlement." See also Rubenstein Dec., ¶ 31(d) (noting the decline in success in strip search class actions post-*Florence*).

The other study, done by National Economic Research Associates, an economics consulting firm, in 1994, found that attorneys' fees in these class actions averaged approximately 32% of the recovery, regardless of the case size, and averaged 34.74% when the fees and expenses were added together. Silber and Goodrich, *supra*, at 545-546. Silber and Goodrich conclude with the observation that a 33% fee award is both reasonable, and in line with the general market for contingent fee work. *Id*. at 546-549.

increase the percentage, the rate should be set at 30%") 723 F.Supp. at 1378.).[8] Plaintiffs' counsel submit that "extraordinarily circumstances" here justify a 33% fee due to the exceptional results in this extremely risky and complex case.

Multipliers are expected, indeed required, in successful class action litigation. *See, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 n.2 (9th Cir. 1994)., 19 F.3d at 1299–300 (reversing denial of risk multiplier in class action; "[i]f this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing," distinguishing common fund cases from fee shifting awards because the class pays the attorneys from the common fund); *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) (abuse of discretion to deny multiplier in risky class action where lodestar is based on non-contingent rates).

In determining an appropriate common fund percentage fee, courts often conduct a lodestar cross-check as a means to ensure that the ultimate fee awarded is reasonable (or, said differently, does not constitute a "windfall" to Plaintiffs' counsel). Percentage awards resulting in a fee in the range of one to four times the lodestar are common. *Vizcaino*, 290 F.3d at at 1051 n.6.. *Id.* (finding a range of 0.6 to 19.6 in a survey of 24 cases, with 83% in the range of 1.0 to 4.0 and 54% in the 1.5 to 3.0 range, and citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("multiples ranging from one to

---

[8] *See also, e.g., In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D. Cal. 2009) ("This court's review of recent reported cases discloses that nearly all common fund awards range around 30%"); *Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at *12 (E.D. Cal. Sept. 1, 2011) (fees in common fund cases average 32% or 34.64%); *Mauss v. NuVasive, Inc.,* No. 13CV2005 JM (JLB), 2018 WL 6421623, at *5–10 (S.D. Cal. Dec. 6, 2018) ("District courts in this circuit have routinely awarded fees of one-third of the common fund or higher after considering the particular facts and circumstances of each case") (citing *Beaver v. Tarsadia Hotels*, 2017 WL 4310707, at *10 (S.D. Cal. Sept. 28, 2017) (listing Ninth Circuit cases approving a fee award of one-third the common fund).

18

four are frequently awarded in common fund cases when the lodestar method is applied." (quoting *3 Newberg* §14.03 at 14–15)). *Vizcaino* lists 46 cases, the smallest of which is a $53 Million fund, and the largest of which is a $193 Million fund. Of those 46 cases, 30 resulted in a multiplier (eight with a multiplier between 1.2-1.8, twelve with a multiplier between 2.0-2.5, six with a multiplier between 3.0-3.6, three with a multiplier between 4.0-6.2, and one with a multiplier of 19.6). Despite the fact these were mostly mega-fund cases over $100 Million, where percentages of the fund are generally smaller, ten of the cases awarded percentages of the fund between 30-40%, and ten had multipliers of 3.0 or more. Given the exceptional results and challenges here, an award at the higher end of the *Vizcaino* range is reasonable. See also *Anderson v. Nextel Retail Stores, LLC*, No. 07-CV-4480-SVW, 2010 WL 11506729, at *7 (C.D. Cal. June 30, 2010) (Wilson, J.) (citing *Vizcaino*, 290 F.3d at 1048–51); Rubenstein Dec., ¶¶ 1-3, 14 et seq. and Exhibit C thereto (citing 100 class fee awards with multipliers over 3). Professor Rubenstein explains at fn. 64 in his declaration that, in 5 *Newberg on Class Actions*, at §15:87, he provides a multiplier "calculator [that] synthesizes reported case law and, following courts' approaches, assigns multiplier points based on the risks counsel took and the results that they achieved," and that "the principles [he] set forth in the *Newberg* treatise years ago would support a multiplier well above Class Counsel's proposed multiplier given the presence here of so many of the many positive factors [he] enumerated there."

The *Vizcaino* decision provides a valuable starting point in determining a reasonable fee. There, objectors challenged the fee of 28% of a settlement fund of $96,885,000, resulting in a multiplier of 3.65. The District Court found that class counsel "achieved exceptional results for the class," including as here pursuing the case "in the absence of supporting precedents" making the case "extremely risky." 290 F.3d at 1049. There, like here, the case "generated benefits beyond the cash settlement fund." The District Court "found the 28% rate to be at or below the

market rate." *Ibid.* The District Court also "found that counsel's representation of the class-on a contingency basis-extended over eleven years, entailed hundreds of thousands of dollars of expense, and required counsel to forgo significant other work, resulting in a decline in the firm's annual income." *ibid*, also true here.

