Barrett S. Litt, SBN 45527
blitt@kmbllaw.com
Lindsay Battles, SBN 262862
Kaye, McLane, Bednarski & Litt, LLP
975 East Green Street
Pasadena, California 91106
Telephone: (626) 844-7660
Facsimile: (626) 844-7670

Donald W. Cook, SBN 116666
manncook@earthlink.net
Attorney at Law
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

Colleen M. Flynn, SBN 234281
cflynnlaw@yahoo.com
LAW OFFICE OF COLLEEN FLYNN
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 9001 0
Phone:  (213) 252-9444
Facsimile: (213) 252-0091

Attorneys for Plaintiffs

Cynthia Anderson-Barker, SBN 175764
cablaw@hotmail.com
Law Offices Of Cynthia Anderson-Barker
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010
Phone: (213) 252-9444
Facsimile: (213) 252-0091

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY AMADOR, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>SHERIFF LEROY D. BACA, et al.,<br><br>Defendants. | Case No. CV 10-01649 SVW (JEMx)<br><br>[Honorable Stephen V. Wilson]<br><br>**NOTICE OF MOTION AND MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT; [PROPOSED] ORDER; DECLARATIONS AND EXHIBITS**<br><br>**Date:    July 20, 2020**<br>**Time:    1:30 P.M.**<br>**Place:   Courtroom 10A** |

1       PLEASE TAKE NOTICE that, on July 20, 2020, at 1:30 p.m., or as soon

2 thereafter as this matter may be heard in Courtroom 10A of the United States District

3 Court for the Central District of California, 350 West First Street, Los Angeles,

4 California 90012, Plaintiffs will, and hereby do, move the Court to finally approve

5 the proposed settlement in this case, and to award attorneys' fees to class counsel.

6       This motion is unopposed by Defendants and is based on the accompanying

7 Memorandum of Law, the proposed Preliminary Approval Order and exhibits

8 thereto filed previously in the case, the exhibits and declarations previously and

9 concurrently filed in this case regarding the class settlement, the records in this case,

10 and on such further evidence as may be presented at a hearing on the motion.

11  DATED: July 6, 2020             Respectfully submitted,

12                              Kaye, McLane, Bednarski & Litt, LLP

13                              By: /s/ Barrett S. Litt

14                                Barrett S. Litt

15                              By: /s/ Lindsay Battles

16                                Lindsay Battles

17                                Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

1

# TABLE OF CONTENTS

**I.    INTRODUCTION** ....................................................................1

**II.   TERMS OF THE SETTLEMENT AND FINAL ALLOCATION OF
        FUNDS** ...........................................................................4

**III.  THE STANDARDS FOR FINAL APPROVAL OF THE SETTLEMENT
        HAVE BEEN MET** ............................................................7**

    **A.    THE AMOUNT OF THE SETTLEMENT IN LIGHT OF THE POTENTIAL
              RECOVERY** ..............................................................7

    **B.    The Extent Of The Discovery Conducted** ....................................8

    **C.    The Complexity And Potential Costs Of Trial** ...............................9

    **E.    The Capacity For The Defendant To Withstand A Larger
              Judgment** ................................................................11

**IV.   THE COURT SHOULD REJECT THE FEW OBJECTIONS THAT
        HAVE BEEN FILED** .........................................................11

    **A.    12/23/19 Darla Jones Objection (Attached as Ex. A) – non-class
              member objection that the class period cutoff of January 1, 2015
              should be extended.** .....................................................11

    **B.    Anika White Objection (Attached as Ex. B); Jessica Vega
              Objection (Attached as Ex. C); Anthonesia Hicks (Attached as Ex.
              D) – non-class member objections that the class period cutoff of
              January 1, 2015 should be extended** .....................................12

    **C.    Tina Caldwell Objection (Attached as Ex. E).** .............................13

    **D.    Mayra Reyes Objection (Attached as Ex. F).** ..............................14

    **E.    Joyce Lucero Objection (Attached as Ex. G).** .............................14

    **F.    Monique Hervey Objection (Attached as Ex. H).** .........................15

    **G.    Teri Lynn Van Leuven Objection (Attached as Ex. I).** ...................16

    **H.    Lecia Shorter Objection (Attached as Ex. J)** ..............................16

    **I.    Natalie Garcia Objection/Optouts (Attached as Ex. L).** .................21

**V.    MANY CLASS MEMBERS SUBMITTED DESCRIPTIONS OF
        THEIR EXPERIENCE AND REQUESTED THAT THE COURT BE
        MADE AWARE OF THEM.** ..............................................22

**VI.   THE CLASS ADMINISTRATION COSTS SHOULD BE PAID.** .........22

**VII.  LATE CLAIMS SHOULD BE ALLOWED.** ............................22

i

VIII.  INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS ARE APPROPRIATE. ........................................................................23

IX.    ATTORNEYS' FEES .................................................................25

X.     CONCLUSION ..........................................................................26

1

# <u>TABLE OF AUTHORITIES</u>

2

### Federal Cases

3

4
*Bostock v. Clayton Cty., Georgia*
  __ U.S. __, 2020 WL 3146686 (U.S. June 15, 2020) ........................................ 15

5
*In re: Cathode Ray Tube (CRT) Antitrust Litig.*
6
  No. 1917, 2016 WL 153265 (N.D. Cal. Jan. 13, 2016) ..................................... 24

7
*Chu v. Wells Fargo Investments, LLC*
8
  Nos. C 05–4526 MHP, C 06–7924, 2011 WL 672645 (N.D. Cal.
9
  Feb. 16, 2011) ........................................................................................................ 25

10
*Chun–Hoon v. McKee Foods Corp*.
11
  716 F.Supp.2d 848 (N.D.Cal.2010) .................................................................... 10

12
*Churchill Village, L.L.C. v. General Electric*
13
  361 F.3d 566 (9th Cir. 2004) ................................................................................ 10

14
*In re Facebook, Inc., IPO Securities and Derivative Litigation*
  312 F.R.D. 332 (S.D. N.Y. 2015) ........................................................................ 20

15
*Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*
16
  566 U.S. 318, 132 S. Ct. 1510 (2012) .................................................................... 7

17
*Glass v. UBS Financial Services, Inc.*
18
  2007 WL 221862 (N.D. Cal. 2007), *aff'd*, 331 Fed. Appx. 452 (9th
19
  Cir. 2009) .................................................................................................. 16, 24, 25

20
*Gould v. Alleco, Inc.*
21
  883 F.2d 281 (4th Cir. 1989) ................................................................................ 12

22
*In re High-Tech Employee Antitrust Litig*.
23
  No. 11-CV-02509-LHK, 2015 WL 5158730 (N.D. Cal. Sept. 2,
  2015) ...................................................................................................................... 24

