# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARY AMADOR, et al., | Case No. CV 10-01649 SVW (JEMx) |
| Plaintiffs, | [Honorable Stephen V. Wilson] |
| vs. | **[PROPOSED] FINAL APPROVAL ORDER; EXHIBITS** |
| SHERIFF LEROY D. BACA, et al., | **Date:** **July 20, 2020** |
| | **Time:** **1:30 P.M.** |
| Defendants. | **Place:** **Courtroom 10A__** |

The Named Plaintiffs/Class Representatives are Mary Amador, Lora Barranca, Diana Paiz, Diane Vigil, Alisa Battiste, Felice Cholewiak, Evangelina Madrid, Myeshia Williams, and Nancy Briseño. Plaintiffs are former (or current at the time of the filing of the complaint) inmates of the Los Angeles Sheriff's Department's ("LASD") women's jail known as Century Regional Detention Facility (hereafter "CRDF"). Plaintiffs contended that the LASD routinely subjected female inmates to highly invasive body cavity inspections, in large groups (often over 40 women), without individual privacy, and despite the absence of a penological justification and the ready availability of alternatives, in violation of the Fourth Amendment. The Court granted summary judgment on liability. See Dkt. 361. The Defendants are the County of Los Angeles, the Los Angeles County Sheriff's Department, former Los Angeles County Sheriff Leroy Baca, and various individual members of the LASD.

A Fairness Hearing was held on July 20, 2020 to consider: (a) the fairness, reasonableness, and adequacy of the Settlement; (b) whether a Final Order of Approval and Settlement should be entered in its current or some modified form; and (c) the application by Class Counsel for attorneys' fees and expenses (the "Fee Motion"). This Order follows that hearing.

## I.    PRELIMINARY ISSUES

While Defendants disputed the validity of Plaintiffs' allegations, the parties agreed to enter into a Settlement Agreement, which the Court preliminarily approved on November 7, 2019 (see Dkt. 399). Notice to class members has gone out per the Court's preliminary approval order. The Court now finally approves the settlement agreement and **ORDERS AS FOLLOWS**:

This Order (the "Final Approval Order") incorporates by reference the definitions in the Settlement Agreement, and all terms defined in that agreement shall have the same meanings when used in this Order.

1

The terms of this Court's Preliminary Approval Order are incorporated by reference in this Order.

The Court has jurisdiction over the subject matter of the Lawsuit, the Parties, and all members of the Class.

The Court reaffirms the class definitions contained in its final class certification order. (See Dkt. #327.)

The Court also reaffirms the appointment of JND Legal Administration as the Class Administrator and directs it to distribute the fund as provided by the terms of this Order.

## II.   SETTLEMENT AGREEMENT IS FAIR, ADEQUATE, AND REASONABLE

The Court hereby finds that the Settlement Agreement (including its exhibits and attachments) and the settlement contemplated thereby are the product of arm's length, good faith settlement negotiations between the Defendants and Class Counsel.

For the reasons elaborated below, the Settlement Agreement and the settlement set forth herein are hereby approved and found to be fair, adequate and reasonable, in the best interest of the Class as a whole, and in satisfaction of Rule 23 of the Federal Rules of Civil Procedure and due process requirements.

The Court hereby finds and concludes that class notice was disseminated to members of the Classes in accordance with the terms set forth in the Settlement Agreement, and was in compliance with this Court's Preliminary Approval Order. The Court further finds and concludes that the notice fully satisfied Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process, was the best notice practicable under the circumstances, and supports the Court's exercise of jurisdiction over the Class as contemplated by the Settlement Agreement and this Order.

The Court hereby finally approves the Settlement Agreement and the settlement contemplated thereby, and finds that the terms constitute, in all respects, a fair, reasonable, and adequate settlement in accordance with Rule 23 of the Federal Rules of Civil Procedure, and directs consummation of the settlement pursuant to the terms and conditions of the Settlement Agreement. The specific terms are elaborated in the following section.

**III.     SETTLEMENT TERMS.**

In summary, the settlement's basic terms, as they relate to Damages Class Members, are that Defendants will provide payment of a total of Fifty-Three Million dollars ($53,000,000) equally spread over a three-year period into a Class Fund. From that amount, the following awards will be made:

a.  Incentive awards to the 9 Named Plaintiffs in the amount of $10,000 each (for a total of $90,000), as set forth in the following chart.

| NAME | INCENTIVE AWARD |
| --- | --- |
| Mary Amador | $10,000 |
| Lora Barranca | $10,000 |
| Alisa Battiste | $10,000 |
| Nancy Briseño | $10,000 |
| Felice (Cholewiak) Vargas | $10,000 |
| Evangelina Madrid | $10,000 |
| Diana Paiz | $10,000 |
| Diane Vigil | $10,000 |
| Myeshia Williams | $10,000 |
| **TOTAL** | **$90,000** |

b.  Payment of the third-party class settlement administration costs to the chosen class administrator, JND Legal Administration, estimated at $ $672,185.96 inclusive of costs to date plus the estimated cost of in fees and expenses in connection with curing the deficient claims, paying the

first round of claims, and addressing additional late claims, complaints for not being included as a valid claimant, and class member inquiries. See Declaration of Jennifer Keogh, for JND Legal Administration, filed with the final approval motion. Only an estimate is available at this time because the processing of class settlement checks in the first of the three installments has not yet occurred. This figure does not include the cost of the second and third round distributions, which are estimated at under $100,000.

c.  Although the cost of class administration exceeded the price fix on the bid, that price fix was based on a 35% filing rate, which ultimately exceeded 40%. That, along with the extraordinary class interest, which increased class inquires, explains why the administration costs are somewhat higher than initially estimated.

d.  Litigation costs of $379,839.79 (to be paid in equal installments over three years), to be awarded to class counsel, in addition to the awarded attorneys' fee.

e.  An award of $_____ (to be paid in equal installments over three years) in attorneys' fees paid to the Client Trust Account of Kaye, McLane, Bednarski & Litt. (The settlement agreement provides the amount of fees are capped at $17,490,000, which is 33% of the total settlement, but is set by the court.)

f.  The remainder of the Class Fund, after payment of the foregoing amounts (estimated at over $34 Million if the full $17,490,000 in requested fees is awarded or otherwise the difference between the foregoing fees and costs and $53 Million) shall be distributed to the class members (including Named Plaintiffs/Class Representatives) under the following formula (which is contained in ¶¶ 5-13 of the Settlement Agreement), particularly ¶ 7.

4

| Time Period | Points Per Strip Search |
|---|---|
| 3/8/2008 – 6/30/2011 | 100 |
| 7/1/2011 – 3/31/2013 | 90 |
| 4/1/2013 – 2/25/2014 | 80 |
| 2/26/2014 – 1/31/2015 | 70 |

g. In addition to the foregoing points, there shall be an additional 10-points for any Strip Search conducted at a temperature of 70 degrees or less (as determined by the analysis of Class Counsel's thermal comfort and statistical experts).

h. The per-search points are assigned to each Class Member, up to their 50th search (which cap applies to less than .04% of the total Class and ensures that outliers who have outsized claims do not distort the meaningfulness of the recovery to the remaining Class Members).

i. Despite the foregoing formula, no class member who qualifies for payment will receive less than a total of $200.

j. A claiming Class Member's point total is the sum of all their assigned points. The final distribution for each claiming class member will be based on the total points for all Class Members who filed claims, divided by the number of points assigned to each individual claiming Class Member, which will provide a percentage of the remainder of the Class Fund due each claimant.

k. It is anticipated that there will be significant variation in the amounts due to claiming class members. Because there is a three-year pay-out, class members at the higher payout end will be paid over multiple years. In order to provide an equitable three-year distribution, and to reduce administrative costs, in each given year, each eligible claiming class member shall receive the same amount, capped by the maximum amount

5

due that person (and in no event less than $200). The objective is to reduce administrative costs by paying off as many claims as possible in total. (For example, if there are 30,000 valid claims and $11 Million is available for general class distribution in the first year; and 10,000 class members are entitled to $400 or less, another 10,000 are entitled to $401-$800, and another 10,000 to $801 plus, the first 10,000 would be paid in full in round one, the next 10,000 would be paid the maximum amount due them so long as the last 10,000 receive the same amount as the highest payout in the second 10,000; if there are still funds remaining, each class members in the third group would receive the same amount up to their maximum. The process would repeat itself in the next two rounds of distribution.)

l.  Although the original settlement provided that there would be a *cy pres* distribution in the event of a low claims rate (and dependent on ultimate court approval), the claims rate has far exceeded that low claims rate. All the remaining funds after payment of incentive fees, litigation costs, class administration costs, and attorneys fees shall be distributed to class members. There is no reversion and no *cy pres* payment,   except for uncashed check funds remaining after a second mailing of uncashed checks from the last round payment. See Settlement Agreement, ¶¶ 54-56 (uncashed funds remaining in the Class Fund one year after the third round of payments shall be given as a donation to a *Cy Pres Fund* to organizations agreed upon by the parties and allocated equally among the qualifying organizations/ programs).

m.  Checks not cashed in round one or round two shall be added to the class fund available for the next round's distribution.