Three years after *Vizcaino*, the court in *Nichols v. SmithKline Beecham Corp.*, 2005 WL 950616 (E.D.Pa.,2005) (awarding 30% of a $65 Million class fund resulting in a 3.15 multiplier) analyzed multiple class fund fee awards and noted that, "[s]ince *Vizcaino,* courts have awarded attorneys' fees amounting to between 25% and 35% of the common fund" in a wide range of cases.[9] *Nichols* noted a survey by the Class Action Reporter, which included 37 cases in the $50 million to $75 million range, where the percentage of recovery awarded as a fee was 30% or more in eight of those cases, and 25% or more in 16 of those cases. *See* Stuart J. Logan, Dr. Jack Moshman & Beverly C. Moore, Jr., *Attorney Fee Awards in Common Fund Class Actions,* 24 Class Action Rep. 167-234 (2003). That survey found that the *average* lodestar multiplier in those cases was 2.75 (with multipliers ranging from a low of 1.16 to a high of 6.19). The *Nichols* Court approved a fee of 30% of the fund, which yielded a multiplier of 3.15. Plaintiffs' request for 33% of the fund here results in a multiplier of approximately 3, well within the 1-4 range.[10]

---

[9] The cases listed by the *Nichols* court were *In re Buspirone Antitrust Litig.,* Civ.A.No. 01-MD-1410 (S.D.N.Y. Apr. 11, 2003) (awarding 33.3% of a $220 million dollar fund; multiplier of 8.46); *In re Cardizem CD Antitrust Litig.,* Civ.A.No. 99-MD-1278 (E.D.Mich. Nov. 26, 2002) (awarding 30% of a $110 million fund; multiplier of 3.7); *In re Vitamins Antitrust Litig.,* Civ.A.No. 99-197, MDL No. 1285, 2001 WL 34312839, at *10 (D.D.C. July 16, 2001) (awarding about 34% of an approximately $360 million fund; multiplier of 3.5).

[10]*See also, e.g., Beaver v. Tarsadia Hotels,* 2017 WL 4310707, at *8–14 (S.D. Cal. Sept. 28, 2017) (1/3 of approximately $51 Million fund, analyzing propriety of fee under both California and federal law) (multiplier of 2.89); *Spann v. J.C. Penney Corp.,* 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016) (27% of the fund, resulting in multiplier of 3.07); *Bradburn Parent Teacher Store, Inc. v. 3M*(, 2007 WL 1468847 (E.D.Pa.,2007) (35% of nearly $40 Million fund; multiplier of 2.5); *In re Remeron Direct Purchaser Antitrust*

20

A comparison to *Craft v. County of San Bernardino*, *supra,* is useful. Mr. Litt (and other of the counsel here) were counsel in *Craft*, which resulted in a strip search settlement of $25.5 Million and a percentage of the fund of 25%. However, the work required to achieve that result was far less than that required here, as were the legal obstacles to a favorable resolution (see Litt Dec. ¶56), and the 25% fee yielded a multiplier of "5.2 times the $1.2 Million lodestar." 624 F. Supp. 2d at 1123. *Craft* surveyed class settlements with high multipliers and noted a variety of percentage of the fund awards where the multiplier was above 5.0. *Id*. at 1125.[11]

*See also, e.g., In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig*., 2017 WL 6040065, at *9 (N.D. Cal. Dec. 6, 2017) (citing class

---

*Litigation*, 2005 WL 3008808, *11 (D.N.J.,2005), (awarding 1/3 of $75 Million class fund resulting in 1.8 multiplier); *Maley v. Del Glob. Techs. Corp.*, 186 F. Supp. 2d 358, 370-71 (S.D.N.Y. 2002) (awarding 33 1/3% of fund, which translated to "the modest multiplier of 4.65").