24
*Hopson v. Hanesbrands Inc*.
25
  2009 WL 928133 (N.D. Cal. 2009) ...................................................................... 24

26
*Jenson v. Continental Financial Corp*.
27
  591 F.2d 477 (8th Cir. 1979) ................................................................................ 16

28

iii

*Moore v. Verizon Communications Inc.*
  2013 WL 450365 (N.D. Cal. 2013)................................................... 12

*Mullane v. Cent. Hanover Bank & Tr. Co.*
  339 U.S. 306, 70 S. Ct. 652, 94 L. Ed. 865 (1950) ............................ 18

*Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*
  688 F.2d 615 (9th Cir. 1982)............................................................. 14

*Phillips Petroleum Co. v. Shutts*
  472 U.S. 797, 105 S. Ct. 2965, 86 L. Ed. 2d 628 (1985) ................... 19

*Rodriguez v. West Publishing*
  563 F.3d 948(9th Cir. 2009).......................................................... 10, 24

*Rutter & Wilbanks Corp. v. Shell Oil Co.*
  55 Fed. Appx. 501 (10th Cir. 2003) ................................................... 16

*Staton v. Boeing Co.*
  327 F.3d 938 (9th Cir. 2003)............................................................. 24

*In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*
  295 F.R.D. 438 (C.D. Cal. 2014) ...................................................... 10

*Van Vranken v. Atlantic Richfield Co.*
  901 F.Supp. 294 (N.D. Cal.1995)...................................................... 24

*White v. Experian Information Solutions, Inc.*
  2011 WL 13242815 (C.D. Cal. 2011), *rev'd and remanded*, 2013
  WL 1715422 (9th Cir. 2013), opinion amended and superseded,
  715 F.3d 1157 (9th Cir. 2013)............................................................ 10

*Wilson v. Garcia*
  471 U.S. 261, 105 S.Ct. 1938 (1985) (§1983................................... 12

**Federal Statutes**

42 U.S.C. § 1983......................................................................................... 12

iv

## State Statutes

Cal.Civ.Proc.Code § 335.1 .................................................................. 12

Cal. Govt. Code § 12940(a) ................................................................. 15

Civil Code § 52.1 ............................................................................ 8, 17

**Rules**

Rule 23 ...................................................................................... 11, 16

Rule 23(C)(4) ................................................................................... 23

Rule 23(e) .................................................................................. 12, 16

Rule 23(e)(5) .................................................................................... 12

## Constitutional Provisions

Fourth Amendment ............................................................................ 1, 2

## Other Authorities

*4 Newberg on Class Actions* § 13:23 (5th ed.) ........................................ 16

*Newberg on Class Actions* § 13:48 (5th ed.) ........................................... 7

*1 Newberg on Class Actions* § 3:77 (5th ed.) ......................................... 20

## MEMORANDUM OF POINTS & AUTHORITIES

## I.   INTRODUCTION

Plaintiffs are former detainees of the Los Angeles Sheriff's Department's Century Regional Detention Facility (hereafter "CRDF"). Plaintiffs filed this class action lawsuit in 2010 challenging what they contended was the systematic violation of their constitutional rights through the unnecessarily humiliating and dehumanizing manner of strip searching female inmates entering CRDF.

Plaintiffs contended that, between 2008 and 2015[1], the LASD routinely subjected female inmates to highly invasive body cavity inspections, in large groups (often over 40 women), without individual privacy, and despite the absence of a penological justification and the ready availability of alternatives, in violation of the Fourth Amendment. Plaintiffs specifically challenged as unconstitutional the search procedures common to the whole period, which included practices that required female inmates to (1) manually spread their labia to expose their vaginal opening in the presence of a group; and (2) expose their naked body – including bare pubic region and bare breasts – in the presence of a group. Plaintiffs contended that the use of these specific, highly invasive, gender-specific procedures in a group setting, without individual privacy, despite the known risk of trauma to female inmates and despite the availability of inexpensive, fully secure alternatives that would have provided privacy for the most egregious intrusions was unconstitutional, represented an extreme departure from accepted practice in women's detention facilities, and were unsupported by a valid penological justification. The County's representative testified that that privacy curtains, which she installed in 2015, were always a viable option and "could have solved the privacy problem years ago [had someone thought

---

[1] While the practice goes back to 2006, the complaint was filed in 2010. Thus the class period begins in 2008, specifically March 5, 2008, which is two years before the filing of the complaint. The class period is between March 5, 2008 and January 1, 2015 (the date body scanners or privacy partitions were available for all CRDF strip searches, per this Court's summary judgment order).

1

1  of them].”[2]

2       In addition to these core conditions, applicable to all class members across the

3  full class period, Plaintiffs also challenged several specific practices applicable to

4  specific time periods or subclasses of women. Plaintiffs challenged the practice of

5  requiring menstruating women to publicly identify themselves and remove their

6  tampons or pads in view of other detainees, and before completing the visual-body-

7  cavity inspection, which often caused them bleed on themselves or the ground.

8  Plaintiffs likewise challenged LASD's practice of searching women outside in cold

9  weather conditions. Because the inmates were wearing no clothing, shoes or socks,

10 the air temperature would often have felt as though it were in the 40's or 50's.

11 Plaintiffs also challenged more intrusive practices used during the first several years

12 of the class, including the requirements that women: (1) face each undressed, with

13 bare breasts and underwear pulled to their knees, while performing various steps in

14 the search process (including inspection of the area under their breasts and stomachs

15 and inspection of their mouths); and (2) that two parallel lines simultaneously

16 complete the visual body cavity inspection by bending over and looking through

17 their legs while deputies inspect their rectum and vagina, one-by-one, during which

18 time they could not avoid seeing similarly positioned women on the opposite wall.

19 The Court did not need to reach whether these additional conditions were

20 unreasonable under the Fourth Amendment because it found that the core conditions,

21 common throughout all time periods and applicable to all class members, uniformly

22 violated all class members' constitutional rights.

23      The Court entered its final class certification order on November 18, 2016.

24 (Dkt. 327.) Notably, there were several rounds of class certification litigation – in

25

26 [2] While there was initially a claim for injunctive relief, Plaintiffs agreed that the
   installation of the previously described body scanners and privacy partitions mooted that
27 claim. Thus, the settlement only addresses damages except for the provision for the
   development of gender responsive policies and the retention of the Moss Group and the
28 Center for Gender and Justice.

2

2010, which motions were not ruled on; in 2013-14, in which the Court certified an injunctive relief class and also found that common issues did not predominate for a damages class but permitted Plaintiffs to file a renewed motion for class damages certification; in 2014, pursuant to the Court's permission to file a renewed motion for class damages certification, which was granted; decertification of the class after the grant of Defendants' motion for summary judgment on injunctive relief in 2016; and in 2016, the final grant of class certification for the damages classes.