**IV.    NOTICE**

6

As required by the Court in its Preliminary Approval Order: (a) Class and Settlement Notice were mailed to all potential class members or their representatives whose addresses could be obtained with reasonable diligence; and (b) Class Settlement and Notice were published and posted in all CRDF as provided for in the Settlement Agreement and Preliminary Approval Order.

The Notice given to the class is hereby determined to be fully in compliance with both the requirements of Rule 23 of the Federal Rules of Civil Procedure and due process. The Notice given is further found to be the best notice practicable under the circumstances and therefore, constitutes due and sufficient notice to all parties.

Due and adequate notice of the proceedings having been given to the Class and a full opportunity having been offered to the Class to participate in the hearing, it is hereby determined that all Class Members, except those who have opted out of the settlement are bound by this Final Order of Approval of Settlement.

## V.   CLASS COUNSEL

The Court reaffirms appointment of Barrett S. Litt and Lindsay Battles of Kaye, McLane, Bednarski & Litt, as Class Counsel. It addresses their request for attorneys' fees and costs below. That fee shall be allocated among counsel pursuant to the agreement of counsel. See Declaration of Barrett S. Litt (hereafter "Litt Dec."), ¶ 8[1].

## VI.   APPOINTMENT OF CLASS ADMINISTRATOR

The Court approves the retention of JND Legal Administration ("JND") as Class Administrator, to administer and to distribute the proceeds of the settlement to all eligible Class Members pursuant to the Plan set out in the Settlement Agreement (Exhibit A). Exhibit E (the Class Administrator bid) includes the

---

[1] There are other Litt Declarations referenced in this Order, specifically his declaration in support of preliminary approval of the settlement (referenced as "Litt Preliminary

qualifications of JND, which establishes to the Court's satisfaction the qualifications of JND to act as the Class Administrator.

The Class Administrator shall preserve all written communications from Class Members in response to the Class and Settlement Notice at least until December 31, 2023, or pursuant to further order of the Court. All written communications received by the Class Administrator from Class Members relating to the Settlement Agreement shall be available at all reasonable times for inspection and copying by Counsel for the Parties, and copies shall be regularly provided to Counsel for the Parties.

The Class Administrator shall be compensated from the Class Damages Fund for its services in connection with notice and administration and for the costs of giving mailed and published notice, and the other services it perform.

## VII.   FACTORS IN ASSESSING FINAL APPROVAL AS APPLIED TO THIS CASE

The factors for entry of a final approval order have been summarized in *Newberg on Class Actions* §13:48 (5th ed.) as generally assessing 1) the amount of the settlement in light of the potential recovery discounted by the likelihood of plaintiffs prevailing at trial; 2) the extent to which the parties have engaged in sufficient discovery to evaluate the merits of the case; 3) the complexity and potential costs of trial; 4) the number and content of objections; 5) the recommendations of experienced counsel that settlement is appropriate; and, in some instances; and 6) the capacity for the defendant to withstand a larger judgment. The Court addresses each issue in turn.

### A.   THE AMOUNT OF THE SETTLEMENT IN LIGHT OF THE POTENTIAL RECOVERY

Plaintiffs addressed this issue in the Preliminary Approval Order submissions, and provided evidence that the recovery was well above those in

Approval Dec.") and his declaration in support of the motion for attorneys' fees

other cases, and specifically was the second largest strip search settlement in the country, and the largest based on per class member recovery. Based on that evidence, this settlement qualifies as among the highest ever in the country for strip searches; is the first successful strip search class action based solely on a challenge to the manner of search (as opposed to challenging the legality of a search at all, on which there have been many successful challenges); provides the largest per class member return of any large strip search case; and comes after successful strip search class actions have significantly declined.[2]

Plaintiffs' counsel recognized that, absent a classwide settlement, this case could have spread out over several years litigating individual damages claims, and only a far smaller percentage of the class would likely have come forward to pursue individual damages in comparison to the number that would file claims. They also recognized that, absent settlement, it was highly likely that Defendants would have appealed the grant of summary judgment on liability.

In light of these factors, the amount of the settlement strongly favors final approval.

### B.    The Extent Of The Discovery Conducted

This case was litigated extensively. Plaintiffs conducted extensive discovery, including documents and database discovery and numerous depositions; litigated four class certification motions; and successfully opposed defendants' summary judgment motion and prevailed on their own. They retained numerous experts on a whole range of issues, who were key to Plaintiffs' ultimate success. The case spanned over ten years from filing to the instant hearing for final approval. This factor favors final approval.

---

(referenced as "Litt Attorney Fee Dec.").

[2] As noted by Prof. Rubenstein in his declaration in support of Plaintiffs' motion for attorneys' fees, after the Supreme Court's decision in *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 352, 132 S. Ct. 1510 (2012), the success of strip search litigation

9

## C.     The Complexity And Potential Costs Of Trial

While liability was established, the Court did not certify the class for general damages and did not reach statutory damages under Cal. Civil Code § 52.1. Thus, a complex issue arose regarding the handling of class member damages if the case did not settle. This factor favors final approval.

## D.     The Number And Content Of Claims, Objections and Opt-Outs.

There were seven class member objections (including the late objection of Natalie Garcia). There were also four non-class member objections, objecting to the fact that the class period did not cover their time at CRDF when, in their view, it should have. The merits of these objections are addressed in Section VIII of this Order.

There were six opt-outs (including the late opt-out of Natalie Garcia), the only one of which expressed dissatisfaction with the settlement was Natalie Garcia's.

There was an exceptionally high claims rate, with 25,528 confirmed timely claims, and another 9,490 claims of people whose status as class members is being verified (because their claim information did not fully comport with the LASD data). Jennifer Keogh Declaration, ¶30(a). The Class Administrator has instituted a process of verification for these "deficient" claims, and estimates that over 50% of them are valid claims. That process includes accepting the claims of class members who filed a claim under a name that appears only once in the jail data (because of the high likelihood that, if they filed a unique claim under a unique name that matched jail data and the name did not come from a pre-printed form, it is reliable), as well as to check aliases. It also includes obtaining different forms of verification that suggest that the claimant is legitimate. The Court approves these methods of verifying class member claims presently classified as deficient.

---

dropped dramatically, making the success of this litigation particularly exceptional. See Declaration in support of Motion for Attorneys' Fees (Dkt.413.)

1    It is expected that over 30,000 out of approximately 94,000 class members

2 will receive class fund payments. (This process has not been completed by the date

3 of the hearing on the Final Approval Motion.) The Court directs the Class

4 Administrator to complete this process.

5    As previously explained, the claims rate in this case is an exceptional claims

6 rate of approximately 1/3, possibly higher. To class counsel's knowledge, this is

7 the highest percentage claims rate of any large class action in the country. This

8 attests to both the significance of the issue to class members and their very high

9 approval of the settlement.

10    The paucity of objections and opt-outs strongly support the fairness and

11 adequacy of the settlement. "The negligible number of opt-outs and objections

12 indicates that the class generally approves of the settlement." *In re Toys R Us-*

13 *Delaware, Inc.--Fair & Accurate Credit Transactions Act (FACTA) Litig.*, 295

14 F.R.D. 438, 456 (C.D. Cal. 2014) (citing *Churchill Village, L.L.C. v. General*

15 *Electric*, 361 F.3d 566, 577 (9th Cir. 2004)(affirming the approval of a class action

16 settlement where 90,000 members received notice and 45 objections were

17 received); *Rodriguez v. West Publishing*, 563 F.3d 948, 967(9th Cir. 2009) ("The

18 court had discretion to find a favorable reaction to the settlement among class

19 members given that, of 376,301 putative class members to whom notice of the

20 settlement had been sent, 52,000 submitted claims forms and only fifty-four [.014

21 percent of class members] submitted objections"); *Chun–Hoon v. McKee Foods*

22 *Corp.*, 716 F.Supp.2d 848, 852 (N.D.Cal.2010) (concluding, in a case where "[a]

23 total of zero objections and sixteen opt-outs (comprising 4.86% of the class) were

24 made from the class of roughly three hundred and twenty-nine (329) members,"

25 that the reaction of the class "strongly supports settlement"). Here, the percentage

26 of objections is less than .0065% of the class (i.e., less than even the very low

27 *Rodriguez* objection rate), a minuscule number.

28

Similarly, the low number of opt-outs supports approval. See, e.g., *Churchill Village, supra* (approving the district court's approval of settlement where 500 people out of an initial notice pool of 90,000 class members); *White v. Experian Information Solutions, Inc.,* 2011 WL 13242815, at *8 (C.D. Cal. 2011), *rev'd and remanded*, 2013 WL 1715422 (9th Cir. 2013), opinion amended and superseded, 715 F.3d 1157 (9th Cir. 2013) ("Class members' failure to exclude themselves in large numbers indicates that reaction to the Settlement was generally positive.").

### E.   The Capacity For The Defendant To Withstand A Larger Judgment.

This was not a factor in this settlement. The Defendants here could unquestionably withstand a larger judgment. The settlement was driven by an assessment of the reasonable value of the case, and was not discounted due to questions regarding the Defendants' ability to pay. This is a neutral factor regarding settlement, neither favoring nor disfavoring it.