[11] *See, e.g., In re Merry–Go–Round Enterprises, Inc.*, 244 B.R. 327 (Bankr.D.Md.2000) (40% award for $71 million fund awarded, resulting in a cross-check multiplier of 19.6); *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, 2005 WL 1213926 (E.D.Pa.) ($100 Million class fund in antitrust case, with an award of 20% of the fund, multiplier of 15.6); *In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706 (E.D.Pa.2001) (in $193 Million fund, class counsel awarded fee of 25% of fund, which amounted to $48 Million and represented a multiplier of 4.5–8.5, which the court described as "handsome but unquestionably reasonable"); *In re Cendant Corp. PRIDES Litigation,* 243 F.3d 722, 732 (3rd Cir.2001) (5.7% of $341,500,000 settlement awarded, resulting in multiplier of 7); *In re Rite Aid Corp. Sec. Litig.*, 362 F.Supp.2d 587 (E.D.Pa.2005) (25% of $126,800,000 fund awarded; multiplier of 6.96); *Di Giacomo v. Plains All Am. Pipeline,* Nos. H–99–4137, H–99–4212, 2001 U.S. Dist. LEXIS 25532, at *31, 2001 WL 3463337 at *10 (S.D.Tex. Dec.18, 2001) (awarding 30% of $29.5 Million fund; multiplier of 5.3); *In re Xcel Energy, Inc. Sec., Derivative & ERISA Litig.*, 364 F.Supp.2d 980 (D.Minn.2005) (25% of $80M settlement; multiplier of 4.7. Declaration of Stuart J. Logan, the editor of the *Class Action Attorney Fee Digest,* submitted by Class Counsel in *Craft* (providing a list of 8 unreported cases from the previous two years with a multiplier of more than five, with three having a multiplier of 6–7.46 and three with multipliers of 7.47–10.26). All of these were cited in *Craft. See also, e.g., Hageman v. AT&T Mobility LLC*, 2015 WL 9855925, at *4 (D. Mont. Feb. 11, 2015) (33% or $15 million awarded from common fund of $45 million obtained for the Class (largest TCPA award awarding full amount allowed)).

fund cases with high multipliers; 3.66 multiplier is "well within the range of multipliers awarded in similar cases"); *Steiner v. Am. Broad. Co.*, 248 Fed.Appx. 780, 783 (9th Cir. 2007) (6.85 multiplier "falls well within the range of multipliers that courts have allowed").[12]

## V.   COUNSEL'S RATES AND HOURS ARE REASONABLE.

### A. Plaintiffs' Rates Are Reasonable.

In anticipation of a lodestar cross-check, Plaintiffs' counsel present substantial expert evidence of the reasonableness of the rates and the overall lodestar. In addition to evidence presented by Mr. Litt, who has been deemed an attorneys' fee expert by several courts, the declarations of Carol Sobel, a civil rights practicers in this district and an attorney's fee expert frequently cited by courts, and Richard Pearl, author of the leading treatise on attorney's fees in California, establish the reasonableness of the rates used for the lodestar cross-check. Current rates for complex federal litigation are commonly used in this District to adjust for delay in payment. *See, e.g., Missouri v. Jenkins,* 491 U.S. 274, 282, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989) ("adjustment for delay in payment— whether by the application of current rather than historic hourly rates or otherwise—is within the contemplation of the statute [42 U.S.C. § 1988]"); *Barjon v.* Dalton, 132 F.3d 496, 502–03 (9th Cir. 1997). Generally, current rates are the

[12] Small firms such as those here face even greater risks in litigating large class actions with no guarantee of payment. *Boyd v. Bank of Am. Corp.*, 2014 U.S. Dist. LEXIS 162880 (C.D. Cal. Nov. 18, 2014) (fee award of 33% rather than 25% benchmark, finding heightened risk of small firm representation should be rewarded with larger percentage fee for good result); *see also, Pennsylvania v. Delaware Valley Citizens' Counsel for Clean Air*, 483 U.S. 711, 750 (1987) (Delaware Valley II) (plurality opinion) ("Contingent litigation may pose great risks to a small firm or a solo practitioner because of the risk of nonpayment may not be offset so easily by the presence of paying work. . .."); *Davis v. Mutual Life Ins. Co.*, 6 F.3d 367, 382 (6th Cir. 1993) ("[T]he maintenance of comparatively large pieces of litigation preens small firms from diversifying risk by taking on additional clients . . .."). Thus, the size of the main firm handling this case (Mr. Litt's current and prior firm) militates in favor of an award at the high end of a reasonable percentage. See Litt Dec., ¶162 (current firm is eight attorneys).

preferred method. *Charlebois v. Angels Baseball LP*, 993 F. Supp. 2d 1109, 1119 (C.D. Cal. 2012) (lodestar award in settled class action, citing *Missouri v. Jenkins*; use of current rates "is justified by comparable increases in the market" (citing *Coles v. City of Oakland,* 2007 WL 39304, *7 (N.D.Cal. Jan. 4, 2007) (adjustment factors in other than inflation, such as attorneys' additional years of experience or changes in the legal market') (quoting *Blum v. Stenson,* 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984)); *see also Parker v. Vulcan Materials Co. Long Term Disability Plan,* 2012 WL 843623, *7 (C.D.Cal. Feb. 16, 2012) (approving as reasonable an approximate 10 percent increase between 2011 rates and 2012 "to account for expertise gained over time, or to keep up with the increasing cost of maintaining a practice"). The tables below provide relevant information for each biller, and the relevant detailed timesheets are submitted as Exhibits C and D to this motion. The time cutoff for hours worked is January 20, 2020.[13]