The Court granted Plaintiffs' motion for summary judgment on liability for the damages classes on June 7, 2017. (Dkt. 361) (2017 WL 9472901). The Court had previously denied the availability of classwide general damages, which left undetermined the procedure to address class member damages.

The parties held three full day in-person settlement conferences before the Hon. George H. King (Ret.), as well as numerous discussions among or between counsel and Judge King. After extensive arms-length negotiations, the parties reached a settlement, which is contingent on this Court's approval. Declaration of Barrett S. Litt in support of Final Approval (hereafter "Litt Dec."), ¶2 . Even after settlement in principle was reached, it took over a year to agree to the specific settlement terms. The proposed settlement was finally agreed to by all parties,  and ultimately the Court preliminarily approved that settlement.

This motion addresses whether the Court should finally approve this settlement. There is no question that it should. The Claims rate in this case exceeds 33%. (The actual figure is 40.7%.) Thus, out of the approximately 94,000 class members, some 25,528 filed timely claims (in addition to the 129 late claims). This is an unprecedented response rate. Past large strip search settlements have ranged from around a 15%, and in some cases lower, to a 25% claims rate. The extent of class members seeking to tell their stories for the Court to understand the extent of the trauma they experienced is unparalleled. See Litt Declaration, ¶¶3, 4.

There have been 129 late claims filed since the June 4 cutoff date. Plaintiffs' counsel request that the Court allow late claims received or postmarked between June 4 and July 20 (which is the date of the final approval hearing). That request is addressed in Section VI.

Of the tens of thousands of claims filed, only six class members filed objections, an exceptionally low rate. There were four objections from non-class members who objected that the class period either started later than it should, or objected that is ended earlier than it should. The objections are submitted with this motion as Exhibits A through J, and their substance is addressed in Section IV of this motion.

Similarly, there were only four opt-outs. None of the opt-outs expressed dissatisfaction with the settlement or explained the reason these class members were opting out. The opt-outs are submitted with this motion as Exhibit L.

The overwhelmingly favorable response of class members attests to the reasonableness of the settlement.

## II.   TERMS OF THE SETTLEMENT AND FINAL ALLOCATION OF FUNDS

The terms of the settlement are set forth in greater detail in the exhibits attached to the original Proposed Preliminary Approval Order, (Dkt. 387), and more specifically in the Settlement Agreement, in Exhibit A thereto (the Settlement Agreement, Dkt. 387-2).

In summary, the settlement's basic terms, as they relate to Damages Class Members, are that Defendants will provide payment of a total of Fifty-Three Million dollars ($53,000,000) equally spread over a three-year period into a Class Fund. From that amount, the following awards will be made, subject to court approval:

   a.   Incentive awards to the 9 Named Plaintiffs in the amount of $10,000 each (for a total of 90,000).

b. Payment of the third-party class settlement administration costs to the chosen class administrator, JND Legal Administration of approximately $672,185.96 (inclusive of costs to date plus the estimated cost of in fees and expenses in connection with curing the deficient claims, paying the first round of claims, and addressing additional late claims, complaints for not being included as a valid claimant, and class member inquiries). See Declaration of Jennifer Keogh, for JND Legal Administration, filed with the final approval motion. Only an estimate is available at this time because the processing of class settlement checks in the first of the three installments has not yet occurred. This figure does not include the cost of the second and third round distributions, which are estimated at under $100,000. (Although the original bid estimated a maximum cost of of approximately $464,000 for a claims rate of up to 35%, the actual claims rate was significantly higher (over 40%), and the class contact with the administrator was beyond expectations. See Declaration of Jennifer Keogh, ¶ 33-34.)

c. A motion for attorneys' fees and costs to be approved by the Court. The agreement provides that Plaintiffs' counsel may request up to 1/3 of the class fund but not more, plus reimbursement of litigation costs. That motion is pending and is to be decided at the same time as this motion.

d. The remainder of the Class Fund, estimated as a minimum of somewhat over $34 Million but dependent in part on the amount of the attorneys' fee award, shall be distributed to the class members, including Named Plaintiffs/Class Representatives) under a formula contained in ¶¶ 5-13 of the Settlement Agreement, particularly ¶ 7.

The distribution formula awards a certain number of points for each strip/visual body cavity search. The number of points per search ranges between 70 – 100, based on the time period in which the search occurred. The points vary according to time period because the invasiveness of the search conditions varied over time, with the worst conditions occurring prior to July 2011.  Each search conducted at a temperature of 70 degrees or less receives an additional 10-points. The per-search points are assigned to each class member, up to their 50th search.[3]

---

[3] The "50-search cap" applies to less than .04% of the class.

This cap is to ensure that outliers who have outsized claims do not distort the meaningfulness of the recovery to the remaining class members. Such outliers would be entitled to opt out and pursue their own claims if they so chose.

Once the valid claims are determined which, in small part, depends on whether late claims are authorized, the claims administrator will calculate the total points for each class member and total points for all claiming class members who submitted timely claims.[4] Each class member's recovery will be determined based on that class member's percentage of the total points for all class members.

Despite the foregoing, no class member who qualifies for payment will receive less than a total of $200. This minimum payment amount would apply only in the event of an unexpectedly high claims rate.

The Class Fund is non-reversionary. While there was provision for a donation to *cy pres* organizations to be agreed on to the extent that the total value of claims was less than the agreed upon "Minimum Remainder" of $31 Million in the event of a low claims rate, that provision is moot and inapplicable because the claims rate has far exceeded what would have triggered that provision.

Defendants had the right to withdraw from the settlement if more than 250 class members opt out of the settlement. That provision is inapplicable due to the low number of opt-outs

The settlement provided for the Class Administrator (JND Legal Administration) to issue notice to all class members via a combination of text message, email, and first class mail notice. Initial notice was be sent by US mail unless JND is able to locate both a mobile phone number and email address, in which case it will initially be sent by both of those means, with follow up notice by regular mail for those who do not file claims in response to text message/email notice. All class members for whom JND could locate email address or phone numbers were to receive follow-up notice by email and text. JND will also public notice in Prison

_____
[4] The Settlement Agreement provides how to determine what claims are timely.

Legal News (a publication widely distributed to inmates throughout the country) and selective social media/online outreach directly targeting class members' Facebook and/or Instagram accounts. JND Legal Administration has filed a declaration attesting to its completion of all of these tasks and providing other information regarding its administration of the settlement, including the costs to date and estimated remaining costs. (See Declaration of Jennifer Keough.)