## VIII.  THE FEW OBJECTIONS THAT HAVE BEEN FILED ARE NOT WELL TAKEN

There are seven objections to the settlement that have been filed by class members (including the late objection of Natalie Garcia). There were also four non-class member objections, objecting to the fact that the class period did not cover their time at CRDF when, in their view, it should have. The Court rejects each of these objections for the reasons stated below.

### A. Tina Caldwell Objection. (Attached As Ex. E)

Tina Caldwell objects to the settlement because she believes that she and others who were pregnant during the search process should receive "higher fees," and she requests to be heard at the final approval hearing. Ms. Caldwell describes her experiences during the searches; how "humiliated" she felt and how "inhumane" the searches were; and how she has "flashbacks and nightmares along with racing thoughts and anxiety attaches" when she thinks of the searches. As sympathetic Ms. Caldwell's description may be, her experiences and feelings are

shared by thousands of class members, and there is no practical way to allocate settlement funds through an individualized process to assess harm without substantially reducing the settlement fund to pay the administrative costs of such assessments.

"Ultimately, the district court's determination [concerning the fairness and adequacy of a proposed settlement] is nothing more than an amalgam of delicate balancing, gross approximations and rough justice…. [I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Officers for Justice v. Civil Serv. Comm'n of City & Cty. of San Francisco*, 688 F.2d 615, 625 (9th Cir. 1982) (internal citation and quotation marks omitted). The current settlement accomplishes that goal. This conclusion is reinforced by the overwhelming approval of class members, the high claims rate, and the low number of objections and opt outs. The rights of those who feel they should receive higher compensation for individualized reasons are protected because they are entitled to opt out and proceed separately to seek damages if they so choose.

## B. Mayra Reyes Objection (Attached as Ex. F).

Mayra Reyes objects to the settlement essentially because she is deaf and was not provided the ability to use ASL (American Sign Language) or other means of communicating and was not allowed to be handcuffed in front so that she could sign. As previously explained, such individualized issues could not be addressed effectively in the context of a classwide settlement. Further, her concern appears to be more that LASD should be more aware of disability issues – which was not an issue certified for class treatment in this case and therefore outside the scope of the settlement – than an objection to the terms of the settlement as such.

## C. Joyce Lucero Objection (Attached as Ex. G).

Joyce Lucero objects to the settlement on the ground that there was not compensation for the fact that she was not provided her crutches or a wheelchair

13

upon her release from jail although she had a broken leg (essentially a disability related objection and unrelated to the strip searches), and because she felt the guards who searched class members were lesbians who should not have been conducting such searches. Ms. Lucero's first objection was relates to the release process, not the strip searches; for reasons previously stated, such individualized issues could not be addressed effectively in the context of a classwide settlement; and her concern appears to be more that LASD should be more about the uncertified issue of treatment of disabled inmates than an objection to the terms of the settlement as such. The objection related to "lesbian women" conducting the searches both lacks any foundation (since Ms. Lucero has not established how she knows the deputies were lesbian), is beyond the scope of the manner of strip search claim in this case, and is legally invalid under federal and state employment law. *See Bostock v. Clayton Cty., Georgia*, __ U.S. __, 2020 WL 3146686 (U.S. June 15, 2020) (Title VII applies to gay, lesbian and transgender employees); Cal. Govt. Code § 12940(a) (prohibiting employment discrimination, inter alia, on the basis of "sex, gender, gender identity, gender expression, …[and] sexual orientation").

### D.  Monique Hervey Objection (Attached as Ex. H).

Monique Hervey's objection is to either the size of the attorney's fee award requested or the size of the settlement as a whole. She stated, in toto, "This is an insult to us we are only getting less than [$]500 while the lawyers get millions and we are the ones who indured [sic] this humiliation the worst kind it's almost like rape molestation and it's like we aren't worth more than that more money should of been awarded to us it's just saying how much we really are worth that's nothing to us it sounds like the lawyers made out more than we did that's bull crap."

14

As to the point of only making "$500," that is inaccurate. Even with the high claims rate in this case, the mean recovery is in the neighborhood of $1000 per class member (but with high variation depending on the number of searches and other factors). As to the attorneys' fee objection, the Court addresses its conclusion regarding fees in Section III of this Order. In doing so, the Court has considered all class member objections.

**E. Teri Lynn Van Leuven Objection (Attached as Ex. I).**

Teri Lynn Van Leuven's objection is to the size of the attorneys' fee award requested. She states that she objects to the requested 1/3 fee because it is "a bit steep, or very steep, in light of the $18 Million in case expenses." As that statements reflects, this objection conflates the estimated maximum total costs and attorney's fees of $18 Million to be separate from the attorney's fee award rather than inclusive of it. Thus, because the objection assumes fees and costs of up to approximately $36 Million rather than $18 Million, it is not well taken.

**F. Lecia Shorter Objection (Attached as Ex. J).**

Lecia Shorter (who filed two objections, Docs 393 and 429, one of which was prior to the November 7, 2019, preliminary approval order) objects to the settlement on numerous grounds. Ms. Shorter has opted out of the settlement (Dkt. 429) and thus is no longer a class member because "[c]lass members who opt out of the class at certification or at settlement are no longer considered class members, and hence Rule 23 does not give them standing to object to the settlement." *4 Newberg on Class Actions* § 13:23 (5th ed.), 13:23.Standing to object—Opt-outs. *See also, e.g., Jenson v. Continental Financial Corp.*, 591 F.2d 477, 482 n.7 (8th Cir. 1979) (citing *Newberg on Class Actions*) ("Opt-outs … are not members of the class and hence are not entitled to the protection of Rule 23(e)."); *Glass v. UBS Financial Services, Inc.*, 2007 WL 221862, *8 (N.D. Cal. 2007), *aff'd*, 331 Fed. Appx. 452 (9th Cir. 2009) (putative objector who opted out of class "is no longer a class member, [and] he has no standing to object"). The

15

only exception is, where the opt-out can demonstrate "plain legal prejudice," to her or him, s/he has standing to object. *E.g., Newberg*, § 13.23; *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 55 Fed. Appx. 501, 503 (10th Cir. 2003) (noting rule that opt-outs could object if they could demonstrate "plain legal prejudice" from settlement). No such prejudice is asserted here.

Nonetheless, since "the purpose of the fairness hearing is to enable the judge to learn about problems with the settlement," objections by opt outs may be entertained because they can provide insight important to the court's determination of the fairness, adequacy and reasonableness of the settlement. Accordingly, the Court considers the merits of Ms. Shorter's objections. *Newberg*, § 13 2.23.

Ms. Shorter's first objection essentially appears to be that the amount of the settlement is too small. She argues that the projected settlement recovery is in the range of $200-$1500, which is "miniscule compared to Class Counsel's representation that many individual class members could receive six figure verdicts. Thus, a significant portion of class members will be disadvantaged because they could obtain significantly more individually than participating in the class." (Dkt. 429, p. 3/4-8 of 30.) Ms. Shorter also raises that the complaint sought statutory damages under Cal. Civil Code §52.1 of $4000 per violation, and the settlement provides far less than that. (Using herself as an example, Ms. Shorter asserts that she would receive at least $64,000 and "could well range into six and possibly seven figures." *Id.* at 3/19-23.)

Ms. Shorter's objections are not well-taken. Under her analysis, a reasonable settlement would have to be in the several hundred million dollar range, a figure that is completely unrealistic in a civil rights settlement against a government entity. Such a requirement for settlement would have doomed the possibility of a settlement; at best, would have required several more years of litigation because Defendants would certainly have sought to reverse the summary judgment ruling in Plaintiffs' favor, and at worst, could have resulted in a reversal; and would have

required individual damages proceedings of some sort for those class members who came forward to seek damages. The Court agrees with Class Counsel that the number of class members who likely would have participated in such individual damages efforts is a fraction of the over 30,000 who have made claims, and that a global settlement was in the interest of the class as a whole. Because 250 class members could opt out and pursue their own damages without it undermining the settlement, this protected those class members – such as Ms. Shorter – who wished to purse a higher recovery in an individual proceeding. (See Declaration of Barrett S. Litt in support of Motion for Final Approval of Settlement, ¶5.)

Ms. Shorter also purports to speak on behalf of class members who have not objected, which is improper. Similarly, she purports to speak for Mary Amador. According to Ms. Shorter, both Ms. Williams and Ms. Amador do not approve of the settlement or have indicated an intent to opt out. (Dkt. 429 at p.3/27-4/3; 5/1-21, 18/1-19/3.) The portion of Ms. Shorter's objection and Declaration where she purports to speak for or quote class representative Ms. Williams or Ms. Amador are hearsay and are not being considered by the court because both have filed claims, and neither has not opted out or objected to the settlement.