The specifics of the rates used and the hours worked for each biller are contained in the chart in Mr. Litt's Declaration at ¶167. The attorney rates range from $600-$1200[14], and $125-$360 for law clerks and paralegals of various levels of experience. The rates used here, after adjustment for inflation, were recently approved as reasonable by Central District Judge Bernal in *McKibben v. McMahon*, 2019 WL 1109683, at *14 (C.D. Cal. Feb. 28, 2019) (finding, in a jail class action involving disparate treatment of gay, bi-sexual and transgender inmates in programming and privileges, that the following rates were "within the

---

[13] Some qualifications and explanations are in order. The Litt firms had eleven billers who billed under 15 hours on the case; all of those were eliminated.

[14] The rates are as high as they are due to the duration of the case and the stability of the personnel assigned to it. For example, Ms. Battles was a two-year attorney when she began working on the case, but is now a 12-year attorney. This stability contributed to the relatively low number of hours worked on the case when contrasted to the results, i.e., the consistency of case knowledge allowed the work to be done very efficiently. For example, the *Young* attorneys contributed nearly double the hours as those here. Litt Dec., ¶ 57.

reasonable range for attorneys of their experience in this district": $1150 for Mr. Litt; $875 for attorneys with 30 and 32 years' experience; $600 for a ten year attorney, $715 for a 15 year attorney; $640 for a 13 year attorney, $480 for a six years attorney, $390 for a four year attorney, $335 for a senior paralegal and $225 for law clerks.).

Based on these hourly rates (which are the rates these attorneys would seek in an awarded statutory fee motion), the lodestar through January 20. 2020, is approximately $5,640,000. See Litt Dec., ¶167. This does not account for the remaining work, which includes work done after January 20 on this motion, the yet to be drafted motion for Final Approval and Order, responses to objections to the extent necessary, and ongoing work with the Class Administrator and class members as needed, which time will be provided for the Final Approval Hearing. The final lodestar is expected to be approximately $5,750,000. Nor is the substantial time spent on this fee motion included in the lodestar.

### B. The Hours Spent On The Case Are Reasonable

Reasonable hours are those that "would have been undertaken by a reasonable and prudent lawyer to advance ,,, his client's interest in the pursuit of a successful recovery." *Moore v. James H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir. 1982) (internal quotations omitted). Deference is due prevailing counsel's judgment regarding the hours reasonably spent; "lawyers are not likely to spend unnecessary time on contingency fee cases in the hope of inflating their fees. The payoff is too uncertain, as to both the result and the amount of the fee…. By and large, the court should defer to the winning lawyer's professional judgment as to how much time he was required to spend on the case; *after all, he won, and might not have, had he been more of a slacker.*" *Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008) (emphasis added). Counsel have presented detailed time records covering the past nearly ten years. *See* Exs C, D; Litt Dec. ¶¶161, 203; Declaration of Donald W. Cook and exhibits thereto. Notably, the time spent here

is approximately 56-57% of that for the comparable result in the *Young* strip search civil rights litigation. Litt Dec., ¶57. This is prima facie evidence of the reasonableness of the hours spent, particularly in light of the multiple pieces of litigation over class certification.

## VI.   THE COSTS ARE REASONABLE.

Plaintiffs seek slightly above $364,013.00 costs (exclusive of class administration) as of January 20, 2020, predominantly for expert, data, class outreach and mediation costs. See Litt Dec. ¶194; Exs E, F. The Court should award such costs (plus class administration), to be supplemented by additional costs as of the Final Approval hearing). Nontaxable cost reimbursement is authorized by Rule 23(h), and includes the "reasonable expenses normally charged to a fee paying client," *Newberg on Class Actions* §16:5 (5th ed.). *See, e.g., Thornberry v. Delta Air Lines, Inc.*, 676 F.2d 1240, 1244 (9th Cir. 1982), *cert. granted, judgment vacated on other grounds,* 461 U.S. 952, 103 S. Ct. 2421, 77 L. Ed. 2d 1311 (1983). Reimbursable costs include such costs as travel, telephone, investigators, consultants, filing fees, photocopies, printing, scans, messenger services, telephone, mailing, computerized legal research, and similar costs normally reimbursed by the client. *See, e.g., In re Immune Responses Sec. Litig.*, 497 F. Supp. 2d 1166, 1177–78 (S.D. Cal. 2007); *Ambriz v. Arrow Fin. Servs., LLC*, No. CV07-5423-JFW(SSX), 2008 WL 2095617 (C.D. Cal. May 15, 2008).

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant Class Counsel's fee request plus costs.

DATED: February 9, 2020          Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT,   LLP

By: /s/ Barrett S. Litt
           Barrett S. Litt

By: /s/ Lindsay Battles
           Lindsay Battles

25