## III. THE STANDARDS FOR FINAL APPROVAL OF THE SETTLEMENT HAVE BEEN MET

The factors for entry of a final approval order have been summarized in *Newberg on Class Actions* §13:48 (5th ed.) as generally assessing  1) the amount of the settlement in light of the potential recovery discounted by the likelihood of plaintiffs prevailing at trial;  2) the extent to which the parties have engaged in sufficient discovery to evaluate the merits of the case; 3) the complexity and potential costs of trial; 4) the number and content of objections; 5) the recommendations of experienced counsel that settlement is appropriate; and, in some instances; and 6) the capacity for the defendant to withstand a larger judgment. We briefly address those factors here:

### A. THE AMOUNT OF THE SETTLEMENT IN LIGHT OF THE POTENTIAL RECOVERY

Plaintiffs addressed this issue in the Preliminary Approval Order submissions, and provided evidence that the recovery was well above those in other cases, and specifically was the second largest strip search settlement in the country, and the largest based on per class member recovery. This settlement not only qualifies as among the highest ever in the country for strip searches, but, to Plaintiffs' counsel's knowledge, it is the first successful strip search class action based solely on a challenge to the manner of search (as opposed to challenging the legality of a search at all, on which there have been many successful challenges). As noted by Prof. Rubenstein, after the Supreme Court's decision in *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 352, 132 S. Ct. 1510 (2012), the

7

success of strip search litigation dropped dramatically, making the success of this litigation particularly exceptional. See Declaration of William B. Rubenstein (Dkt. 413) filed in support of Motion for Attorneys' Fees.

Plaintiffs do not doubt that awards for many individual class members would have been five figures, and for some six figures, but only after individual damages trials. General damages were not available for the class as a whole based on the Court's rulings. Statutory damages were potentially available, but only if Civil Code §52.1 was ruled available. That code section has been the subject of considerable legal debate. Its contours are not yet clearly set, and the Court did not rule on its availability.

A factor driving settlement from Plaintiffs' perspective was that, even given summary judgment on liability, this case could have spread out over several years litigating individual damages claims, and only a far smaller percentage of the class would likely have come forward to pursue individual damages in comparison to the number that would file claims. In addition, absent settlement, it was highly likely that Defendants would have appealed the grant of summary judgment on liability.

Given all of these factors, it was the judgment of Plaintiffs' counsel that the settlement represents a fair compromise given the preceding considerations. The reaction of the class, discussed *infra,* clearly supports that conclusion.

**B.    The Extent Of The Discovery Conducted**

This case was litigated extensively. Plaintiffs conducted extensive discovery, including documents and database discovery and numerous depositions; litigated four class certification motions; and successfully opposed defendants' summary judgment motion and prevailed on their own. They retained numerous experts on a whole range of issues, who were key to Plaintiffs' ultimate success. The case spanned over ten years from filing to the instant hearing for final approval.

C.      **The Complexity And Potential Costs Of Trial**

While liability was established, the court did not certify the class for general damages and did not reach statutory damages under Civil Code §52.1. Thus, a complex issue arose regarding the handling of class member damages if statutory damages were not available.

D.      **The Number And Content Of Claims, Objections and Opt-Outs (and the Overall Class Reaction).**

There were six class member objections and four non-class member objections, objecting to the fact that the class period did not cover their time a CRDF when it should have, in their view. The merits of these objections are addressed in Section IV. There were six opt-outs, including the late opt-out of Natalie Garcia, attached as Ex.L. The only one of which expressed dissatisfaction with the settlement was Ms. Garcia who considered the class member recovery too low.

There was an exceptionally high claims rate, with 25,528 confirmed timely claims, and another 9,490 claims of people whose status as class members is being verified because their claim information did not fully comport with the LASD data.[5] Jennifer Keogh Declaration, ¶30(a). The Class Administrator has instituted a process of verification for these "deficient" claims, and estimates that over 50% of these are valid claims. That process includes, subject to Court approval, accepting the claims of class members who filed a claim under a name that appears only once in the jail data because of the high likelihood that, if they filed a unique claim under a unique name that matched jail data and the name did not come from a pre-printed form, it is reliable, as well as to check aliases. It also includes, again subject to Court approval, obtaining different forms of verification that suggest that the claimant is legitimate.

---

[5] It is a reality of any data system, and especially one reliant on large daily manual inputs of information, that mistakes are relatively common. Thus, the fact that jail data do not fully match information provided by class members is to be expected.

Thus, it is expected that over 30,000 out of approximately 94,000 class members will receive class fund payments. This process will not be completed by the date of the Final Approval hearing. This is, as previously explained, an exceptional claims rate of approximately 1/3, possibly higher. This attests to both the significance of the issue to class members and their very high approval of the settlement. To class counsel's knowledge, this is the highest percentage claims rate of any large class action in the country. This attests to both the significance of the settlement to class members and their very high approval it.  Litt Dec., ¶ 8.

The paucity of objections and opt-outs strongly support the fairness and adequacy of the settlement. "The negligible number of opt-outs and objections indicates that the class generally approves of the settlement." *In re Toys R Us-Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig*., 295 F.R.D. 438, 456 (C.D. Cal. 2014) (citing *Churchill Village, L.L.C. v. General Electric*, 361 F.3d 566, 577 (9th Cir. 2004)(affirming the approval of a class action settlement where 90,000 members received notice and 45 objections were received); *Rodriguez v. West Publishing*, 563 F.3d 948, 967(9th Cir. 2009) ("The court had discretion to find a favorable reaction to the settlement among class members given that, of 376,301 putative class members to whom notice of the settlement had been sent, 52,000 submitted claims forms and only fifty-four [.014 percent of class members] submitted objections"); *Chun–Hoon v. McKee Foods Corp*., 716 F.Supp.2d 848, 852 (N.D.Cal.2010) (concluding, in a case where "[a] total of zero objections and sixteen opt-outs (comprising 4.86% of the class) were made from the class of roughly three hundred and twenty-nine (329) members," that the reaction of the class "strongly supports settlement"). Here, the percentage of objections is less than .0065% of the class (i.e., less than even the very low *Rodriguez* objection rate), a minuscule number.

Similarly, the low number of opt-outs supports approval. See, e.g., *Churchill Village, supra* (approving the district court's approval of settlement where 500

people out of an initial notice pool of 90,000 class members opted out); *White v. Experian Information Solutions, Inc.,* 2011 WL 13242815, at *8 (C.D. Cal. 2011), *rev'd and remanded*, 2013 WL 1715422 (9th Cir. 2013), opinion amended and superseded, 715 F.3d 1157 (9th Cir. 2013) ("Class members' failure to exclude themselves in large numbers indicates that reaction to the Settlement was generally positive.").