Ms. Shorter next objects that the class administrator should calculate points in advance of any opt out deadline, and that class members have not been advised that participation in the Settlement may preclude a claim for other related damages *Id.*, p. 6/1-24. As to the first, because the amount per point is determined based on total claims, which (along with objections or opt outs) are due by a set cutoff date (standard practice in class action settlements), it is not practicable to know the amount per points in advance of the cutoff dates. Due process requires that cutoff dates for claims, objections and opt outs be communicated to class members as part of the settlement notice, which occurred here. *See, e.g., Mullane v. Cent. Hanover Bank & Tr. Co.*, 339 U.S. 306, 314, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950) (due process requires "notice reasonably calculated, under all the

17

circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections"); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812, 105 S. Ct. 2965, 2974, 86 L. Ed. 2d 628 (1985) (to comply with due process, settlement "notice should describe the action and the plaintiffs' rights in it[, and provide]…. an absent plaintiff … with an opportunity to remove himself from the class by executing and returning an 'opt out' or 'request for exclusion' form to the court"). And it would significantly dilute the class fund, increase costs of administration, and delay class payment, to require a second round of notice advising class members of the precise amount of their settlement payment (which would still not be known at that point due to yet undetermined administrative and attorneys' fee costs)

As to the failure to apprise class members that participation in the Settlement may preclude a claim for other related damages, the class notice sent to class members (and approved by the Court) states, "People who submit claims, object or do nothing, give up their right to sue the LASD (or its employees) for claims covered by this case. This means that you will not be able to sue the LASD for strip searches that occurred when entering or returning to CRDF between March 5, 2008 and January 31, 2015. You are not giving up claims against the LASD unrelated to this case." (Dkt. 395-4, p. 77 of 91.) Thus, class members were so advised.

Ms. Shorter claims that most class members did not receive a copy of the settlement agreement and are unaware of its actual terms. (Dkt. 429, p. 8/1-10 of 20.) However, the class notice accurately summarizes the key settlement terms and directs class members to the settlement website for the "complete settlement documents in this case, as well as the motion for attorneys' fees," and provides a phone number to call if the class members has questions. (Dkt. 395-4, p. 77 of 91.)

Ms. Shorter's objection included that there should be no *cy pres* fund, and all funds should be distributed to class members. This issue is moot. Since the number

1   of claims well exceeds 30,000, the provision of the settlement agreement for a *cy*

2   *pres* distribution in the event of a low claims rate is inapplicable.

3          Ms. Shorter also indicates that class members who want to object or seek

4   clarification of their rights should be able to consult with independent counsel free

5   of charge at class counsel's or defendants' expense. She cites no authority for this

6   proposition. To make a claim for appointment of independent counsel, an actual

7   conflict of interest would have to be demonstrated either between classes or

8   subclasses. *See, e.g., In re Facebook, Inc., IPO Securities and Derivative*

9   *Litigation,* 312 F.R.D. 332, 345 (S.D. N.Y. 2015) (declining to require

10  separate counsel for subclasses on the basis that "[c]ounsel is only conflicted if the

11  subclasses truly conflict" and finding no such conflict between the subclasses). Or

12  there would have to be a conflict of interest between class counsel and the class,

13  such as class counsel serving as both class representative and class counsel or

14  having an overly close relationship with the designated class representative. *See* 1

15  *Newberg on Class Actions* §3:77 (5th ed.)). No conflict exists here, and Ms.

16  Shorter does not claim to demonstrate one.

17         Ms. Shorter also objects that the settlement does not address or compensate

18  for the culture of abuse at CRDF or the mistreatment endured by female inmates.

19  Plaintiffs sought, and the Court rejected, the claim that abusive treatment by

20  Sheriff's deputies was a common issue. Accordingly, any failure to compensate for

21  such treatment is due to that ruling, and is not a proper basis of objection. In

22  addition, Ms. Shorter has not demonstrated that the settlement does not, in practical

23  terms, encompass reasonable class compensation for the treatment class members

24  experienced from Sheriff's deputies.

25         Ms. Shorter further objects in general terms that the class members' interests

26  were being slighted in terms of damages when compared to the "windfall" that will

27  be received by Class Counsel. The fees are addressed in a separate section of this

28  Order.

In her pre-approval objection (Dkt. 393), Ms. Shorter says that class notice should include notice inside CRDF (which the settlement provides for) and in local newspapers. As to the latter, plaintiffs explained in the preliminary approval motion that newspaper ads have been of little value in locating class members, and skip tracing and contact through cell phone and email had been far more successful. This strategy has been borne out by the fact that the claims rate here exceeds 1/3, higher than any strip search case of which class counsel is aware.

### G. Natalie Garcia Objection/Opt-Out (Attached as Ex. L).

Natalie Garcia both opted out and filed an objection (postmarked June 19, 2020, which was later). Although late, the Court considers the merits of Ms. Garcia's objection, which is that the award that she will receive is not commensurate with her damages; she opted out for the same reason. The Court has previously explained why it concludes that the settlement is fair and adequate, and the fact that those class members who wish to do so have the right to opt out, as Ms. Garcia has done.

### H. 12/23/19 Darla Jones Objection (Attached as Ex. A) – non-class member objection that the class period cutoff of January 1, 2015 should be extended.

Darla Jones objects to the settlement because she was strip searched at CRDF before the beginning of the class period, and she objects to the fact that the settlement does not cover strip searches before March 5, 2008. According to her objection, she was strip searched at Twin Towers in 2005 and believes that those searches should have been included. However, "[a]s Rule 23 confers the right to object upon class members, the Rule itself does not confer standing upon non-class members [to object]." § 13:22.Standing to object—Generally, 4 Newberg on Class Actions § 13:22 (5th ed.). Rule 23(e)(5) provides that "[a]ny class member may object to the proposal if it requires court approval." *See also, e.g., Gould v. Alleco, Inc.,* 883 F.2d 281, 284 (4th Cir. 1989) ("The plain language of Rule 23(e) clearly contemplates allowing only class members to object to settlement proposals.");

*Moore v. Verizon Communications Inc.*, 2013 WL 450365, *4 (N.D. Cal. 2013)
("[N]on-class members have no standing to object to the settlement of a class
action."). Ms. Jones is not a class member because the lawsuit, filed March 5,
2010, goes back two years from the date of filing, and her claims arose long before
that. Claims for damages under 42 U.S.C. §1983 are subject to the forum state's
(here, California's) two-year statute of limitations for personal injury claims. *See
Wilson v. Garcia*, 471 U.S. 261, 280, 105 S.Ct. 1938, (1985) (§ 1983 claims are
best characterized as personal injury actions, and the statute of limitations is
subject to the forum state's personal injury statutes of limitation);
Cal.Civ.Proc.Code § 335.1 (an action for personal injury must be brought within
two years). Accordingly, she is not a class member because her claim is outside the
Court established class period. She is also not a class member because the case did
not involve, and the Court did not address, the legality of strip searches at facilities
other than CRDF.

### I. Anika White Objection (Attached as Ex. B); Jessica Vega Objection (Attached as Ex. C); Anthonesia Hicks (Attached as Ex. D) – non-class member objections that the class period cutoff of January 1, 2015 should be extended.

Anika White objects to the settlement because she was strip searched at
CRDF after the conclusion of the class period (September 2017-July 2018). Jessica
Vega similarly objects to the settlement because she was strip searched at CRDF
after the conclusion of the class period (December 3. 2015 through 2016). So too
does Anthonesia Hicks (who believes the end date should be January 31, 2017) All
three feel that they were subjected to the same or similar practices as were
involved in the practices found unconstitutional in the court's summary judgment
order, albeit after the class period.

Defendants represented to the Court that, by the end of January 2015, they
were no longer strip searching in groups in the bus bay; were primarily searching
through the use of scanners (according to Defendants, 98% of searches were with

scanners; and, where the scanners could not be used, were strip searching with privacy screens). (See Dkt. 303, pp.. 1-5 of Memorandum in support of Motion for Summary Judgment). The class period termination was based on these representations and on the Court's dismissal of the injunctive relief claim based on these representations. Plaintiffs' counsel had no contrary information upon which to claim widespread strip searches after January 2015 of the type that were occurring previously. Accordingly, the end of the class period is based on substantial evidence in the record and this Court's findings granting summary judgment on the injunctive relief claim. Since these objectors' searches post-date the end of the class period, they are not class members, and, for the reasons explained regarding Ms. Jones, they lack standing to object.

## IX.    LATE CLAIMS AND LATE OPT OUTS.

As indicated previously, the settlement agreement left open the issue of including in the settlement late claims. Plaintiffs' counsel have recommended to the Court that such claims be allowed, given the obstacles some class members may face in filing claims by the Bar date. The Court concludes that such late claims, postmarked or received through the hearing date on the final approval motion of July 20, 2020, should be allowed.

There was one late opt out request, that of Natalie Garcia. The Court concludes that it is appropriate to allow that late opt out since doing so will not interfere with the orderly administration of the fund distribution, and has a negligible impact since Defendants agree to up to 250 opt outs, and there were only six, including Ms. Garcia.

## X.    INCENTIVE AWARDS FOR THE NAMED PLAINTIFFS ARE APPROPRIATE.

The proposed settlement provides a slight benefit to the class representatives ($10,000 in addition to their class member formula award). The proposal for incentive awards was at Class Counsel's initiative and the proposed incentive

awards to each class representative reflects counsel's assessment of the value of their contributions to the case, the risk taken by them and the size of the settlement. No agreements were made with class representatives prior to settlement to seek incentive awards. (Litt Preliminary Approval Dec., ¶ 7.) No class member objected to the incentive awards. (Litt Final Approval Dec., ¶ 6.)