In addition to the overwhelmingly favorable class member response based on objections and opt-outs, an additional indication of the very favorable class reaction is that 539 class members felt so strongly about their experience that they filled out the "My Experience" tab on the class administrator website to record how devastating their strip search experience had been. Class counsel indicate that they have never seen anything similar in their decades of experience with jail class actions. See Litt Dec., ¶4.

**E.      The Capacity For The Defendant To Withstand A Larger Judgment.**

This was not a factor in this settlement. The Defendants here could unquestionably withstand a larger judgment. The settlement was driven by an assessment of the reasonable value of the case, and was not discounted due to questions regarding the Defendants' ability to pay.

**IV.     THE COURT SHOULD REJECT THE FEW OBJECTIONS THAT HAVE BEEN FILED**

There are six objections to the settlement that have been filed, although upon review not all qualify as true objections, and some are by people who are not class members, whether because they were not searched during the class period or they opted out of the settlement (thereby excluding themselves from the settlement class). We address them all.

**A. 12/23/19 Darla Jones Objection (Attached as Ex. A) – non-class member objection that the class period cutoff of January 1, 2015 should be extended.**

11

Darla Jones objects to the settlement because she was strip searched at CRDF before the beginning of the class period, and she objects to the fact that the settlement does not cover strip searches before March 5, 2008. However, "[a]s Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon non-class members [to object." §13:22.Standing to object—Generally, 4 Newberg on Class Actions §13:22 (5th ed.). Rule 23(e)(5) provides that "[a]ny class member may object to the proposal if it requires court approval." *See also, e.g., Gould v. Alleco, Inc.,* 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals."); *Moore v. Verizon Communications Inc.*, 2013 WL 450365, *4 (N.D. Cal. 2013) ("[N]on-class members have no standing to object to the settlement of a class action."). Ms. Jones is not a class member because the lawsuit, filed March 5, 2010, goes back two years from the date of filing. Claims for damages under 42 U.S.C. §1983 are subject to the forum state's (here, California's) two-year statute of limitations for personal injury claims. *See Wilson v. Garcia*, 471 U.S. 261, 280, 105 S.Ct. 1938, (1985) (§1983 claims are best characterized as personal injury actions, and the statute of limitations is subject to the forum state's personal injury statutes of limitation); Cal.Civ.Proc.Code §335.1 (an action for personal injury must be brought within two years).

**B. Anika White Objection (Attached as Ex. B); Jessica Vega Objection (Attached as Ex. C); Anthonesia Hicks (Attached as Ex. D) – non-class member objections that the class period cutoff of January 1, 2015 should be extended.**

Anika White objects to the settlement because she was strip searched at CRDF after the conclusion of the class period (September 2017-July 2018). Jessica Vega similarly objects to the settlement because she was strip searched at CRDF after the conclusion of the class period (December 3. 2015 through 2016). So too does Anthonesia Hicks (who believes the end date should be January 31, 2017) All three feel that they were subjected to the same or similar practices as were involved in the

practices found unconstitutional in the court's summary judgment order, albeit after the class period.

As the Court is aware, Defendants represented to the Court that, by the end of January 2015, they were no longer strip searching in groups in the bus bay; were primarily searching through the use of scanners (according to Defendants, 98% of searches were with scanners; and, where the scanners could not be used, were strip searching with privacy screens). (See Dkt. 303) (pp. 1-5 of Memorandum in support of Motion for Summary Judgment). The class period termination was based on these representations and on the Court's dismissal of the injunctive relief claim based on these representations. While Plaintiffs' counsel have heard occasional complaints such as these objectors, they do not have information upon which to claim widespread strip searches after January 2015 of the type that were occurring previously. Accordingly, the end of the class period is based on substantial evidence in the record and this Court's findings granting summary judgment on the injunctive relief claim. Since these objectors' searches post-date the end of the class period, they are not class members, and, for the reasons explained regarding Ms. Jones, they lack standing to object.

### C. Tina Caldwell Objection (Attached as Ex. E).

Tina Caldwell objects to the settlement because she believes that she and others who were pregnant during the search process should receive "higher fees," and she requests to be heard at the final approval hearing. Ms. Caldwell describes her experiences during the searches; how "humiliated" she felt and how "inhumane" the searches were; and how she has "flashbacks and nightmares along with racing thoughts and anxiety attaches" when she thinks of the searches. As sympathetic as class counsel are to Ms. Caldwell's experience, her experiences and feelings are shared by thousands of class members, and there is no practical way to allocate settlement funds through an individualized process to assess harm without substantially reducing the settlement fund to pay the administrative costs of such

assessments. "Ultimately, the district court's determination [concerning the fairness and adequacy of a proposed settlement] is nothing more than an amalgam of delicate balancing, gross approximations and rough justice…. [I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (internal citation and quotation marks omitted). Plaintiffs' counsel submit that the current settlement accomplishes that goal, a conclusion reinforced by the overwhelming approval of class members, the high claims rate exceeding that of any other class strip search settlement of which class counsel are aware, and the low number of objections and opt outs. The rights of those who feel they should receive higher compensation for individualized reasons are protected because they are entitled to opt out and proceed separately to seek damages.

**D. Mayra Reyes Objection (Attached as Ex. F).**

Mayra Reyes objects to the settlement essentially because she is deaf and was not provided the ability to use ASL (American Sign Language) or other means of communicating and was not allowed to be handcuffed in front so that she could sign. Again, and as explained previously, as sympathetic as Ms. Reyes's experience was, such individualized issues could not be addressed effectively in the context of a classwide settlement, and her concern appears to be more that LASD should be more aware of disability issues – which was not an issue certified for class treatment in this case and therefore outside the scope of the settlement – than an objection to the terms of the settlement as such.

**E. Joyce Lucero Objection (Attached as Ex. G).**

Joyce Lucero objects to the settlement on the ground that there was not compensation for the fact that she was not provided her crutches or a wheelchair upon her release from jail although she had a broken leg, essentially a disability related objection and unrelated to the strip searches, and because she felt the guards

who searched them were lesbians who should not have been conducting such searches. Again, and as explained previously, as sympathetic as Ms. Lucero's first objection was, her description relates to the release process; in any event, such individualized issues could not be addressed effectively in the context of a classwide settlement; and her concern appears to be more that LASD should be more aware of the uncertified issue of treatment of disabled inmates than an objection to the terms of the settlement as such. The objection related to "lesbian women" conducting the searches both lacks any foundation (since Ms. Lucero has not established how she knows the deputies were lesbian), is beyond the scope of the manner of strip search claim in this case, and is legally invalid under federal and state employment law. *See Bostock v. Clayton Cty., Georgia*, __ U.S. __, 2020 WL 3146686 (U.S. June 15, 2020) (Title VII applies to gay, lesbian and transgender employees); Cal. Govt. Code §12940(a) (prohibiting employment discrimination, inter alia, on the basis of "sex, gender, gender identity, gender expression, …[and] sexual orientation").