While there is a larger than normal number of class representatives, that is due to Class Counsel's judgment that there were several categories of class representatives needed in order to have both those in custody with standing to seek injunctive relief, and those not in custody in order to have damages class representatives who were not in custody and therefore not subject to PLRA restrictions. Further, the Court's 2016 Rule 23(C)(4) class certification order required Plaintiffs to add additional class members to represent subclasses specific to various time periods, as well as a subclass of women who were searched while menstruating.

Plaintiffs proposal for $10,000 for each of the nine class representatives is appropriate in light of the factors to be considered in determining the reasonableness of incentive awards. The Named Plaintiffs either initiated the lawsuit (Plaintiff Mary Amador), entered the lawsuit while still imprisoned thereby risking retaliation (Plaintiffs Lora Barranca, Diane Vigil and Diana Paiz) or were added to the lawsuit to fill potential class representative gaps to account for time period based classes or subclasses (Plaintiffs Felice Cholewiak, Evangelina Madrid, Alisa Battiste, Nancy Briseno and Myeshia Williams). All nine Plaintiffs were deposed and responded to discovery requests. All of the Plaintiffs submitted declarations disclosing intimate details of their experiences and publicly revealing themselves as having spent time in jail, which were used in support of the class certification motions, summary judgment motions and motions to amend. The class substantially benefited from these class representatives' efforts, resulting in one of

the largest jail class action settlements ever recorded and the first based exclusively on an unconstitutional manner of strip search. Litt Preliminary Approval Dec., ¶7.

The requested $10,000 incentive award is well within the range of reasonable incentive awards. *See Staton v. Boeing Co*., 327 F.3d 938, 977 (9th Cir. 2003) (identifying factors to consider in evaluating the reasonableness of incentive awards); *Rodriguez v. West Publishing Corp*., 563 F.3d 948, 958–59, 2009-1 Trade Cas. (CCH) ¶ 76614, 60 A.L.R.6th 723 (9th Cir. 2009) (incentive awards are "intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action, and, sometimes, to recognize their willingness to act as a private attorney general"); *In re: Cathode Ray Tube (CRT) Antitrust Litig.*, No. 1917, 2016 WL 153265, at *2–3 (N.D. Cal. Jan. 13, 2016). The awards here – totaling $90,00 – represent a very small proportion (less than .17% ) of the Class Fund, which is also a factor in evaluating the reasonableness of proposed incentive awards. *See, e.g.., id.* at *3 (0.196%.of class fund); *Hopson v. Hanesbrands Inc*., 2009 WL 928133, *10 (N.D. Cal. 2009) (1.25% of the settlement amount). Numerous cases have approved incentive awards of $10,000 or more. See, e.g., *Cathode Ray Tube (CRT) Antitrust Litig., supra* ($25,000 for each of ten class representatives in $127.45 Million settlement); *Glass v. UBS Fin. Servs., Inc.,* 2007 WL 221862, at *16 (N.D. Cal. Jan.26, 2007) (approving payments of $25,000 to each named plaintiff); *Van Vranken v. Atlantic Richfield Co.,* 901 F.Supp. 294, 299 (N.D. Cal.1995) (awarding $50,000 to a lead plaintiff); *In re High-Tech Employee Antitrust Litig*., No. 11-CV-02509-LHK, 2015 WL 5158730, at *18 (N.D. Cal. Sept. 2, 2015) (awarding $120,000 and $80,000 to class representatives in a case that settled for $415 million, noting such awards were in line with "megafund" cases, and collecting cases); *Glass v. UBS Fin. Servs., Inc*., No. C-06-4068 MMC, 2007 WL 221862, at *17 (N.D. Cal. Jan. 26, 2007) aff'd, 331 F. App'x 452 (9th Cir. 2009) (approving award of $25,000 for each of four class representative in a six-year case

settling for $45 million where named plaintiffs provided help with informal discovery, insight into an industry, and "placed something at risk by putting their names on a complaint against one of the largest brokerage houses in America"); *Chu v. Wells Fargo Investments, LLC*, Nos. C 05–4526 MHP, C 06–7924, 2011 WL 672645, *5 (N.D. Cal. Feb. 16, 2011) (awarding $10,000 to two plaintiff representatives involved in case for five years and $4,000 to three representative plaintiffs participating in case for two years, from a $6.9 million settlement fund).

## XI.   ATTORNEYS' FEES

Plaintiffs' counsel requested that they be awarded 33% of the class fund ($17,490,000) plus costs of $379,839.79. There was no objection to the costs reimbursement, but there was class member or opt out objection by three class members – Hervey (objecting in general terms that class members receive "less than [$]500 while the lawyers get millions," but not objecting to the specific size of the requested fee beyond that characterization; Van Leuven (mistakenly objecting to total costs and attorney's fees of $18 Million as separate from and in addition to the requested attorneys' fee award rather than inclusive of it); Shorter (generally objecting that the class members' interests were being slighted in terms of damages when compared to the "windfall" that will be received by Class Counsel).

### A. Factors Favoring Settlement

In *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50, 27 (9th Cir. 2002), the court identified the following factors when selecting a percentage fee award in a common fund case: (1) the results achieved for the class; (2) the risk of the litigation (including complexity of litigation); (3) benefits generated by class counsel beyond the settlement fund; (4) the comparison between the proposed fee and market rate; and (5) the burdens of the litigation for class counsel (including contingency basis, length of litigation, expenses to counsel, and opportunity cost of foregone work)). In addition, other courts have identified the additional factors of (6) counsel's skill and experience; (7) the reaction of the class; and (8) comparison

25

1  with counsel's lodestar. *See, e.g., In re Quintus Sec. Litig.,* 148 F.Supp.2d 967,
2  973-74 (N.D.Cal.2001). Before addressing the award that the Court makes, this
3  Order addresses these factors although not in that precise order.

4  ## 1.      *The Complexity Of The Issues*

5  This was unquestionably a complex case. Class actions are generally one of
6  the most complex types of litigation. (See Litt Attorney's Fee Motion Dec.,
7  §II(C).) *See, e.g., Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977) ("class
8  action suits have a well-deserved reputation as being most complex," which is
9  "attest[ed]" to by the "requirement that counsel for the class be experienced");
10  Declaration of William B. Rubenstein, ¶27 (noting that this Court required special
11  briefing as to the *Wal-Mart* decision's impact on the claims and this Court's
12  observation that there had been seven "rounds of briefing concerning certifying or
13  decertifying the proposed class and seven hea[r]ings or status conferences on the
14  same issue").

15  Further, civil rights cases, even if not class actions, are generally considered
16  complex litigation, a conclusion confirmed by the 1976 legislative history of the
17  civil rights attorneys' fee statute (42 U.S.C. §1988), which states, "It is intended
18  that the amount of fees awarded under S. 2278 (42 U.S.C. §1988) be governed by
19  the same standards which prevail in other types of equally complex federal
20  litigation, such as antitrust cases." S.Rep.No. 94-1011, 1976 U.S.Code Cong. &
21  Admin. News at 5913. Finally, *Monell* liability and causation often pose
22  particularly difficult issues. *See, e.g., Bd. of Cty. Comm'rs of Bryan Cty., Okl. v.*
23  *Brown*, 520 U.S. 397, 117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997), Justice Breyer,
24  dissenting (*Monell* "has produced a highly complex body of interpretive law"); see
25  also Rubenstein Dec. ¶27. Finally, in jail and prison litigation, the Supreme Court
26  has left "no doubt" that courts are to be "extremely deferential" to prison
27  administrators. *See Amador v. Baca*, 2017 WL 9472901, at *4 (C.D. Cal. June 7,
28  2017) (the Supreme Court has emphasized the "substantial deference that must be

given to prison officials in this [the strip/visual body cavity search] context"). (See Litt Attorneys' Fee Dec., §II (D), for elaboration.) (See also Litt Attorneys' Fee Dec. §§II(A, B); Rubenstein Dec., ¶27 (noting that §1983 litigation of the type here "is notoriously complex because of, *inter alia*, the standards for municipal liability, the doctrines involving governmental immunities, and the deference given to prison administrators").

The issues in this case involved complex and largely uncharted questions of constitutional law in the jail context where such deference to jail administrators is required. For many years, strip search litigation had been successful in the context of strip searching new admittees to the general population without reasonable suspicion. Beginning with *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008), some Courts of Appeal questioned that analysis, resulting in the Supreme Court's decision in *Florence v. Board of Freeholders of the County of Burlington*, 132 S.Ct. 1510, 1516 (2012), which reversed decades of Circuit decisions and concluded that no reasonable suspicion was necessary to strip search new admittees to the general population. Class counsel noted the decline in successful cases after *Florence*. (Litt Attorneys' Fee Dec., ¶ 43.) Prof. Rubenstein charted the change in the number and success of strip search class actions before and after *Florence*, (Rubenstein Dec., ¶ 31, 31(a)-(d)), and concluded that "the *Florence* case has so significantly impacted strip-search litigation that this settlement stands out as an absolute milestone." *Id.*

This case asserted that LASD's policy and practice of strip searches at CRDF violated class members' Fourth Amendment rights because the manner of strip search was unreasonable. *See Bell v. Wolfish*, 441 U.S. 520, 559-560 (1979) (reasonableness of strip search assessed based on, *inter alia,* "the manner in which [the search] is conducted" and "the justification for initiating it"). According to Plaintiffs' counsel's, this is the first and only class action where Plaintiffs prevailed

1    on a claim in which the sole issue was whether the manner of strip search was

2    lawful. (See Litt Attorneys' Fee Dec. §III.)