### F.  Monique Hervey Objection (Attached as Ex. H).

Monique Hervey's objection is to either the size of the attorneys' fee award requested or the size of the settlement as a whole. She stated, in toto, "This is an insult to us we are only getting less than [$]500 while the lawyers get millions and we are the ones who indured [sic] this humiliation the worst kind it's almost like rape molestation and it's like we aren't worth more than that more money should of been awarded to us it's just saying how much we really are worth that's nothing to us it sounds like the lawyers made out more than we did that's bull crap."

As to the point of only making "$500," that is inaccurate. Even with the high claims rate in this case, the mean recovery will be in the neighborhood of $1000 per class member, but with high variation depending on the number of searches and other factors. As explained in Plaintiffs' fee motion, Plaintiffs' counsel believe that the fee they have requested is justified by the complexity of the case, the quality of

the lawyering, and the enormous risk taken in litigating this case over 10 years without compensation, and with compensation dependent on a highly uncertain favorable outcome. The Court, of course, will make the final judgment on that issue.

**G. Teri Lynn Van Leuven Objection (Attached as Ex. I).**

Teri Lynn Van Leuven's objection is to the size of the attorneys' fee award requested. She states that she objects to the requested 1/3 fee because it is "a bit steep, or very steep, in light of the $18 Million in case expenses." As that statements reflects, this objection reflects a misunderstanding, and conflates the estimated maximum total costs and attorneys' fees of $18 Million to be separate from the attorneys' fee award rather than inclusive of it. Thus, because the objection assumes fees and costs of up to approximately $36 Million rather than $18 Million, it is not well taken.

**H. Lecia Shorter Objection (Attached as Ex. J).**

Lecia Shorter (who filed two objections, (Dkts 393 and 429), one of which was prior to the November 7, 2019, preliminary approval order) objects to the settlement on numerous grounds. However, the starting point in assessing her objection is that she has opted out of the settlement (Dkt 429) and thus is no longer a class member because "[c]lass members who opt out of the class at certification or at settlement are no longer considered class members, and hence Rule 23 does not give them standing to object to the settlement." *4 Newberg on Class Actions* §13:23 (5th ed.), 13:23.Standing to object—Opt-outs. *See also, e.g., Jenson v. Continental Financial Corp.*, 591 F.2d 477, 482 n.7 (8th Cir. 1979) (citing *Newberg on Class Actions*) ("Opt-outs … are not members of the class and hence are not entitled to the protection of Rule 23(e)."); *Glass v. UBS Financial Services, Inc.*, 2007 WL 221862, *8 (N.D. Cal. 2007), *aff'd*, 331 Fed. Appx. 452 (9th Cir. 2009) (putative objector who opted out of class "is no longer a class member, [and] he has no standing to object"). The only exception is, where the opt-out can demonstrate "plain legal prejudice," to her or him, s/he has standing to object. *E.g., Newberg*,

16

§13.23; *Rutter & Wilbanks Corp. v. Shell Oil Co*., 55 Fed. Appx. 501, 503 (10th Cir. 2003) (noting rule that opt-outs could object if they could demonstrate "plain legal prejudice" from settlement). No such prejudice is asserted here.

Nonetheless, "if the purpose of the fairness hearing is to enable the judge to learn about problems with the settlement, there may be no better source of that information than those opting out of the settlement. Even if these opt-outs technically have no standing to register their objections as class members/parties, they serve a function similar to amici curiae, and the court might entertain their views on that basis." *Newberg*, §13 2.23. Plaintiffs' counsel agree that, although Ms. Shorter lacks standing to object the settlement, the Court has the authority to assess the merits of her objection, and we accordingly address them. Doc 429 contains the elaboration of Ms. Shorter's objections, and we therefore address those objections unless otherwise indicated.

Ms. Shorter's first objection essentially appears to be that the amount of the settlement is too small.  She argues that the projected settlement recovery is in the range of $200-$1500, which is "miniscule compared to Class Counsel's representation that many individual class members could receive six figure verdicts. Thus, a significant portion of class members will be disadvantaged because they could obtain significantly more individually than participating in the class." (Dkt. 429, p. 3/4-8 of 30.) Ms. Shorter also raises that the complaint sought statutory damages under Cal. Civil Code §52.1 of $4000 per violation, and the settlement provides far less than that. Using herself as an example, Ms. Shorter asserts that she would receive at least $64,000 and "could well range into six and possibly seven figures." *Id*. at 3/19-23.

Ms. Shorter's objections are not well-taken. Under her analysis, a reasonable settlement would have to be in the several hundred million dollar range, a figure that is completely unrealistic in a civil rights case against a government entity. Such a requirement for settlement would have doomed the possibility of a settlement; at

best, would have required several more years of litigation because Defendants would certainly have sought to reverse the summary judgment ruling in Plaintiffs' favor and, at worst, could have resulted in a reversal; and would have required individual damages proceedings of some sort for those class members who came forward to seek damages. It was, and remains, class counsel' judgment that the number of class members who would have participated in such individual damages efforts is a fraction of the over 25,000 who have made claims, and that a global settlement was in the interest of the class as a whole. Because 5% of the class could opt out and pursue their own damages without it undermining the settlement, this protected those class members – such as Ms. Shorter – who wished to purse a higher recovery in an individual proceeding. See Declaration of Barrett S. Litt in support of Motion for Final Approval of Settlement, ¶5.

Ms. Shorter also purports to speak on behalf of class members who have not objected, which is improper. Similarly, she purports to speak for Mary Amador. According to Ms. Shorter, both Ms. Williams and Ms. Amador do not approve of the settlement or have indicated an intent to opt out. (Dkt. 429 at p.3/27-4/3; 5/1-21, 18/1-19/3.) The portion of Ms. Shorter's objection and Declaration where she purports to speak for or quote class representative Ms. Williams or Ms. Amador are hearsay and should not be considered by the Court. Both have filed claims, and neither one has opted out or objected to the settlement.