3            The fact that this is apparently the sole case to successfully challenge the

4    manner of strip search on a classwide basis attests to the difficulty and complexity

5    of the case. Plaintiffs had to demonstrate not only that the practices were

6    standardized but that they were so unnecessary, intrusive and unrelated to any

7    legitimate penological objective as to place them beyond the broad discretion of

8    jail officials. They further had to demonstrate readily available alternatives that

9    would meet the Jail's legitimate security needs. For the most part, Plaintiffs were

10   breaking new ground in their legal arguments. While those arguments were based

11   on established general principles, the issues were novel, and required substantial

12   creativity and careful analysis to reach the across the board success obtained. (See

13   also Rubenstein Dec., ¶¶ 31-32) (successful class strip search litigation has become

14   far less successful after the Supreme Court's *Florence* decision.)

15           In addition, Plaintiffs had to successfully certify the class. There were four

16   class certification related motions in this case. The first, filed pre-*Florence*, was

17   never ruled on. At the Court's direction, Plaintiffs again moved for class

18   certification. The Court granted Rule 23(b)(2) certification but denied 23(b)(3)

19   certification with permission to refile. Plaintiffs then succeeded in persuading the

20   Court to grant (b)(3) certification. (See *Amador v. Baca*, No. CV-10-1649 SVW,

21   2014 WL 10044904, at *9 (C.D. Cal. Dec. 18, 2014) (the court "was too

22   demanding in its previous order. The Ninth Circuit—and respected jurists across

23   the country—have energetically endorsed the concept [of issue certification on

24   liability]. And such enthusiastic embrace compels reconsideration in this case.").

25   Later, after summary judgment on injunctive relief was granted to Defendants

26   because the challenged strip search practices ceased when Defendants installed

27   scanners, the Court *sua sponte* decertified the class, which required Plaintiffs to

28   file (ultimately successfully) for a new 23(b)(3)/(c)(4) certification.

Establishing liability based on undisputed facts was also a significant challenge, and required a full analysis of the relevant LASD documents and many depositions. Defendants vigorously contested liability and contended they were entitled to summary judgment. Plaintiffs deposed the key County officials throughout the chain of command, including a critical 30(b)(6) deposition.

Plaintiffs retained numerous experts on a range of issues, including a corrections expert, an expert on the social and cultural aspects of menstruation and its public disclosure, psychological experts on the adverse psychological impact of Defendants' strip search practices on the inmates, an expert on acceptable thermal conditions for normal human activity regarding the frequency and impact of cold weather conditions during the strip searches, and a statistician regarding LASD data to identify class members' search times and cross-tabulated LASD class member data and weather data for use by the thermal expert.

Counsel also displayed skill in reaching a settlement, the potential for which the Court initially expressed skepticism. Plaintiffs' counsel pursued the novel approach of reaching out to class members and setting up social communication with potential class members pre-settlement in order to convince Defendants that the alternative to settlement was to litigate a huge number of individual damages claims, many of which would have potential for six figure verdicts and substantial Plaintiffs' attorneys' fees, and for which potential Plaintiffs were already identified. Plaintiffs' counsel presented detailed projections of the cost to Defendants of such a course.

Plaintiffs also carefully analyzed the summary judgment's prospects of standing up on appeal. There were three in-person mediation sessions with retired District Judge George King, plus numerous phone calls with him and with defense counsel. Plaintiffs explored a variety of settlement options, including a Ninth Circuit or private appeal with high-low options, before settlement was reached. (Litt Attorneys' Fee Dec., ¶¶ 129-132.)

And Plaintiffs' counsel also provided substantial evidence of their skill, experience and reputation by reference to other courts' comments, their standing in the legal community, their litigation history and other evidence.

### 2.       The Risks Of Non-Payment Were Substantial

Class counsel faced a substantial risk of non-payment. The risk lay in establishing that the underlying conduct was illegal and, if so, what the appropriate remedy was. The fact that this is the only stand-alone manner of strip search class challenge to date that has been successful attests to the risk, as does the documented reduction in successful strip search class actions post-*Florence*. As Prof. Rubenstein explained at ¶ 27 of his Declaration, the risks included no antecedent government case, its novelty and complexity, intervening and potentially harmful Supreme Court precedent on both merits and class issues, and defendants' resources, the litigation's high stakes and high expense.

Achieving class status presented a substantial risk. A minority of class actions are successful. In this case, the history of the class litigation demonstrates the risks. Had Plaintiffs not succeeded in their class certification efforts, their success would have been limited at best to the Named Plaintiffs, and any recovery would have been modest. Class actions are inherently risky for a variety of reasons noted previously. Plaintiffs' counsel state that they were aware of the high risk and expected that, if successful, it would result in a significant fee enhancement. This risk was enhanced by this Court's grant of summary judgment to Defendants on a Los Angeles County group strip search class action in *Solis v. Baca,* Case No. CV 06-1135 SCW (CTx) early during this case.

### 3.       The Result Obtained For The Class

This case was hard fought, as we have already described. The class members are by definition low income individuals of little means. All work was performed on a contingent fee basis. The settlement was the result of arm's length negotiations entered into only after plaintiffs won summary judgment on liability

and contested class certification. Resolution required extensive settlement efforts. It served the public interest by "helping to uncover unconstitutional state action so as to bring our governmental practices further in line with our ideals." (Rubenstein Dec., ¶ 29) (last bullet point).

The financial terms of the settlement are very favorable. Only one other strip search case settled for a comparable amount of money – *Young v. County of Cook* (2010) ($55,000 Million for a class of approximately 250,000 class members, in contrast to the approximately 94,000 class members here). (See Litt Dec. §IV, ¶¶ 50-62) (addressing the largest strip search class action settlements). The other settlements all involved relatively straightforward claims based on the law at the time – either strip searches upon entry to the general population when the law was clear that was unconstitutional, differential treatment of similarly situated male and female inmates (strip searching women but not men) (*Young*), or strip searching inmates post-release, i.e., *after* they had been ordered released from jail (*Williams* and *Craft*).[3] In contrast, this case involved unsettled law and, according to class counsel, achieved the highest per class member recovery of any large strip search settlement. (See also Rubenstein Dec., ¶29) (exceptional results include significant monetary relief, 100% of class eligible for award, all cash compensation, ease of

---

[3] Although there were no Circuit decisions on the post-release strip searches, they were so obviously unjustified that every court to address the issue had no difficulty finding them facially unconstitutional. *See, e.g., Barnes v. D.C.*, 793 F. Supp. 2d 260, 288 (D.D.C. 2011). Mr. Litt was counsel in *Barnes*, and Defendants there made no effort to seek reconsideration of summary judgment after *Florence*, which makes sense in light of the fact that "eight Justices of the Supreme Court agreed that it is an open question whether it is 'reasonable to conduct a full strip search of an arrestee whose detention has not been reviewed by a judicial officer and who could be held in available facilities apart from the general population.' *Florence*, 566 U.S. at 341." *Shields-Nordness v. Galindo*, No. 18-CV-1426 (PJS/DTS), 2019 WL 1003114, at *9 (D. Minn. Mar. 1, 2019). Post-release strip searches were more egregious because a judicial officer had ordered release.

claim process, adversarial litigation with no hint of collusion, changes in LASD strip search practices and advancing the public interest).

### 4. Benefits Generated Beyond The Settlement Fund.

The litigation also resulted in significant benefits for future women inmates in LASD custody. First, LASD made numerous changes that were the direct result of this litigation – including, in 2011, elimination of two lines of women facing each other while undressed; and in 2013 limiting searches to no more than 24 at a time, enclosing the bus bay and installing heaters to eliminate cold weather strip searches, which was the case more often than not before then. LASD completely ceased strip searching inmates willing to be scanned beginning 2015. This litigation was a significant factor in that change, as was evidenced by Defendants' reliance on this change in seeking summary judgment for the current practices.

Finally, it appears the settlement helped spur the Board of Supervisors' February 2019 motion titled "Building a Gender-Responsive Criminal Justice System," which, *inter alia*, calls for the hiring of "expert consultants on gender responsive programming" for CRDF and for any future new women's facility. That motion followed the Board of Supervisors' review of the terms of the proposed settlement.