Ms. Shorter next objects that the class administrator should calculate points in advance of any opt-out deadline, and that class members have not been advised that participation in the Settlement may preclude a claim for other related damages. *Id*., p. 6/1-24. As to the first, because the amount per point is determined based on total claims, which, along with objections or opt outs, are due by a set cutoff date, which is standard practice in class action settlements, it is not practicable to know the amount per points in advance of the pre-set cutoff dates. Due process requires that cutoff dates for claims, objections and opt outs be communicated to class members

1   as part of the settlement notice, which occurred here. *See, e.g., Mullane v. Cent.*
2   *Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950)
3   (due process requires "notice reasonably calculated, under all the circumstances, to
4   apprise interested parties of the pendency of the action and afford them an
5   opportunity to present their objections"); *Phillips Petroleum Co. v. Shutts*, 472 U.S.
6   797, 812, 105 S. Ct. 2965, 2974, 86 L. Ed. 2d 628 (1985) (to comply with due
7   process, settlement "notice should describe the action and the plaintiffs' rights in it[,
8   and provide].… an absent plaintiff … with an opportunity to remove himself from
9   the class by executing and returning an 'opt out' or 'request for exclusion' form to
10  the court"). And it would significantly dilute the class fund, and delay class payment,
11  to require second round of notice advising class members of the precise amount of
12  their settlement payment (which would still not be known at that point due to yet
13  undetermined administrative and attorney's fee costs)

14          As to the failure to apprise class members that participation in the Settlement
15  may preclude a claim for other related damages, the class notice sent to class
16  members (and approved by the Court) states, "People who submit claims, object or
17  do nothing, give up their right to sue the LASD (or its employees) for claims covered
18  by this case. This means that you will not be able to sue the LASD for strip searches
19  that occurred when entering or returning to CRDF between March 5, 2008 and
20  January 31, 2015. You are not giving up claims against the LASD unrelated to this
21  case." (Dkt. 395-4, p.77 of 91.)

22          Ms. Shorter claims that most class members did not receive a copy of the
23  settlement agreement and are unaware of its actual terms. (Dkt. 429, p.8/1-10 of 20.)
24  She neglects to mention that the class notice accurately summarizes the key
25  settlement terms and directs class members to the settlement website for the
26  "complete settlement documents in this case, as well as the motion for attorney's
27  fees," and provides a phone number to call if the class members has questions. (Dkt.
28  395-4, p.77 of 91.)

1    Ms. Shorter's objection included that there should be no *cy pres* fund, and all

2    funds should be distributed to class members. This issue is moot. Since the number

3    of claims well exceeds 25,000, the provision of the settlement agreement for a c*y*

4    *pres* distribution in the event of a low claims rate is inapplicable.

5    Ms. Shorter also indicates that class members who want to object or seek

6    clarification of their rights should be able to consult with independent counsel free

7    of charge at class counsel's or Defendants' expense. She cites no authority for this

8    proposition. To even begin to make a claim for appointment of independent counsel,

9    an actual conflict of interest would have to be demonstrated either between classes

10   or subclasses (*see, e.g., In re Facebook, Inc., IPO Securities and Derivative

11   Litigation,* 312 F.R.D. 332, 345 (S.D. N.Y. 2015) (declining to require

12   separate counsel for subclasses on the basis that "[c]ounsel is only conflicted if the

13   subclasses truly conflict" and finding no such conflict between the subclasses), or a

14   conflict of interest between class counsel and the class, such as class counsel serving

15   as both class representative and class counsel or having an overly close relationship

16   with the designated class representative (1 *Newberg on Class Actions* § 3:77 (5th

17   ed.)). No conflict exists here, and Ms. Shorter does not even claim to demonstrate

18   one.

19   Finally, Ms. Shorter objects that the settlement does not address or

20   compensate for the culture of abuse at CRDF or the mistreatment endured by female

21   inmates. As the Court will recall, Plaintiffs sought, and the Court rejected, the claim

22   that abusive treatment by Sheriff's deputies was a common issue. Accordingly, any

23   failure to compensate for such treatment is due to that ruling. In addition, Ms. Shorter

24   has not demonstrated that the settlement does not, in practical terms, encompass

25   reasonable class compensation for the treatment class members experienced from

26   Sheriff's deputies.

27   In her pre-approval objection (Dkt. 393), Ms. Shorter says that class notice

28   should include notice inside CRDF (which the settlement provides for) and in local

newspapers. As to the latter, Plaintiffs explained in the preliminary approval motion that newspaper ads have been of little value in locating class members, and skip tracing and contact through cell phone and email had been far more successful. This strategy is borne out by the fact that the claims rate here exceeds 1/3, higher than any strip search case of which class counsel is aware.

### I.  Natalie Garcia Objection/Optouts (Attached as Ex. L).

Natalie Garcia both opted out and filed an objection (postmarked June 19, 2020). For reasons already stated, we address objections even if not timely or by persons who excluded themselves and therefore are not class members. Ms. Garcia's objection is that the award that she will receive is not commensurate with her damages; she opted out for the same reason. For reasons we have already explained, the settlement amount is reasonable.

Plaintiffs' counsel recommends that the Court permit the opt-out even though it was technically later. In a class of this size, involving former jail inmates who are more difficult than the average person to reach, it is not uncommon that, for a variety of reasons, some class members learn of the lawsuit and its time limitations in an untimely manner, or did not fully understand those limitations. Plaintiffs' counsel consider it to be in the interest of justice to allow such class members' expressed desires to be accommodated, so long as it does not interfere with the orderly administration of the fund distribution. A late opt-out (such as here) prior to final approval does not interfere with the orderly administration of the fund distribution, and so should be allowed. [6]

---

[6] In the event the Court does not allow a late opt-out, but does allow late claims, Ms. Garcia's should be deemed a late claimant, and should be individually notified that her late opt-out was not allowed, and that she may receive the allocated award, but has to indicate that she wishes to do so.

## V.    MANY CLASS MEMBERS SUBMITTED DESCRIPTIONS OF THEIR EXPERIENCE AND REQUESTED THAT THE COURT BE MADE AWARE OF THEM.

Despite Class Counsel's broad experience in strip search class actions in particular, and law enforcement class actions more generally, the class member outpouring of outrage and hurt from the practices at issue in this case far exceed anything counsel has seen. (See Litt Dec. ¶¶3, 4.) Because so many women asked that their stories be told to the court, a section was added to the settlement website titled "My Experience" where class members' experiences could be memorialized, with the understanding that their stories would be provided to the court. Attached as Ex. K is a compilation of those submissions. *Id.* Class counsel, have never before seen such an intense class reaction. (See Litt Dec., ¶4.) See also Section II(D). Counsel urge the Court to review them in order to fully appreciate the horrific impact of these strip search practices on class members and the intense class member support for this lawsuit and settlement.

## VI.    THE CLASS ADMINISTRATION COSTS SHOULD BE PAID.

The Class Administrator, JND Legal Administration, has submitted a declaration from its CEO, Jennifer Keogh, explaining that the current amount due on its bill is $503,501.96, and it anticipates an additional approximately $168,684 for its work to cure the deficient claims, to pay the first round of claims, and to address likely additional late claims, complaints for not being included as a valid claimant, and class member inquiries.