### 5. The Burdens On, And Effort Expended By, Counsel.

Including the investigation time, and pre-litigation settlement efforts, counsel litigated this case for what will be over ten years by the time of the final approval order. A partial list of the work performed (or to be performed) includes: 1) extensive investigation of the underlying circumstances, including communicating directly with class members; 2) preparation of the complaint and amended complaint and extensive legal research related to framing the issues; 3) the Rule 26 conference and report; 4) extensive litigation defending against Defendants' efforts to dismiss the complaint, and to oppose amendments to the complaint; 5) the entry of a stay and subsequent litigation over the impact of the

*Florence* decision on this case (including whether it required dismissal of the case); 6) propounding discovery related to liability, which included extensive analysis of the relevant documents and at least 15 depositions taken by Defendants as well as defending Defendants' depositions of the Named Plaintiffs; 7) organizing a complex operation to reach out to class members, to obtain questionnaires and declarations from them, and to maintain contact with them which information was used extensively in the class and summary judgment litigation, which included several rounds of oral argument; 8) locating and working extensively with a variety of experts (described previously) to present detailed expert declarations/reports for the class and summary judgment litigation; 9) litigating four motions to certify and decertify the classes; 10) litigating cross motions for summary judgment which included just in Plaintiffs' Undisputed Facts over 300 facts and citations to literally hundreds of different references; 11) after summary judgment was granted, presentation of a post-summary judgment litigation plan; 12) hundreds of hours interacting with class members which included interviews, 240 declarations, questionnaires, letters, and Facebook outreach; 13).extensive settlement negotiations, which included preparing a 46 page single spaced mediation statement and dozens of hours of in person or telephonic discussions, in order to reach a settlement in principle; and 14) further extensive settlement discussions, themselves lasting over one year and involving countless conferences between Plaintiffs' and defense counsel, to reach agreement on the precise terms of the settlement agreement.

    The total hours devoted to the case through July 2, 2020 is approximately 9,000 hours. (See Litt Attorney Fee Dec., ¶167); (Litt Dec. ¶ 10). A case of this magnitude requires that Class Counsel reject other cases. Class counsel fronted all costs and received no compensation through the decade of litigation.

### 6.    Counsel's Skill And Experience

Class Counsel are highly experienced litigators in the fields of civil rights and class actions. The first set of counsel is Mr. Litt and attorneys in his office. Mr. Litt is a well-known civil rights lawyer in the Los Angeles area, and has extensive class action and civil rights experience, as his Declaration and CV attest. He likely has more civil rights class action experience than any attorney practicing in the Central District. The attorneys associated with him who worked on the case (primarily Paul Estuar when he was with Mr. Litt and Lindsay Battles throughout) are highly experienced class action litigators. Mr. Litt has been named a Super Lawyer continuously since 2005 and is listed in Best Lawyers In America. Mr. Litt's Declaration and CV contain a variety of attestations to his skill, experience and reputation from judges in this District. *See, e.g.*, *Rodriguez et al. v. County of Los Angeles et al.*, CV 10-6342-CBM (AJWx) (Mr. Litt "is considered one of the leading civil rights attorneys in the country"). His CV identifies numerous certified class actions in which he has been the, or one of the, lead counsel as well as pending class actions. He has been lead counsel in three of the five largest strip search settlements in the country. Litt Dec. §IV. Mr. Estuar has been named as a Super Lawyer continuously from 2012-2020 and worked extensively on class litigation when he was with Mr. Litt. Ms. Battles has been named as a Super Lawyer Rising Star continuously from 2012-2019 and a Super Lawyer in 2020, has worked with Mr. Litt on most of his civil rights class actions since she came to work with him in 2008, and was critical to this case's success. (Litt Dec. ¶166.) The other set of counsel are Donald W. Cook (continuously named as a Super Lawyer from 2016-2020) and attorneys in or associated with his office, Cynthia Anderson Barker and Colleen Flynn, all of whom are experienced civil rights attorneys. (See Litt Dec. ¶ 67; Sobel Dec. ¶¶51-63.) Plaintiffs' counsel performance in this case, and its successful outcome, attest to their skill level.

### 7.     *The Reaction Of The Class*

34

This has been discussed previously regarding the number of objections and opt outs in assessing the reasonableness of the settlement, and will not be repeated. In addition to the overwhelmingly favorable class member response based on objections and opt-outs, an additional indication of the very favorable class reaction is that 28,000 class members felt so strongly about their experience that they filled out the "My Experience" tab on the class administrator website to record how devastating their strip search experience had been. Class Counsel indicate that they have never seen anything similar in their decades of experience with jail class actions. (See Litt Dec., ¶4.)

**B. The Court Will Employ the Percentage of the Fund Approach**

While the Court has discretion to use either a percentage of the fund or a lodestar approach, the "the primary basis of the [class] fee award remains the percentage [of the class fund] method." *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1050 (9th Cir. 2002); *see also, e.g., In re Enron Corp. Securities, Derivative & ERISA Litigation*, 586 F.Supp.2d 732, 748 (S.D.Tex. 2008) ("Most federal courts use the percentage of the fund approach in awarding attorneys' fees in common fund classes.").

The percentage of the fund approach is generally preferred because it most closely aligns the interests of counsel and the class as compared to the lodestar method, i.e., class counsel directly benefit from increasing the size of the class fund and working efficiently. *See, e.g., Vizcaino.*, 290 F.3d at 1050 ("lodestar method is merely a cross-check on the reasonableness of a percentage figure, and it is widely recognized that the lodestar method creates incentives for counsel to expend more hours than may be necessary on litigating a case so as to recover a reasonable fee, since the lodestar method does not reward early settlement.")

Plaintiffs' counsel seek an award of $17,490,000 (33% of the available fund of $53 Million), plus litigation costs of $379,839.79. Given the risks in the case, the novelty and complexity of the issues, the highly contested nature of this

1    litigation throughout, and the exceptional result, the Court finds that 33% is a

2    reasonable fee (for a total fee exclusive of litigation costs). In addition, the Court

3    awards a total of $379,839.79 in litigation costs.

4         Other courts have awarded a 33 1/3% fee specifically in strip search cases.

5    *See, e.g., Bynum v. D.C.*, 412 F. Supp. 2d 73 (D.D.C. 2006) (awarding 1/3 of $12

6    Million fund); *Young v. Cty. of Cook*, No. 06 C 552, 2017 WL 4164238, at *1

7    (N.D. Ill. Sept. 20, 2017) (noting the 1/3 of the fund attorney fee award in the civil

8    rights case [which resulted in a multiplier of approximately 3.0, (Litt Fee Dec.

9    ¶57), and awarding 1/3 in the follow-on insurance litigation].

10        While the Ninth Circuit has set a benchmark of 25% as a percentage of the

11   fund (*see. e.g., Six Mexican Workers v. Arizona* Citrus *Growers,* 904 F.2d 1301,

12   1311 (9th Cir.1990), this is an across the board benchmark, which is often adjusted

13   upward or downward depending upon an assessment of the particular

14   circumstances and results of the case. "[I]n most common fund cases, the award

15   exceeds that [25%] benchmark." *In re Omnivision Technologies, Inc.*, 559 F. Supp.

16   2d 1036, 1047 (N.D. Cal. 2009). Courts in the Ninth Circuit and other circuits have

17   frequently awarded a percentage of the fund in the 30—33% range. *See, e.g.,*

18   *Romero v. Producers Dairy Foods, Inc.*, 2007 WL 3492841, at *4 (E.D. Cal. Nov.

19   14, 2007) ("Empirical studies show that, regardless whether the percentage method

20   or the lodestar method is used, fee awards in class actions average around one-third

21   of the recovery" *citing Newberg* (4th Ed.)); *In re Activision Sec. Litig.*, 723 F. Supp.

22   1373, 1373 (N.D. Cal. 1989) ("nearly all common fund awards range around

23   30%"; "absent extraordinary circumstances that suggest reasons to lower or

24   increase the percentage, the rate should be set at 30%") 723 F.Supp. at 1378.).[4]

25

26   ───────────────
     [4] *See also, e.g., In re Omnivision Technologies, Inc.*, 559 F. Supp. 2d 1036, 1046 (N.D.
27   Cal. 2009) ("This court's review of recent reported cases discloses that nearly all common
     fund awards range around 30%"); *Lopez v. Youngblood*, 2011 U.S. Dist. LEXIS 99289, at
28   *12 (E.D. Cal. Sept. 1, 2011) (fees in common fund cases average 32% or 34.64%);
     *Mauss v. NuVasive, Inc.*, No. 13CV2005 JM (JLB), 2018 WL 6421623, at *5–10 (S.D.

Multipliers are expected in successful class action litigation. *See, e.g., In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1295 n.2 (9th Cir. 1994)., 19 F.3d at 1299–300 (reversing denial of risk multiplier in class action; "[i]f this 'bonus' methodology did not exist, very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing," distinguishing common fund cases from fee shifting awards because the class pays the attorneys from the common fund); *Fischel v. Equitable Life Assur. Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002) (abuse of discretion to deny multiplier in risky class action where lodestar is based on non-contingent rates).

In determining an appropriate common fund percentage fee, courts often conduct a lodestar cross-check as a means to ensure that the ultimate fee awarded is reasonable (or, said differently, does not constitute a "windfall" to Plaintiffs' counsel). Percentage awards resulting in a fee in the range of one to four times the lodestar are common. *Vizcaino*, 290 F.3d at at 1051 n.6.. *Id.* (finding a range of 0.6 to 19.6 in a survey of 24 cases, with 83% in the range of 1.0 to 4.0 and 54% in the 1.5 to 3.0 range, and citing *In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 341 (3d Cir. 1998) ("multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." (quoting *3 Newberg* §14.03 at 14–15)). *Vizcaino* lists 46 cases, the smallest of which is a $53 Million fund, and the largest of which is a $193 Million fund. Of those 46 cases, 30 resulted in a multiplier (eight with a multiplier between 1.2-1.8, twelve with a multiplier between 2.0-2.5, six with a multiplier between 3.0-3.6, three with a multiplier between 4.0-6.2, and one with a multiplier of 19.6).