## VII.   LATE CLAIMS SHOULD BE ALLOWED.

Plaintiffs' counsel's experience in the several strip search class actions in which they have been involved is that, for the reasons described in the previous paragraph, there are consistently late claims filed. The Court left open the possibility of approving late claims in the preliminary approval order (Dkt.399), under the definition of "late claim." That provision provides, "A "Timely Claim" is one filed a) within the 150-day window provided by the notice to be sent to the class, and b)

22

*to the extent the Court approves, late claims* (i.e., claims filed after the Class Notice period) that are filed prior to the Final Approval Hearing." (Emphasis supplied.)

As of July 2, 2020, there have been 129 late claims filed of verified class members. (See Declaration of Jennifer Keough [JND])

## VIII.  INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS ARE APPROPRIATE.

The proposed settlement provides a slight benefit to the class representatives ($10,000 in addition to their class member formula award). The proposal for incentive awards was at class counsel's initiative and the proposed incentive awards to each class representative reflects counsel's assessment of the value of their contributions to the case, the risk taken by them and the size of the settlement. No agreements were made with class representatives prior to settlement to seek incentive awards. Litt Preliminary Approval Dec., ¶ 7. No class member objected to the incentive awards. Litt Dec., ¶ 6.

While there is a larger than normal number of class representatives, that is due to class counsel's judgment that there were several categories of class representatives needed in order to have both those in custody with standing to seek injunctive relief, and those not in custody in order to have damages class representatives who were not in custody and therefore not subject to PLRA restrictions. Further, the Court's 2016 Rule 23(C)(4) class certification order required Plaintiffs to add additional class members to represent subclasses specific to various time periods, as well as a subclass of women who were searched while menstruating.

Plaintiffs' proposal for $10,000 for each of the nine class representatives is appropriate in light of the factors to be considered in determining the reasonableness of incentive awards. The Named Plaintiffs either initiated the lawsuit (Plaintiff Mary Amador), entered the lawsuit while still imprisoned thereby risking retaliation (Plaintiffs Lora Barranca, Diane Vigil and Diana Paiz) or were added to the lawsuit

1    to fill potential class representative gaps to account for time period based classes or

2    subclasses (Plaintiffs Felice Cholewiak, Evangelina Madrid, Alisa Battiste, Nancy

3    Briseno and Myeshia Williams). All nine Plaintiffs were deposed and responded to

4    discovery requests. All of the Plaintiffs submitted declarations disclosing intimate

5    details of their experiences and publicly revealing themselves as having spent time

6    in jail. These declarations were used in support of the class certification motions,

7    summary judgment motions and motions to amend. The class substantially benefited

8    from these class representatives' efforts, resulting in one of the largest jail class

9    action settlements ever recorded and the first based exclusively on an

10   unconstitutional manner of strip search. Litt Dec., ¶7.

11           The requested $10,000 incentive award is well within the range of reasonable

12   incentive awards. *See Staton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003)

13   (identifying factors to consider in evaluating the reasonableness of incentive

14   awards); *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958–59, 2009-1 Trade

15   Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (incentive awards are

16   "intended to compensate class representatives for work done on behalf of the class,

17   to make up for financial or reputational risk undertaken in bringing the action, and,

18   sometimes, to recognize their willingness to act as a private attorney general"); *In*

19   *re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 153265, at *2–3

20   (N.D. Cal. Jan. 13, 2016). The awards here – totaling $90,00 – represent a very small

21   proportion (less than .17% ) of the Class Fund, also a factor in evaluating the

22   reasonableness of proposed incentive awards. *See, e.g.., id.* at *3 (0.196%.of class

23   fund); *Hopson v. Hanesbrands Inc*., 2009 WL 928133, *10 (N.D. Cal. 2009) (1.25%

24   of the settlement amount). Numerous cases have approved incentive awards of

25   $10,000 or more. See, e.g., *Cathode Ray Tube (CRT) Antitrust Litig., supra* ($25,000

26   for each of ten class representatives in $127.45 Million settlement); *Glass v. UBS*

27   *Fin. Servs., Inc.,* 2007 WL 221862, at *16 (N.D. Cal. Jan.26, 2007) (approving

28   payments of $25,000 to each named plaintiff); *Van Vranken v. Atlantic Richfield*

1   *Co.,* 901 F.Supp. 294, 299 (N.D. Cal.1995) (awarding $50,000 to a lead plaintiff);

2   *In re High-Tech Employee Antitrust Litig*., No. 11-CV-02509-LHK, 2015 WL

3   5158730, at *18 (N.D. Cal. Sept. 2, 2015) (awarding $120,000 and $80,000 to class

4   representatives in a case that settled for $415 million, noting such awards were in

5   line with "megafund" cases, and collecting cases); *Glass v. UBS Fin. Servs., Inc*.,

6   No. C-06-4068 MMC, 2007 WL 221862, at *17 (N.D. Cal. Jan. 26, 2007) aff'd, 331

7   F. App'x 452 (9th Cir. 2009) (approving award of $25,000 for each of four class

8   representative in a six-year case settling for $45 million where named plaintiffs

9   provided help with informal discovery, insight into an industry, and "placed

10  something at risk by putting their names on a complaint against one of the largest

11  brokerage houses in America"); *Chu v. Wells Fargo Investments, LLC*, Nos. C 05–

12  4526 MHP, C 06–7924, 2011 WL 672645, *5 (N.D. Cal. Feb. 16, 2011) (awarding

13  $10,000 to two plaintiff representatives involved in case for five years and $4,000

14  to three representative plaintiffs participating in case for two years, from a $6.9

15  million settlement fund).

16  **IX.   ATTORNEYS' FEES**

17         Plaintiffs' counsel previously filed an extensive fee motion and evidentiary

18  support explaining the reasonableness of the rates used and hours expended in this

19  case, and that their requested percentage of the fund fee is reasonable in light of the

20  highly risky nature of the case, the exceptional result, the quality of representation

21  and other factors. That argument will not be repeated here, but the proposed final

22  order does include proposed conclusions on the attorney's fee request.

23         Plaintiffs' counsel also updated their fee totals, which now come to the

24  amounts in parentheses: Hours (8949.45); lodestar ($5,709,924.50); costs

25  ($379,839.79). Litt Dec., ¶¶ 9-10.

26

27

28

25

## X.      CONCLUSION

For the foregoing reasons, Plaintiffs ask that the Court enter the proposed Final Approval Order with any revisions consistent with the material provisions of the Settlement Agreement that the Court deems necessary or appropriate.

DATED: July 6, 2020                Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT,   LLP

By: /s/ Barrett S. Litt
      Barrett S. Litt

By: /s/ Lindsay Battles
      Lindsay Battles
      Attorneys for Plaintiffs

26