---

Cal. Dec. 6, 2018) ("District courts in this circuit have routinely awarded fees of one-third of the common fund or higher after considering the particular facts and circumstances of each case") (citing *Beaver v. Tarsadia Hotels*, 2017 WL 4310707, at *10 (S.D. Cal. Sept. 28, 2017) (listing Ninth Circuit cases approving a fee award of one-third the common fund).

Despite the fact these were mostly mega-fund cases over $100 Million, where percentages of the fund are generally smaller, ten of the cases awarded percentages of the fund between 30-40%, and ten had multipliers of 3.0 or more. Given the exceptional results and challenges here, an award at the higher end of the *Vizcaino* range is reasonable. See also *Anderson v. Nextel Retail Stores, LLC*, No. 07-CV-4480-SVW, 2010 WL 11506729, at *7 (C.D. Cal. June 30, 2010) (Wilson, J.) (citing *Vizcaino*, 290 F.3d at 1048–51); (Rubenstein Dec., ¶¶ 1-3, 14 et seq. and Exhibit C thereto) (citing 100 class fee awards with multipliers over 3). Professor Rubenstein explains at fn. 64 in his declaration that, in 5 *Newberg on Class Actions*, at §15:87, he provides a multiplier "calculator [that] synthesizes reported case law and, following courts' approaches, assigns multiplier points based on the risks counsel took and the results that they achieved," and that "the principles [he] set forth in the *Newberg* treatise years ago would support a multiplier well above Class Counsel's proposed multiplier given the presence here of so many of the many positive factors [he] enumerated there."

In *Vizcaino*, objectors challenged the fee of 28% of a settlement fund of $96,885,000, resulting in a multiplier of 3.65. The District Court found that class counsel "achieved exceptional results for the class," including as here pursuing the case "in the absence of supporting precedents" making the case "extremely risky." 290 F.3d at 1049. There, like here, the case "generated benefits beyond the cash settlement fund." The District Court "found the 28% rate to be at or below the market rate." *Ibid.* The District Court also "found that counsel's representation of the class-on a contingency basis-extended over eleven years, entailed hundreds of thousands of dollars of expense, and required counsel to forgo significant other work, resulting in a decline in the firm's annual income." *ibid*, also true here.

A comparison to the strip search settlement in *Craft v. Cty. of San Bernardino*, 624 F. Supp. 2d 1113 (C.D. Cal. 2008) (awarding 25% of fund in early settlement, resulting in multiplier in excess of 5) *Craft* resulted in a strip

search settlement of $25.5 Million and a percentage of the fund of 25%. However, the work required to achieve that result was far less than that required here, as were the legal obstacles to a favorable resolution (see Litt Dec. ¶56), and the 25% fee yielded a multiplier of "5.2 times the $1.2 Million lodestar." 624 F. Supp. 2d at 1123. *Craft* surveyed class settlements with high multipliers and noted a variety of percentage of the fund awards where the multiplier was above 5.0. *Id.* at 1125. *See also, e.g., In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 2017 WL 6040065, at *9 (N.D. Cal. Dec. 6, 2017) (citing class fund cases with high multipliers; 3.66 multiplier is "well within the range of multipliers awarded in similar cases"); *Steiner v. Am. Broad. Co.*, 248 Fed.Appx. 780, 783 (9th Cir. 2007) (6.85 multiplier "falls well within the range of multipliers that courts have allowed").

Here, the multiplier of a 33% of the fund award is approximately 3.0, which is well within the range of a reasonable multiplier. Class counsel presented extensive evidence of the reasonableness of the rates used in calculating the lodestar, which included rates of $1200 for Mr. Litt and $700 for Ms. Battles, who were the two primary attorneys who handled the case; there was also extensive paralegal use. While the $1200 and $700 rates for Mr. Litt and Ms. Battles are on the high end, they were supported by declarations from two attorneys whom courts have frequently cited for attorneys' fee rates in civil rights cases, as well as supported by extensive evidence from Mr. Litt, who has also been cited by courts to support attorneys' fee awards. This evidence demonstrated that the rates are within the range of reasonable fees for complex civil rights litigation. Further, Class Counsel's expertise and skill were manifested in the efficient manner in which the case was litigated. (See Litt Attorney's Fee Declaration, ¶ 57) (total attorneys' hours in this case amounted to approximately 9,000 in comparison to the approximately 16,000 spent in the most comparable case – *Young v. County of Cook*.) Based on his declaration, Mr. Litt appears to have handled more strip

search class actions than any attorney in the country, and that expertise, as well as that of Ms. Battles, who has worked with Mr. Litt on his class actions over the past 12 years, showed in the quality and efficiency of their work in this case.

## XII.   PAYMENT OF CLASS FUND

Defendants shall cause to be deposited with JND Legal Administration a total of $17,666,67 within 30 days of the effective date of the settlement, as defined in the Settlement Agreement. From that amount, JND shall first pay the Class Administration Fee due to it for work through the first round of checks distribution, and shall pay 1/3 of the combined total of fees and costs due to Class Counsel under this Order (the amount of which shall be wired to the Client Trust Account of Kaye, McLane, Bednarski & Litt).  The remainder of the funds shall be distributed to class members as provided by this Order.

One year following the first year's distribution, as provided in the previous paragraph, Defendants shall cause to be deposited with JND Legal Administration an additional amount of $17,666.66. From that amount, JND shall first pay the Class Administration Fee due to it for work between the first round of check distribution and the second round of check distribution, and shall pay 1/3 of the combined total of fees and costs due to Class Counsel under this Order (the amount of which shall be wired to the Client Trust Account of Kaye, McLane, Bednarski & Litt).   The remainder of the funds shall be distributed to class members as provided by this Order.

One year following the second year's distribution, as provided in the previous paragraph, Defendants shall cause to be deposited with JND Legal Administration an additional amount of $17,666.66. From that amount, JND shall first pay the Class Administration Fee due to it for work between the second round of check distribution and the third round of check distribution, and shall pay 1/3 of the combined total of fees and costs due to Class Counsel under this Order (the amount of which shall be wired to the Client Trust Account of Kaye, McLane,

1    Bednarski & Litt).   The remainder of the funds shall be distributed to class
2    members as provided by this Order.

3    **XIII. GENERAL PROVISIONS**

4    All Class Members except those who timely filed opt-out forms shall be
5    bound by this Order.

6    Except as provided by this Order, each party shall bear its own expenses and
7    attorneys' fees.

8    At the conclusion of the third round of Class Distribution, the Class
9    Administrator shall submit a report to the Court and the parties summarizing the
10   payments pursuant to the provisions of this Order.

11   **XIV. FINAL RESOLUTION**

12   The Court hereby dismisses this Lawsuit, with prejudice, and without fees or
13   costs to any party except as otherwise expressly provided by this Order.

14   Each and every Class Member other than those who have opted out hereby
15   unconditionally, fully and finally releases and forever discharges Defendants, their
16   agents, servants, officers, officials, and/or employees, from further claims that arise
17   out of the allegations raised by Plaintiffs in the complaint or any amended
18   complaint in the Lawsuit.

19   This Order is binding on all non opt-out class members and their privies and
20   prevents them from bringing a subsequent suit alleging the same or similar claims
21   for relief as contained in the complaint or in any amended complaint in this lawsuit
22   and based upon facts occurring prior to the execution of the Settlement Agreement.

23   If for any reason the settlement contemplated by the Settlement Agreement
24   does not become effective (whether as a result of further judicial review or
25   otherwise), this Final Judgment and Order of dismissal, including but not limited to
26   the release of claims previously ordered, shall be rendered null and void and
27   vacated *nunc pro tunc*; the Parties will revert to the positions they occupied prior to
28   the execution of the Settlement Agreement; and all proceedings in connection with

the settlement shall be without prejudice to the *status quo ante* rights of the Parties to the Lawsuit. In such event, the Parties expressly do not waive, and will not be construed to have waived, any claims, arguments, objections, and/or defenses.

The Court approves the Settlement Agreement, which was attached to the Preliminary Approval Order (Dkt. #399) and is part of the settlement record in this case, and the Court retains jurisdiction to enforce the Settlement Agreement's terms, although no party anticipates that there should be any issue regarding implementation of the Settlement Agreement.

From the date of this Order forward, each Party shall bear its own costs, including attorneys' fees.

Finding that there is no just reason for delay, the Court orders that this Order shall constitute a final judgment pursuant to Rule 54 of the Federal Rules of Civil Procedure. The Clerk of the Court is directed to enter this order on the docket forthwith.

**IT IS SO ORDERED.**

DATED: _____        _____
                              STEVEN V. WILSON, JUDGE
                              UNITED STATES DISTRICT COURT

SUBMITTED BY:

**KAYE, McLANE, BEDNARSKI & LITT**

By:__ /s/ Barrett S. Litt_____
        Barrett S. Litt
        Attorneys for Plaintiffs

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28